UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
In re STATE STREET BANK AND TRUST :    MDL No. 1945
CO. FIXED INCOME FUNDS                :
INVESTMENT LITIGATION              :
                                            :
———————————————————— :
PLUMBERS AND STEAMFITTERS UNION :    Civil Action No. 1:08-cv-07934-RJH
LOCAL NO. 10 HEALTH & WELFARE     :    (Relates to MDL No. 1945)
FUND, Individually and on Behalf of All    :
Others Similarly Situated,              :    <u>CLASS ACTION</u>
                                            :
               Plaintiff,            :
                                            :
      vs.                              :
                                            :
STATE STREET CORPORATION, et al.,      :
                                            :
               Defendants.       :
———————————————————— x

## AMENDED COMPLAINT FOR VIOLATION
## OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Plumbers and Steamfitters Union Local No. 10 Health & Welfare Fund ("PSU" or "Plaintiff") makes the following allegations, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, based upon the investigation undertaken by Plaintiff's counsel, which investigation included analysis of public filings, publicly available news articles and reports about State Street Corporation, State Street Global Advisors and the Intermediate Fund, as well as press releases, investor communications and other public statements issued by Defendants, and media reports about the Defendants and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and entities (other than Defendants and certain others identified below) who purchased shares of the SSgA Intermediate Fund (Ticker: SSINX) (the "Intermediate Fund" or "Fund") between September 12, 2005 and September 11, 2008, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") (the "Class").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].  In connection with the acts complained of, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act [15 U.S.C. §77v].

4.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b).  This action is coordinated with, and related to the underlying conduct in, the action titled *In re State Street Bank*

*and Trust Co. Fixed Income Funds Investment Litigation*, MDL No. 1945, that is in the Southern District of New York.

## PARTIES

5.  Plaintiff PSU acquired shares of the Intermediate Fund, pursuant and/or traceable to several Registration Statements (defined below) accompanying the issuance of the Intermediate Fund as set forth in their certification previously filed in this case and incorporated herein by reference, and has been damaged thereby.

6.  Defendant State Street Corporation ("State Street") (NYSE: STT) is one of the world's largest global financial services companies.  State Street, through its subsidiaries, provides a range of products and services for investors worldwide.  It operates in two divisions, Investment Servicing and Investment Management.  These divisions provide a range of products and services, which include mutual funds and other collective investment funds, corporate and public retirement plans, insurance companies, foundations, endowments and other investment pools, and investment managers.

7.  Defendant State Street Global Advisors ("SSgA") is the investment management arm of State Street.  SSgA focuses on delivering investment strategies and integrated solutions to institutional and individual investors worldwide.

8.  Defendant SSgA Funds is organized as a Massachusetts business trust and is an unincorporated business trust organized under the laws of the Commonwealth of Massachusetts. SSgA Funds engages in business as an open-end management investment company and is registered as such under the Investment Company Act of 1940.

9.  The Intermediate Fund is offered by SSgA and is managed by the SSgA Global Fixed Income Team and is one of the funds offered by SSgA Funds.  The Intermediate Fund's initial

registration statement was filed with the Securities and Exchange Commission ("SEC") on September 1, 1993.

10.     The Defendants named in ¶¶6-9 are collectively referred to herein as the "State Street Defendants."

11.     Defendant Lynn L. Anderson ("Anderson") was President and Chairman of the Board of State Street and SSgA Funds and a trustee of SSgA Funds and the Fund at times relevant herein. Anderson signed each of the Registration Statements.

12.     Defendant Peter G. Leahy ("Leahy") was a trustee of SSgA Funds and the Fund at times relevant herein. Leahy signed the Registration Statements filed on December 18, 2006 and December 18, 2007.

13.     Defendant William L. Marshall ("Marshall") was a trustee of SSgA Funds and the Fund at times relevant herein. Marshall signed each of the Registration Statements.

14.     Defendant Steven J. Mastrovich ("Mastrovich") was a trustee of SSgA Funds and the Fund at times relevant herein. Mastrovich signed each of the Registration Statements.

15.     Defendant Patrick J. Riley ("Riley") was a trustee of SSgA Funds and the Fund at times relevant herein. Riley signed each of the Registration Statements.

16.     Defendant James Ross ("Ross") was President (principal executive officer) of State Street Master Funds and the Fund at times relevant herein. Ross signed the Registration Statements filed on December 16, 2005, December 18, 2006 and December 18, 2007.

17.     Defendant Richard D. Shirk ("Shirk") was a trustee of SSgA Funds and the Fund at times relevant herein. Shirk signed each of the Registration Statements.

18.    Defendant Mark E. Swanson ("Swanson") was a Treasurer (principal financial officer) of State Street and the Fund at times relevant herein.   Swanson signed each of the Registration Statements.

19.    Defendant Bruce D. Taber ("Taber") was a trustee of SSgA Funds and the Fund at times relevant herein.  Taber signed each of the Registration Statements.

20.    Defendant Henry W. Todd ("Todd") was a trustee of SSgA Funds and the Fund at times relevant herein.  Todd signed each of the Registration Statements.

21.    Each of the Defendants named in ¶¶11-20 (the "Individual Defendants") prepared, reviewed and/or signed or authorized the signing of some or all of the Registration Statements for the offering of shares of the Intermediate Fund at times relevant herein.

22.    The Board of Trustees is responsible for overseeing generally the management, activities and affairs of each fund and has approved contracts with various financial organizations to provide, among other services, day-to-day management required by the Fund.  There are four standing committees of the Board of Trustees: (i) the Audit Committee; (ii) the Valuation Committee; (iii) the Governance Committee and the Nominating Sub-Committee; and (iv) the Legal and Compliance Committee.  The Fund's Statement of Additional Information ("SAI") filed on February 6, 2006 described the primary purpose of the Valuation Committee as follows:

> The Valuation Committee's primary purpose is to make fair value determinations as set forth in the SSgA Funds' Securities Valuation Procedures.  The Investment Company has established procedures and guidelines for valuing portfolio securities and makes fair value determinations from time to time through the Valuation Committee, with the assistance of the Oversight Committee, State Street Bank and Trust Company (State Street) and SSgA Funds Management, Inc.  The Valuation Committee reviews the actions and recommendations of the Oversight Committee at each quarterly Board of Trustees meeting. The Valuation Committee consists of all of the Independent Trustees and held no meetings during the fiscal year ending August 31, 2005.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.  Excluded from the Class are Defendants, the officers and directors of the Defendant companies, at all relevant times, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, heirs, successors or assigns and any such excluded party.

24.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants, or specifically by SSgA Funds, the Intermediate Fund or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' conduct in violation of federal law that is complained of herein.  Plaintiff does not have any interests antagonistic to, or in conflict with, the other members of the Class.

26.     Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class and has retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     Whether the Registration Statements negligently omitted and/or misrepresented material facts about the Fund;

(c)     Whether the Registration Statements contained untrue statements of material fact; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Intermediate Fund and Relevant SEC Filings

29.     On or about September 1, 1993, Defendants began offering shares of the Intermediate Fund pursuant to an initial registration statement filed with the SEC.

30.     Defendants annually filed nearly identical Registration Statements and Prospectuses throughout the Class Period in connection with the continuous offerings of the Intermediate Fund's shares.  The Fund's shares were issued to investors pursuant to the following series of Registration Statements and Prospectuses that formed part of the Registration Statements filed with the SEC and

made effective during the relevant period, which are referred to collectively herein as the "Registration Statements":

(a)     Registration Statement and Prospectus filed on December 20, 2004;

(b)     Prospectus dated December 20, 2004 filed on December 23, 2004;

(c)     Registration Statement and Prospectus filed on December 16, 2005;

(d)     Prospectus Supplement filed on March 24, 2006;

(e)     Registration Statement and Prospectus and filed on December 18, 2006;

(f)     Prospectus dated December 18, 2006 filed on December 22, 2006;

(g)     Prospectus Supplement filed on July 2, 2007;

(h)     Prospectus filed on September 17, 2007;

(i)     Registration Statement and Prospectus filed on December 18, 2007; and

(j)     Prospectus Supplement filed on December 21, 2007.

31.     The Prospectuses expressly incorporated by reference an SAI and the Fund's Annual Report for that year, each of which provided investors with additional guidance about, *inter alia*, the Fund's investment strategies and limitations.  The Fund filed Annual Reports with the SEC on Form N-CSR on October 27, 2005, November 2, 2006 and November 8, 2007, which were part of the Registration Statements.

32.     The Registration Statements referred investors seeking more information to the SAI, which "may contain more details on the Investment Policies" of the Fund.  Defendants reissued and updated the SAIs throughout the relevant time period.  The Registration Statements direct investors to review the SAIs, Annual Reports and Semi-Annual Reports for additional information. Disclosure of each Fund's complete holdings is required to be made quarterly within 60 days of the end of each fiscal quarter in the Annual Report and Semi-Annual Report to Fund shareholders and in

the quarterly holdings report on Form N-Q.  The Semi-Annual Reports and Form N-Qs were part of

the Registration Statements.  Each member of the Class purchased shares of the Intermediate Fund

pursuant to the Registration Statements.

### The Stated Investment Objectives of the Intermediate Fund

33.     The State Street Defendants and the Individual Defendants marketed the Intermediate

Fund as a conservative bond fund seeking "a high level of current income while preserving principal

by investing primarily in a diversified portfolio of debt securities with a dollar-weighted average

maturity between three and ten years."  Defendants used the conservative Lehman Brothers U.S.

Intermediate Government/Credit Index as a benchmark for the Fund, which consisted primarily of

U.S. Government and Government-related bonds and a smaller amount of corporate bonds.  The

components of the benchmark index were all investment grade and a vast majority were rated AAA,

the highest credit ranking assigned by Standard & Poor's, a rating agency.  The index excluded

Collateralized Mortgage Obligations, bonds with equity-type features, and structured notes with

embedded swaps.

34.     The Intermediate Fund determined the price per share once each business day at the

close of the regular trading session of the New York Stock Exchange, which ordinarily is 4 p.m.

Eastern time. A business day is one on which the New York Stock Exchange is open for regular

trading. Pricing does not occur on non-business days.  The price of Fund shares or the Net Asset

Value (the "NAV") was computed by dividing the current represented value of the Fund's assets

(less liabilities) by the number of shares of the Fund outstanding and rounding to the nearest cent.

35.     The NAVs that were paid by each Class Member were inflated because the

Defendants failed to properly value the NAV and failed to timely write-down the troubled mortgage-

related assets in the Fund's portfolio.

- 8 -

**The Intermediate Fund Heavily Invested in Risky Mortgage Related Securities**

36.     During the Class Period, Defendants devoted a large portion of the Fund's investments to financial instruments that included asset-backed securities that overwhelmingly derived their value from home-equity loans, mortgage-backed securities swaps, derivatives and other exotic financial instruments, thereby materially increasing the Fund's exposure to the subprime mortgage market.

37.     For example, as of February 28, 2003, the Intermediate Fund reported that mortgage-backed securities comprised approximately 7.1% of its portfolio, but mortgage-backed securities increased significantly thereafter.  The Intermediate Fund reported that mortgage-backed securities had grown to comprise approximately 20.3% of it portfolio on May 31, 2006, approximately 25.7% on May 31, 2007, and approximately 34.4% November 30, 2007.

38.     These high-risk investments directly exposed the Fund to the volatility of the subprime mortgage market at precisely the time when it was publicly reported that defaults of subprime mortgages were skyrocketing, and that numerous subprime lenders were facing insolvency. Thus, the Fund significantly increased its exposure to risky mortgage-related securities at the same time that the mortgage meltdown that caused an economic crisis in the United States was occurring.

39.     For example, as of May 31, 2006, 52.2% of the Fund's portfolio was invested in Asset Backed Securities (21.9%), Mortgage-Backed Securities (20.3%) and International Debt Securities (10%), much of which were comprised of risky subprime mortgage related assets and other risky assets tied to mortgages.  Similarly, as of May 31, 2007, 54.4% of the Fund's portfolio was invested in Asset Backed Securities (20.7%), Mortgage-Backed Securities (25.7%), and International Debt Securities (8%), much of which were comprised of risky subprime mortgage related assets and other risky assets tied to mortgages.  The Fund's concentration in risky mortgage related securities continued into 2008.

- 9 -

### The Meltdown of the Subprime Mortgage
### Industry and Mortgage Related Securities

40.    In June 2004, the U.S. Federal Reserve signaled that it would begin to increase key short-term interest rates.  As a result, the U.S. prime interest rate, which had remained flat at four percent for more than a year, climbed steadily throughout 2005 and 2006 before reaching 8.25% in June 2006.  As key short-term and the prime rates rose, other interest rates rose as well, including those for most residential mortgage loans.  This rise in interest rates made it more difficult for borrowers to meet their payment obligations, particularly since many of the borrowers of the sub-prime mortgage pools held adjustable rate mortgages.

41.    As illustrated in the chart below, at the same time that interest rates were rising, U.S. property value appreciation began to slow significantly and actually began a decline in several U.S. markets during 2006:



42.    The combination of higher interest rates and the dramatic slowing of U.S. property appreciation was devastating to U.S. non-prime borrowers who over-extended themselves by

purchasing homes that they could not afford without low initial "teaser" mortgage interest rates. Previously, when property values were increasing, non-prime borrowers were able to refinance their loans as mortgages adjusted to higher interest rates.  As interest rates rose and property prices leveled, many non-prime U.S. borrowers were unable to refinance their existing loans when they could not meet their payment obligations.  The result – beginning in 2005 – was a significant increase in U.S. mortgage default rates, particularly for sub-prime mortgage loans.

43.     For example, in August 2005, HSBC Holdings PLC ("HSBC") issued a memo to companies from which it was buying loans.  The paper, called "Threads of Early Payment Default," reported that delinquencies were rising.  HSBC said mortgage lenders had seen "a wealth of surprising data" on loans originated in 2005, including "surges" in 60-day-past-due delinquencies, particularly on "borrower-friendly" second lien loans, and "heightened fraud incidents."  When borrowers didn't have to verify their incomes, the report said they were overstating them, and they bolstered their false claims by overstating their job positions.

44.     An August 23, 2006 story on CBS' *MarketWatch* noted, "July was dry for the U.S. real estate market, as sales of existing homes plunged 4.1% to a two-year low, prices stagnated and the number of homes on the market soared to a 13-year high, according to a report from the National Association of Realtors released Wednesday."

45.     On August 29, 2006, *Dow Jones Newswires* reported "[m]ore subprime borrowers are defaulting in the early months of their home loans, a trend that has led to greater fear among investors and lenders of rising delinquencies and losses."

46.     A September 15, 2006, article on *CNNMoney.com* noted:

In August, 115,292 properties entered into foreclosure, according to RealtyTrac, an online marketplace for foreclosure sales.  That was 24 percent above the level in July and 53 percent higher than a year earlier.

It was the second highest monthly foreclosure total of the year; in February, 117,151 properties entered foreclosure.

Some of the bellwether real estate market states are among the leading foreclosure markets. Florida had more than 16,533 properties in foreclosure in August. That led all states and was 50 percent higher than in July and 62 percent higher than in August 2005.

California foreclosures are increasing at an even faster annual rate, up 160 percent since last year to 12,506. And the formerly red-hot Nevada market recorded a spike of 24 percent compared with July and a whopping 255 percent increase from August 2005.

*     *     *

Usually, foreclosures are a lagging [market] indicator [ ] But we've never had a situation like this with adjustable-rate mortgages amounting to $400 billion to $500 billion coming up for adjustment over the rest of the year.

*     *     *

These exotic mortgages, which have been issued by lenders at much higher numbers the past few years, default at a higher rate than do fixed-rate mortgages. And sub-prime loans, which are much more common than in the past, have a higher default rate as well.

47.    On November 13, 2006, *American Banker* reported:

UBS Securities issued a report last week that found that sub-prime loans made this year are "going bad" at a rate that is 50% faster than the rate for those made last year. About 2.4% of sub-prime loans originated this year were more than 60 days delinquent by the sixth month, compared with 1.6% for 2005 loans and 0.9% for 2004 loans, the report said.

48.    On November 30, 2006, the *National Mortgage News* reported:

"How bad is 2006 sub-prime collateral is a question I think most of you have an opinion on already," said Mr. Zimmerman [the Executive Director of UBS Securities]. We were a bit surprised at the magnitude and speed at which this vintage year deteriorated.

Mr. Liu [a Director at UBS Securities] pointed out at the conference that the industry is seeing "a steady increase of delinquencies and that rate has been accelerating over the past two to three months." Not only have there been higher delinquencies but also the delinquency numbers have been showing up earlier in 2006 than they had been in 2005. "2006 is tapped to be the worst vintage ever," he said.

**Foreclosures have also risen.  And the foreclosures, like the delinquency rates, are also happening at earlier dates**.  [Emphasis added.]

49.     On December 13, 2006, the *Associated Press* reported:

**U.S. mortgage delinquency rate rises sharply**

Late Mortgage Payments Jump in Summer

**Late mortgage payments shot up in the third quarter as higher interest rates squeezed budgets and made it harder for homeowners – especially those with weaker credit records – to keep up with their monthly obligations.**

The Mortgage Bankers Association, in its quarterly snapshot of the mortgage market released Wednesday, reported that the percentage of mortgage payments that were 30 or more days past due for all loans tracked jumped to 4.67 percent in the July-to-September quarter.

That marked a sharp rise from the second quarter's delinquency rate of 4.39 percent and was the worst showing since the final quarter of last year, when delinquent payments climbed to a 2 1/2-year high in the aftermath of the devastating Gulf Coast hurricanes.

The association's survey covers 42.6 million loans.

Delinquency rates in the third quarter were considerably higher for "subprime" borrowers – people with weaker credit records who are considered higher risks – especially those who have adjustable-rate mortgages.

Subprime borrowers had a delinquency rate of 12.56 percent in the third quarter, **the highest in more than three years**.  The delinquency rate for these borrowers holding adjustable-rate mortgages was even higher -- at 13.22 percent in the third quarter, also the worst reading in more than three years.  [Emphasis added.]

50.     By early 2007, some of the top mortgage lenders with sub-prime U.S. mortgage exposure started to reveal enormous losses and warned of future market losses.  For example, on February 7, 2007, citing trouble with the U.S. sub-prime lending market, HSBC announced that provisions for bad loans would be 20% higher than analysts expected.  On that the same day, New Century Financial, the second largest sub-prime mortgage originator in the U.S., reported significant problems with loan defaults.

51.     Indications of turmoil in the U.S. sub-prime mortgage market continued as other mortgage lenders, including Countrywide Financial and Washington Mutual, reported huge losses. According to a February 9, 2007 article published by *The Wall Street Journal*, foreclosure rates on sub-prime mortgage loans in 2006 ***more than doubled*** from 2005.

52.     By March 2007, several lenders, including Fremont General Corporation and New Century Financial, exited the sub-prime residential real estate lending business completely.  Then, on April 2, 2007, New Century Financial Corporation announced that it was filing for Chapter 11 bankruptcy protection.

53.     Accordingly, during the Class Period, the following U.S. mortgage market events had occurred: (a) mortgage interest rates were trending higher; (b) home prices had stagnated and began to fall; (c) there was a dramatic rise in sub-prime mortgage loans delinquency rates; (d) there was a significant increase in early payment defaults on non-prime mortgage loans; and (e) subprime and Alt-A mortgage loan originators were closing or winding down business.

54.     In addition, numerous reports were published about non-prime loans being associated with rampant mortgage fraud, and public indices, like the ABX Index, which tracks the cost of buying protection [*i.e.*, CDSs] for sub-prime mortgage-backed securities, indicating that sub-prime mortgage loan risk has increased dramatically.

55.     Each of these factors were strong indicators that the problems being experienced by sub-prime lenders would generate huge losses for mortgage related securities, such as those held by the Fund.

**The Registration Statements and Prospectuses Contained Inaccurate Statements
of Material Fact and Omitted Material Information Required to Be Disclosed Therein**

56.     Throughout the Class Period, Defendants issued and offered for sale shares of the Fund.  The Registration Statements, including Prospectuses, SAIs and Annual and SemiAnnual

Reports used throughout the Class Period to register and offer shares of the Fund to Plaintiff and the Class contained untrue statements of material facts and omitted material facts necessary to make the statements therein not misleading.  Even though the Registration Statements issued during the Class Period were not perfectly identical, they did contain many of the same untrue statements set forth below and were rendered misleading by the same omissions.

57.     The Registration Statements contained inflated values for the Fund's holdings of mortgage related assets.  Further, the Registration Statements misrepresented the description of the Fund and misrepresented the Fund's exposure to risky mortgage related assets and the risk of investing in the Fund.

### The Registration Statements Misrepresented the Description of the Fund

58.     The Registration Statements described the Intermediate Fund as follows:

**Intermediate Fund.** The fundamental investment objective is to seek a high level of current income while preserving principal by investing primarily in a diversified portfolio of debt securities with a dollar-weighted average maturity between three and ten years.

In pursuing this goal, the Fund under normal market conditions invests at least 80% of its total assets in debt instruments.  Shareholders will be notified 60 days prior to changing the non-fundamental 80% investment policy.  The basis for calculating total assets for purposes of the 80% test includes the Fund's net assets plus any borrowings for investment purposes.  The 80% investment requirement applies at the time the Fund invests its assets.  Debt securities may be either fixed, zero coupon, payment in kind, variable or floating rate, and may be denominated in US dollars or foreign currencies.  In addition, Fund investments will primarily be in debt instruments rated investment grade or better.  The Fund may also invest in derivative securities, including futures and options, interest rate swaps, credit default swaps, index securities referencing a basket of credit default swaps, total return swaps, interest rate caps, floors and collars and other structured securities; mortgage related securities; and repurchase agreements.  The Fund may actively trade portfolio securities and typically has a portfolio turnover rate in excess of 100% and is therefore subject to portfolio turnover and transaction costs.  A portfolio turnover rate that is in excess of 100% is not managed for tax efficiency, and taxable investors may wish to consult a tax professional prior to investing.  Please see "Principal Risks-Portfolio Turnover Risk."

The Fund seeks to match or exceed the return of the Lehman Brothers® Intermediate Government/Credit (LBIGC) Index and to manage the Fund's duration to correspond to the LBIGC Index's duration while adding value through issue and sector selection. The Fund will actively trade to benefit from short-term yield disparities among different issues of fixed-income securities, or otherwise to increase current income to the Fund.

The Intermediate Fund considers the following instruments or investment strategies to be principal to the achievement of its investment objective. Please see "Additional Information about the Funds' Investment Policies and Risks" in this Prospectus: asset-backed securities; cash sweep; Eurodollar certificates of deposit, Eurodollar time deposits, and Yankee certificates of deposit; futures contracts and options on futures; interest rate swaps, credit default swaps, total return swaps, interest rate caps, floors and collars; management; mortgage-backed securities; mortgage-backed rolls; options on securities and securities indexes; portfolio duration; portfolio maturity; repurchase agreements; securities lending; Treasury inflation-protected securities; US government securities; Section 4(2) commercial paper; and variable and floating rate securities.

The Intermediate Fund is subject to the following risks, as described under "Principal Risks:" Asset-backed securities, call, credit/default, derivatives, dollar-denominated instruments of foreign banks and corporations, extension, government securities, income, interest rate, liquidity, management, market, mortgage-backed rolls, mortgage-backed securities, portfolio turnover, prepayment and sector.

59.     The statements referenced above in ¶58 were each inaccurate statements of material fact when made because of the following facts that existed at the time of the Registration Statements: (i) the Fund was heavily invested in risky mortgage related assets and the risk of investing in the Fund was significantly greater than represented; (ii) many of the holdings of the Fund had declined, and were continuing to decline, in value at a significant rate; and (iii) based upon facts existing at that time concerning problems with the real estate and mortgage industries, the Fund materially overstated the value of its portfolio and NAV by failing to properly value its investments in mortgage-related securities and by failing to write-down those investments in a timely fashion.

60.     The statement in ¶58 that the Fund seeks to "match or exceed the return of the Lehman Brothers® Intermediate Government/Credit (LBIGC) Index" was misleading because that index was a conservative and stable index comprised primarily of U.S. Government and

- 16 -

Government-related bonds and a smaller amount of corporate bonds and the Fund was much riskier than that index.  Thus, Defendants misrepresented the true nature of the risks inherent in the Fund.

### The Registration Statements Misrepresented the Value of the Fund

61.     The Registration Statements reported inflated values for the Fund's risky mortgage related securities.  The inflation of the value of the Fund's portfolio in the Registration Statements resulted in an inflation of the Fund's NAV during the Class Period as a result of the Fund's failure to properly value and write-down these risky assets.

62.     Furthermore, the Registration Statements stated that the securities in the Fund are valued according to board-approved Securities Valuation Procedures, including Market Value Procedures, Fair Value Procedures and Pricing Services.  Many of the securities held by the Intermediate Fund did not trade frequently or have prices that were readily available.  According to the Registration Statements, if market quotations were not readily available for a security or if subsequent events suggest that a market quotation is not reliable, the SSgA Funds will use the "security's fair value," as determined in accordance with Fair Value Procedures.

63.     The statement referenced above in ¶62 that State Street would use the "security's fair value" was an inaccurate statement of material fact because the Fund did not use the "Security's fair value" but instead was unable to or otherwise failed to properly value the securities as represented and reported inflated values for mortgage-related investments, which failed to take into account prevailing economic conditions.

64.     Each member of the Class that purchased shares of the Intermediate Fund purchased those shares pursuant to the Registration Statements.  The NAVs that were paid by each Class Member were inflated when purchased because the Intermediate Fund failed to properly value the

securities as represented and failed to timely write-down the troubled assets in its portfolio, including the mortgage backed securities.

**The Registration Statements Misrepresented the
Fund's Exposure to Risky Mortgage-Related Securities**

65.     The Registration Statements misrepresented the Fund's exposure to mortgage-related securities.  The Registration Statements listed securities by type, including, Asset Backed Securities, Corporate Bonds and Notes, International Debt, Mortgage-Backed Securities, and U.S. Government Agencies.  The grouping of securities in the Registration Statements was materially misleading because they understated the Fund's true exposure to high risk mortgage-related securities because mortgage-related securities were listed under other groups, such as the Asset Backed Securities and International Debt groups.

66.     For example, the Fund's Annual Report filed on November 2, 2006 contained a Schedule of Investments broken down as follows: (i) Asset-Backed Securities – 22%; (ii) Mortgage-Backed Securities – 36%; (iii) International Debt – 7.7%; and (iv) a mixture of other investments. Under each group was a list of securities.  The grouping of securities under the Schedule of Investments were untrue statements of material fact and materially misleading because they misrepresented the Fund's true exposure to risky mortgage-related securities.  Risky mortgage-related investments were not just listed under Mortgage-Backed Securities but were also listed within Asset-Backed Securities and International Debt.  Furthermore, it was unclear from the descriptions of many of these securities that they were risky mortgage-related securities.

67.     The Registration Statements contain a description of the types of securities held by the Fund and states in pertinent part as follows:

> **Asset-Backed Securities.**  Asset-backed securities are securities whose principal and interest payments are collateralized by pools of assets such as auto loans, credit card receivables, leases, installment contracts and personal property.  Payments of principal and interest are passed through to holders of the securities and are typically

supported by some form of credit enhancement, such as over collateralization, a letter of credit, surety bond, limited guarantee by another entity or by priority to certain of the borrower's other securities.  The degree of credit enhancement varies, generally applying only until exhausted and covering only a fraction of the security's par value. If the credit enhancement of an asset-backed security held by a Fund has been exhausted, and if any required payments of principal and interest are not made with respect to the underlying loans, the Fund may experience loss or delay in receiving payment and a decrease in the value of the security.

68.     The statement referenced above in ¶67 were each inaccurate statements of material fact when made because Defendants failed to disclose that mortgage-related securities were also part of the Fund's grouping of Asset-Backed Securities.

69.     The description of the Fund in the Registration Statements stated that the Fund is subject to certain risks under the "Principal Risks" section, including "Asset-backed securities" and "mortgage-backed securities" risks.  The Registration Statements stated under Principal Risks in pertinent part as follows:

**PRINCIPAL RISKS**

\*          \*          \*

Each of the Funds has risks associated with it.  This section contains a detailed description (arranged alphabetically) of the risks associated with a Fund, as identified in "Principal Investment Strategies" above.  Information about the specific instruments or investment techniques referred to in this section is contained in the section called "Additional Information about the Funds' Investment Policies and Risks."

\*          \*          \*

**Asset-Backed Securities Risk.**  Asset-backed securities are obligations whose principal and interest payments are supported or collateralized by pools of other assets, such as automobile loans, credit card receivables and leases.  Defaults on the underlying assets may impair the value of an asset-backed security.  Furthermore, there may be legal and practical limitations on the enforceability of any security interest granted with respect to those underlying assets.  Asset-backed securities are also subject to prepayment risk.

\*          \*          \*

**Mortgage-Backed Securities Risk.**  Mortgage-backed securities represent either direct or indirect participation in, or obligations collateralized by and payable from, mortgage loans secured by real property.  The investment characteristics of mortgages differ from those of traditional fixed-income securities. These differences can result in significantly greater price and yield volatility than is the case with traditional fixed-income securities.  Furthermore, mortgage-backed securities are subject to prepayment risk as described elsewhere in this section.  Mortgage-backed securities may also be subject to call risk and extension risk, as described elsewhere in this section.

70.     The statement referenced above in ¶69 were each inaccurate statements of material fact when made because they failed to adequately inform investors of the risks of investing in the Fund for the reasons set forth above in ¶59.  Furthermore, the statements about Asset-Backed Securities Risk were each inaccurate statements of material fact when made because Defendants failed to inform investors that mortgage-related securities were listed under Asset-Backed Securities in the Schedule of Investments, thereby failing to inform investors of the full extent of the Fund's investments in mortgage-related securities.  Moreover, the Registration Statements failed to warn investors that the Fund also held mortgage-related securities that were grouped as International Debt.

### Misrepresentations in the Certifications

71.     Semi-annually, throughout the Class Period, the Fund issued Certified Reports to Shareholders of the Fund.  Each report discussed the performance of the Fund and its holdings.

72.     Attached to each report was a certification by Defendants Ross and Swanson, certifying:

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the Registrant as of, and for, the periods presented in this report;

4.    The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the Registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report based on such evaluation; and

(d)    Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the second quarter of the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.    The Registrant's other certifying officer and I have disclosed to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize, and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

73.    The statements referenced above in ¶72 were each an untrue statement of material fact for the reasons set forth above in ¶59.

- 21 -

### The Intermediate Fund Loses Value

74.     Beginning in late 2007 and accelerating through the first quarter of 2008, and continuing throughout 2008, the Fund took massive write-downs as it belatedly marked the value of mortgage-related investments down to their reduced market values.  Those write-downs caused a commensurate decline in the Fund's NAV, which in turn resulted in losses to investors.

75.     The Fund's NAV plummeted from a price of approximately $9.84 per share at the beginning of the Class Period to $8.36 per share on September 11, 2008, or a loss of more than 15% since September 12, 2005.  During June and early July 2007, the Fund's NAV generally ranged between $9.30 to $9.49 per share.  Then, Defendants slowly began lowering the NAV for the Fund. By August 8, 2007, the Fund's NAV was reduced to $8.98; by November 28, 2007 to $8.69; by December 26, 2007 to $8.56; by May 29, 2008 to $8.39; and by September 11, 2008 to $8.36.

76.     The below chart depicts the drop of the NAV of the Fund:



State Street Intermediate Fund
September 12, 2005 to September 11, 2008

77.     An October 5, 2007 article in *Bloomberg* reported Jeff Tjornehoj, an analyst at fund-research firm Lipper Inc., as stating the following concerning SSgA's investments in mortgage-related assets for its funds: "When you're investing in an investment-grade debt fund, you are expecting some level of preservation of capital . . . Some funds have held certain subprime issues, and for their intrepid adventures, investors have suffered terribly."

78.     In an email dated October 2, 2007, Arleme Roberts, a State Street spokeswoman, said portfolios "with over-weights in residential mortgage-backed securities, representing various risk/return profiles, have been impacted negatively by the recent market conditions."

79.     During the fourth quarter of 2007, State Street set aside $625 million to cover legal claims arising out of its inappropriate investments in mortgage-related securities, such as the investments by the Fund.

80.     On January 3, 2008, State Street announced that it fired William Hunt, the head of its investment unit.   On February 14, 2008, State Street announced that it appointed six senior executives to help oversee global fixed income following losses tied to subprime-mortgage securities, including losses suffered in the Fund.

81.     On October 15, 2008, State Street announced that it may set aside up to $450 million to absorb losses for investors whose funds were negatively impacted in connection with losses to mortgage and credit related securities.  These funds were in addition to the reserve set up by State Street during January 2007.

82.     On January 20, 2009, State Street announced that it took a $450 million charge in the fourth quarter of 2007 for the cost of protecting investors in its so-called "stable value accounts" managed by its SSgA unit as a result of problems with risky investments, including mortgage-related securities.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

83.     Plaintiff repeats and realleges each and every allegation contained above.

84.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

85.     The Registration Statements were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

86.     SSgA Funds is the registrant for the shares of the Fund, and as such is strictly liable for the false statements contained in the Registration Statements.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statements.

87.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

88.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

89.     Plaintiff acquired shares of the Fund during the Class Period and pursuant to the Registration Statements.

90.     Plaintiff and the Class have sustained damages.  The value of the shares of the Fund declined substantially subsequent to and due to Defendants' violations.

91.     At the times they purchased shares of the Fund, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year had elapsed from the time that Plaintiff discovered or reasonably could have

discovered the facts upon which this complaint is based to the time of filing of the initial complaint in this action.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time of the filing of the initial complaint.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

92.      Plaintiff repeats and realleges each and every allegation contained above.

93.      This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all Defendants.

94.      Defendants were sellers and offerors and/or solicitors of purchasers of the shares of the Intermediate Fund offered pursuant to the Registration Statements, Prospectuses and other documents incorporated therein.

95.      The Registration Statements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Registration Statements and participating in marketing the shares of the Fund to investors.

96.      Defendants owed to the purchasers of the shares of the Fund, including Plaintiff and other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements and corresponding amendments to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants in the exercise of reasonable care should have known of the misstatements and omissions contained in the offering materials as set forth above.

97.     Plaintiff and other members of the Class purchased or otherwise acquired shares of the Fund pursuant to the defective Registration Statements.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in Defendants' solicitation materials.

98.     By reason of the conduct alleged herein, Defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold shares of the Fund have the right to rescind and recover the consideration paid for their shares of the Intermediate Fund and hereby elect to rescind and tender those shares to the Defendants sued herein.  Plaintiff and Class members who have sold their shares of the Fund are entitled to rescissory damages.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

99.     Plaintiff repeats and realleges each and every allegation contained above.

100.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

101.    Each of the Individual Defendants was a control person of the Fund by virtue of his or her position as a director, trustee and/or senior officer of Fund or other Defendant companies.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other trustees,  directors and/or officers and/or major shareholders of the Fund.

102.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statements and having otherwise participated in the process which allowed the sale of the shares of the Fund to be successfully completed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages as to Count II; and

E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  February 13, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
EVAN J. KAUFMAN

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on February 13, 2009, I caused a true and correct copy of the attached:

Amended Complaint for Violations of The Federal Securities Laws

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel on the attached service list.

SAMUEL H. RUDMAN

Service List

ROPES & GRAY LLP
CHRISTOPHER G. GREEN
JOHN D. DONOVAN, JR
HARVEY J. WOLKOFF
ROBERT A. SKINNER
OLIVIA S. CHOE
One International Place
Boston, MA  02110
Telephone:  617/951-7000
617/951-7050 (fax)

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
THOMAS J. DOUGHERTY
PETER SIMSHAUSER
One Beacon Street
Boston, MA  02108
Telephone:  617/573-4800
617/573-4822 (fax)