| | |
|---|---|
| IN RE STATE STREET BANK AND TRUST CO. FIXED INCOME FUNDS INVESTMENT LITIGATION | MDL No. 1945 |

| | |
|---|---|
| HOUSTON POLICE OFFICERS' PENSION SYSTEM, | |
| Plaintiffs, | |
| v. | No. 08 Civ. 5442 (RJH) |
| STATE STREET BANK & TRUST COMPANY and  STATE STREET GLOBAL ADVISORS, INC., | |
| Defendants. | |

## STATE STREET'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................3

MATERIAL UNDISPUTED FACTS ........................................................................................6

ARGUMENT ......................................................................................................................11

I.    HPOPS'S INFORMED DECISION NOT TO REDEEM OUT OF LDBF
      AFTER MID-AUGUST REFLECTS A FAILURE TO MITIGATE DAMAGES,
      AND STATE STREET CANNOT HAVE CAUSED HPOPS'S LATER LOSSES ........12

      A.    HPOPS Had A Duty To Mitigate Its Losses and Failed To Do So .........................13

      B.    HPOPS Cannot Recover Damages That Were Not Proximately Caused by
            State Street's Alleged Misconduct............................................................................17

II.   HPOPS'S FRAUD CLAIMS REGARDING ITS INVESTMENT DECISION
      ARE UNSUPPORTED BY THE RECORD EVIDENCE, AND SHOULD BE
      DISMISSED ..................................................................................................................20

III.  HPOPS'S CONSPIRACY CLAIM IN COUNT VII SHOULD BE DISMISSED,
      BECAUSE IT ALLEGES A CONSPIRACY BETWEEN STATE STREET
      AND ITSELF .................................................................................................................24

CONCLUSION....................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

C**ASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................................11

*Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   651 F.2d 615 (9th Cir. 1981) ...........................................................................14, 19

*Arthur Andersen & Co. v. Perry Equipment Corp.*,
   945 S.W.2d 812 (Tex. 1997).......................................................................13, 18, 20

*Cant v. Becker & Co.*,
   379 F. Supp. 972 (N.D. Ill. 1974) ..........................................................................18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..................................................................................................11

*Crescendo Investments, Inc. v. Brice*,
   61 S.W.3d 465 (Tex. App. 2001).............................................................................21

*David H. v. Spring Branch Independent School District*,
   569 F Supp. 1324 (S.D. Tex. 1983) ........................................................................13

*Drummond v. Morgan Stanley & Co., Inc.*,
   No. 95 Civ. 2011, 1996 WL 631723 (S.D.N.Y. Oct. 31, 1996) .......................16, 19

*Duperier v. Texas State Bank*,
   28 S.W.3d 740 (Tex. App. 2000).............................................................................17

*Employees Retirement System v. Putnam, LLC*,
   294 S.W.3d 309 (Tex. App. 2009).............................................................17, 18, 19, 20

*In re Fortune System Security Litigation*,
   680 F. Supp. 1360 (N.D. Cal. 1987) ..................................................................14, 17

*Harris v. American Investment Co.*,
   523 F.2d 220 (8th Cir. 1975) ...................................................................................18

*Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*,
   331 F.3d 452 (5th Cir. 2003) ...................................................................................25

*Matsushita Electric Industry Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..................................................................................................11

*In re Mutual Funds Investment Litigation,*
    608 F. Supp. 2d 677 (D. Md. 2009) ................................................................2

*Nye v. Blyth Eastman Dillon & Co., Inc.,*
    588 F.2d 1189 (8th Cir. 1978) ......................................................................19

*Pitman v. Lightfoot,*
    937 S.W.2d 496 (Tex. App. 1996)..............................................................21, 24

*Pulaski Bank and Trust Co. v. Texas American Bank,*
    759 S.W.2d 723 (Tex. App. 1988) ................................................................13

*Quinn v. Syracuse Model Neighborhood Corp.,*
    613 F.2d 438 (2d Cir. 1980).........................................................................11

*Sears, Roebuck & Co. v. Meadows,*
    877 S.W.2d 281 (Tex. 1994).........................................................................20

*Si Kyu Kim v. Harstan, Ltd.,*
    286 S.W.3d 629 (Tex. App. 2009) ................................................................17

*Swank v. Cunningham,*
    258 S.W.3d 647 (Tex. App. 2008) ................................................................18

*Van Syckle v. C.L. King & Assocs., Inc.,*
    822 F. Supp. 98 (N.D.N.Y. 1993) .............................................................13, 14

*Walker v. Salt Flat Water Co.,*
    96 S.W.2d 231 (Tex. 1936)...........................................................................13

*In re Westcap Enterprises,*
    230 F.3d 717 (5th Cir. 2000) ........................................................................21

*Yu v. State Street Corp.,*
    No. 08 Civ. 8235, 2010 WL 668645 (S.D.N.Y. Feb. 25, 2010) ......................23

S TATUTES AND OTHER AUTHORITIES

13 Tex. Jr. 3d. Civil Conspiracy § 3 .....................................................................25

15 U.S.C. § 80a-3(c)(3).........................................................................................21

15 U.S.C. § 80b-2(a)(11)(A)..................................................................................21

29 U.S.C. § 1003(b) ...............................................................................................3

Fed. R. Civ. P. 56....................................................................................................1

Restatement (Second) of Torts § 440 (1965).....................................................17, 18

Tex. Rev. Civ. Stat. Ann. art. 581-4(N)(1) ..................................................................21

Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) (Vernon 2001).........................................20

Defendants State Street Bank and Trust Company and State Street Global Advisors, Inc. (collectively, "State Street")[1] respectfully submit this memorandum in support of their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1.[2]

## PRELIMINARY STATEMENT

Plaintiff Houston Police Officers Pension System ("HPOPS") has brought this action under Texas common law and the Texas Securities Act ("TSA") to recover its 2007 investment losses in a bond fund managed by State Street.  The losses arose from the fund's exposure to bonds collateralized by subprime mortgages (known as "asset backed securities" or "ABS").  The fund at issue was State Street's Limited Duration Bond Fund ("LDBF"), a collective trust fund that served as the actively managed investment vehicle for 75% of the cash collateral of an "enhanced" commodities strategy that HPOPS hired State Street to manage in 2006.  HPOPS alleges that State Street managed LDBF imprudently by investing the fund in high concentrations of subprime-backed bonds and using leverage to meet its investment objective of excess returns.  It also alleges that State Street misled HPOPS about these practices, both before HPOPS invested in 2006 and during the life of the investment.  According to HPOPS, the over-concentration of LDBF in subprime-backed securities, coupled with HPOPS's lack of knowledge about that exposure, caused HPOPS to lose approximately $31.4 million when unprecedented illiquidity in the asset-backed securities market triggered a collapse of the prices of these bonds

---

[1]   Plaintiff has incorrectly named State Street Global Advisors, Inc. ("SSgA, Inc.") as a defendant.  See Section III, infra.  The funds at issue in this case were managed by State Street Global Advisors ("SSgA"), an unincorporated division of State Street.  R. 56.1 Stmt. ¶ 3.

[2] Pursuant to Local Civil Rule 56.1, State Street submits herewith a statement of undisputed material facts ("R. 56.1 Stmt.").  Copies of documents referred to in the Rule 56.1 Statement or herein are found in a separately-submitted volume of exhibits to the accompanying declaration of Harvey J. Wolkoff, dated June 2, 2010 ("Wolkoff Declaration").

in July and August 2007 – the so-called "subprime crisis" that foreshadowed the broader

financial market collapse in 2008.

    State Street is entitled to judgment as a matter of law on HPOPS's claims.  The

undisputed facts establish that (i) State Street informed HPOPS about LDBF's subprime

exposure, use of leverage, and the mounting subprime-related losses by no later than mid-August

2007; (ii) at that time, HPOPS made an informed decision not to redeem out of the fund, leading

to sharply higher losses thereafter; and (iii) HPOPS has already received over $20 million

through a payment from the Fair Fund established in State Street's settlement with the Securities

and Exchange Commission ("SEC") and other regulators, an amount greater than the investment

losses it incurred in LDBF through mid-August 2007.[3]  Based on these undisputed facts, HPOPS

is not entitled to recover additional amounts as damages, for two reasons: first, because HPOPS

failed to mitigate its alleged losses and instead made the conscious decision to "ride out the

market;" and, second, because HPOPS's decision not to redeem stands as a superseding cause of

its losses.  Rather than taking responsibility for the investment risks that it assumed no later than

mid-August, HPOPS now demands that State Street insure it for this decision.  HPOPS is not

entitled, however, to a "heads I win/ tails you lose" recovery, under which HPOPS can recoup its

investment losses either by riding out the market from mid-August 2007 through the end of

---

[3]  In February 2010, State Street entered into a settlement agreement with the SEC and state
regulators pursuant to which a Fair Fund was established and distributed to affected investors.
Through the Fair Fund, HPOPS received $21,649,660.81.  R. 56.1 Stmt. ¶ 69.  As has been held
in similar cases, of that $21.6 million payment, State Street is entitled to a $20,017,425 credit
against any damages that HPOPS may eventually recover.  *Id. In re Mut. Funds Inv. Litig.*, 608
F. Supp. 2d 677, 679 (D. Md. 2009) (granting summary judgment to defendants because any
damages caused by market timing in benefit plans were "fully offset by the restitution paid by
defendants [through a Fair Fund] pursuant to regulatory settlements").  State Street does not seek
an offset for the $50,000,000 penalty paid by State Street, which constitutes 7.54% of the
$663,191,540 in total compensation paid to investors.  *Id.*  Thus, of the $21,649,660.81 payment
made to HPOPS, $20,017,425 (or 92.46%) is not attributable to the civil penalty portion of the
total compensation paid to investors.  *Id.*

2007, or if this strategy did not work, then by claiming reimbursement for the investment risks that HPOPS assumed.

HPOPS's fraud-in-the-inducement theories under common law and the TSA also find no support in the record evidence, and must be dismissed. The undisputed facts establish as a matter of law that State Street's statements to HPOPS prior to its investment in LDBF and the commodities strategy were accurate and not materially misleading.

## <u>BACKGROUND</u>

As of 2005, the HPOPS defined benefit retirement plan[4] was significantly underfunded, with its forecasted liabilities exceeding its assets by $884 million. R. 56.1 Stmt. ¶ 6. HPOPS embarked on an aggressive investment strategy, allocating $887 million of its assets to what it called "alternative investments." R. 56.1 Stmt. ¶ 7. HPOPS's investments included sophisticated high risk/ high return strategies, including $200 million in hedge funds, $300 million in private equity funds, $187 million in junk bonds, and a $72 million commodities investment in State Street's Enhanced Dow Jones-AIG Commodities Futures Strategy (the "Enhanced DJ-AIG Strategy"). R. 56.1 Stmt. ¶ 8.

In connection with its request for a commodities investment strategy, State Street offered HPOPS a passive index commodities strategy using a money market fund to invest the cash collateral, but HPOPS chose the *Enhanced* DJ-AIG Strategy, which was a more aggressive strategy that attempted to outperform its commodities benchmark index by combining commodities exposure together with LDBF, a bond fund that sought enhanced returns. R. 56.1 Stmt. ¶¶ 12, 17. The Enhanced DJ-AIG Strategy gained exposure to the commodities market

---

[4] HPOPS and its operations are governed by Texas law rather than ERISA, because employee benefit plans of state and municipal governmental entities are expressly excluded from ERISA. Complt. ¶ 12; 29 U.S.C. § 1003(b).

through the use of swap transactions – which involved future payments based on the gains or losses of the benchmark index (called the "DJ-AIG Commodities Index"), but did not involve holding direct positions in any commodities investment.  R. 56.1 Stmt. ¶¶ 12, 13.  The investor's cash collateral equal to the value of the swap contracts was available for investment in other vehicles, specifically a fixed income fund or funds.  R. 56.1 Stmt. ¶ 13.  As State Street presented the strategy to HPOPS, the swap component of the Enhanced DJ-AIG Strategy would by design earn a return of 45 to 50 basis points short of the benchmark commodities index, as a result of transaction costs arising from the commodities swaps.  R. 56.1 Stmt. ¶ 18.  LDBF was presented as a cash collateral vehicle to provide the 50-70 basis points of "excess returns" required to offset and exceed the commodities-related transaction costs, allowing the strategy to attempt to beat the commodities index.  R. 56.1 Stmt. ¶ 18.  Hence the derivation of the name "Enhanced" DJ-AIG Commodities Strategy:  LDBF was designed to provide the "enhancement."

HPOPS chose the enhanced (and not the passive) commodities strategy, and the parties entered into an amendment to their pre-existing contract, with an agreed upon "Objective" that required State Street "to attempt to outperform the commodities index." R. 56.1 Stmt. ¶ 24. Before entering into the contract, State Street again offered HPOPS the choice of investing all the collateral in a fund other than LDBF, but HPOPS did not choose that option.  R. 56.1 Stmt. ¶ 23.  Beginning in July 2006, HPOPS began to invest $6 million per month in the enhanced strategy for the following 12 months, with 75% invested in LDBF and the remaining 25% placed in a money market fund with AIG to cover "margin variations"  in the commodities investments. R. 56.1 Stmt. ¶¶ 25-26.

Before HPOPS invested, State Street presented LDBF to HPOPS as a fund heavily concentrated (75.8%) in one sector:  asset backed securities, or "ABS."  R. 56.1 Stmt. ¶ 19.

Patrick Franey, HPOPS'S Chief Investment Officer who oversaw HPOPS'S $3.5 billion of investments, testified that he knew "ABS" included bonds collateralized by subprime mortgages, but thought the ABS category also included bonds collateralized by a "diversified" number of other types of consumer debt, such as auto loans, credit card loans, student loans, and other receivables.  R. 56.1 Stmt. ¶¶ 5, 29.  Importantly, despite HPOPS retaining a bevy of experts, none has advanced the theories that as of mid-2007, such a mixed portfolio of bonds backed by consumer debt would have been perceived as less risky than one collateralized entirely by subprime mortgages, would have been any more "diversified" (in the sense of not all performing in the same way in the event of a sharp recession), could have earned the 50-75 basis points of excess returns necessary to meet the contractual mandate of beating the commodities index, or would have performed any better than LDBF eventually did.  Indeed, State Street submitted the expert opinions that as of mid-2007, the market perceived a mortgage on a home, even those backed by subprime, as the last thing a consumer would fail to pay and thus was safer than auto or student loans or credit card debt (R. 56.1 Stmt ¶29) – and such opinions went unrebutted.

When it appeared in late July and early August, 2007 that the subprime crisis would continue to impair LDBF's investments, State Street brought the facts to HPOPS concerning the burgeoning market meltdown, specifically inquiring if in light of the circumstances HPOPS wanted to redeem out of LDBF and move to a money market fund.  R. 56.1 Stmt. ¶¶ 34-35, 40-47.  Mr. Franey expressed an understanding of the situation and an initial desire to redeem from the fund.  R. 56.1 Stmt. ¶¶ 50-57.  But despite Mr. Franey's knowledge of the pertinent details regarding LDBF's situation by no later than August 9-13, 2007, and his expressed intention at that time to redeem, he instead elected not to redeem HPOPS out of LDBF until November 13, 2007. R. 56.1 Stmt. ¶ 65.   Indeed, Mr. Franey later opted to receive certain securities held by

LDBF in-kind, rather than having them liquidated by State Street – so that HPOPS could continue to hold and manage them on its own.  R. 56.1 Stmt. ¶¶ 65-67.

HPOPS has already been reimbursed from the Fair Fund in an amount exceeding HPOPS's investment losses in LDBF through August 20, 2007.  R. 56.1 Stmt. ¶¶ 68-69.  Having intentionally maintained its subprime exposure from mid-August 2007 (at the latest) through early 2008, HPOPS is barred as a matter of law from recovering the investment losses it incurred during this latter period from State Street.

## MATERIAL UNDISPUTED FACTS

State Street submits herewith a separate statement of material undisputed facts, as required by Local Rule 56.1 ("Rule 56.1 Statement"), with supporting documentation.

Following are the key undisputed facts on which this motion are premised:

- In August 2005, at HPOPS's request, State Street provided a written presentation of two potential commodities strategies to HPOPS's Chief Investment Officer, Patrick Franey. R. 56.1 Stmt. ¶¶ 11-12.  As described in the presentation, one was a passive commodities index fund with a money market fund to hold the collateral. R. 56.1 Stmt. ¶¶ 12, 14, 16. The other was the Enhanced DJ-AIG Strategy, featuring LDBF holding 75% of the cash, with the remaining 25% in a money market fund. R. 56.1 Stmt. ¶¶ 12, 14-15, 17.  LDBF was described as having an investment objective of matching or exceeding its benchmark index by 50 basis points.[5]  R. 56.1 Stmt. ¶ 17.

- The August 2005 presentation to HPOPS also included a representation that 75.8% of LDBF's holdings were invested in one sector, asset-backed securities ("ABS").  R. 56.1 Stmt. ¶ 19.  Mr. Franey has testified that he was aware that the ABS category included securities backed by subprime home mortgage loans, but thought it also included other types of consumer debt, like auto and student loans, credit card debt, and other receivables.  R. 56.1 Stmt. ¶ 29.

- On June 16, 2006, HPOPS amended its existing investment management agreement with State Street ("IMA") to provide that HPOPS would invest $72 million in the Enhanced DJ-AIG strategy, in $6 million monthly installments over the course of twelve months. R. 56.1 Stmt. ¶¶ 24-25.  HPOPS began to fund the investment on July 1, 2006, ultimately investing $54 million in LDBF, with $18 million in the AIG money market fund.  R. 56.1 Stmt. ¶¶ 25-26.  The IMA "appoint[ed]" State Street "as investment manager," R. 56.1

---

[5] A "basis point" is one one-hundredth of a percentage point.

Stmt. ¶ 21, and HPOPS understood that State Street was not retained as an "investment advisor."  R. 56.1 Stmt. ¶ 21.

- On January 5, 2007, in response to an inquiry by HPOPS, State Street stated in an email to Mr. Franey that LDBF had a higher risk/return profile than LIBOR Plus – consistent with the comparison between the two funds set forth in the August 2005 presentation.  R. 56.1 Stmt. ¶ 27.   State Street also sent HPOPS a LDBF "Fact Sheet," which showed that asset backed securities comprised more than two-thirds of LDBF's holdings as of September 30, 2006.  R. 56.1 Stmt. ¶ 28.

- In June, 2007, Mr. Franey was aware that securities backed by subprime home mortgage loans were experiencing severe performance problems, and followed the deteriorating subprime market through the Wall Street Journal.  R. 56.1 Stmt. ¶ 32.  He also asked Barclay's Global Investors, another HPOPS asset manager, in June 2007 about HPOPS's exposure to subprime securities in the Barclay's fund, and was told that "the entire [subprime] sector was hit hard in the months of March and April."  R. 56.1 Stmt. ¶ 33.

- On July 20, 2007, State Street emailed Mr. Franey, noting that it was "working on a letter that [it would] send to [him] soon explaining the underperformance [in LDBF] as a result of the Sub-Prime issue."  R. 56.1 Stmt. ¶ 34.

- On July 23, 2007, State Street sent Mr. Franey a performance summary indicating that LDBF had underperformed its benchmark by 82 basis points just in the month of June, 2007.  R. 56.1 Stmt. ¶ 35.

- On July 24, 2007, State Street emailed Mr. Franey, informing HPOPS that a letter regarding the events in the subprime market was being prepared and reviewed by counsel, and offering to set up a phone call with a member of the State Street Portfolio Management Team to discuss the subprime issues in LDBF.  R. 56.1 Stmt. ¶ 40.

- The July 24, 2007 email from State Street to Mr. Franey attached a quarterly Fact Sheet for the quarter ending June 30, 2007, a LDBF Fund Declaration, and the 2006 audited financial statement for LDBF.  R. 56.1 Stmt. ¶ 36.   The Fact Sheet reported that ABS comprised 81.3% of LDBF's holdings as of June 30, 2007.  R. 56.1 Stmt. ¶ 37.  The audited financial statement, certified by Pricewaterhouse Coopers in June, 2007, showed that the ABS categories of auto loans, student loans and credit card debt were collectively less than 1% of the portfolio.  R. 56.1 Stmt. ¶ 38.  In contrast, 32.2% of the fund was invested in "Home Equity ABS," and 41.6% of the fund was invested in "Other ABS," with security descriptions indicating they were mortgage related bonds.  R. 56.1 Stmt. ¶ 38.

- On July 30, 2007, State Street sent an email to HPOPS discussing the impact of the subprime market on State Street's active fixed income portfolios, including LDBF.  R. 56.1 Stmt. ¶¶ 42-43.  The memo stated that the July events were driven by liquidity and leverage issues and that such events had adversely affected performance in State Street active fixed income portfolios.  R. 56.1 Stmt. ¶ 43.

- On August 2, 2007, State Street sent a letter to HPOPS, stating that LDBF had experienced recent negative performance as a result of technical pressures and spread widening in ABS collateralized by subprime mortgages. R. 56.1 Stmt. ¶¶ 44-45. The letter noted that LDBF's underperformance in turn affected the Enhanced DJ-AIG Strategy, which at the end of July had lost 3.87% during 2007, in contrast to its benchmark DJ-AIG Index, which had returned 6.63% during the same time – a total underperformance of over 1000 basis points. R. 56.1 Stmt. ¶ 45. The memo also stated that LDBF reduced its exposure to securities rated BBB and had sold a significant portion of its AAA-rated positions. R. 56.1 Stmt. ¶ 46.[6]

- From August 2 through August 22, 2007, Mr. Franey went on vacation and did not check his voice mail during this time at all, and did not timely check State Street emails, either. R. 56.1 Stmt. ¶ 48.

- On August 3, 2007, State Street left a voicemail for Mr. Franey, and asked whether HPOPS wished to move its cash collateral out of LDBF and into another cash vehicle. R. 56.1 Stmt. ¶ 47. Mr. Franey has testified that he did not check his voice messages while on vacation, and the other investment professional in his office was not asked to, and thus did not provide back up. R. 56.1 Stmt. ¶ 48.

- On August 8, Mr. Franey acknowledged in an internal e-mail that he had finally read the August 2 email, R. 56.1 Stmt. ¶ 45, at which point he held a telephone conference with a State Street relationship manager. R. 56.1 Stmt. ¶ 50. State Street informed Mr. Franey that LDBF was experiencing continued underperformance and significant redemptions by outside investors and State Street funds. R. 56.1 Stmt. ¶ 50. State Street also sent HPOPS an email on that same day, August 8, 2007, which stated that the State Street managed funds invested in LDBF "intend to redeem in-kind their respective proportionate interests." R. 56.1 Stmt. ¶ 49.

- After his conversation with State Street, Mr. Franey called HPOPS's outside investment advisor, Jerry Woodham of Hammond Associates. R. 56.1 Stmt. ¶ 52. According to Mr. Woodham's deposition testimony, Mr. Franey told him that LDBF had "lots of subprime" and that other investors were exiting the fund, and that "he who leaves last gets hurt the most." R. 56.1 Stmt. ¶ 52.

- On August 8 and 9, 2007, at Mr. Franey's request, Mr. Woodham spoke with State Street regarding LDBF. R. 56.1 Stmt. ¶¶ 53, 55-56. State Street informed Mr. Woodham that LDBF's exposure to subprime-mortgage backed securities was 90%. R. 56.1 Stmt. ¶¶ 56-57. Mr. Woodham relayed this information to Franey, who told him that HPOPS's Executive Director wanted to redeem and fire State Street. R. 56.1 Stmt. ¶¶ 56-57.

---

[6] LDBF had been represented to be an AA quality fund, with at least 95% of its assets invested in AA bonds or higher. R. 56.1 Stmt at 30. After the sale of most of the AAA bonds, LDBF remained AA quality. R. 56.1 Stmt at 46.

- Also in the morning on August 9, 2007, Mr. Franey called Shenkman Capital, another asset manager for HPOPS.  R. 56.1 Stmt. ¶ 58.  Mr. Franey told Shenkman Capital that LDBF was invested 90% in subprime and that he wanted assistance to get out of the Fund "as quickly as possible."  R. 56.1 Stmt. ¶ 58.

- On August 13, 2007 State Street informed HPOPS that LDBF was 3.3 times leveraged on a notional to market value basis.  R. 56.1 Stmt. ¶ 59.

- On August 13, 2007, another advisor retained by HPOPS, Northern Trust, emailed Mr. Franey and stated that "the least expensive option for you here is to place an order to sell the current fund and replace it with one that does not have any sort of subprime exposure."  R. 56.1 Stmt. ¶ 60.  In response, Mr. Franey asked "Why not hold to maturity?"  Northern Trust responded that holding to maturity would just extend HPOPS's exposure to higher-risk assets, and many market analysts had stated their beliefs that the subprime market would worsen.  R. 56.1 Stmt. ¶ 60.

- On August 17, 2007, Northern Trust provided an independent valuation of HPOPS's holdings in LDBF, valuing the portfolio at $35.5 million as of that date.  R. 56.1 Stmt. ¶ 61.  Northern Trust's valuation of the portfolio differed from State Street's by only 9.57%.  R. 56.1 Stmt. ¶ 61.  As of this date, even using Northern Trust's slightly lower number, HPOPS's losses in its $54 million LDBF investment stood at approximately $18.5 million, or less than what HPOPS has received via the Fair Fund. R. 56.1 Stmt. ¶¶ 61, 69.  In the August 17 email, Northern Trust again recommended to Mr. Franey that HPOPS "should consider moving ahead with the liquidation of this fund and reducing your exposure immediately."  R. 56.1 Stmt. ¶ 61.

- The HPOPS Board of Trustees determined to terminate State Street in November 2007. R. 56.1 Stmt. ¶ 63.  HPOPS sent a termination letter to State Street on November 13, 2007.  R. 56.1 Stmt. ¶ 65.

- On December 14, 2007, State Street distributed approximately $27.9 million to HPOPS in the form of $14.3 million in cash, as well as in-kind securities.  R. 56.1 Stmt. ¶ 66. The in-kind securities were valued separately at $13.6 million by both Northern Trust and State Street.  R. 56.1 Stmt. ¶ 66.

- HPOPS elected to hold the securities that it received in-kind for two more months, finally liquidating them in February 2008 for $6.5 million, incurring an additional $7 million in losses during the time it held the securities.  R. 56.1 Stmt. ¶ 67.

- In February 2010, as part of a settlement State Street reached with the SEC and state regulators, HPOPS received a Fair Fund payment in the amount of $21,649,660.81.  R. 56.1 Stmt. ¶ 69.  State Street is entitled to a credit against any judgment in this action equal to 92.5% of this payment, or $20,017,425.  R. 56.1 Stmt. ¶ 69.

- The following table summarizes HPOPS's net investment losses had it elected to redeem out of LDBF on certain of the relevant dates described above.

| Date | Event | HPOPS Net Loss[7] |
|------|-------|-------------------|
| 7/24/2007 | HPOPS notified of LDBF's underperformance, pending "subprime issue," and substantial home equity ABS.  R. 56.1 Stmt. ¶¶ 34-40. | ($1.10 million) |
| 7/30/2007 | Letter to HPOPS describing the impact of the subprime market on LDBF.   R. 56.1 Stmt. ¶¶ 41-43. | ($4.57 million) |
| 8/2/2007 | Letter to HPOPS describing negative performance as a result of ABS collateralized by subprime mortgages and sale of significant portion of AAA-rated positions. R. 56.1 Stmt. ¶¶ 44-46. | ($6.13 million) |
| 8/3/2007 | Voicemail to HPOPS asking if HPOPS wished to move out of LDBF into another cash vehicle, and noting continued fund deterioration. R. 56.1 Stmt. ¶ 47. | ($8.33 million) |
| 8/8/2007 | Notice to HPOPS and Hammond of significant redemptions, continued underperformance, and that SSgA funds intend to completely redeem in-kind from LDBF on August 10.  HPOPS reports to Hammond the negative effect of redemptions on the value of the fund and 90% subprime in LDBF.  R. 56.1 Stmt. ¶¶ 49-53, 56. | ($11.07 million) |
| 8/9/2007 | HPOPS contacts Shenkman, to seek help redeeming "as quickly as possible." R. 56.1 Stmt. ¶ 58.  HPOPS tells Hammond that it wants to redeem and fire State Street. R. 56.1 Stmt. ¶ 57. | ($11.08 million) |
| 8/10/2007 | HPOPS receives LDBF holdings. R. 56.1 Stmt. ¶ 60. | ($11.76 million) |
| 8/13/2007 | SSgA informs HPOPS that LDBF is 3.3 times leveraged.  Northern Trust recommends that HPOPS redeem.  HPOPS is told the subprime market would worsen. R. 56.1 Stmt. ¶ 59. | ($12.65 million) |
| 8/17/2007 | Northern Trust again recommends that HPOPS redeem, and values its portfolio at $35.5 million.  R. 56.1 Stmt. ¶ 61. | ($15.38 million) |
| 8/28/2007 | State Street reports to Mr. Franey the updated market value of HPOPS's account, and that there are only two participants left in LDBF.  R. 56.1 Stmt. ¶ 64. | ($20.77 million) |

---

[7] The loss figures in the table are derived from the daily net asset value for LDBF in State Street's books and records, which are the values at which State Street was redeeming clients.  R. 56.1 Stmt. ¶ 68.  It is undisputed that HPOPS's investment losses based on LDBF's reported net asset value would have been less than the amount it has recovered through the Fair Fund at all times through at least August 20, 2007, on which HPOPS'S losses were $19.72 million.  R. 56.1 Stmt. ¶ 68-69.

## ARGUMENT

Because plaintiffs bear the burden to prove all the elements of their claims, a defendant is entitled to summary judgment where it demonstrates "that there is an absence of evidence to support [plaintiffs'] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Plaintiffs then "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted). Plaintiffs must make a "showing sufficient to establish the existence of [every] element essential to [their] case, and on which [they] will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Evidence that "is merely colorable, or is not significantly probative," cannot defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Raising "some metaphysical doubt as to the material facts" cannot defeat summary judgment. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. As the Second Circuit long has held, "[t]he litigant opposing summary judgment, therefore, may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) (citation and internal quotation marks omitted).

Here, HPOPS raises seven causes of action: breach of fiduciary duty, breach of contract, fraud, fraud by omission, negligent misrepresentation, violations of the Texas Securities Act ("TSA"), and conspiracy. Compl. ¶¶ 71-116. All of these claims should be dismissed due to HPOPS's undeniable responsibility for any investment losses it incurred after early to mid-August 2007, at the latest, by which point the undisputed facts demonstrate that HPOPS made an informed decision to ride out the subprime market turmoil. The more than $20 million that HPOPS has already received from the Fair Fund exceeds the investment losses HPOPS

experienced prior to mid-August.  HPOPS must bear responsibility for its later losses, which

resulted from risks it assumed.  As a matter of law, HPOPS failed to mitigate its losses, and it

cannot establish that State Street was the proximate cause of any losses after mid-August 2007,

as HPOPS's decision not to leave the Fund stands as a superseding cause of HPOPS's losses.

In addition, HPOPS's fraud-in-the-inducement theories under the common law and the

TSA also fail as a matter of law because the undisputed record shows that the purported

misstatements alleged by HPOPS were in fact accurate and were not misrepresentations.  Finally,

HPOPS's conspiracy claim must be dismissed, as it alleges a conspiracy between defendant State

Street Bank and Trust Company and its own unincorporated investment *division*, State Street

Global Advisors.  A single entity cannot conspire with itself.

## I.  HPOPS'S INFORMED DECISION NOT TO REDEEM OUT OF LDBF AFTER MID-AUGUST REFLECTS A FAILURE TO MITIGATE DAMAGES, AND STATE STREET CANNOT HAVE CAUSED HPOPS'S LATER LOSSES

State Street in no way concedes the validity of any of HPOPS's allegations of imprudent

management of LDBF or misrepresentations regarding LDBF, or its assertions that other clients

were for some unspecified reason alerted first.  State Street will vigorously dispute all of these

assertions if there is a trial.  A trial on these issues is unnecessary, however, because HPOPS

cannot legally recover any damages in excess of the more than $20 million it has already

received from the Fair Fund.  This sum exceeds the investment losses that HPOPS incurred

through mid-August, 2007, by which time HPOPS had been informed by State Street of LDBF's

heavy subprime mortgage exposure, leverage, and the very negative impact that LDBF's

subprime exposure was having on the fund's performance in the escalating subprime market

liquidity crisis.  Mr. Franey's awareness of the risks is apparent, as he initially expressed his

desire to promptly redeem HPOPS out of LDBF.  But HPOPS changed course and elected not to

redeem.  HPOPS ultimately took no action to exit LDBF until November 14, 2007, at which time

it requested that part of its assets be returned in-kind, which HPOPS held for another two months while the market continued to deteriorate.  This conduct reflects an intentional and informed decision by HPOPS to try to ride out the subprime crisis by remaining invested in LDBF. HPOPS is barred from recovering damages for its investment losses incurred after mid-August 2007, because HPOPS failed to mitigate its damages, and cannot prove that State Street's conduct proximately caused it damage.

### A.      HPOPS Had A Duty To Mitigate Its Losses and Failed To Do So

"The rule has ever been in Texas that no recovery may be had for losses or damages, whether from tort or breach of contract, which might have been prevented, or the consequences avoided by reasonable efforts or expenditures by the person damaged."  *Walker v. Salt Flat Water Co.*, 96 S.W.2d 231, 232 (Tex. 1936) (internal quotation marks omitted); *see also Pulaski Bank and Trust Co. v. Texas Am. Bank*, 759 S.W.2d 723, 735 (Tex. App. 1988) ("[D]amages that might be avoided or mitigated are not recoverable. . . . Texas has applied the mitigation doctrine in both tort and breach of contract cases.").  HPOPS had a duty reasonably to mitigate its losses upon being apprised of LDBF's underperformance due to the subprime crisis, rather than "sitting still and letting damages pile up."  *Pulaski*, 759 S.W.2d. at 735 (citing *David H. v. Spring Branch Indep. Sch. Dist.*, 569 F. Supp. 1324, 1340 (S.D. Tex. 1983)); *see also Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (holding in a misrepresentation case that a plaintiff's "recovery of damages is limited not only by his own evidence, but also by the defendant's evidence of the plaintiff's failure to reasonably mitigate losses or evidence of intervening causes").

Analogous securities law cases recognize and apply the same mitigation principles.  "A party cannot recover the part of their loss caused by their own failure to take reasonable steps to avoid further harm once they had reason to know of the wrongdoing."  *Van Syckle v. C.L. King*

& *Assocs., Inc.*, 822 F. Supp. 98, 102 (N.D.N.Y. 1993).  "A plaintiff is thus obligated to mitigate

his damages as soon as 'the nature of the danger of holding [the] securities . . . [becomes]

apparent,'" and may not recover "that part of their loss caused by their own failure, once they

had reason to know of the wrongdoing, to take reasonable steps to avoid further harm."  *In re*

*Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1370 (N.D. Cal. 1987) (granting partial summary

judgment with respect to plaintiffs' failure to mitigate) (quoting *Arrington v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 620 (9th Cir. 1981)).

        As detailed above and in the accompanying Rule 56.1 Statement, the undisputed facts

demonstrate that State Street notified HPOPS of the pending subprime crisis and its impact on

LDBF's performance, and provided information sufficient to allow HPOPS to conclude that it

should mitigate its ongoing losses by redeeming from LDBF.  State Street's disclosures both cut

off the causal connection between any of its alleged improper conduct and HPOPS's later

investment losses (as discussed further below), and gave rise to HPOPS's duty to mitigate its

losses at that time.

        HPOPS had been informed before any investment that 75% or more of LDBF was

invested in ABS, a sector that Mr. Franey knew included securities collateralized by subprime

mortgages.  R. 56.1 Stmt. ¶¶ 19, 29.  On July 20, 2007, State Street communicated to Mr. Franey

that the fund was experiencing "underperformance as a result of the subprime issue."  R. 56.1

Stmt. ¶ 34.  On July 23, Mr. Franey requested and received performance data indicating that

LDBF had suffered material underperformance.  R. 56.1 Stmt. ¶ 35.  On July 24, Mr. Franey

received the LDBF fact sheet, showing that the fund continued to be heavily invested in just one

sector, specifically 81.3% invested in ABS as of June 30, 2007.  R. 56.1 Stmt. ¶¶ 36-37.  Mr.

Franey also received LDBF's audited financial statements on July 24, which identified by name

the fund's holdings, including swaps, nearly all of which were recognizable as being backed by subprime mortgages.  R. 56.1 Stmt. ¶¶ 38-39.  Mr. Franey was invited to set up a time for a conference call with the LDBF portfolio manager, but he did not.  R. 56.1 Stmt. ¶ 40.

Mr. Franey received a letter from State Street by no later than July 30, 2007 (it was emailed 4 days earlier, but Mr. Franey claimed he needed it resent), which provided State Street's predictions of liquidity problems and related volatility in the subprime ABS market for up to the next eighteen months.  R. 56.1 Stmt. ¶¶ 42-43.  In another letter on August 2, State Street further highlighted the ongoing problems in the subprime market and LDBF's "pronounced negative performance," resulting in an extraordinary 1000 basis point underperformance.  R. 56.1 Stmt. ¶¶ 44-45.  The August 2 letter also explained that LDBF "sold a significant amount" of its AAA-rated bonds.  R. 56.1 Stmt. ¶ 46.  On August 3, 2007, a State Street relationship manager inquired in a voicemail to Mr. Franey whether HPOPS was interested in moving out of its LDBF investment to either a money market fund or to "LDBF II", designed to shield HPOPS's investment from other clients' redemptions.  R. 56.1 Stmt. ¶ 47. Mr. Franey was further warned by State Street in an August 8 phone call that the market was continuing downward, that HPOPS faced potential harm from continued redemptions, and that HPOPS should "consider looking into the possibility of moving out because a lot of clients were getting out of funds that had LDBF exposure."  R. 56.1 Stmt. ¶¶ 49-50.

Mr. Franey confirmed his understanding of LDBF's subprime-related performance problems and foreseeable redemptions in discussions with at least four outside investment professionals during the period August 7-9.  R. 56.1 Stmt. ¶¶ 52, 54, 58, 60.  He shared with them his negative feelings about the fund, and even sought one investment firm's assistance in redeeming from LDBF "as quickly as possible."  R. 56.1 Stmt. ¶ 58.  Mr. Franey also stated his

awareness on August 8 that LDBF was almost exclusively (90%) composed of subprime ABS securities, that others were redeeming, and commented on two separate occasions that the investor who redeems last would get hurt the most.  R. 56.1 Stmt. ¶¶ 52,54.

Simply put, State Street equipped Mr. Franey with the information needed to make a decision to redeem, as evinced by Mr. Franey's discussions with multiple independent investment professionals about redeeming, all of which occurred on or before August 9-13, 2007. R. 56.1 Stmt. ¶¶ 52-58, 60.  Had Mr. Franey followed through with his stated intention to exit the fund on August 9, 2007, HPOPS investment losses would have been $11,081,019.  R. 57.1 Stmt. ¶ 68.

In *Drummond v. Morgan Stanley & Co., Inc.*, No. 95 Civ. 2011, 1996 WL 631723, at *2 (S.D.N.Y. Oct. 31, 1996) (Chin, J.), the plaintiff held bonds that were declining in value at the time the defendant rescinded a transaction involving the bonds.  *Id*. at *2-3.  At summary judgment, Judge Chin noted that the plaintiff could have mitigated his damages by accepting a third party's bid for the bonds, made only "one to three days after the cancellation," but instead waited six months while the bonds' value continued to decline.  *Id*.  Because "a reasonable factfinder could only conclude that plaintiff failed to make reasonable efforts to mitigate damages," the court ordered on summary judgment that the damages recoverable by plaintiff be limited by his failure to mitigate.  *Id*.

HPOPS's conduct here was similarly unreasonable as a matter of law:  instead of promptly acting to protect its investments during a crisis, HPOPS waited several months to act, incurring millions of dollars in additional investment losses.  The "nature of the danger of holding the securities" was made apparent to HPOPS by mid-August, after State Street informed HPOPS that LDBF had substantial exposure to a sector of the fixed income market that was in

the midst of an unprecedented decline, requiring HPOPS "to take reasonable steps to avoid further harm." *In re Fortune Sys.,* 680 F. Supp. at 1370 (internal citation and quotation marks omitted). As a result, HPOPS's losses post-dating mid-August, 2007 are now unrecoverable.[8]

**B.    HPOPS Cannot Recover Damages That Were Not Proximately Caused by State Street's Alleged Misconduct**

Although mitigation and causation have different burdens, the concepts are closely related in this case.[9] Just as a plaintiff cannot recover damages resulting from a failure to mitigate, a plaintiff cannot recover damages which were not proximately caused by a defendant's misconduct. Causation is an element of both contract and tort claims (including fraud and breach of fiduciary duty), requiring that the plaintiff prove that the damages sought resulted from the defendant's alleged wrongful act. *See Employees Ret. Sys. v. Putnam, LLC*, 294 S.W.3d 309, 315-318 (Tex. App. 2009) (holding that plaintiff could not recover damages under its common law fraud, negligent misrepresentation and breach of contract claims because the "damages did not result from [defendant's] alleged wrongful act"); *Si Kyu Kim v. Harstan, Ltd*., 286 S.W.3d 629, 635 (Tex. App. 2009) (affirming grant of summary judgment for failure to show causation with respect to fiduciary duty, fraud, and negligent misrepresentation claims, and noting that "[b]reach of fiduciary duty requires a showing that the breach caused damages."). It is hornbook law that a superseding proximate cause of a plaintiff's damages relieves the defendant of liability for subsequent losses.[10]

---

[8] There is Texas case law suggesting that the duty to mitigate does not apply to claims under the TSA. *Duperier v. Texas State Bank*, 28 S.W.3d 740, 754 (Tex. App. 2000) ("[W]e have found no cases where mitigation was applied to article 581-33 claims . . . ."). As discussed below in Section II, however, HPOPS's TSA claim fails because there is no evidence of material misrepresentations or omissions connected to HPOPS's initial LDBF investment, as required under the statute.

[9] Mitigation is an affirmative defense, while causation is the plaintiff's burden to prove.

[10] As set forth in the Restatement (Second) of Torts:

The same causation requirements govern all of HPOPS's claims. *See Employees Ret. Sys.*, 294 S.W.3d at 1315-318 (affirming summary judgment for defendant investment firm where plaintiff could not prove damages for its common law fraud, negligent misrepresentation and breach of contract claims, because plaintiff's losses were a result of the securities market, and not alleged misrepresentations related to market timing in defendant's funds); *Swank v. Cunningham*, 258 S.W.3d 647, 667 (Tex. App. 2008) (holding that breach of fiduciary duty claim for actual damages requires showing of proximate cause "that establishes a direct causal link between the damages awarded, the actions of the defendant, and the injury suffered"); *Arthur Andersen*, 945 S.W.2d at 817 (remanding for a new trial where plaintiff failed to prove "how much of its loss occurred at the time of the sale and how much was attributable to subsequent events for which [defendant] should bear legal responsibility").

Case law examining loss causation principles pertaining to investment losses in the securities law context is instructive. When a party fails to sell at a time he should know of an alleged wrongdoing, "[he] has, in effect, made a second investment decision unrelated to his initial decision to purchase the stock," and he "will not be able to avail himself of any further decrease in the value of the security after that date." *Harris v. Am. Inv. Co.*, 523 F.2d 220, 228 (8th Cir. 1975) (quoting *Cant v. Becker & Co.*, 379 F. Supp. 972, 975 (N.D. Ill. 1974) ("[T]he key date [after which damages are unrecoverable] is the date the plaintiff discovered or should have discovered that he was 'defrauded.'")). The decision to remain invested in the hopes of a

---

A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm. Therefore, if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm.

Restatement (Second) of Torts § 440 (1965).

recovery in the market value of a security "involve[s] precisely that weighing of risks that constitutes an investment decision" and "[a]ny increase or decrease in the value of the stock after a reasonable time is causally unrelated to the initial decision to purchase and can serve to neither decrease nor increase the amount of damages." *Nye v. Blyth Eastman Dillon & Co., Inc.*, 588 F.2d 1189, 1198-99 (8th Cir. 1978).  Where plaintiffs' own superseding investment decisions sever the causal connection between the defendants' conduct and the plaintiff's losses, recoverable damages are "limited by what they would have realized had they acted to preserve their assets or rights when they first learned of the fraud or had reason to know of it." *Arrington*, 651 F.2d at 620 (affirming district court's ruling limiting recoverable damages where "the nature of the danger of holding securities on margin in a declining market must have become apparent" by district court's cut-off date for damages calculation).  A court in this district has similarly held that a plaintiff who "declines other offers to purchase the securities in effect makes a new investment decision as to which he or she must suffer the consequences." *Drummond*, 1996 WL 631723, at *2.

Despite all the information that Mr. Franey possessed, and despite his repeated, stated intentions to redeem from LDBF on and prior to August 9, 2007, HPOPS did not redeem from LDBF during August, September, or October of 2007.  During this time, the subprime crisis only deepened.  Even after it terminated State Street as its investment manager in November, HPOPS continued to hold subprime securities, incurring even further losses. R. 56.1 Stmt. ¶¶ 63-66. Where a plaintiff's damages are caused not by any act or omission of the defendant, "but by the risks inherent in the securities market," such damages are not recoverable. *Employees Ret. Sys.*, 294 S.W.3d at 317.  A plaintiff "may, with the benefit of hindsight, regret its investment decisions, but the law does not allow an investor to use tort claims as a vehicle to insure itself

against market risks." *Id.* The law prohibits Mr. Franey from transferring the risk to State Street, as doing so would "unfairly transform [State Street] into an insurer of [HPOPS's] entire investment." *Arthur Andersen*, 945 S.W.2d at 817. As a result, State Street cannot, as a matter of law, be liable for HPOPS's investment losses after mid-August, 2007. Given that HPOPS has received a payment through the Fair Fund in excess of its losses through mid-August, 2007, its claims in this action should be dismissed in their entirety.

## II.    HPOPS'S FRAUD CLAIMS REGARDING ITS INVESTMENT DECISION ARE UNSUPPORTED BY THE RECORD EVIDENCE, AND SHOULD BE DISMISSED

In connection with its original decision to invest in the Enhanced DJ-AIG Strategy, including LDBF as the enhancement vehicle, HPOPS asserts that it was fraudulently induced by State Street's misstatements regarding LDBF under both common law fraud and violations of the Texas Securities Act ("TSA"). *See* Compl. ¶¶ 87(a), 105-106. To the extent that these claims are not extinguished by the mitigation and causation issues argued above, they also fail for the additional reason that there is no evidentiary support of record for plaintiff's allegations of misstatements by State Street.

In order to prove its claim for common law fraud, HPOPS must establish that State Street (1) made a material misrepresentation, or failed to disclose material information, (2) either knowing it was false or without knowledge of its truth, (3) which it intended HPOPS to rely upon, and (4) which HPOPS did rely upon, (5) causing it harm. *See Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994). The TSA imposes liability for selling a security "by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading . . . ." Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) (Vernon 2001). Like a common law fraud claim, a claim under the TSA requires that the plaintiff establish the

materiality and falsity of the alleged misrepresentation.  Further, with the exception of an

inapplicable provision related to investment advisors,[11] the TSA explicitly pertains only to the

sale of securities, and the actionable representations or omissions must therefore be made in

connection with the purchase, and must have induced the purchase, as the statute "speaks

exclusively to liability for *sales* of a security."  *In re Westcap Enters.*, 230 F.3d 717, 726 n.11

(5th Cir. 2000) (citing *Pitman v. Lightfoot*, 937 S.W.2d 496, 531 (Tex. App. 1996) ("[T]he

plaintiff must show the untrue statements were made before the sale occurred."); *see also*

*Crescendo Invs., Inc. v. Brice*,  61 S.W.3d 465, 475 (Tex. App. 2001) ("A statement made after

purchase of the securities could not induce purchase and is therefore not relevant.").

　　　　HPOPS alleges that it selected State Street to manage the commodities strategy on or

about September 13, 2005, Complt. ¶ 19, and that the decision was memorialized in a June 16,

2006 amendment to the parties' investment management agreement, Complt. ¶ 21.  The specific

alleged misrepresentations by State Street that preceded the investment decision – and thus could

---

[11] HPOPS alleges that State Street is also liable under a subpart of the TSA that only applies
explicitly to an investment advisor, Compl. ¶ 109, defined by the TSA as "a person who, for
compensation, engages in the business of advising another, either directly or through
publications or writings, with respect to the value of securities or to the advisability of investing
in, purchasing, or selling securities or a person who, for compensation and as part of a regular
business, issues or adopts analyses or a report concerning securities."  Tex. Rev. Civ. Stat. Ann.
art. 581-4(N)(1).  State Street performed none of the listed advisory services with respect to
HPOPS.  Moreover, State Street is expressly excluded from the statutory definition of
"investment advisor" pursuant to an exemption for "a bank or a bank holding company."  Tex.
Rev. Civ. Stat. Ann. art. 581-4(N)(1) (providing that "investment adviser" does not include "a
bank or bank holding company as defined by the Bank Holding Company Act of 1956 (12
U.S.C. Section 1841 et seq.), as amended, that is not an investment company").  Under similar
statutory exemptions, State Street's unregistered, commingled trust funds at issue here are
excluded from the definition of investment adviser and investment company under the
Investment Advisers Act of 1940 and the Investment Company Act of 1940.  *See* 15 U.S.C. §
80b-2(a)(11)(A) (stating that investment advisers do not include "a bank, or any bank holding
company as defined in the Bank Holding Company Act of 1956 [12 U.S.C.A. § 1841 et seq.]
which is not an investment company"); 15 U.S.C. § 80a-3(c)(3) (excluding from the definition of
"investment company," "[a]ny bank or insurance company," and certain common trust funds or
similar funds "maintained by a bank").

form the basis for a TSA violation or fraud in the inducement claim – are quite narrow, and are based upon the August 2005 written presentation to LDBF regarding the Enhanced DJ-AIG Strategy and LDBF.  *See generally* Complt. ¶¶ 12-18 ("The Inducement"), 44, 87(a) (Count III), 105-106 (Count VI).  Indeed, this was the only substantive communication about LDBF alleged to have occurred between HPOPS and State Street before HPOPS effected its investment almost one year later.  Each of these alleged statements attributed to State Street in the Complaint was either true, and thus was not a misrepresentation at all, or was not actually made.

First, HPOPS alleges that State Street misrepresented LDBF as a "short term cash vehicle."  Complt. ¶ 16.  This representation does not appear in the August 2005 presentation. *See* R. 56.1 Stmt. ¶¶ 11-19.  HPOPS does not specify where the representation that LDBF was a "short term cash vehicle" was made, nor is there record evidence that any such statement was ever made by State Street to HPOPS.

Second, HPOPS alleges that the August 2005 presentation "represented that the Fund would hold only 5.3% in mortgage-backed securities and would be well-diversified."  Complt. ¶ 44.  This is simply a misstatement of the record.  The term "well-diversified" is simply not used anywhere in the presentation in reference to LDBF, and indeed the presentation showed that LDBF was heavily concentrated in asset backed securities.  *See* R. 56.1 Stmt. ¶ 19.  As for the supposed 5.3% limitation on mortgage-backed securities, the "Portfolio Characteristics" chart in the August 2005 presentation set forth the sector breakdowns as of a specific date, June 30, 2005. R. 56.1 Stmt. ¶ 19.  Nowhere does the presentation state any limitations or predictions as to what the *future* sector allocations of the fund would be.  *See* R. 56.1 Stmt. ¶ 19.  Nor does the

- 22 -

Complaint assert that the sector allocation in the presentation was inaccurate as of June 30, 2005.[12]

      <u>Third</u>, HPOPS contends that State Street's representation that LDBF invested in "high quality" securities was a fraudulent misrepresentation.  Complt. ¶ 87(a).  Yet this was not a misrepresentation at all – "high quality" referred to the credit quality of the securities, not a guarantee of future performance or a description of the "quality" of the asset pool underlying the security.  *See Yu v. State Street Corp.*, No. 08 Civ. 8235, 2010 WL 668645, at *5 (S.D.N.Y. Feb. 25, 2010) (holding that description of mortgage-related securities as "high quality" in mutual fund prospectus was not misleading, as it referred to investment-grade credit ratings and was not a guaranty that the securities would not lose value).   It is undisputed that all of LDBF's investments at all relevant times were investment grade – *i.e.*, had a credit rating of BBB or above – and that more than 95% of LDBF's investments consisted of the most highly rated fixed income securities, with ratings of AAA and AA. R. 56.1 Stmt. ¶ 30.  The fund was represented as AA average quality, R. 56.1 Stmt. ¶ 17, and this was at all times true.

      <u>Fourth</u>, HPOPS is also incorrect in asserting that State Street represented in the August 2005 presentation that LDBF offered "daily liquidity."  The presentation does not use "daily liquidity" as a term to describe LDBF.  R. 56.1 Stmt. ¶ 14.  Indeed, State Street not only did *not* represent LDBF as offering "daily liquidity," but the fact sheet sent to HPOPS *after* its investment stated explicitly that LDBF should *not* be used for daily liquidity.  *See* R. 56.1 Stmt. ¶ 28.

---

[12]   HPOPS also asserts that it incorrectly assumed that the "MBS" category was the only asset sector intended to include assets collateralized by mortgage loans.  Mr. Franey knew, however, that the 75% ABS sector included bonds collateralized by subprime mortgages.  R. 56.1 Stmt. at 29.  However, the Court need not address this issue to grant the present motion.

Fifth, HPOPS alleges that the August 2005 presentation misrepresented that LDBF "would be invested in securities with an 'average quality of AAA' with only 1.8% in BBB; and that **only 5.3%** of the of the Limited Duration Bond Fund's holdings would be invested in **mortgage-backed securities**."  Complt. ¶ 87(a) (emphases in original).  Here again, HPOPS's assertion is incorrect, as it misstates the "Portfolio Characteristics" chart within the August 2005 presentation.  These cited characteristics were a snapshot of the fund as of June 30, 2005, and nowhere did the presentation state that these characteristics were intended as predictions or limitations as to future characteristics.  R. 56.1 Stmt. ¶ 19.  To the contrary, the "Overview" summary for LDBF states the actual targeted average credited quality for the fund:  "Average Quality AA."  R. 56.1 Stmt. ¶ 17.  The fact that the Fund happened to have a higher average credit quality as of June 30, 2005 than in later periods in no way constitutes a misrepresentation.

Because none of the statements that HPOPS alleges as misrepresentations in support of its claims of fraudulent inducement or liability under the TSA was actually a misleading statement of material fact made by State Street, the Court should dismiss these claims in their entirety.  *See Pitman*, 937 S.W.2d at 532 (reversing trial court judgment against defendants where "there is simply no evidence there were any untrue statements or omissions regarding the stock itself" prior to plaintiffs' purchase).

## III. HPOPS'S CONSPIRACY CLAIM IN COUNT VII SHOULD BE DISMISSED, BECAUSE IT ALLEGES A CONSPIRACY BETWEEN STATE STREET AND ITSELF

Count VII of the Complaint alleges a conspiracy between defendants State Street Bank and Trust Company ("SSBT") and State Street Global Advisors, Inc. ("SSgA, Inc.").  As State Street has explained to HPOPS's counsel from and after the outset of the case – supported by affidavit – SSgA, Inc. is incorrectly named as a defendant in this action.  It is a separately incorporated holding company that is a wholly-owned subsidiary of SSBT's parent company,

State Street Corporation, but has no connection to the facts of this case.  R. 56.1 Stmt. ¶ 4.  It

performs no investment management services of any kind, is party to no agreement in this case,

and had no involvement in the management of LDBF or any other investment strategy.  Plaintiffs

confuse SSgA, Inc. with State Street Global Advisors ("SSgA"), the unincorporated investment

*division* of SSBT, which did manage LDBF and the Enhanced DJ-AIG Strategy.  *See* R. 56.1

Stmt. ¶ 3.  No evidence has been adduced in discovery linking SSgA, Inc. to the facts of this case

in any fashion.  Accordingly, SSgA, Inc. should be dismissed as a party to the case for all

purposes.

   With respect to the conspiracy claim, it is apparent that the allegations regarding SSgA,

Inc. were in fact targeted to the SSgA division of SSBT.  As a matter of law, an entity cannot

form a conspiracy with itself.  *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d

452, 463 (5th Cir. 2003) ("[I]t is established that a corporation cannot conspire with itself, no

matter how many of its agents participated in the wrongful action.") (citing 13 Tex. Jr. 3d Civil

Conspiracy § 3).  This claim must be dismissed.

## <u>CONCLUSION</u>

   For all of the foregoing reasons, State Street respectfully requests that that the Court enter

an order dismissing HPOPS's claims in their entirety.

Dated:  June 2, 2010                    ROPES & GRAY LLP


                                        By: /s/ Harvey J. Wolkoff
                                        Harvey J. Wolkoff
                                        Robert A. Skinner
                                        Daniel J. Maher
                                        One International Place
                                        Boston, MA  02110
                                        Tel: (617) 951-7000
                                        Fax: (617) 951-7050
                                        harvey.wolkoff@ropesgray.com
                                        robert.skinner@ropesgray.com
                                        daniel.maher@ropesgray.com

                                        *Attorneys for Defendant State Street Bank and Trust Company*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2010, I caused a true and correct copy of the foregoing document to be served upon the following counsel of record by e-mail.

/s/ Lila A. Palmer
Lila A. Palmer

Edwin G. Schallert
Jeremy Klatell
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

John R. Nelson
LOCKE LORD BISSELL & LIDDELL LLP
100 Congress, Suite 300
Austin, TX 78701

Caren S. Sweetland
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002

Robert Burford
BURFORD & MANEY PC
700 Louisiana, Suite 4600
Houston, TX 77002

John J. Butts, Esq.
Steven Cherry
Felicia Ellsworth
Kevin Prussia
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109

Thomas J. Dougherty
Peter Simshauser
Michael S. Hines
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts  02108

Lewis R. Clayton
Jonathan Hurwitz
Aliza Balog
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON
1285 Avenue of the Americas
New York, NY  10019-6064

Steven L. Severson
Justin Krypel
Debbie Ellingboe
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

David E. Lurie
Thomas Lent
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109

Samuel H. Rudman
David A. Rosenfeld
Evan J. Kaufman
Carolina Torres
Mark Reich
ROBBINS GELLER RUDMAN & DOWD
LLP
58 S. Service Road, Ste. 200
Melville, NY 11747