UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

IN RE STATE STREET BANK AND
TRUST CO. FIXED INCOME FUNDS                    MDL No. 1945
INVESTMENT LITIGATION

_____

MEMORIAL HERMANN HEALTHCARE
SYSTEM AND THE HEALTH
PROFESSIONALS INSURANCE COMPANY,
LTD.,

       Plaintiffs,

                                          No. 08 Civ. 5440 (RJH)

v.

STATE STREET BANK & TRUST
COMPANY,

       Defendant.

_____

## STATE STREET'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

MATERIAL UNDISPUTED FACTS ...........................................................................6

ARGUMENT .............................................................................................................9

I.   MEMORIAL HERMANN'S INFORMED DECISION NOT TO REDEEM OUT OF
     LDBF AT THE END OF JULY 2007 REFLECTS A FAILURE TO MITIGATE
     DAMAGES, AND STATE STREET IS NOT RESPONSIBLE FOR MEMORIAL
     HERMANN'S LATER LOSSES ..........................................................................10

     A.   Memorial Hermann Had a Duty to Mitigate Its Damages and Failed to Do So ......11

          1.   May 2007:  Memorial Hermann ignores its investment advisor's
               recommendation to reduce its LDBF target allocation following a
               subprime market event ...........................................................................12

          2.   July 27, 2007:  Memorial Hermann's investment advisor recommends
               an immediate redemption out of the Fund because of LDBF's critical and
               deterioriating situation .........................................................................13

          3.   July 31, 2007:  Memorial Hermann's CFO decides not to redeem out
               of LDBF ..............................................................................................15

          4.   August 2007:  Memorial Hermann ignores investment advisor's
               recommendation to move to LDBF II ......................................................16

     B.   Plaintiffs Cannot Recover Damages That Were Not Proximately Caused by State
          Street's Alleged Misconduct ...................................................................17

II.  PLAINTIFFS' FRAUD/FRAUDULENT INDUCEMENT AND NEGLIGENT
     MISREPRESENTATION CLAIMS FAIL BECAUSE THE COMPLAINT DOES NOT
     ALLEGE MATERIAL MISREPRESENTATIONS THAT ARE ACTIONABLE AS A
     MATTER OF LAW ...........................................................................................19

     A.   State Street Fully and Accurately Disclosed LDBF's Investment Objective,
          Portfolio Composition and Strategy .......................................................20

CONCLUSION ........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................................9

*Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
651 F.2d 615 (9th Cir. 1981) ....................................................................................12, 17, 19

*Bachini v. A.G. Edwards*,
No. 03-1068, 2008 WL 2359727 (Mass. Super. June 5, 2008) ...............................................11

*Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*,
864 N.E.2d 518 (Mass. App. Ct. 2007) ...................................................................................11

*Brian v. B. Sopkin & Sons*,
49 N.E.2d 894 (Mass. 1943) ....................................................................................................11

*Burleson State Bank v. Plunkett*,
27 S.W.3d 605 (Tex. App. 2000) .............................................................................................20

*Burnham v. Mark IV Homes, Inc.*,
441 N.E.2d 1027 (Mass. 1982) ................................................................................................11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................................................................9

*Cespedes v. C&C Construction Corp.*,
No. 042203B, 2008 WL 5608972 (Mass. Super. Ct. Dec. 2, 2008) .......................................18

*David H. v. Spring Branch Independent School District*,
569 F. Supp. 1324 (S.D. Tex. 1983) .......................................................................................11

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003) ....................................................................................................24

*Doe v. Harbor Schools, Inc.*,
843 N.E.2d 1058 (Mass. 2006) ...............................................................................................11

*Drummond v. Morgan Stanley & Co.*,
No. 95 Civ. 2011 DC, 1996 ...................................................................................11, 12, 19

*Duperier v. Texas State Bank*,
28 S.W.3d 740 (Tex. App. 2000) ........................................................................................21, 25

*Employees Retirement System v. Putnam LLC*,
294 S.W.3d 309 (Tex. App. 2009) ......................................................................................17, 18

*Fairfield v. Salem*,
  100 N.E. 542 (Mass. 1913) ...........................................................................11

*Federal Land Bank Ass'n of Tyler v. Sloane*,
  825 S.W.2d 439 (Tex. 1991) ..........................................................................20

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*,
  960 S.W.2d 41 (Tex. 1998) ............................................................................20

*In re Fortune System Security Litigation*,
  680 F. Supp. 1360 (N.D. Cal. 1987) ........................................................12, 17

*Haase v. Glazner*,
  62 S.W.3d 795 (Tex. 2001) ............................................................................20

*Harris v. American Investment Co.*,
  523 F.2d 220 (8th Cir. 1975) ...................................................................18, 19

*Hughes Wood Products, Inc. v. Wagner*,
  18 S.W.3d 202 (Tex. 2000) ..............................................................................1

*In re IAC/InterActiveCorp Security Litigation*,
  No. 04 Civ. 744(RJH), 2010 WL 996483 (S.D.N.Y. Mar. 19, 2010) ..........24, 25

*Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*,
  329 F.3d 216 (1st Cir. 2003) ..........................................................................20

*Lobao v. Leahy*,
  2008 Mass. App. Div. 7 (Mass. Dist. Ct. 2008) ..............................................18

*Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*,
  142 F.3d 26 (1st Cir. 1998) ............................................................................20

*Matsushita Electric Industry Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .........................................................................................9

*McClelland v. Climax Hosiery Mills*,
  169 N.E. 605 (N.Y. 1930) ...............................................................................11

*McKenna v. Commissioner of Mental Health*,
  199 N.E.2d 686 (Mass. 1964) .........................................................................11

*McMahon & Co. v. Wherehouse Entertainment, Inc.*,
  900 F.2d 576 (2d Cir. 1990) ...........................................................................24

*Meehan v. Shaughnessy*,
  535 N.E.2d 1255 (Mass. 1989) .......................................................................18

*Moulton v. Alamo Ambulance Service, Inc.*,
  414 S.W.2d 444 (Tex. 1967) ...........................................................................11

*In re Mutual Funds Investment Litigation*,
608 F. Supp. 2d 677 (D. Md. 2009) ................................................................................2

*National Communications Ass'n, Inc. v. American Telephone & Telegraph Co.*,
No. 93 CIV. 3707 (LAP), 2001 WL 99856 (S.D.N.Y. Feb. 5, 2001) .....................................12

*Nye v. Blyth Eastman Dillon & Co., Inc.*,
588 F.2d 1189 (8th Cir. 1978) ........................................................................18, 19

*Pulaski Bank & Trust Co. v. Texas American Bank*,
759 S.W.2d 723 ......................................................................................................11, 23

*Quinn v. Syracuse Model Neighborhood Corp.*,
613 F.2d 438 (2d Cir. 1980) .................................................................................................9

*Sax v. DiPrete*,
639 F. Supp. 2d 165 (D. Mass. 2009) ...............................................................................20

*Si Kyu Kim v. Harstan, Ltd.*,
286 S.W.3d 629 (Tex. App. 2009) .....................................................................................18

*Van Syckle v. C.L. King & Assocs., Inc.*,
822 F. Supp. 98 (N.D.N.Y. 1993) ......................................................................................12

## OTHER AUTHORITIES

Fed. R. Civ. P. 56 .....................................................................................................................1

Restatement (Second) of Torts § 440 (1965). .................................................................18

Defendant State Street Bank and Trust Company ("State Street") respectfully submits this memorandum in support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1.[1]

## PRELIMINARY STATEMENT

Plaintiffs Memorial Hermann Healthcare System ("MHHS") and its wholly-owned captive insurer, the Health Professionals Insurance Company, Ltd. ("HePIC") (collectively, "Memorial Hermann") have brought this action under Massachusetts and Texas common law[2] to recover their 2007 investment losses in a bond fund managed by State Street – losses that arose from the fund's exposure to bonds collateralized by subprime mortgages (known as "asset backed securities" or "ABS"). The fund at issue was State Street's Limited Duration Bond Fund ("LDBF" or the "Fund"). The complaint alleges that State Street misrepresented the Fund's investment objective prior to Memorial Hermann's first investment in 2005, and further, that State Street was grossly negligent in managing the Fund. According to Memorial Hermann, the Fund was unjustifiably and recklessly invested in "high-risk, long-term mortgage instruments

---

[1] Pursuant to Local Civil Rule 56.1, State Street submits herewith a statement of undisputed material facts ("R. 56.1 Stmt."). Copies of documents referred to in the Rule 56.1 Statement or herein are found in a separately-submitted volume of exhibits to the accompanying declaration of Robert A. Skinner, dated June 2, 2010 ("Skinner Decl.").

[2] State Street maintains that Massachusetts law applies to all of plaintiffs' claims. MHHS and HePIC both contractually agreed that Massachusetts law would govern their relationship with State Street. R. 56.1 Stmt. ¶ 35. Texas courts apply the "most significant relationship" test to decide choice of law issues, weighing the following factors: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. *See Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000). Because State Street originated the vast majority of communications from Massachusetts, factors (b), (c), and (d) weigh in favor of Massachusetts law. But regardless of whether Massachusetts or Texas law applies, the outcome is the same for the purposes of this motion, as there is no meaningful difference between the relevant substantive law of the two states.

without diversification," which caused Memorial Hermann to lose approximately $42.9 million when unprecedented illiquidity in the asset backed securities market triggered a collapse in the prices of these bonds in July/August 2007 – the so-called "subprime crisis" that foreshadowed the broader financial market collapse in 2008.

State Street is entitled to judgment as a matter of law on Memorial Hermann's claims. The undisputed facts establish that by no later than July 27, 2007:  (i) State Street had informed Memorial Hermann through its outside independent investment advisor of LDBF's substantial subprime exposure, and the deteriorating liquidity crisis in the market; (ii) based on this information, Memorial Hermann's investment advisor "strongly advised" an immediate redemption from the Fund; (iii) despite its advisor's recommendation, Memorial Hermann's Chief Financial Officer made an informed decision not to redeem out of the Fund, leading to substantial losses thereafter; and (iv) Memorial Hermann has already been paid $38 million from a Fair Fund established in State Street's settlement with the Securities and Exchange Commission ("SEC") and other regulators, an amount greater than all the investment losses it incurred in LDBF through at least November 2007.[3]  Based on these undisputed facts, Memorial Hermann is not entitled to recover additional amounts as damages, because it failed to mitigate

---

[3] In February 2010, State Street entered into a settlement agreement with the SEC and state regulators pursuant to which a Fair Fund was established and distributed to affected investors. Through the Fair Fund, Memorial Hermann received a payment of $41,433,135.16.  R. 56.1 Stmt. ¶ 70.  As has been held in similar cases, of that $41 million dollar payment, State Street is entitled to a $38,309,076.77 credit against any damages that Memorial Hermann may eventually recover.  *In re Mut. Funds Inv. Litig.*, 608 F. Supp. 2d 677, 678-79 (D. Md. 2009) (granting summary judgment to defendants because any damages caused by market timing in benefit plans were "fully offset by the restitution paid by defendants [through a Fair Fund] pursuant to regulatory settlements").  State Street does not seek an offset for the civil penalty portion of the total compensation it paid to investors in the affected funds.  *Id*.  The $50,000,000 penalty paid by State Street constitutes 7.54% of the $663,191,540 in total compensation paid to investors.  *Id*.  Thus, of the $41,433,135.16 payment made to Memorial Hermann, $38,309,076.77 (or 92.46%) is not attributable to the civil penalty portion of the total compensation paid to investors.  *Id*.

its alleged losses.  In fact, had Memorial Hermann followed its investment advisor's advice and redeemed, Memorial Hermann would have made a profit.

Memorial Hermann's decision to remain invested also stands as a superseding cause of its losses.  Memorial Hermann cannot benefit from a "heads I win / tails you lose" strategy under which Memorial Hermann either stood to recoup its investment losses by riding out the market from late July through the end of 2007, or demand compensation after the fact from State Street for the investment risks that Memorial Hermann decided to assume in late July 2007.

Memorial Hermann's fraud-in-the-inducement theories under common law also find no support in the record evidence, and must be dismissed for this additional reason.  The undisputed facts establish as a matter of law that State Street's representations to Memorial Hermann prior to its investment in LDBF were accurate and in no way misleading.

## BACKGROUND

In July of 2004, State Street was sent a Request for Proposal ("RFP") to serve as an asset manager for Memorial Hermann.  R. 56.1 Stmt. ¶ 10.  Memorial Hermann's investment advisor, Ernest Liebre of Cambridge Financial Services ("Cambridge") handled the RFP process.[4]  *Id*. State Street offered two funds in response:  the Prime Money Market Fund, which touted "preservation of capital" as its first investment objective, and LDBF, which was marketed as having an aggressive investment goal of 50-75 basis points over the LIBOR benchmark.[5]  R.

---

[4] Mr. Liebre, whom Memorial Hermann admits was its agent, has over 25 years of experience in financial advisory services.  R. 56.1 Stmt. ¶¶ 5-6.  He is the managing director of Cambridge Financial Services, which has offices and clients nationwide.  *Id*.  Some of Cambridge's major clients include Boehringer Ingelheim, Spalding Sports Equipment, and Sharp Electronics that alone constitute over $700 million in assets under management.  R. 56.1 Stmt. ¶ 5.

[5] LIBOR refers to the "London Inter-Bank Offer Rate," and indicates the going market rate at which banks loan money to one another.  A "basis point" is one one-hundredth of a percentage point.

56.1 Stmt. ¶¶.10-14.  Ultimately, both MHHS and HePIC decided to invest in LDBF.  R. 56.1 Stmt. ¶ 33.

Prior to investing in LDBF, Memorial Hermann and Cambridge were informed by State Street of LDBF's aggressive return goal, its heavy concentration in the single sector of ABS, details of the Fund's holdings concentrated in ABS backed by home equity mortgages, and its strategy, such as its ability to utilize derivatives.  R. 56.1 Stmt. ¶¶ 14-18, 20, 22, 25-29.  After receiving this information, MHHS and HePIC invested a combined $84,700,000 in LDBF in January and September of 2005, respectively.[6]  R. 56.1 Stmt. ¶ 33.   At the same time, the respective parties entered into virtually identical Agreements of Trust ("Agreements"), which delegated State Street broad authority to invest in any securities, without any diversification requirement or restrictions on the use of derivatives.  R. 56.1 Stmt. ¶¶ 32, 34, 36, 37.  In addition, the Agreements set forth the standard of care, specifically that State Street shall "not be liable for any error of judgment or law on its own part, but it shall be liable only for its own willful default or gross negligence," as determined under the laws of the Commonwealth of Massachusetts.  R. 56.1 Stmt. ¶ 35.

Memorial Hermann and Mr. Liebre also received materials before investing in LDBF stating that the Fund was a "portable alpha vehicle," meaning a fund used to generate excess returns.  R. 56.1 Stmt. ¶ 16.  The Fund did just that, consistently outperforming its benchmark following MHHS's and HePIC's investments.[7]  R. 56.1 Stmt. ¶ 38.  Memorial Hermann was in a substantial profitable position as of the end of July 2007.  R. 56.1 Stmt. ¶ 72.  However, when

---

[6] Memorial Hermann has an Investment Subcommittee that is responsible for approving, evaluating and monitoring MHHS's and HePIC's investments (in conjunction with the HePIC Board of Directors).  R. 56.1 Stmt. ¶¶ 7, 8.  Various members of the Investment Subcommittee have extensive experience with investments and money management.  R. 56.1 Stmt. ¶ 7.

[7] From its inception in 2002, LDBF met or exceeded the return of its benchmark 11 out of the 16 quarters through the end of 2006.  R. 56.1 Stmt. ¶ 38.

the subprime mortgage market experienced an unprecedented liquidity crisis in the summer and fall of 2007, the Fund's performance followed suit, and investors incurred substantial losses.  R. 56.1 Stmt. ¶ 43.

When the subprime crisis broke in July 2007, State Street informed Memorial Hermann through its advisor Mr. Liebre of LDBF's precarious and deteriorating situation.  Mr. Liebre has testified that on July 27, 2007, State Street informed him that LDBF was substantially invested in bonds backed by subprime mortgages, that LDBF had underperformed by 500 basis points so far that month, that there was no market in which to sell the Fund's subprime securities, that things looked like they would get worse before they got better, and that State Street did not know if the subprime market would ever return.  R. 56.1 Stmt. ¶ 44.  On the same conference call, State Street offered to transfer Memorial Hermann's money into a money market fund by the next business day.  *Id.*  Mr. Liebre informed State Street that he wanted to redeem Memorial Hermann out of the Fund right away, but State Street told him that they needed Memorial Hermann's direct authorization.  *Id.*  Mr. Liebre immediately called Lynn DeBlance, System Executive at Memorial Hermann, and reiterated what State Street had just told him, based on which he strongly advised that Memorial Hermann immediately move its LDBF assets into a money market fund.  R. 56.1 Stmt. ¶ 46.  Mr. DeBlance felt he did not have the authority to authorize a redemption, and his immediate supervisor, Carrol Aulbaugh, the CFO, was out of the office on that day, July 27.  *Id.*  Despite various messages from Mr. DeBlance, Mr. Aulbaugh did not return Mr. Liebre's phone call until four days later, on Tuesday, July 31.  R. 56.1 Stmt. ¶¶ 48, 50.  On July 31, 2007, Mr. Liebre informed Mr. Aulbaugh of the Fund's severe underperformance due to its substantial subprime exposure, and conveyed State Street's opinion that there was no longer any market for the securities, and the situation was likely going to get worse before it got better.  R. 56.1 Stmt. ¶ 51.  However, despite Mr. Liebre's "strong and definitive"

recommendation to exit LDBF immediately, Mr. Aulbaugh made the decision on the phone call

not to redeem out of LDBF, without bringing the issue to the attention of MHHS's Investment

Subcommittee or HePIC's Board of Directors.  R. 56.1 Stmt. ¶¶ 52, 53, 57.[8]

If Memorial Hermann had followed its investment advisor's advice and redeemed out of

LDBF by July 31, it would have lost nothing.  R. 56.1 Stmt. ¶ 72.  In fact, Memorial Hermann's

Fair Fund payment covers its losses through November 2007.  R. 56.1 Stmt. ¶ 74.

## MATERIAL UNDISPUTED FACTS

State Street submits herewith a separate Rule 56.1 Statement, with supporting

documentation.  Following are the key material undisputed facts on which this motion is

premised:

- Before MHHS and HePIC invested in LDBF, State Street informed Memorial Hermann that LDBF's investment philosophy was to "maximize risk-adjusted returns";  LDBF had an investment goal of earning 50-75 basis points over the LIBOR benchmark; the majority of the Fund was composed of securities in a single sector, ABS; a substantial number of those securities were specifically backed by home equity loans; and LDBF's permitted classes of assets included derivative securities.  R. 56.1 Stmt. ¶¶ 14-18, 20, 22, 25-29..

- On May 2, 2007, State Street informed Mr. Liebre that LDBF had underperformed in the first quarter of 2007 as a result of the Fund's "exposure to the investment grade triple B asset-backed securities market, specifically the sub-prime housing market," which "had been one of the primary drivers" of the Fund's outperformance the year before.  R. 56.1 Stmt. ¶ 39.

- After he was told in early May about LDBF's underperformance from investments in bonds backed by subprime mortgages, Mr. Liebre indicated in his report to MHHS's Investment Subcommittee on June 8, 2007, that MHHS's target allocation in LDBF should be reduced from 13% of operating assets to 5% – a reduction from approximately $81 million to $31 million.  R. 56.1 Stmt. ¶ 40.

---

[8] Mr. Liebre testified that on July 31, 2007, Mr. Aulbaugh made the decision not to redeem, but that he also wanted more information.  R. 56.1 Stmt. ¶ 55.  Mr. Aulbaugh himself testified, however, that he felt he had sufficient information to decide not to redeem.  R. 56.1 Stmt. ¶¶ 54, 57.  The record does not contain any request by Mr. Liebre or Mr. Aulbaugh for anything more, for at least a few weeks.

- In December 2004, the Investment Subcommittee approved Cambridge's recommendation to rebalance the portfolios on a quarterly basis. The minutes from that meeting state: "Upon a motion duly made and seconded, the Investment Subcommittee unanimously accepted Cambridge's recommendation to re-balance the portfolio to the target allocations on a quarterly basis." R. 56.1 Stmt. ¶ 41. However, MHHS did not implement the June 2007 reduction, and MHHS's LDBF investment remained at $81 million. R. 56.1 Stmt. ¶ 42.

- On July 27, 2007, State Street informed Mr. Liebre that LDBF had continued to underperform due to its heavy investments in ABS backed by subprime mortgages, that this underperformance was likely to continue, that there was no market for the securities, and that State Street did not know if the market would ever return, but things were likely to get worse before they got any better. R. 56.1 Stmt. ¶ 44. State Street told Mr. Liebre that it could redeem Memorial Hermann's LDBF investments or transfer them into a money market fund by the next business day. *Id.*

- Mr. Liebre of Cambridge – not State Street – was Memorial Hermann's investment advisor. As a money manager, State Street's job was to manage the Fund in accordance with its objectives, not to provide investment advice to Memorial Hermann. R. 56.1 Stmt. ¶¶ 4-6.

- During his July 27, 2007 conversation with State Street, Mr. Liebre said that he wanted to redeem Memorial Hermann out of LDBF immediately and move the money into a money market fund. R. 56.1 Stmt. ¶ 44. However, State Street told him they could not do so without Memorial Hermann's direct authorization. *Id.*

- On July 27, Mr. Liebre immediately telephoned Mr. DeBlance of Memorial Hermann. R. 56.1 Stmt. ¶ 46. Mr. Liebre relayed to Mr. DeBlance what State Street had told him as set forth above, and he strongly recommended redeeming Memorial Hermann's investments in the Fund immediately. *Id.* Mr. DeBlance told Mr. Liebre that his boss, MHHS's CFO Carrol Aulbaugh, was out of the office on vacation that day and that he would need to speak with him before any decisions could be made. *Id.*

- Between Friday, July 27 and Tuesday July 31, Mr. DeBlance left messages for Mr. Aulbaugh. R. 56.1 Stmt. ¶ 48.

- During this time, Mr. Liebre continued to communicate with State Street about alternative investment options for Memorial Hermann. R. 56.1 Stmt. ¶ 49. On July 30, 2007, State Street sent Mr. Liebre fact sheets for three money market funds as alternatives. *Id.* State Street internally communicated that Memorial Hermann would be redeeming out of LDBF by the next business day. R. 56.1 Stmt. ¶ 45.

- On July 31, 2007, Mr. Aulbaugh returned Mr. Liebre's phone call from July 27. R. 56.1 Stmt. ¶ 50. Mr. Liebre reiterated what State Street had told him on July 27 and what he had told Mr. DeBlance on July 27. *Id.* Mr. Liebre communicated what he characterized as a "strong and definitive" recommendation that Memorial Hermann redeem out of LDBF immediately. R. 56.1 Stmt. ¶ 52.

- During this conversation with Mr. Liebre, Mr. Aulbaugh made the decision not to redeem from LDBF.  R. 56.1 Stmt. ¶ 53.  Mr. Aulbaugh has testified that he alone made the decision.  *Id.*  Mr. Aulbaugh did not consult with any members of MHHS's Investment Subcommittee, or the HePIC Board (he is a member of neither), or his superiors about this decision.  R. 56.1 Stmt. ¶ 57.  Mr. Aulbaugh also testified that he had sufficient information to make the decision, and did not request additional information at that time.  R. 56.1 Stmt. ¶¶ 54, 56.

- Memorial Hermann is suing State Street to recover the difference between its initial LDBF investments in 2005 and the liquidation payments it received in 2008.  R. 56.1 Stmt. ¶ 69.  Plaintiffs' proposed damages expert, Karyl Van Tassel, calculates plaintiffs' combined capital losses as $42,864,815.  *Id.*

- As detailed above, in February 2010, as part of State Street's settlement with the SEC and state regulators, Memorial Hermann received a payment through a Fair Fund in the amount of approximately $41 million.  R. 56.1 Stmt. ¶ 70.  State Street is entitled to a credit against any judgment in this action equal to approximately $38 million.  *Id.*  Memorial Hermann also settled for a confidential amount with Mr. Liebre and Cambridge and gave them general releases, before Mr. Liebre's testimony.  R. 56.1 Stmt. ¶ 71.  Mr. Liebre's testimony was taken as an evidentiary deposition since Mr. Liebre is beyond the subpoena power of the Court.  R. 56.1 Stmt. ¶ 6.

- The following table summarizes MHHS's and HePIC's net investment gains and/or losses had they elected to redeem out of LDBF on certain of the relevant dates described above.[9]  R. 56.1 Stmt. ¶¶ 72, 73.  For example, if MHHS and HePIC had redeemed from LDBF on July 31, 2007, Memorial Hermann would not have sustained any losses.  *Id.*  The $38 million Fair Fund payment that Memorial Herman received exceeds its cumulative losses through November 26, 2007.  R. 56.1 Stmt. ¶ 74.

| Date | Event | MHHS's net gain/(loss) | HePIC's net gain/(loss) | Cumulative gain/(loss) |
|------|-------|------------------------|-------------------------|------------------------|
| 7/27/2007 | Memorial Hermann's investment advisor recommends immediate redemption from LDBF | $2.2 million | $76,100 | $2.3 million |
| 7/31/2007 | Memorial Hermann's CFO decides not to redeem out of LDBF | $0.3 million | ($0.3 million) | $0 |
| 8/31/2007 | Memorial Hermann remains in LDBF | ($24.4 million) | ($5.6 million) | ($29.9 million) |
| 11/26/2007 | Memorial Hermann remains in LDBF | ($24.6 million) | ($5.6 million) | ($30.1 million) |

[9] The cumulative gain/loss numbers reflected in the table are derived from Exhibit 27 to the expert report of Andrew S. Carron, dated January 15, 2010.  *See* Declaration of Andrew S. Carron, dated June 2, 2010, Exs. A and B.  Plaintiffs' experts have not challenged these figures, or submitted their own.

## ARGUMENT

Because plaintiffs bear the burden to prove all the elements of their claims, a defendant is entitled to summary judgment where it demonstrates "that there is an absence of evidence to support [plaintiffs'] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Plaintiffs then "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original; citation and internal quotation marks omitted). Plaintiffs must make a "showing sufficient to establish the existence of [every] element essential to [their] case, and on which [they] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Evidence that "is merely colorable, or is not significantly probative," cannot defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). Raising "some metaphysical doubt as to the material facts" cannot defeat summary judgment. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. As the Second Circuit long has held, "[t]he litigant opposing summary judgment, therefore, may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) (citation and internal quotation marks omitted).

Here, plaintiffs' Second Amended Complaint alleges five causes of action against State Street: fraud/fraudulent inducement, negligent misrepresentation, breach of contract, breach of fiduciary duty, and breach of trust. Compl. at 6-10.[10] All of these claims should be dismissed due to Memorial Hermann's responsibility for any investment losses incurred after July 2007, by which point the undisputed facts demonstrate it made an informed decision not to redeem out of LDBF. Memorial Hermann must bear responsibility for its later losses, which resulted from

---

[10] References to the complaint refer to plaintiffs' Second Amended Complaint filed on March 14, 2008 ("Compl.").

risks it consciously assumed.  As a matter of law, Memorial Hermann failed to mitigate its losses, and Memorial Hermann's decision not to join other investors in leaving the Fund stands as a superseding cause of its losses.  The $38 million Fair Fund payment that Memorial Hermann received as part of State Street's regulatory settlement far exceeds the investment losses Memorial Hermann experienced, well beyond the end of July.  R. 56.1 Stmt. ¶¶.72-74  Given that there are no further damages to litigate, the Court should grant State Street summary judgment.

In addition, Memorial Hermann's fraud-in-the-inducement theories under common law fail as a matter of law because the undisputed record shows that the purported misstatements alleged by Memorial Hermann were in fact accurate and were not material misrepresentations.

I.   **MEMORIAL HERMANN'S INFORMED DECISION NOT TO REDEEM OUT OF LDBF AT THE END OF JULY 2007 REFLECTS A FAILURE TO MITIGATE DAMAGES, AND STATE STREET IS NOT RESPONSIBLE FOR MEMORIAL HERMANN'S LATER LOSSES**

State Street in no way concedes the validity of any of Memorial Hermann's allegations of grossly negligent management of LDBF or material misrepresentations regarding LDBF.  State Street will vigorously dispute these assertions if there is a trial.  A trial on these issues is unnecessary, however, because Memorial Hermann cannot legally recover any damages in addition to the $38 million it has already received through the Fair Fund.  This sum exceeds the investment losses that Memorial Hermann incurred well past the end of July 2007, by which time Memorial Hermann had indisputably been informed of LDBF's material subprime mortgage exposure and the very negative impact that this exposure was having on the Fund's performance in the growing subprime market liquidity crisis.  R. 56.1 Stmt. ¶¶.39, 44, 46, 51, 52, 72-74.  This conduct reflects an intentional and informed decision by Memorial Hermann to ride out the subprime crisis by remaining invested in LDBF.

### A.    Memorial Hermann Had a Duty to Mitigate Its Damages and Failed to Do So

A plaintiff may not recover damages that were "avoidable by the use of reasonable precautions on his part."  *Burnham v. Mark IV Homes, Inc.*, 441 N.E.2d 1027, 1034 (Mass. 1982) (citing *Fairfield v. Salem*, 100 N.E. 542 (Mass. 1913)); *see also McKenna v. Comm'r of Mental Health*, 199 N.E.2d 686, 688 (Mass. 1964) (citing *McClelland v. Climax Hosiery Mills*, 169 N.E. 605, 609-10 (N.Y. 1930) (Cardozo, J., concurring)); *Pulaski Bank & Trust Co. v. Tex. Am. Bank*, 759 S.W.2d 723, 735 ("[D]amages that might be avoided or mitigated are not recoverable. . . . Texas has applied mitigation in both tort and breach of contract cases.").[11]   So, for example, where an investor claims that its broker committed a breach of fiduciary duty by failing to honor its investment intentions or criteria, the investor is obligated to take steps to protect its interests after learning of the wrongdoing.  *See Bachini v. A.G. Edwards*, No. 03-1068, 2008 WL 2359727, at *5-6 (Mass. Super. June 5, 2008) (upholding decision that, although broker breached fiduciary duty by failing to disclose fully the risks her investments entailed, plaintiff "fail[ed] to mitigate losses when she learned . . . that her investments were not conservative").  In short, a plaintiff cannot "sit still and let damages pile up when reasonable steps would prevent further losses." *Pulaski*, 759 S.W.2d at 735 (citing *David H. v. Spring Branch Ind. Sch. Dist.*, 569 F. Supp. 1324, 1340 (S.D. Tex. 1983)).

Similarly, in *Drummond v. Morgan Stanley & Co.*, No. 95 Civ. 2011 DC, 1996 WL 631723, at *2 (S.D.N.Y. Oct. 31, 1996), the plaintiff held bonds he knew to be declining in value at the time the defendant rescinded a transaction involving the bonds.  *Id*.  Judge Chin noted that the plaintiff could have mitigated his damages by accepting a third party's bid for the bonds,

---

[11] *See also Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*, 864 N.E.2d 518, 543-44 (Mass. App. Ct. 2007) (applying duty to mitigate in contract case); *Brian v. B. Sopkin & Sons*, 49 N.E.2d 894, 895 (Mass. 1943) (duty arises in tort cases); *Moulton v. Alamo Ambulance Serv., Inc.*, 414 S.W.2d 444, 449 (Tex. 1967) (applying duty to mitigate in tort case); *Doe v. Harbor Schs., Inc.*, 843 N.E.2d 1058, 1065 (Mass. 2006) (breach of fiduciary duty sounds in tort).

made only "one to three days after the cancellation," but instead waited six months, during which time the bonds' value continued to decline. *Id.* Because "a reasonable factfinder could only conclude that plaintiff failed to make reasonable efforts to mitigate damages," the court ordered on summary judgment that the damages recoverable by the plaintiff would be limited by his failure to mitigate. *Id.* at *2-3.

Analogous securities law cases recognize the same mitigation principles. "A party cannot recover the part of their loss caused by their own failure to take reasonable steps to avoid further harm once they had reason to know of the wrongdoing." *Van Syckle v. C.L. King & Assocs., Inc.*, 822 F. Supp. 98, 102 (N.D.N.Y. 1993) (cited in *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.*, No. 93 CIV. 3707 (LAP), 2001 WL 99856, at *6 (S.D.N.Y. Feb. 5, 2001)). A plaintiff is obligated to mitigate damages when "'the nature of the danger of holding [the] securities . . . [becomes] apparent,' and may not recover 'that part of their loss caused by their own failure, once they had reason to know of the wrongdoing, to take reasonable steps to avoid further harm.'" *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1370-1371 (N.D. Cal. 1987) (quoting *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 620 (9th Cir. 1981) (granting partial summary judgment based on plaintiffs' failure to mitigate).

### 1.   May 2007:  Memorial Hermann ignores its investment advisor's recommendation to reduce its LDBF target allocation following a subprime market event

The conference call on July 27, 2007 was not the first discussion that State Street had with Memorial Hermann's investment advisor about LDBF's underperformance due to its exposure to the subprime market. Prior to the subprime crisis in the summer of 2007, LDBF underperformed in the first quarter of 2007 as a result of the Fund's subprime market exposure. R. 56.1 Stmt. ¶ 39. In early May 2007, State Street discussed the Fund's exposure to the subprime housing market with Mr. Liebre. *Id.* State Street informed Mr. Liebre that while

LDBF's exposure to the subprime market was one of the drivers of the Fund's substantial

outperformance in 2006, the Fund underperformed in the first quarter of 2007 due to its exposure

to subprime.  *Id.*  After discussing LDBF's subprime exposure with State Street, Mr. Liebre

indicated in his report to MHHS's Investment Subcommittee on June 8, 2007, that the LDBF

target allocation should be reduced from 13% of operating assets to 5%, constituting a reduction

from approximately $81 million to $31 million.  R. 56.1 Stmt. ¶ 40  The Investment

Subcommittee had previously approved the practice of periodic rebalancing of the target

allocations; however, MHHS did not implement the reduction, and MHHS's LDBF investment

remained at $81 million.  R. 56.1 Stmt. ¶¶ 41,42.

> **2.**     **July 27, 2007:  Memorial Hermann's investment advisor recommends an immediate redemption out of the Fund because of LDBF's critical and deteriorating situation**

On July 27, 2007, Memorial Hermann's agent, Mr. Liebre, was informed by State Street

that LDBF had underperformed by 500 basis points (or 5%) due to the Fund's substantial

subprime exposure and the sudden implosion of the subprime market, and that this

underperformance was likely to continue.  R. 56.1 Stmt. ¶ 44.  Although it was just a money

manager and not an investment advisor to Memorial Hermann, State Street all but recommended

to Mr. Liebre that Memorial Hermann redeem out of the Fund and/or transfer into one of State

Street's various money market funds, saying it could make either option happen by the next

business day.  R. 56.1 Stmt. ¶¶ 4-6, 44.  Mr. Liebre wanted to immediately redeem into a money

market fund, but State Street could not do so without Memorial Hermann's direct authorization.

R. 56.1 Stmt. ¶ 44.  Mr. Liebre called Mr. DeBlance at Memorial Hermann immediately.  R. 56.1

Stmt. ¶ 46.  Mr. Liebre testified as follows about his conversation with Mr. DeBlance:

> Q.     Did you tell Mr. DeBlance in that conversation on
>        July 27th what the major problem [was]?
>
> A.     Yes.

Q.    What did you tell him the major problem was?

A.    That they were heavily involved in the subprime area, very heavily involved.

Q.    Very heavily involved in subprime.  And he told you that notwithstanding your recommendation -- and, by the way, did you put it in what you would characterize as strong terms, a strong opinion to get out to Mr. DeBlance?

A.    Yes.

Q.    What kind of picture did you paint for him with regard to LDBF on that phone call on July 27th, 2007?

A.    I pictured when you had a -- a Limited Duration Bond Fund that was losing a four percent -- almost five percent, that is a significant, significant drop, and the rationale behind it, which was the subprime mortgage crisis, is something that it doesn't appear to be going way, because what they had said was there's no market for anyone who wants to buy these securities, and it's not going to get better and it's going to get worse.

Q.    Who had told you that?

A.    On this phone conversation between Nick Mavro, Jim Hopkins and Beth-Anne Flynn [all of State Street].  They didn't -- they said it would -- we don't know where it's going to go, but it doesn't appear to be getting better and I don't know if it will ever come back.

Q.    And State Street told you that on that conversation on July 27th?

A.    That's right.

Q.    And you said that to Mr. DeBlance on that same day?

A.    I said that to -- to Lynn DeBlance.

Q.    So, in sum and substance, you painted a pretty dire picture to Mr. DeBlance, correct?

A.      Yes.

*Id.*  Mr. DeBlance informed Mr. Liebre that before any decisions could be made, he needed to speak with his boss, Mr. Aulbaugh, who was out of the office that day on vacation.  *Id.*

Mr. Liebre did not have the authorization from Mr. Aulbaugh to directly communicate with MHHS's Investment Subcommittee.  R. 56.1 Stmt. ¶ 47.  Nonetheless, he continued to communicate with State Street about alternative money market funds for Memorial Hermann; on July 30, 2007, at his request, State Street sent Mr. Liebre fact sheets for three money market funds.  R. 56.1 Stmt. ¶ 49.  On the same day, State Street forwarded these facts sheets to Memorial Hermann, and was standing by for the authorization to immediately process Memorial Hermann's redemption.  *Id.*

Had Memorial Hermann elected to redeem on July 27, 2007, it would have realized a net cumulative gain of $2.3 million on its investments.  R. 56.1 Stmt. ¶ 72.

### 3.      July 31, 2007:  Memorial Hermann's CFO decides not to redeem out of LDBF

Despite Mr. DeBlance's attempts to reach Mr. Aulbaugh beginning on Friday, July 27, Mr. Aulbaugh did not return Mr. Liebre's call until July 31.  R. 56.1 Stmt. ¶¶ 48, 50.  During their phone conversation, Mr. Liebre relayed to Mr. Aulbaugh what State Street had communicated to him on July 27 and what he had informed Mr. DeBlance of on July 27.  R. 56.1 Stmt. ¶ 51.  Mr. Liebre further communicated what he characterized as a "strong and definitive" recommendation based on the State Street information that Memorial Hermann redeem out of LDBF immediately.  R. 56.1 Stmt. ¶ 52.

During the call with Mr. Liebre, Mr. Aulbaugh made the unilateral decision that Memorial Hermann not redeem from LDBF.  R. 56.1 Stmt. ¶ 53.  Mr. Aulbaugh has testified that he alone made the decision not to redeem, he felt he had all the information he needed to make the decision, and he did not request any additional information at that time.  R. 56.1 Stmt. ¶¶ 53,

- 15 -

54, 56.  Mr. Aulbaugh did not bring the LDBF situation to the attention of MHHS's Investment

Subcommittee or HePIC's Board (he is a member of neither), nor did he consult with any of his

superiors.  R. 56.1 Stmt. ¶ 57.

Had MHHS and HePIC elected to redeem on July 31, 2007, Memorial Hermann would

not have incurred any cumulative losses.  R. 56.1 Stmt. ¶¶ 72, 73.

### 4.   August 2007:  Memorial Hermann ignores investment advisor's recommendation to move to LDBF II

On August 2, 2007, State Street sent an email to Memorial Hermann and Cambridge,

stating that LDBF continued to underperform due to its subprime exposure, and that it had sold a

significant portion of LDBF's AAA-rated cash bonds.  R. 56.1 Stmt. ¶ 59.  On August 7, 2007,

State Street presented Memorial Hermann with the option of transferring its investments to a new

fund called, "LDBF II" R. 56.1 Stmt. ¶ 60, which was intended to protect Memorial Hermann's

investments from other investors' redemptions that could have reduced the Fund's liquidity.  *Id.*

Again, Mr. Liebre recommended the shift to LDBF II, but Memorial Hermann remained in

LDBF.  *Id.*

State Street continued to provide Memorial Hermann additional information.  On August

8, 2007, State Street provided Memorial Hermann with LDBF's holdings as of June 30, 2007, as

well as Audited Financial Statements.  R. 56.1 Stmt. ¶¶.61, 63  Both LDBF's holdings and the

Audited Financial Statements included pages and pages listing ABS collateralized by home

equity loans, as well as the derivative contracts in the Fund.  R. 56.1 Stmt. ¶¶ 62, 64, 65.  State

Street also provided information throughout August 2007 as to the number of investors that had

not yet redeemed from the Fund.  R. 56.1 Stmt. ¶ 67.[12]

---

[12] Mr. Aulbaugh testified that he knew throughout this period that other investors were
redeeming out of LDBF.  R. 56.1 Stmt. ¶ 67.

Mr. Aulbaugh did not inform the Investment Subcommittee about a problem with the LDBF investment until August 13, 2007.  R. 56.1 Stmt. ¶ 66.  Even then, he merely stated "[the LDBF] strategy has been adversely affected in the downward valuation of their underlying assets backed AAA and AA securities."  *Id.*  He indicated that LDBF would be taken up as an issue in the ordinary course at the Investment Subcommittee's next meeting, in September.  *Id.*

Had MHHS and HePIC elected to redeem as late as August 31, 2007, Memorial Hermann would have realized a net cumulative loss of $29.9 million, which is still $8.1 million less than the Fair Fund payment which Memorial Hermann received.  R. 56.1 Stmt. ¶¶ 72, 73.

Memorial Hermann's failure to mitigate its damages prevents it from recovering any losses after the end of July 2007.  Notwithstanding State Street's disclosures and warnings and the strong recommendation of its investment advisor to redeem from LDBF, Memorial Hermann remained in the Fund in the midst of a rapidly deteriorating market.  *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. at 1370 ("A plaintiff is thus obligated to mitigate his damages as soon as 'the nature of the danger of holding [the] securities . . . [becomes] apparent,' and may not recover 'that part of their loss caused by their own failure, once they had reason to know of the wrongdoing, to take reasonable steps to avoid further harm.'") (quoting *Arrington*, 651 F.2d at 620).

**B.    Plaintiffs Cannot Recover Damages That Were Not Proximately Caused by State Street's Alleged Misconduct**

Just as a plaintiff cannot recover damages resulting from a failure to mitigate, a plaintiff also cannot recover damages which were not proximately caused by a defendant's misconduct.  Causation is an element of both contract and tort claims (including fraud and breach of fiduciary duty), requiring that the plaintiff prove that the damages sought resulted from the defendant's alleged wrongful act.  *See Employees Ret. Sys. v. Putnam LLC*, 294 S.W.3d 309, 315-318 (Tex. App. 2009) (holding that plaintiff could not recover damages under its common law fraud, negligent misrepresentation and breach of contract claims because the "damages did not result

- 17 -

from [defendant's] alleged wrongful act"); *Si Kyu Kim v. Harstan, Ltd*., 286 S.W.3d 629, 635 (Tex. App. 2009) (affirming grant of summary judgment for failure to show causation with respect to fiduciary duty, fraud, and negligent misrepresentation claims, and noting that "[b]reach of fiduciary duty requires a showing that the breach caused damages").[13]  It is hornbook law that a superseding cause of a plaintiff's damages relieves the defendant of liability for subsequent losses.[14]

      Case law under the federal securities laws examining loss causation principles pertaining to investment losses is highly instructive.  When a party fails to sell despite reason to know of the wrongdoing, "[he] has, in effect, made a second investment decision unrelated to his initial decision to purchase the stock," and he "will not be able to avail himself of any further decrease in the value of the security after that date."  *Harris v. Am. Inv. Co.*, 523 F.2d 220, 228 (8th Cir. 1975) (citing *Cant v. Becker & Co.*, 379 F. Supp. 972, 975 (N.D. Ill. 1974)); *Nye v. Blyth Eastman Dillon & Co., Inc.*, 588 F.2d 1189, 1198 (8th Cir. 1978) (stating that the choice to retain shares after the discovery of wrongdoing results in an independent investment decision that does not affect the defendant's liability for the fraud, and that "[a]ny increase or decrease in the value of the stock after a reasonable time is causally unrelated to the initial decision to purchase and

---

[13] *See also Meehan v. Shaughnessy*, 535 N.E.2d 1255, 1266 (Mass. 1989) (causation required for breach of fiduciary duty claim); *Lobao v. Leahy*, 2008 Mass. App. Div. 7, at *3 (Mass. Dist. Ct. 2008) (causation required for negligent misrepresentation claim); *Cespedes v. C&C Constr. Corp.*, No. 042203B, 2008 WL 5608972, at *8 (Mass. Super. Ct. Dec. 2, 2008) (causation required for breach of contract claim).

[14] As set forth in the Restatement (Second) of Torts:

> A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm. Therefore, if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm.

Restatement (Second) of Torts § 440 cmt. b (1965).

can serve to neither decrease nor increase the amount of damages"). The decision to remain

invested in the hopes of a recovery in the market value of a security "involve[s] precisely that

weighing of risks that constitutes an investment decision." *Nye*, 588 F.2d at 1199. Where

plaintiff's superseding investment decisions sever the causal connection between the defendants'

conduct and the plaintiff's losses, recoverable damages are "limited by what they would have

realized had they acted to preserve their assets or rights when they first learned of the fraud or

had reason to know of it." *Arrington*, 651 F.2d at 620 (affirming district court's ruling limiting

recoverable damages where "the nature of holding securities on margin in a declining market

must have become apparent" by district court's cut-off date for damages calculation). The Court

in *Drummond* similarly held that a plaintiff who "declines other offers to purchase the securities

in effect makes a new investment decision as to which he or she must suffer the consequences."

*Drummond*, 1996 WL 631723, at *2.

As described above, the undisputed record shows that when the subprime crisis hit in July

2007, State Street informed Memorial Hermann through its investment advisor of LDBF's

critical situation. R. 56.1 Stmt. ¶ 44. Mr. Aulbaugh, then made an informed decision on

Memorial Hermann's behalf not to redeem out of the Fund. R. 56.1 Stmt. ¶¶ 44, 46, 51-53, 56.

That decision not to redeem on July 31 was tantamount to a new investment decision, and this

superseding investment decision severs the causal connection between State Street's alleged

misconduct and Memorial Hermann's continuing losses. *Harris*, 523 F.2d at 228.

## II.  PLAINTIFFS' FRAUD/FRAUDULENT INDUCEMENT AND NEGLIGENT MISREPRESENTATION CLAIMS FAIL BECAUSE THE COMPLAINT DOES NOT ALLEGE MATERIAL MISREPRESENTATIONS THAT ARE ACTIONABLE AS A MATTER OF LAW

Plaintiffs allege that State Street knowingly, recklessly or negligently made material

misrepresentations regarding LDBF's investment objective, which Memorial Hermann

justifiably relied upon in contracting with State Street for their LDBF investments. Compl. at

pp.7-9.  But plaintiffs' claims that State Street failed to adequately disclose LDBF's investment objective, portfolio composition, and its strategy are flatly contradicted by the disclosures that State Street made to Memorial Hermann and Mr. Liebre.  To make their case, plaintiffs isolate a quotation (or in some cases a partial quotation) from a LDBF Fact Sheet; however, viewed in the context of the entire "mix of information" provided to plaintiffs, none of the misrepresentations alleged by plaintiffs can reasonably be read to have misled them about the nature of their investment in the Fund.  A material misrepresentation is an essential element of a fraud/fraudulent inducement claim.  *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47-48 (Tex. 1998) (citation omitted); *Haase v. Glazner*, 62 S.W.3d 795, 798-799 (Tex. 2001).[15]  A representation is "material" if a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question.  *See Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 613 (Tex. App. 2000).  An action for negligent misrepresentation requires a false representation asserted without exercising reasonable care which was justifiably relied upon.  *See Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

> ### A.      State Street Fully and Accurately Disclosed LDBF's Investment Objective, Portfolio Composition and Strategy

Plaintiffs' pre-contractual fraud/fraudulent inducement and negligent misrepresentation claims focus on a single statement contained in a LDBF Fact Sheet, which said that LDBF seeks to "maximize income while preserving capital by investing in a diversified portfolio of highly

---

[15] Massachusetts law also requires that the alleged misrepresentation or false statement be material under all three causes of action.  *See Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 225 (1st Cir. 2003); *Sax v. DiPrete*, 639 F. Supp. 2d 165, 173 (D. Mass. 2009); *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 41 (1st Cir. 1998).

rated fixed income securities." [16]  Compl. ¶¶ 29, 35.  However, plaintiffs ignore the remainder of

the Fact Sheet's content, the presentations, holdings report, Fund Declaration, and Agreements of

Trust – all of which provided plaintiffs with complete and accurate information about the nature

of LDBF's investment objective, portfolio composition and strategy.  *Duperier v. Tex. State*

*Bank*, 28 S.W.3d 740, 745 (Tex. App. 2000) (stating that a misrepresentation is material if there

is "a substantial likelihood that proper disclosure would have been viewed by a reasonable

investor as significantly altering the total mix of information made available").  Following are

the detailed pre-contractual disclosures which State Street made to Memorial Hermann and Mr.

Liebre/Cambridge.

LDBF Presentations.  State Street made two pre-contractual presentations to Memorial

Hermann and Cambridge on August 12, 2004 (the "August 2004 Presentation") and November

15, 2004 (the "November 2004 Presentation"), which featured information about LDBF.  R. 56.1

Stmt. ¶ 11.  The August 2004 Presentation proposed two fund options for consideration:  the

SSgA Prime Money Market Fund and LDBF.  R. 56.1 Stmt. ¶ 12.  The presentation emphasized

"preservation of capital" as the first core portfolio objective of the SSgA Prime Money Market

Fund and noted that this fund offered daily liquidity.  R. 56.1 Stmt. ¶ 13.  In contrast, the August

2004 Presentation never stated LDBF's objective as "preservation of capital," but rather that

LDBF's investment philosophy was "structured to maximize risk-adjusted returns" and that

LDBF's goal was to "generate returns of LIBOR + 50-75 bps (basis points)."  R. 56.1 Stmt. ¶ 14.

---

[16] There is no documentary evidence that prior to MHHS' initial LDBF investment in January 2005, Memorial Hermann or Cambridge even *received* a LDBF Fact Sheet.  Mr. Liebre (who gathered and handed out the materials at Investment Subcommittee meetings), Mr. Aulbaugh, Mr. DeBlance, and an Investment Subcommittee member, Mr. Montague, all testified that they do not recall seeing any Fact Sheets before the investment in LDBF.  R. 56.1 Stmt. ¶ 30.  A single Investment Subcommittee member stated that he recalls seeing a fact sheet, although he could not recall from whom, or anything else at all from the meeting.  *Id.*  Regardless, as discussed, the LDBF Fact Sheet did not contain any material misrepresentations.

The August 2004 Presentation also informed Memorial Hermann and Mr. Liebre that LDBF was used as a "portable alpha vehicle," which is a strategy specifically used to generate excess returns. R. 56.1 Stmt. ¶ 16. It further disclosed that 51.4% of LDBF was concentrated in a single sector, ABS, and 84.8% of the Fund was concentrated in "structured products" (ABS, CMBS and MBS. R. 56.1 Stmt. ¶ 17.

The November 2004 Presentation focused on LDBF alone and highlighted State Street's expertise in structured products. R. 56.1 Stmt. ¶ 24. It reiterated LDBF's aggressive return objective of 50 to 75 basis points over the LIBOR benchmark, and also showed an increase in the Fund's ABS concentration to 56.7%, with structured products investments up to 86.2%. R. 56.1 Stmt. ¶ 25.

LDBF Holdings. After the August 2004 Presentation, "in order to get more insight into the Fund," Mr. Liebre requested a holdings report for LDBF, which State Street sent to him on August 19, 2004. R. 56.1 Stmt. ¶ 20. The LDBF holdings showed that the Fund was concentrated in a single sector, ABS backed by home equity loans, by categorizing 53 out of the 70, or 75.7%, of the ABS owned by the fund as "ABS-HEL" or "ABS-HELIO." *Id*. Mr. Liebre understood that "ABS-HEL" meant home equity loans backed by second mortgages. R. 56.1 Stmt. ¶ 21. [17]   Additionally, the LDBF holdings report contained the CUSIP number, Bloomberg name, sector and credit rating for each of the Fund's securities. R. 56.1 Stmt. ¶ 20. Mr. Liebre

---

[17] Plaintiffs' expert Mr. Weiner contends that the LDBF holdings sent to Mr. Liebre on August 19, 2004 were misstated because there was a discrepancy between the holdings worksheet sent to Mr. Liebre and the "Official Holdings" worksheet for June 30, 2004. R. 56.1 Stmt. ¶ 23. However, even if this were the case, the relevant undisputed fact remains that the LDBF holdings sent to Mr. Liebre showed that a substantial number of the Fund's bonds were collateralized by home equity loans. R. 56.1 Stmt. ¶ 20. Mr. Weiner admitted that providing the "Official Holdings" instead of the holdings worksheet sent to Mr. Liebre would not have made any difference to a reasonable investor in making a decision to invest in LDBF. R. 56.1 Stmt. ¶ 23.

testified that he was aware that the CUSIP number could be entered into a Bloomberg system in order to determine the level of subprime exposure in each security.  *Id.*

LDBF Fund Declaration.  State Street also sent Memorial Hermann the LDBF Fund Declaration on December 22, 2004.  R. 56.1 Stmt. ¶ 28.  The Fund Declaration set forth the permitted classes of assets and investment strategy of the Fund, stating that "the fund seeks to achieve its objective by investing . . . asset-backed securities . . . [and] derivative securities, including but not limited to financial futures contracts, options and swaps . . . ."  R. 56.1 Stmt. ¶ 29.

Agreements of Trust.  In January and September of 2005, MHHS and HePIC respectively entered into virtually identical Agreements of Trust ("Agreements") with State Street.  R. 56.1 Stmt. ¶ 32.  The Agreements stated that State Street could "retain, purchase and invest in any securities, regardless of their character, their quality, any requirement of diversification or any other principle applicable to the investments of fiduciaries."  R. 56.1 Stmt. ¶ 34.  The Agreements, which are governed by the laws of Massachusetts, further provided that State Street shall "not be liable for any error of judgment or law on its own part, but it shall be liable only for its own willful default or gross negligence."  R. 56.1 Stmt. ¶ 35.  Therefore, the Agreements provided State Street with broad authority to invest in any securities, with no diversification requirement or restriction on the use of derivatives.

LDBF Fact Sheet.  In May 2005, prior to HePIC's LDBF investment, Memorial Hermann and Mr. Liebre/Cambridge received a LDBF Fact Sheet.  R. 56.1 Stmt. ¶ 30.  The Fact Sheet provided LDBF's portfolio characteristics including the Fund's sector allocation and credit quality.  R. 56.1 Stmt. ¶ 31.  Like the August and November 2004 Presentations detailed above, the Fact Sheet showed the Fund's heavy concentration in the ABS sector.  *Id.*  Similar to the LDBF Fund Declaration of Trust detailed above, the Fact Sheet stated that LDBF "may utilize

futures, options, and swaps." *Id*.  Further, the Fact Sheet stated that the Fund was subject to

more volatility than a traditional money market fund, and that the Fund was not to be used for

daily liquidity.  *Id*.  Finally, with regard to diversification, plaintiffs contend that the general

statement of the Fund's investment objective was misleading because it states that the strategy

seeks to invest in a "diversified portfolio."  Compl. ¶ 15.  However, plaintiffs ignore the

contractual disclaimer about diversification discussed above, as well as the fact that in the very

same Fact Sheet, the specific sector allocation is provided which showed that the Fund was

heavily concentrated in the ABS sector.[18]  R. 56.1 Stmt. ¶¶ 31, 34, 37.

   Memorial Hermann and its investment advisor were accurately informed that:

(1) LDBF's investment philosophy was to "maximize risk-adjusted returns"; (2) LDBF had an

aggressive return objective of 50-75 basis points over the benchmark LIBOR; (3) the majority of

the Fund was composed of securities in a single sector, ABS; (4) a substantial number of

LDBF's bonds were backed by home equity loans, with the identifiers fully provided to

determine they were subprime mortgages; (5) State Street was delegated by contract with broad

authority to invest Memorial Hermann's funds, without accounting for diversification or other

similar investment principles; and (6) LDBF's permitted classes of assets included derivative

securities.  Given the overall mixture of information provided to Memorial Hermann and its

investment advisor about the Fund, plaintiffs cannot carry their burden of offering evidence that

---

[18] In determining the materiality of an allegedly false or misleading statement in a document, the
document in question must be read "as a whole."  *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d
Cir. 2003) (affirming dismissal in favor of defendants because prospectus did not materially
mislead investors); *In re IAC/InterActiveCorp Sec. Litig.*, No. 04 Civ. 744(RJH), 2010 WL
996483, at *6 (S.D.N.Y. Mar. 19, 2010) (Holwell, J.) ("Statements in a prospectus, for example,
should be read in the context of the whole document.") (granting summary judgment to
defendants).  Thus, the inquiry does not focus on whether "'particular statements, taken
separately, were literally true, but whether defendants' representations, taken together and in
context, would have misled a reasonable investor about the nature of the [investment].'"  *Id.*
(quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990))
(alterations in original).

State Street made any material misrepresentations prior to plaintiffs' investment in LDBF.

*Duperier*, 28 S.W.3d at 745; *In re IAC/InterActiveCorp Sec. Litig.*, 2010 WL 996483, at *6.

Accordingly, plaintiffs' fraud/fraudulent inducement and negligent misrepresentation claims also

must fail.

<u>**CONCLUSION**</u>

For the reasons set forth herein, in State Street's Rule 56.1 Statement, and in the Skinner

Declaration, State Street respectfully requests that the Court grant summary judgment dismissing

all five causes of action against State Street in plaintiffs' Second Amended Complaint.

Dated:  June 2, 2010                               ROPES & GRAY LLP

By: <u>/s/ Harvey J. Wolkoff</u>
Harvey J. Wolkoff
Robert A. Skinner
Daniel J. Maher
One International Place
Boston, MA  02110
Tel: (617) 951-7000
Fax: (617) 951-7050
harvey.wolkoff@ropesgray.com
robert.skinner@ropesgray.com
daniel.maher@ropesgray.com

*Attorneys for Defendant State Street Bank and*
*Trust Company*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 2, 2010, I caused a true and correct copy of the foregoing document to be served upon the following counsel of record electronically.

<u>/s/ Lila A. Palmer</u>
Lila A. Palmer

Edwin G. Schallert
Jeremy Klatell
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

John R. Nelson
LOCKE LORD BISSELL & LIDDELL LLP
100 Congress, Suite 300
Austin, TX 78701

Caren S. Sweetland
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002

Robert Burford
BURFORD & MANEY PC
700 Louisiana, Suite 4600
Houston, TX 77002

John J. Butts, Esq.
Steven Cherry
Felicia Ellsworth
Kevin Prussia
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109

Thomas J. Dougherty
Peter Simshauser
Michael S. Hines
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts  02108

Lewis R. Clayton
Jonathan Hurwitz
Aliza Balog
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON
1285 Avenue of the Americas
New York, NY  10019-6064

Steven L. Severson
Justin Krypel
Debbie Ellingboe
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

David E. Lurie
Thomas Lent
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109

Samuel H. Rudman
David A. Rosenfeld
Evan J. Kaufman
Carolina Torres
Mark Reich
ROBBINS GELLER RUDMAN & DOWD
LLP
58 S. Service Road, Ste. 200
Melville, NY 11747