# In The Matter Of:

*IN RE: STATE STREET BANK AND TRUST CO*

---

ELIZABETH SHEA

*September 29, 2009*

---

***CONFIDENTIAL***
***SUBJECT TO PROTECTIVE ORDER***

***MERRILL CORPORATION***
*25 West 45th Street - Suite 900*
*New York, NY 10036*
*PH: 212-557-7400 / FAX: 212-692-9171*

SHEA, ELIZABETH - Vol. 1

No. 08-05442
HPOPS v. State Street
Memo in Resp to
M/Strike Weiner
Exhibit 4

ELIZABETH SHEA

01:18 A. Yes.
01:18 Q. True?
01:18 A. Yes.
01:18 Q. Commercial mortgage-backed securities rated investment grade by Moody's and ERISA eligible?
01:18 A. Right.
01:18 Q. Right?
01:18 A. Yeah.
01:18 Q. Derivative securities, including, but not limited to, financial futures contracts, options and SWAPS?
01:18 A. Yes.
01:18 Q. Deposits and other debt instruments of domestic banks for both the U.S. and non- U.S. branchs?
01:18 A. Yep.
01:18 Q. And the last one, bank commingled funds maintained by the trustee which have characteristics with the overall investment objectives?
01:18 A. Right.
01:18 Q. So when you or a member of your team would review the Limited Duration Bond Fund for

ELIZABETH SHEA

01:18 compliance with fund dec, what you would do is you would look at the portfolio holdings and make sure that the assets in the portfolio holdings comprise at least one of these particular assets, right?
01:19 A. No.
01:19 Q. All right. What would you do?
01:19 A. We would review to ensure that the holdings complied with this. That doesn't -- that does not mean at least one.
01:19 Q. Okay. What do you mean "complied with this"?
01:19 A. That --
01:19 Q. What -- how do you comply with this permitted categories of assets investment?
01:19 A. That what the fund holds falls within the permitted categories.
01:19 Q. All right. And it falls within one of these permitted categories, at least one?
01:19 A. That it falls within the permitted categories.
01:19 Q. Okay.
01:19 A. If the fund held exclusively debt of agencies of the U.S. government, that would be

ELIZABETH SHEA

01:19 fine.
01:19 Q. That would be fine?
01:19 A. Yes.
01:19 Q. So you could 100 percent, according to the fund dec, in one -- even one of these -- any one of these ten categories?
01:19 A. That's correct.
01:20 Q. Okay. Now, assume with me that it's a hundred percent invested in one subsector, or let's just say instead of a hundred percent, let's use the actual numbers.
01:20 You know, do you not, that by the summer of 2007, July 31st, 2007 --
01:20 A. Uh-huh.
01:20 Q. -- that 95 percent of this fund was in subprime securities?
01:20 A. No, I did not know that.
01:20 Q. That would surprise you?
01:20 A. Given where we are today, no, that would not surprise me.
01:20 Q. Okay. Now, do you believe that a fund that is 95 percent exposed to subprime securities is diversified?
01:20 MR. MAHER: Objection. Calls for a

ELIZABETH SHEA

01:20 legal conclusion.
01:20 A. No.
01:21 Q. Okay.
01:21 A. However, it does not say that it needs to be diversified.
01:21 Q. No. But my question was, do you believe that a fund that would be 95 percent exposed to subprime securities is diversified?
01:21 A. No. Standing alone, no.
01:21 Q. Okay. And that's because that's an overweight to subprime, right?
01:21 A. Yes.
01:21 Q. Now, did you know that the Limited Duration Bond Fund fact sheet described the two clients that the Limited Duration Bond Fund was a well diversified portfolio of securities?
01:21 A. No.
01:21 Q. Okay. Well, 95 percent in subprime would not be a well diversified portfolio of securities, would it?
01:21 A. No, I would not disagree.
01:21 Q. And compliance was not charged --
01:22 I'm certainly not trying to blame you, ma'am, but I just want to make sure -- compliance was not

b556a598-0d4b-423b-ac88-38a9401a7083

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

ELIZABETH SHEA
02:39 A. Uh-huh.
02:39 Q. Okay?
02:39 A. There's a great deal of information here that is data that you could commonly find on a fact sheet that would go to anyone.
02:39 Q. Uh-huh. Okay. Is the risk -- is the risk capital utilization on a fact sheet?
02:39 A. No, that is not.
02:39 Q. Is the cVAR for the end of the month on a fact sheet?
02:39 A. No.
02:39 Q. Is the monthly risk tolerance on a fact sheet?
02:39 A. No.
02:39 Q. Is the amount of the risk budget assigned to each of the trades on a fact sheet?
02:39 A. No, it is not.
02:39 Q. Okay. Now, let me ask the question again.
02:39 Do you believe that it is proper that the other portfolio managers, including those that had invested in the Limited Duration Bond Fund, had access to this information when the public did not?

ELIZABETH SHEA
02:39 MR. MAHER: Objection. Foundation.
02:39 A. Probably not.
02:40 Q. And that's because that would be disseminating information to some of the investors in the Limited Duration Bond Fund without disseminating the same information to all the investors on or about the same time, right?
02:40 MR. MAHER: Objection. Foundation.
02:40 A. It gave them the ability to access it. I wouldn't say it was disseminated, and I don't know that anyone knows whether it was accessed.
02:40 Q. Okay. All right. But if they had access, they should not have access, is what you're saying?
02:40 A. I -- my preference is that they would not have had access.
02:40 Q. Okay. And that's because it would have made available to them, the other portfolio managers that invested in the Limited Duration Bond Fund, information that was not publicly available?
02:41 MR. MAHER: Objection. Foundation.
02:41 Q. Right?

ELIZABETH SHEA
02:41 A. Yes.
02:41 Q. I mean, it's no secret that these Excel spreadsheets aren't posted on any website, right?
02:41 A. That's correct. Public website, absolutely not.
02:41 Q. Yes.
02:41 ARMSTRONG EXHIBIT NO. 71 INTRODUCED
02:41 Q. And we'll look at Armstrong Exhibit 71, which is for August.
02:41 Have you seen that exhibit before?
02:41 A. No.
02:41 Q. Look at with me, by August, the market value of the CMY1 fund had fallen to $31 million, from $1.35 billion to $31 million, do you see that, between June 30th of 2007 and August 31, 2007?
02:42 A. Yes.
02:42 Q. And do you see -- do you see the risk capital utilization there?
02:42 The risk capital utilization has gone from 115 percent to 426 percent?
02:42 A. I see that.
02:42 Q. So a substantial increase in risk,

ELIZABETH SHEA
02:42 right?
02:42 A. I don't technically know what that statistic means.
02:42 Q. All right. So you don't know what the risk budget means?
02:42 A. No.
02:42 Q. As a member of compliance?
02:42 A. No, that was not our area of responsibility.
02:42 Q. Okay. You see the performance of the -- if we look at total performance on June -- as of June 30th, it was negative 52.7 basis points?
02:42 A. Uh-huh.
02:42 Q. Look at the performance by June.
02:42 A. Uh-huh.
02:42 Q. 4,313 basis points.
02:42 A. Uh-huh.
02:42 Q. That's a disastrous performance, isn't it?
02:43 A. Yes, it is.
02:43 Q. Now, these Excel spreadsheets were updated on a daily basis.
02:43 Are you aware of that?

b556a598-0d4b-423b-ac88-38a9401a7083

ELIZABETH SHEA

02:55 Q. It had at least --
02:55 A. I would expect it did.
02:55 Q. Yes. And it could have liquidated any of them other -- any of those other investments in order to make redemptions, right?
02:55 A. Yes.
02:55 MR. MAHER: Objection. Foundation.
02:55 Q. It didn't have to pick the Limited Duration Bond Fund in order to meet redemptions?
02:55 MR. MAHER: Objection. Foundation. Misleading.
02:55 A. The challenges without understanding exactly how the portfolio was run and what the portfolio manager's method of raising liquidity was, I don't -- I can't answer that question.
02:56 Q. Well, what we can see -- what we can see here is we can see -- and so 8 -- let's see, when was the first in-kind liquidation made?
02:56 The last cash distribution is made on 8/8/07. That's not true. There's some small -- very small ones made after that, and then we have one, two, three, four, five large in-kind distributions that are made on 8/10/07.
02:56 Do you see that?

ELIZABETH SHEA

02:56 A. Yes.
02:56 Q. Did you know that there were some large in-kind distributions made --
02:56 A. No.
02:56 Q. -- to other State Street funds?
02:56 A. No.
02:56 Q. And -- but do you see above that there are millions and millions of dollars of liquidations and sales by other State Street funds?
02:57 A. I do.
02:57 Q. And if other State Street funds and GAA clients and the Office of Fiduciary Advisor clients all got out before information on subprime prices was disseminated publicly to all clients, would that be proper?
02:57 MR. MAHER: Objection. Foundation.
02:57 A. If that was the case, I wouldn't see that that was -- I would not think that appropriate. I don't know that that was the case.
02:57 Q. If that was the case, that would be a serious breach of fiduciary duty; would it not?
02:57 MR. MAHER: Objection. Calls for a

ELIZABETH SHEA

02:57 legal conclusion.
02:57 A. I don't know that I'm qualified to state that, but --
02:58 Q. Well, we've already gone over that you're qualified because you're -- you're in charge of compliance, portfolio compliance at State Street, right, and we've talked about your understanding of fiduciary responsibility throughout this deposition, and your -- and you have acknowledged to me repeatedly that all clients ought to be treated fairly.
02:58 Would it be treating all clients fairly if only State Street-related funds, GAA clients and Office of Fiduciary Advisor clients got out before other outside clients got out?
02:58 MR. MAHER: Objection. Foundation.
02:58 A. If --
02:58 Q. Based on insider information?
02:58 MR. MAHER: Objection. Foundation. Calls for a legal conclusion.
02:58 A. If it was based on inside information, yes.
02:58 Q. That would be a breach of fiduciary duty, wouldn't it?

ELIZABETH SHEA

02:59 A. In my opinion, yes.
02:59 MR. BURFORD: Give me just a minute. I need to -- I need to turn this over to him, and I just need to make sure that I've got it and I don't have any documents I have to ask about.
02:59 MR. MAHER: Do you want to take like a five-minute break then?
02:59 MR. BURFORD: Will you give me five?
02:59 MR. MAHER: Sure.
02:59 THE VIDEOGRAPHER: Going off the record 2:58 p.m.
03:06 (A recess was taken.)
03:06 SHEA EXHIBIT NOS. 12, 13, 14 and 15 MARKED
03:07 THE VIDEOGRAPHER: Here marks the beginning of Tape No. 4 in the videotaped deposition of Elizabeth Shea. Back on the record 3:07 p.m.
03:07 BY MR. BURFORD:
03:07 Q. Let me show what is Shea Exhibit No. 13.
03:07 A. Thank you.
03:07 Q. This is from Jack Moore to the Office of Fiduciary Advisors, dated July 26th,

b556a598-0d4b-423b-ac88-38a9401a7083

ELIZABETH SHEA

05:12 Consistency of what?

05:12 Q. He asked you a series of questions that if that the governing document was inconsistent with ERISA, then ERISA should --

05:12 A. Prevail.

05:12 Q. -- prevail?

05:12 A. Yes.

05:12 Q. And there were a number of those questions --

05:12 A. Yes.

05:12 Q. -- and variations of that.

05:12 Do you recall that?

05:12 A. Yes.

05:12 Q. I just wanted to clarify that am I correct that during the years that you served as a compliance officer overseeing fixed income, the fixed income funds, it was not compliance's function or job to identify inconsistency between the governing documents and ERISA?

05:13 A. That is correct.

05:13 Q. And so, for example, it would not be your job or compliance's job to identify inconsistencies between any of the governing documents and, for example, the prudent investor

ELIZABETH SHEA

05:13 standard under ERISA?

05:13 A. That is correct. Compliance does not have a role in creating legal documents for either our clients or the business.

05:13 Q. Mr. Burford also asked you about the LDBF being 95 percent invested in subprime.

05:13 A. Yes.

05:13 Q. If that was diversified.

05:13 A. Yes.

05:13 Q. I recall that you testified that would not be diversified --

05:13 A. Right.

05:13 Q. -- correct?

05:13 A. Correct.

05:13 Q. If the LDBF had 95 percent of its investments all in the subprime sector, but some were Triple A and some were Double A and some were Single A, would that change your answer, that it wasn't diversified, but they're all still in the real estate subprime sector?

05:14 A. It slightly modifies my response in that the fund is not diversified from a sector perspective, so to speak. It may be somewhat more diversified from a credit standpoint;

ELIZABETH SHEA

05:14 however, because all of the securities are -- predominant number of the securities are in the same sector, you're still at a high risk of non-diversification.

05:14 Q. And in your role overseeing the mutual funds, there was an accepted definition of sector risk, wasn't there?

05:14 A. I don't --

05:15 Q. And I'm speaking about the SAIs.

05:15 A. There is -- mutual funds have a requirement to concentrate no more than 25 percent in any one industry. Sector and industry are not defined in the same fashion, but effectively, that requirement within mutual funds, you know, by definition would help them to avoid the situation that LDBF found itself in.

05:15 Q. Because it would be more -- there would be more sectors within the portfolio, rather than just a single subprime sector; is that right?

05:15 A. That's correct.

05:15 MR. ENG: Thank you very much. I have no further questions.

05:15 THE WITNESS: All right. Thank you.

ELIZABETH SHEA

05:15 MR. MAHER: We have don't have any questions either for the witness.

05:15 THE VIDEOGRAPHER: This marks the end of Tape No. 5 the videotaped deposition of Elizabeth Shea. Going off the record 5:15 p.m.

05:16 (The deposition was adjourned at 5:15 p.m.)

b556a598-0d4b-423b-ac88-38a9401a7083

ELIZABETH SHEA

COMMONWEALTH OF MASSACHUSETTS )
SUFFOLK, SS )

I, Deborah L. Roth, and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that on September 29, 2009, Elizabeth Shea, personally appeared before me, and proved to through satisfactory evidence of identification to be the person who was by me duly sworn to the truth concerning any knowledge in this cause; that that person was thereupon examined under oath, and the examination reduced to typewriting; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to nor employed by any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand this 2nd day of October, 2009

DEBORAH ROTH, Notary Public
My commission expires: 1/23/2015

b556a598-0d4b-423b-ac88-38a9401a7083