IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HOUSTON POLICE OFFICERS' PENSION SYSTEM | § § § § § | MDL No. 1945 |
| V. | § § § | |
| STATE STREET BANK & TRUST COMPANY and STATE STREET GLOBAL ADVISORS | § § § § § | Civil Action No. 08-05442-RJH |

---

## Houston Police Officers' Pension System's
## Reply in Support of Motion for Partial Summary Judgment

---

**BURFORD MANEY, L.L.P.**
Robert R. Burford
TBA No. 03258500
Andrew Meade
TBA No. 24032854
1221 McKinney, Ste. 3150
Houston, Texas 77010
Telephone: (713) 658-9001
Facsimile: (713) 658-9011

**GIBBS & BRUNS, L.L.P.**
Grant J. Harvey
TBA No. 09177700
Caren S. Sweetland
TBA No. 24001333
Laura Hanley Carlock
TBA No. 24027221
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805
Facsimile:  (713) 750-0903

**ATTORNEYS FOR PLAINTIFF HOUSTON
POLICE OFFICERS' PENSION SYSTEM**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

I.  The scope of State Street's discretionary authority under the IMA is appropriate for summary judgment because it is determinative of a State Street defense and will narrow the issues for trial. ................................................................................ 1

II.  Because HPOPS's proffered construction is the only reasonable interpretation of the IMA, the IMA is not ambiguous and HPOPS is entitled to summary judgment. ............................................................................................................. 4

    A.  State Street provides no reasonable alternative construction of the IMA. ............. 5

    B.  State Street cannot create an ambiguity by selectively citing certain provisions of the IMA, while ignoring or misciting others. ................................... 6

    C.  State Street cannot create an ambiguity through extrinsic evidence of pre-contractual disclosures or post-contractual conduct. ...................................... 10

    D.  Even if it were considered, State Street's extrinsic evidence creates no ambiguity. ....................................................................................................... 12

III.  State Street's affirmative defenses should be dismissed. .................................... 16

    A.  Section 802.203(c) immunizes the Trustees. ...................................................... 16

        1.  State Street misinterprets § 802.203(c). ...................................................... 16

        2.  State Street cannot transfer its liability to HPOPS's participants. ............. 18

        3.  Texas proportionate responsibility law is inapplicable in this case. ......... 19

    B.  The governmental function doctrine bars State Street's defenses ....................... 20

    C.  State Street's assertion that Texas law recognizes a duty to mitigate damages resulting from fraud is directly contrary to a 112-year-old axiom of Texas law. .................................................................................... 22

    D.  HPOPS had no duty to mitigate because State Street had an equal or greater opportunity to avoid such damages. ...................................................... 24

CONCLUSION ............................................................................................................. 25

i

# TABLE OF AUTHORITIES

## Cases

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*,
    631 F. Supp. 2d 308 (S.D.N.Y. 2009) ......................................................................... 3

*Arthur Andersen & Co. v. Perry Equipment Corp.*,
    945 S.W.2d 812 (Tex. 1997) ...................................................................................... 22

*Bandera Drilling Co., Inc. v. Sledge Drilling Corp.*,
    293 S.W.3d 867 (Tex. App.—Eastland 2009, no pet.) ................................................. 11

*Bowen v. Comstock*,
    No. 10-05-00295-CV, 2008 WL 2209722 (Tex. App.—Waco 2008, pet. dism'd) .......... 19

*Chem. Bank v. Affiliated FM Ins. Co.*,
    815 F. Supp. 115 (S.D.N.Y. 1993) .............................................................................. 3

*City of El Paso v. Heinrich*,
    284 S.W.3d 366 (Tex. 2009) ...................................................................................... 19

*City of Houston v. Petroleum Traders Corp.*,
    261 S.W.3d 350 (Tex. App.—Houston [14th Dist.] 2008, rule 53.7(f) motion granted) ................. 20

*City of Plano v. Homoky*,
    294 S.W.3d 809 (Tex. App.—Dallas 2009, no pet.) ..................................................... 21

*City of San Antonio v. Butler*,
    131 S.W.3d 170 (Tex. App.—San Antonio 2004, pet. denied) ...................................... 21

*COC Servs., Ltd. v. CompUSA, Inc.*,
    150 S.W.3d 654 (Tex. App.—Dallas 2004, pet. denied) ............................................... 11

*Coker v. Coker*,
    650 S.W.2d 391 (Tex. 1983) ...................................................................................... 4

*Cook Composites, Inc. v. Westlake Styrene Corp.*,
    15 S.W.3d 124 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd) .................... 4, 5, 10

*Cricket Hollow Partners, L.P. v. MMA Cricket Hollow, LLC*,
    No. 01-08-00254-CV, 2009 WL 2050708 (Tex. App.—Houston [1st Dist.] July 16, 2009, pet.
    filed) .......................................................................................................................... 11

*Dallas v. Arnett*,
    762 S.W.2d 942 (Tex. App.—Dallas 1988, writ denied) ............................................. 21

*FDIC v. Altholz*,
 4 F. Supp. 2d 80 (D. Conn. 1998) ........................................................................ 1

*FDIC v. Giammettei*,
 34 F.3d 51 (2d Cir. 1994) ................................................................................... 1

*Formosa Plastics Corp. v. Kajima Int'l, Inc.*,
 216 S.W.3d 436 (Tex. App.—Corpus Christi 2006, pet. denied) .................................... 23

*Gala Homes, Inc. v. Fritz*,
 393 S.W.2d 409 (Tex. Civ. App.—Waco 1965, writ ref'd n.r.e.) .................................... 11

*Galveston, Harrison & San Antonio Ry. Co. v. Zantzinger*,
 48 S.W. 563 (Tex. 1898) ..................................................................................... 22

*Gordon v. San Antonio Water Sys.*,
 No. 04-06-00699-CV, 2007 WL 748692 (Tex. App.—San Antonio Mar. 14, 2007,
 pet. denied) ............................................................................................. 20, 21

*Great Am. Homebuilders, Inc. v. Gerhart*,
 708 S.W.2d 8 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) .......................... 22

*Greenstein, Logan & Co. v. Burgess Mktg., Inc.*,
 744 S.W.2d 170 (Tex. App.—Waco 1987, writ denied) ............................................. 17

*Gucci Am., Inc. v. Ashley Reed Trading, Inc.*,
 No. 00 CV 6041 (RCC), 2003 WL 22327162 (S.D.N.Y. Oct. 10, 2003) ........................... 3

*Gunn Infiniti, Inc. v. O'Byrne*,
 996 S.W.2d 854 (Tex. 1999) ................................................................................ 22

*Hamblin v. British Airways, Inc.*,
 No. 09 Civ. 3077 (BMC), __ F. Supp. 2d __, 2010 WL 2423581 (E.D.N.Y. June 15, 2010) ............. 3

*Helms v. S.W. Bell Tel. Co.*,
 794 F.2d 188 & n.14 (5th Cir. 1986) ...................................................................... 23

*Herschbach v. City of Corpus Christi*,
 883 S.W.2d 720 (Tex. App.—Corpus Christi 1994, writ denied) ................................... 21

*Huang v. Gruner + Jahr USA Pub.*,
 No. 99 CIV. 5058(DLC), 2000 WL 640660 (S.D.N.Y. May 17, 2000) ............................. 1

*In re Ciprofloxacin Hydrochloride Antitrust Litig,*,
 261 F. Supp. 2d 188 (E.D.N.Y. 2003) ................................................................. 2, 3

*In re Healthsouth*,
 308 F. Supp. 2d 1253 (N.D. Ala. 2004) .................................................................. 4

*ISG State Operations, Inc. v. Nat'l Heritage Ins.*,
  234 S.W.3d 711 (Tex. App.—Eastland 2007, pet. denied)............................................. 11

*Korea Life Ins. Co. v. Morgan Guar. Trust Co.*,
  No. 99 Civ. 12175(AKH), 2004 WL 1858314 (S.D.N.Y. Aug. 20, 2004) ...................................... 25

*Lone Star Heat Treating Co. v. Liberty Mut. Fire Ins. Co.*,
  233 S.W.3d 524 (Tex. App.—Houston [14th Dist.] 2007, no pet.).................................................. 10

*Meadolake Foods, Inc. v. Estes*,
  218 S.W.2d 862 (Tex. Civ. App.—El Paso 1948, writ ref'd n.r.e.)........................................... 22, 23

*Meadolake Foods, Inc. v. Estes*,
  219 S.W.2d 441 (Tex. 1949)................................................................................................ 23

*N.W. Mut. Life Ins. Co. v. Fogel*,
  78 F. Supp. 2d 70 (E.D.N.Y. 1999) ......................................................................................... 1

*Nat'l Union Fire Ins. Co. v. L.E. Lyers Co. Group*,
  937 F. Supp. 276 (S.D.N.Y. 1996) .......................................................................................... 3

*New Process Steel Corp. v. Steel Corp. of Tex., Inc.*,
  703 S.W.2d 209 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.)....................................... 23

*Reata Construction Corp. v. City of Dallas*,
  197 S.W.3d 371 (Tex. 2006)............................................................................................. 21, 22

*Rhythm & Hues, Inc. v. The Terminal Mktg. Co.*,
  No. 01 Civ. 4697 (DAB) GWG, 2004 WL 941908 (S.D.N.Y. May 4, 2004).............................. 2, 3

*Rothenberg v. Lincoln Farm Camp, Inc.*,
  755 F.2d 1017 (2d Cir. 1985)................................................................................................. 2

*Saboundjian v. Bank Audi (USA)*,
  556 N.Y.S.2d 258 (N.Y. App. Div. 1990) ............................................................................... 25

*SEC v. Thrasher*,
  152 F. Supp. 2d 291 (S.D.N.Y. 2001)..................................................................................... 2

*Seiden Assoc. v. ANC Holdings, Inc.*,
  959 F.2d 425 (2d Cir. 1992)................................................................................................... 2

*Sun Oil Co. v. Madeley*,
  626 S.W.2d 726 (Tex. 1981)........................................................................................... 10, 11

*Superior Leasing, LLC v. Kaman Aerospace Corp.*,
  No. 04-3099-CO, 2006 WL 3756950 (D. Or. Dec. 19, 2006)................................................. 4

*Tex. A & M Univ. v. Bading*,
  236 S.W.3d 801 (Tex. App.—Waco 2007, pet. denied)....................................................... 19

*Tex. River Bargers v. City of San Antonio,*
21 S.W.3d 347 (Tex. App.—San Antonio 2000, pet. denied)........................................ 20

*Tex. Utils. Fuel Co. v. First Nat'l Bank in Dallas,*
615 S.W.2d 309 (Tex. App.—Dallas 1981, no writ)................................................ 10

*Thaler v. PRB Metal Prods., Inc.,*
815 F. Supp. 99 (E.D.N.Y. 1993) ................................................................. 1

*Thomas v. Callaway,*
251 S.W.2d 921 (Tex. Civ. App.—San Antonio 1952, writ ref'd n.r.e.)......................... 23

*Travelers Indem. Co. v. Maho Mach. Tool Corp.,*
952 F.2d 26 (2d Cir. 1991)....................................................................... 24

*United States v. Gabelli,*
No. 03 CIV 8762(PAC), 2005 WL 2978921 (S.D.N.Y. Nov. 4, 2005) ........................... 2

*Walker v. Salt Flat Water Co.,*
96 S.W.2d 231 (Tex. 1936)................................................................. 24, 25

*Warner v. United States,*
698 F. Supp. 877 (S.D. Fla. 1988)................................................................. 3

*Williams v. Houston Firemen's Relief & Ret. Fund,*
121 S.W.3d 415 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ........................... 19, 21

*Yale Transport Corp. v. Yellow Truck & Coach Mfg. Co.,*
3 F.R.D. 440 (S.D.N.Y. 1944)................................................................. 3

## Statutes

29 U.S.C. §1105(d)(1)........................................................................... 18

Tex. Civ. Prac. & Rem. Code Ann. § 33.003 ................................................... 18

Tex. Gov't Code Ann. § 802.203(a) ........................................................... 18

Tex. Gov't Code Ann. § 802.203(c) ........................................................ 9, 19

Tex. Rev. Civ. Stat. art. 6243g-4, § 10(a) ................................................... 20

Tex. Rev. Civ. Stat. art. 6243g-4, § 3(a) ................................................ 20, 21

**Other Authorities**

11 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 56.40[1] (3d ed. 2003)................................. 2

28 TEX. JUR. 3D Damages § 196 (2010) ...................................................................................... 23

**Rules**

FED. R. CIV. P. 12(f)(1) .............................................................................................................. 3

FED. R. CIV. P. 16 ...................................................................................................................... 3

FED. R. CIV. P. 56 ...................................................................................................................... 2

**I.      The scope of State Street's discretionary authority under the IMA is appropriate for summary judgment because it is determinative of a State Street defense and will narrow the issues for trial.**

In its response, State Street ignores the substance of HPOPS's motion and contends that HPOPS seeks an impermissible advisory opinion. State Street's "advisory opinion" argument is easily defeated: In the Second Circuit, summary judgment is appropriate to strike an affirmative defense that is not supported by the law or evidence. *See FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994).[1] Here, HPOPS's motion is determinative of State Street's mitigation defense.

State Street asserts that HPOPS is not entitled to damages, even if HPOPS establishes its case against State Street, because HPOPS allegedly failed to mitigate its damages despite a duty to do so. HPOPS moved for partial summary judgment in part to dismiss State Street's mitigation defense because it fails as a matter of law. In particular, a mitigation defense is unavailable to a defendant who had at least "an equal opportunity" to take actions that would have mitigated a plaintiff's losses. *See* HPOPS's Mem. in Support of Its Motion for Partial Summary Judgment ("MSJ Mem.") at 47-48. Because the unambiguous language of the IMA vested State Street with the discretionary power to move HPOPS's cash collateral out of the LDBF, State Street had at least an equal opportunity to minimize HPOPS's losses and, therefore, cannot assert the defense of mitigation. *See id.*; *see also infra* Part III.D. Accordingly, HPOPS's motion seeking construction of the unambiguous language of the IMA with respect to State Street's discretion to move the cash collateral to a different cash management fund is in fact dispositive of a complete defense and is fatal to State Street's characterization of HPOPS's motion as seeking an advisory opinion.

Moreover, even if the Court were to adopt State Street's characterization of HPOPS's motion as seeking only to resolve "part of" HPOPS's breach of contract claim (and State Street feigns ignorance

---

[1] *See also Huang v. Gruner + Jahr USA Pub.*, No. 99 CIV. 5058(DLC), 2000 WL 640660, at *1 (S.D.N.Y. May 17, 2000); *FDIC v. Altholz*, 4 F. Supp. 2d 80, 82 (D. Conn. 1998); *N.W. Mut. Life Ins. Co. v. Fogel*, 78 F. Supp. 2d 70, 73-75 (E.D.N.Y. 1999); *Thaler v. PRB Metal Prods., Inc.*, 815 F. Supp. 99, 102 (E.D.N.Y. 1993).

that this contract construction issue is also central to many of HPOPS's claims), HPOPS is still entitled

to summary judgment.  Although the Second Circuit has not decided this issue, district courts in this

Circuit have repeatedly held that summary judgment may be used to resolve "part of" a claim,

especially for legal issues that must be decided by the Court as a matter of law, such as the contract

construction at issue here.[2]  *See Rhythm & Hues, Inc. v. The Terminal Mktg. Co.*, No. 01 Civ. 4697

(DAB) GWG, 2004 WL 941908, at *8 n.7 (S.D.N.Y. May 4, 2004) (construing validity of lease

assignments and waiver of defense clauses); *United States v. Gabelli*, No. 03 CIV 8762(PAC), 2005

WL 2978921, at *2 (S.D.N.Y. Nov. 4, 2005) (summary judgment procedure appropriate when seeking

statutory construction ruling where motion presented "solely a question of law"); *In re Ciprofloxacin*

*Hydrochloride Antitrust Litig,*, 261 F. Supp. 2d 188, 230-31 (E.D.N.Y. 2003) (deciding partial summary

judgment on whether agreements constitute per se violation of antitrust laws).[3]  As one district court in

this Circuit explained:

> Fed. R. Civ. P. 56(a) states that a party may move for summary judgment upon "any
> part" of a claim or counterclaim.  As one treatise notes, "it is now well-established that
> a court may 'grant' partial summary 'judgment' that establishes the existence or
> nonexistence of certain facts, *even though no actual judgment is entered on a claim*."
> 11 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 56.40[1], at 56-279 (3d ed.
> 2003).

---

[2] State Street's cited cases either contain no reasoning or concern determinations of nondispositive, nonlegal issues.  For example, in *SEC v. Thrasher*, the SEC sought summary judgment on "nondispositive fact issues."  152 F. Supp. 2d 291, 295 (S.D.N.Y. 2001).  Here, HPOPS seeks construction of unambiguous contract language—a purely legal matter that *must* be determined by the Court as a matter of law.  *See Seiden Assoc. v. ANC Holdings, Inc.*, 959 F.2d 425, 426, 429 (2d Cir. 1992); *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985).  State Street's remaining cases are similarly distinguishable.

[3] Lest there be any doubt, the Advisory Committee's Note to the 2010 amendments to Rule 56 (effective December 1st of this year) puts to rest any debate with respect to whether summary judgment on a "part of" a single claim is permissible.  The Advisory Committee sought to clarify its intent that Rule 56 may be utilized to seek a "partial summary judgment" on just a "part of [a] claim or defense." As the Advisory Committee's Note explains, "The first sentence is added to *make clear at the beginning* that *summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense*.  The subdivision caption adopts the common phrase 'partial summary judgment' to describe disposition of less than the whole action, whether or not the order grants all the relief requested by the motion." FED. R. CIV. P. 56 advisory committee's note (2010).

*Rhythm & Hues, Inc.*, 2004 WL 941908, at *8 n.7.[4]

In addition, this Court has inherent authority under Rule 56(d)[5] to decide issues raised on summary judgment.[6] Thus, even assuming *arguendo* that HPOPS's motion for partial summary judgment cannot be considered under Rule 56(a), the Court has inherent authority and discretion to issue an order under Rule 56(d) narrowing issues for trial and should exercise that discretion in the interest of judicial economy.[7] *See also* FED. R. CIV. P. 16 (authorizing the court to take appropriate action on "formulating and simplifying the issues"); FED. R. CIV. P. 12(f)(1) (court has power to strike deficient defense "on its own").

---

[4] Unless otherwise indicated, all emphasis herein has been added.

[5] State Street claims that a party must first move to dispose of an entire claim before the Court may rule on part of it pursuant to Rule 56(d), but that argument has been rejected. *See, e.g., Rhythm & Hues, Inc.*, 2004 WL 941908, at *8 n.7 ("[I]f a court has the power under Fed. R. Civ. P. 56(d) to make a ruling regarding the establishment of facts for trial as an ancillary result of a motion for summary judgment, a court surely has the power to do so in situations where a party recognizes that a motion for summary judgment as to a particular claim is not possible."); *see also Hamblin v. British Airways, Inc.*, No. 09 Civ. 3077 (BMC), __ F. Supp. 2d __, 2010 WL 2423581, at *4-5 (E.D.N.Y. June 15, 2010) (Rule 56(d) expressly contemplates summary judgment motions that, although granted in part, will result in the entry of an order other than a judgment).

[6] District courts in this Circuit have approved the use of Rule 56(d) motions for partial summary judgment to narrow legal and factual issues for trial. *See, e.g., In re Ciprofloxacin*, 261 F. Supp. 2d at 230-31; *Chem. Bank v. Affiliated FM Ins. Co.*, 815 F. Supp. 115, 116 (S.D.N.Y. 1993); *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 631 F. Supp. 2d 308, 313 (S.D.N.Y. 2009); *see also Nat'l Union Fire Ins. Co. v. L.E. Lyers Co. Group*, 937 F. Supp. 276, 285 (S.D.N.Y. 1996) ("Rule 56(d) . . . empowers a court, when it would be practicable to save time and expense and to simplify the trial, to issue an order specifying the facts that appear without substantial controversy."); *Gucci Am., Inc. v. Ashley Reed Trading, Inc.*, No. 00 CV 6041 (RCC), 2003 WL 22327162, at *9 (S.D.N.Y. Oct. 10, 2003) ("[A]n order under Rule 56(d) is more akin to a pre-trial order under Rule 16 and 'likewise serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact.'" (citing FED. R. CIV. P. 56(d) advisory committee's note)).

[7] Even the cases cited by State Street recognize that this Court has inherent authority to simplify issues for trial. *See Warner v. United States*, 698 F. Supp. 877, 880 (S.D. Fla. 1988) (holding that an order pursuant to Rule 56(d) is appropriate where "[a] determination with respect to the legal issue raised by the Plaintiff at this stage would serve to narrow the issues in the case, advance the progress of the litigation, and provide the parties with some guidance in how they proceed with the case"); *Yale Transport Corp. v. Yellow Truck & Coach Mfg. Co.*, 3 F.R.D. 440, 441-42 (S.D.N.Y. 1944) (affording plaintiff relief requested in motion for partial summary judgment pursuant to Rule 16).

Simply put, State Street's contention that HPOPS seeks an "advisory opinion" that cannot be granted under the Federal Rules has been repeatedly rejected[8] and is also wrong because the construction is dispositive of State Street's mitigation defense. For these reasons, HPOPS's motion may appropriately be decided on summary judgment.

## II. Because HPOPS's proffered construction is the only reasonable interpretation of the IMA, the IMA is not ambiguous and HPOPS is entitled to summary judgment.

As previously explained, the plain language of the IMA establishes that State Street, as HPOPS's Investment Manager, had full and absolute discretionary power to manage and oversee the entire Commodities Strategy, including the discretion to determine at all times into which cash management fund to invest the cash collateral for the strategy. *See* MSJ Mem. at 25-30. In response, State Street fails to offer any reasonable alternative construction under the four corners of the IMA. Instead, State Street avoids the ambiguity analysis by arguing that it prudently exercised its discretion by investing HPOPS's cash in the LDBF, which is irrelevant for purposes of the relief HPOPS requested. Finally, as a last resort and contrary to Texas law, State Street tries to create an ambiguity by referencing extrinsic "evidence" that cannot even be considered prior to a court finding of ambiguity based on the plain meaning of the language.

---

[8] *See In re Healthsouth*, 308 F. Supp. 2d 1253, 1266-67 (N.D. Ala. 2004) (holding that an order on a motion for partial summary judgment to construe the legal effect of a severability clause in an insurance policy would not amount to an improper advisory opinion, "but rather an interlocutory adjudication of a very real, present legal dispute"); *see also Superior Leasing, LLC v. Kaman Aerospace Corp.*, No. 04-3099-CO, 2006 WL 3756950, at *16 (D. Or. Dec. 19, 2006).

### A.   State Street provides no reasonable alternative construction of the IMA.

Under Texas law, a contract is not ambiguous unless there are at least two reasonable, alternative constructions. *See Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 131 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd).[9]  In its response, State Street fails to offer any alternative construction, much less a reasonable one.

State Street argues that the IMA "mandated" State Street to invest HPOPS's $54 million in cash collateral for the Commodities Strategy solely in the LDBF, and to keep it in the LDBF, in order to meet the Strategy's aspirational objective "to *attempt* to outperform the performance of the Dow Jones-AJG Commodities Index (the 'Index')." Ex. 13 (1st Am. IMA).[10]  Moreover, State Street proclaims this so-called mandate overrides every provision in the IMA.

As a threshold matter, State Street's argument fails as one of "contract interpretation" because the IMA nowhere includes the term "LDBF," let alone provides for its exclusive use; nor does it otherwise exclude cash management from the full and absolute discretionary power granted under ¶ 5 of the IMA.  More fundamentally, State Street's argument simply ignores the contract interpretation question: whether State Street had full and absolute discretion to determine where to invest HPOPS's cash collateral.  Instead, State Street merely argues that the aspirational goal of attempting to beat the Index somehow obligated it at all times in the exercise of prudent discretion to invest HPOPS's cash in the unidentified LDBF.  By making this argument, State Street is effectively admitting that it—not

---

[9] Under Texas law, the court's primary focus is to ascertain the true intentions of the parties as expressed in the contract. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  "To achieve this objective, courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all provisions* of the contract so that none will be rendered meaningless." *Id.* (emphasis in original).  If the language of the contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous and the court will construe the contract as a matter of law.  *See id.*  "If, however, the contract can be given two or more *reasonable* interpretations, it is ambiguous." *Cook Composites, Inc.*, 15 S.W.2d at 131.  "[C]onflicting interpretations of a contract and unclear and uncertain language do not necessarily mean a contract is ambiguous." *Id.*

[10] Unless otherwise noted, references to "Ex." are to the Exhibits in the Appendix to HPOPS's Memorandum in Support of its Motion for Partial Summary Judgment.

HPOPS—was saddled with the cash management obligation and that it satisfied that obligation by selecting the LDBF at inception and keeping the collateral there through the life of the investment. *See* Opp. at 7-8 (declaring that its discretion was subject to the "confines" of attempting to outperform the Commodities Index, which "effectively required State Street to utilize [the] LDBF or a bond fund with comparable risk/return characteristics"). The former point is correct—State Street indeed had discretion to use various cash management accounts as required by the unambiguous language of the IMA. The latter point—whether State Street properly exercised its discretion—will be addressed at trial with consideration of all of State Street's fiduciary duties. State Street's admission is determinative of the contract construction upon which HPOPS is asking the Court to rule, thus confirming that the discretion to choose, monitor, and move the cash was vested exclusively in State Street.

Separately, although State Street spills much ink discussing the stated Objective of the Commodities Strategy, this does not advance any contract-construction argument. Once again, State Street is simply trying to argue that it prudently exercised its admitted discretion. The Objective did not establish the existence or scope of State Street's powers; rather, it determined the benchmark of the aspirational performance of the Commodities Strategy.[11]

### B.    State Street cannot create an ambiguity by selectively citing certain provisions of the IMA, while ignoring or misciting others.

In its response, State Street completely ignores all but the first sentence and last paragraph of section 1 of the First Amendment. When read in full, however, the First Amendment provides that

---

[11] Moreover, the objective was not to "outperform the performance of the Dow Jones-AJG Commodities Index" but to "*attempt*" to outperform that index. *See* Ex. 13 (1st Am. IMA). In other words, there was no mandate to outperform the Index. If such a mandate actually existed, State Street undeniably breached it. In addition, under ¶ 5, the discretionary power vested in State Street to manage the assets consistent with the Objectives (including "its attempt to outperform" the index) expressly required that State Street's power be exercised "[s]ubject to the terms and conditions of this Agreement, the Code of Ethics, and in accordance with the investment guidelines established by the Trustees." Ex. 11 (IMA) ¶ 5. State Street was required to exercise its discretion to select a cash collateral vehicle not only "to attempt to outperform the Index," but also to comply with its duties as a fiduciary under Texas and federal law and the Texas Government Code; to "exercise the care, skill, prudence and diligence of a prudent" manager; and to "diversify the investment of the Account Assets so as to minimize the risk of losses with respect to the Account Assets." Ex. 13 (1st Am. IMA) ¶ 1; Ex. 11 (IMA) ¶¶ 4, 5(c), 5(g).

HPOPS's cash collateral (that was not sent to AIG as an upfront margin payment) was not mandated for deposit into the LDBF but instead into unspecified "*money market funds and other cash management funds*[.]" Ex. 13 (1st Am. IMA) ¶ 1. Indeed, there is no mention of the LDBF, much less any requirement that State Street fully invest HPOPS's $54 million cash collateral solely in the LDBF, no matter the risks, changes in the market, or incurrence of huge losses. Such a reading would render meaningless the fiduciary provisions of the IMA and rewrite the IMA to require that the cash be invested only in the LDBF.

The only reasonable reading of the IMA is that State Street's discretion to manage "all assets held in the Account" under ¶ 5 of the IMA, consistent with the Objective, expressly encompassed management of all components of "*the strategy*," including the investment of the $54 million in cash collateral into unspecified "*money market funds and other cash management funds*." *Id.*

Likewise, State Street's efforts to create ambiguity by partially citing selected portions of HPOPS's Investment Policy Guidelines are grossly misleading. State Street ignores the IMA's direct and explicit language vesting State Street with "full and absolute discretionary power to manage all assets in the Account," Ex. 11 (IMA) ¶ 5, and argues that HPOPS Policy Guidelines, which were incorporated by reference in the IMA, somehow establish that HPOPS—not State Street—is to blame for the huge losses resulting from investing the cash collateral in a fund invested nearly 100% in the subprime market. In making this argument, State Street cites only to the HPOPS Board of Trustees' broad oversight responsibilities to oversee the entire Pension Fund, while conveniently ignoring HPOPS's contractual and statutory rights to delegate specific duties with respect to specific carved-out portions of its portfolio to its investment managers. For example, State Street asserts that §§ 400.01(B) and (F), which state that the Trustees alone are to administer the System by selecting appropriate investment options for the Plan as a whole and monitoring the overall performance for the Plan, establish that the Trustees bore responsibility to select the appropriate cash fund for the Commodities

Strategy. *See* Ex. 11 (IMA) at Ex. E §§ 400.01(B), (F).  But State Street somehow ignores the express

delegation language from the same Guidelines:

- The Trustees are authorized to "[s]elect qualified investment manager(s) and consultants," *id.* § 400.01(C);

- "The Investment Manager(s) [and not the Trustees] will be responsible for *determining investment strategy and implementing security selection and timing* within the policy and guidelines limitations established by the Board," *id.* § 400.03;

- The Investment Manager is responsible for "developing an appropriate investment strategy" based on the Investment Policy Guidelines, *id.* § 401.02; and

- "Because of the complexity of the investment environment, the Board has decided to retain the services of separate investment managers to manage separate portions of the System's assets," *id.* § 402.04.

State Street also points selectively to § 413.01(A) of Appendix A to the Investment Policy

(setting forth the "Roles and Responsibilities of Fiduciaries to the System") for the general statement

that the Board "bears ultimate responsibility for the System and the appropriateness of its investment

policy and its execution," while once again ignoring that the very next sentence establishes that the

Board *"[e]ngages* consultants, *investment managers*, custodian and other advisors *to implement and

execute investment policy as it relates to the Plan*." *Id.* § 413.01(B).  Importantly, the fiduciary duties

of the investment managers are also specifically referenced in the very same section.[12]  Thus, contrary

to State Street's continued selective and partial citations, these Guidelines do not establish that the

Board, rather than State Street, bore responsibility for selecting, monitoring, and moving if prudent the

---

[12] In defining the roles and responsibilities of investment managers, § 413.03 expressly provides that investment managers:

    A. *Will have full discretion in the management of those monies of the System allocated to the investment managers*, subject to the overall investment guidelines set by the Board;

    B. *Serve as fiduciaries responsible for specific securities decisions*;

    C. *Will abide by duties, responsibilities and guidelines detailed in any specific investment manager agreement.*

Ex. 11 (IMA) at Ex. E § 413.03.  State Street's omission of this in its response can hardly be an oversight.

cash collateral for the Strategy. Rather, the Guidelines expressly provide that the Board is authorized to delegate to an investment manager full and absolute discretion to manage the money allocated to it, and thus, they are entirely consistent with ¶ 5, and the other fiduciary obligations of the IMA, which gave State Street full and absolute discretion to manage the Commodities Strategy, including the ability to select, monitor, and change the unnamed cash collateral fund.

Moreover, this is the only reading consistent with the fiduciary standards imposed by the Texas Government Code, which was also expressly incorporated into the IMA and by which State Street expressly agreed to abide. *See* Ex. 11 (IMA) ¶ 4. Section 802.203(c) of the Code provides that "*a trustee [is not] obligated to invest or otherwise manage any asset of the system subject to management by the investment manager.*" TEX. GOV'T CODE ANN. § 802.203(c). State Street's contorted interpretation requiring that HPOPS, and not State Street, manage the cash collateral for the Commodities Strategy would violate this clear mandate of Texas law and would rewrite ¶ 5 so that State Street's discretionary power extended to all Account Assets except the $54 million to be deposited in unnamed cash management funds.[13]

The only reasonable construction that harmonizes all provisions of the IMA is that State Street, not HPOPS, had full discretionary power to manage the Commodities Strategy, including the selection of the cash management fund to hold the cash collateral and the responsibility to monitor and change that fund if prudent. Because State Street can proffer no reasonable alternative construction, the IMA is not ambiguous, and the Court is authorized to construe it as a matter of law.

---

[13] State Street also cites selectively to § 407.02 of the Guidelines to claim that State Street had to adhere to its "professed investment style" of investing in the LDBF. *See* Opp. at 11. Even if the selection of the "LDBF" could be considered an "investment style," the adjacent sentence provides that "investment managers *must avoid becoming guided by a narrow investment strategy simply because it was successful in the past.*" Ex. 11 (IMA) at Ex. E § 407.02. Moreover, the Guidelines also require that investment managers adhere to the prudent expert standard, serve as fiduciaries, and abide by all duties and responsibilities of the IMA. *See id.* §§ 407.01, 413.03.

**C.      State Street cannot create an ambiguity through extrinsic evidence of pre-contractual disclosures or post-contractual conduct.**

State Street also attempts to create ambiguity through "evidence" of pre-contractual disclosures and the parties' subsequent conduct. *See* Opp. at 10. But the use of such evidence to alter the plain meaning of an otherwise unambiguous agreement is not permitted under Texas law. Rather, only *if the court first determines that the contract is ambiguous* can extrinsic evidence be considered to determine the contract's meaning:

> There are two steps to an ambiguity analysis. First, we apply the applicable rules of construction and decide if the contract is ambiguous. A contract is not ambiguous if it can be given a certain and definite meaning or interpretation. If, however, the contract can be given two or more *reasonable* interpretations, it is ambiguous. *If we find the contract ambiguous, the second part of the analysis comes into play and the trier of fact may consider the parties' interpretation and other extraneous evidence.*

*Cook Composites*, 15 S.W.3d at 131 (internal citations omitted); *see also id.* ("We look only within the four corners of the agreement to see what is actually stated, and not at what was allegedly meant."); *Lone Star Heat Treating Co. v. Liberty Mut. Fire Ins. Co.*, 233 S.W.3d 524, 527 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (any ambiguity must be evident from the contract language itself; extrinsic evidence may not be considered unless the language is first found to be ambiguous).

State Street fundamentally misconstrues the extent to which Texas law will allow courts to consider "surrounding circumstances evidence" in determining the meaning of language used in a contract. *See* Opp. at 10-12. In particular, surrounding circumstances evidence cannot be used to create an ambiguity by overriding a contract's otherwise plain language:

> If a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous. It follows that *parol evidence is not admissible to render a contract ambiguous*, which on its face, is capable of being given a definite certain legal meaning. This rule obtains even to the extent of *prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties*, or is so worded that it is not fairly susceptible of more than one legal meaning or construction.

*Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981); *see also Cook Composites*, 15 S.W.3d at 132.[14]

In addition, when a merger clause is present in a contract, as here, courts may not consider parol evidence of prior drafts or negotiations, not even as surrounding circumstances evidence. *See Bandera Drilling Co., Inc. v. Sledge Drilling Corp.*, 293 S.W.3d 867, 872 (Tex. App.—Eastland 2009, no pet.) (holding that it could not consider the parties' negotiations, prior drafts, or oral promises as evidence of surrounding circumstances leading to the execution of an agreement with a merger provision).[15]   The merger clause in the IMA plainly operates to "supercede[] all other prior related understandings and agreements," Ex. 13 ¶ 8, and thus, the "evidence" cited by State Street as "pre-investment disclosures" and pre-contractual "understandings" purportedly revealed in oral and written discussions pertaining to different strategies that occurred months before the IMA was executed cannot be considered.  *See Bandera Drilling Co.*, 293 S.W.3d at 872; *COC Servs.*, 150 S.W.3d at 666. Because the writing is not ambiguous, State Street's parol evidence "has no legal effect and merely constitutes proof of facts that are immaterial and inoperative." *Cricket Hollow Partners, L.P. v. MMA*

---

[14] State Street's cited authority does not hold differently. *See, e.g., Tex. Utils. Fuel Co. v. First Nat'l Bank in Dallas*, 615 S.W.2d 309, 312 (Tex. App.—Dallas 1981, no writ) (explaining that "parol evidence may be resorted to in aid of applying the language to the subject matter," but that "this does not mean that parol evidence may be introduced to vary or contravene the language of the writing or to establish a different contract, but merely to prove the then existing circumstances, so as to enable the court to apply the language used to the existing facts").

[15] *See also COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 666 (Tex. App.—Dallas 2004, pet. denied) ("When interpreting an integrated writing—one stating that all previous agreements between the parties are merged, or integrated, into the subject writing—the parol evidence rule applies to circumscribe the use of extrinsic evidence."); *ISG State Operations, Inc. v. Nat'l Heritage Ins.*, 234 S.W.3d 711, 719 (Tex. App.—Eastland 2007, pet. denied) ("When . . . a contract contains a merger or integration clause, the contract's execution presumes that all prior negotiations and agreements relating to the transaction have been merged into the contract, and it will be enforced as written and cannot be added to, varied, or contradicted by parol evidence.").

*Cricket Hollow, LLC*, No. 01-08-00254-CV, 2009 WL 2050708, at *7 n.11 (Tex. App.—Houston [1st Dist.] July 16, 2009, pet. filed).[16]

Likewise, State Street's reliance on extrinsic evidence of the parties' conduct after the execution of the contract is improper. *See Sun Oil Co.*, 626 S.W.2d at 732 (holding that extrinsic evidence of subsequent conduct may only be considered "where a contract is first found to be ambiguous"); *Gala Homes, Inc. v. Fritz*, 393 S.W.2d 409, 410-11 (Tex. Civ. App.—Waco 1965, writ ref'd n.r.e.) (court would not consider "the subsequent conduct of the parties as evidencing their interpretation of the agreement" because "[a]cts of the parties cannot furnish an interpretation contrary to the plain meaning of the contract"). Thus, State Street's reliance on the *Restatement (Second) of Contracts* is misplaced. Under governing Texas law, evidence of the parties' subsequent conduct may not be considered unless and until the Court makes a determination that the plain language of the contract is in fact susceptible to two or more reasonable constructions and is, therefore, ambiguous. Because the contractual language is not ambiguous, State Street cannot contradict the plain-meaning construction by citation to post-contractual parol evidence.[17]

### D.    Even if it were considered, State Street's extrinsic evidence creates no ambiguity.

Even if State Street's "evidence" of pre-contractual disclosures could be considered, it does not render the contract language uncertain or ambiguous. State Street's reliance on the presentation made to HPOPS in August 2005 is misplaced. The August 2005 presentation concerned State Street's capabilities for a ***commingled*** commodities product. By contrast, HPOPS invested in a ***separately managed*** Commodities Strategy over ten months later in June 2006 that did not specify into what cash

---

[16] HPOPS will not waste the Court's time by disputing here every legally irrelevant contention raised by State Street regarding what the evidence shows. That work was done in HPOPS's Rule 56.1 Statement and in its Counter-Statement to State Street's Rule 56.1 Statement.

[17] Again, HPOPS will not address every contention raised by State Street regarding what the post-contract evidence allegedly shows. HPOPS instead refers the Court to both HPOPS's Rule 56.1 Statement and its Counter-Statement to State Street's Rule 56.1 Statement.

management fund HPOPS's cash collateral would be invested. *See* Ex. 11 (IMA); *see also* Ex. 9 (State

Street's Answer) ¶ 16 (admitting that HPOPS's investment in the Commodities Strategy "was a

separately managed strategy, and not part of the fund utilized by other institutional investors").[18]

Further, State Street's effort to use the November 18, 2005 email from Donna Watkins to Pat

Franey to create an ambiguity similarly fails. The Watkins email does not establish that HPOPS failed

to exercise any "option" of choosing a cash vehicle other than the LDBF. *See* Ex. 7. Rather, the

contract unambiguously reflects that over six months later the parties agreed <u>not</u> to specify into which

fund the cash collateral would be invested (not LDBF, not Libor Plus, nor any other fund by name) and

that State Street (not HPOPS) would be given full and absolute discretionary power to choose where

the collateral should be placed. *See generally* Ex. 13 (1st Am. IMA).[19] Indeed, if extrinsic evidence of

surrounding circumstances could be considered, the only conclusion that would be reached is that State

Street agreed to not limit its ability to utilize any particular cash management fund for the cash

collateral portion of HPOPS's Commodities Strategy. *See* Ex. 48; Ex. 11 (IMA) ¶ 5.[20]

---

[18] As it has done repeatedly in its summary judgment briefing, State Street again cites selectively from Pat Franey's deposition to claim that "he was aware that the 'ABS' category included securities backed by subprime mortgages[,]" Opp. at 12 & n.9, when Mr. Franey actually testified that where the terms "MBS" and "ABS" are set forth as separate sectors to describe securities in a fund, it would be "misleading" to place subprime in the ABS category. HPOPS respectfully refers the court to its Counter-Statement to State Street's Rule 56.1 Statement refuting this misleading characterization. *See* Counter-Statement at 25-27 (HPOPS's Opp. ¶ 29) (citing to Burford Decl. Ex. 5 [Franey Dep., 3/25/2009] at 36, 116).

[19] As reflected in the Fund Declaration attached to Ms. Watkins pre-contract email, even in the commingled commodities strategy that Ms. Watkins represented would be run "***substantially the same***" as HPOPS's separately managed strategy, *see* Ex. 7 at SS 009116572, State Street expressly retained discretion over which fund the cash collateral would be deposited into: "The Fund will also hold U.S. Treasury Bills and units of the Limited Duration Bond Common Trust Fund ***or other Common Trust Funds of the Trustee at the discretion of the Trustee***." *Id.* at SS 009116575. After the subprime meltdown, State Street in fact exercised its discretion to change the fund holding the cash collateral for the commingled commodities strategy from the LDBF to Libor Plus in November 2007 because of the LDBF's inability to meet the objectives of the commingled commodities strategy. *See* Ex. 43. Thus, even if Ms. Watkins email is considered, State Street retained discretion to move the cash collateral in the commingled commodities strategy, which was to be "substantially the same" as the HPOPS Strategy.

[20] The ***complete*** record of the legally irrelevant pre-contractual evidence is in accord. An email exchange dated December 15-19, 2005 between John Tucker and Chris Douglass of State Street

Likewise, there is no evidence that HPOPS's post-contractual actions were inconsistent in any way with the position HPOPS takes in this contract dispute. Nothing State Street cites establishes that HPOPS ever sought to take over the management of the cash collateral account or took any other actions inconsistent with the understanding that the IMA required that State Street, not HPOPS, manage the cash management fund for the Commodities Strategy. Rather, the conduct State Street references only reflects that HPOPS (not an expert in subprime) was grappling with trying to obtain full and accurate information from various sources about its subprime holdings, the market, and how to best salvage this disastrous investment.

Further complicating matters, HPOPS only learned of its exposure to subprime **after** the subprime meltdown in August 2007. Moreover, throughout this period, State Street gave HPOPS incomplete, contradictory, and untimely information while continuing to tout subprime as having good fundamentals; that the bonds were "money good"; that "judicious" investors would hold; and that State Street was taking actions to reduce risk in the LDBF, which would correspondingly reduce risk in the Commodities Strategy. *See, e.g.*, Wolkoff Decl. Exs. 9, 15, 16, 29. *See also generally* HPOPS Rule 56.1 Statement; HPOPS Counter-Statement to State Street's Rule 56.1 Statement. None of this suggested that **HPOPS** had assumed management of the cash collateral funds. Rather, State Street's behavior unequivocally assured HPOPS that State Street was continuing to manage the cash collateral.

In addition, and contrary to State Street's characterizations, HPOPS never contemplated the prospect of retaining State Street as its Investment Manager for the Commodities Strategy and then

---

reflects that, contrary to Ms. Watkins November 2005 email, State Street had not yet made the decision of which cash management fund it would use even as of December 2005. *See* Ex. 48 at SS 008492897 (reflecting that rather than merely adopt the language from the Fund Declaration for the commingled strategy—that "the Fund will also hold units of the Limited Duration Bond Common Trust Fund or other Common Trust Funds of the Trustee"—State Street replaced those terms with the open reference "[Cash Management Holdings?]"). Revised drafts of the language were circulated with the question "[d]oes this get you what you need for cash management?" The final revised draft (to which Tucker commented in the final email: "Looks good") replaced the open cash management issue with the exact language of the First Amendment: "The strategy may invest in money market funds and other cash management funds," making no mention of the LDBF. *Id.* at SS 008492895.

"instruct[ing] State Street to terminate its holdings in the LDBF" and move the collateral to a different cash fund.  Opp. at 15.  Nor did State Street ever present this as a decision that HPOPS was required to make or otherwise inform HPOPS that HPOPS now bore the responsibility to direct the movement of the cash collateral to a different cash fund and that State Street was no longer managing the cash.[21]

Instead, HPOPS's actions focused on obtaining sufficient information to determine whether to terminate the Commodities Strategy as a whole and fire State Street as its Investment Manager (which it eventually did in November 2007) and how to handle the toxic subprime bonds.  This point is made clear in State Street's own brief where it references an HPOPS memorandum to the Board dated August 28, 2007: "Under the heading 'Liquidation,' Mr. Franey wrote: 'We could instruct SSGA to terminate the swaps and distribute the cash to us that is derived from the sale of the remaining securities in the bond fund.'"  Opp. at 15 (citing Wolkoff Decl. Ex. 12).

In sum, after learning of its shocking exposure to subprime, HPOPS  immediately began evaluating its options in a complex market regarding whether, and how best, to *liquidate from the Commodities Strategy as a whole*, not to simply take over the management of the strategy's cash collateral.

*       *       *

For these reasons, the only reasonable interpretation of the IMA is that State Street was vested with full and absolute discretion to manage the entire Commodities Strategy and thus bore the responsibility to select into which unspecified cash management fund to invest HPOPS's cash

---

[21] The only time State Street ever referenced the possibility of moving the collateral to a cash fund other than the LDBF was in a voicemail message Craig DeGiacomo left for Pat Franey on August 3, 2007 when Mr. Franey was on vacation—a voicemail Mr. Franey never received—and DeGiacomo made no attempt to contact any other HPOPS employees.  The voicemail stated only that "if you wish to move out of the limited duration bond fund, we can "*talk*" to you about moving into another cash vehicle Libor Plus; *but that information will be in the letter*."  *See* Wolkoff Decl. Ex. 5.  However, no such letter was ever sent nor was there any further "talk" of moving the cash to another fund.  A letter about a new "cash" fund (the LDBF II) was sent on August 8, 2007, but the goal of that fund was to preserve the very same exposure to subprime.  Moreover, the LDBF II would offer no liquidity until October 31, 2007 and would provide no protection from subprime pricing issues.  *See* Wolkoff Decl. Ex. 29.

collateral, to monitor that fund, and to move the cash collateral to a different fund if prudent to do so, as long as the IMA remained in effect.

**III.    State Street's affirmative defenses should be dismissed.[22]**

### A.    Section 802.203(c) immunizes the Trustees.

HPOPS has moved to dismiss State Street's affirmative defenses because the plain language of Texas Government Code § 802.203(c) immunizes the Trustees, and thus HPOPS, from liability stemming from the management of the funds entrusted to State Street. *See* MSJ Mem. at 38-42. The core of State Street's response is that, § 802.203(c) notwithstanding, it can pass off to the Trustees all or some of State Street's own liability for having grossly mismanaged the Commodities Strategy because the Trustees purportedly failed to either uncover State Street's fraud more promptly or conduct the appropriate due diligence when they hired State Street in the first place. As next shown, State Street's response misinterprets the statutory scheme; posits a "straw man" (that HPOPS inappropriately based its argument on ERISA); and relies on inapplicable proportionate responsibility principles.

### 1.    *State Street misinterprets § 802.203(c).*

Section 802.203(c) provides that "[a] trustee is not liable for the acts or omissions of an investment manager appointed under Section 802.204, ***nor is a trustee obligated to invest or otherwise manage any asset of the system subject to management by the investment manager***," Tex. Gov't Code Ann. § 802.203(c), and its legislative history clarifies that "'after an investment manager has been hired, ***no trustee is responsible for the investment of funds under the manager's authority***, or for the manager's acts or omissions.'" MSJ Mem. at 45 (quoting legislative history). Thus, under § 802.203, the accountability for the mismanagement about which HPOPS complains rests ***solely*** with State Street. By advancing the various defenses at issue here, State Street seeks to accomplish exactly what § 802.203 says State Street cannot do: transfer its own responsibility for managing entrusted

---

[22] State Street does not address HPOPS's argument that none of State Street's affirmative defenses are applicable to HPOPS's Texas Securities Act Claim. *See* MSJ Mem. at 49-50.

assets to the Trustees who, pursuant to statutory authority (§ 802.204), delegated that responsibility to State Street.[23]

State Street cites § 802.203(b) and § 802.206, but neither alters this calculus.   Section 802.203(b), the only of the two that falls within the "Fiduciary Responsibility" subsection, simply states the obvious—that when the Trustees undertake to hire an investment manager, they need to make sure they hire qualified professionals.   But neither HPOPS nor State Street has placed State Street's qualifications at issue; thus, § 802.203(b) is not germane to this issue.

In contrast to § 802.203, which is titled "Fiduciary Responsibility," § 802.206 is an entirely separate subsection entitled "Evaluation of Investment Services."   That section states that the Board shall "monitor the investments made by any investment manager for the system," but it does not obligate the Board to oversee or manage the manner and method by which an investment manager carries out its investment duties—an obligation that § 802.203(c) makes clear is unequivocally ***not*** owed by the Board.[24]   Were this not the case, every professional investment manager who fails to carry out its tasks in a prudent manner could offload its tortious conduct to the client that hired it by claiming that the client is liable for having failed to catch the investment manager's mismanagement midstream and/or for having hired the investment manager in the first place.   Even outside the pension plan/investment management arena, courts reject responsibility-shifting arguments like this:

---

[23] As noted, State Street has endorsed this argument in other proceedings based on almost identical language.  *See* MSJ Mem. at 40-41.  State Street had no answer to this in its response.

[24] In order to understand why State Street's efforts to parry the impact of § 802.203(c) fail, it is as important to understand what HPOPS ***is not*** contending as it is to understand what HPOPS ***is*** contending regarding its allegations that State Street mismanaged the Commodities Strategy. Consistent with § 802.203, HPOPS contends that State Street did not prudently manage the assets entrusted to it—assets that it was supposed to have managed ***in accordance with*** the investment strategy agreed to by HPOPS and State Street.  The investment strategy was prudent, but it was State Street's management of HPOPS's assets in accordance with that strategy that was not.  It simply is not an answer to the § 802.203 bar for State Street to attempt (cleverly) to recast HPOPS's complaint as one raising issues of oversight by arguing that the Trustees were responsible to "monitor [State Street's] performance and prudently determine whether the selected investment strategy remains suitable for the plan." Opp. at 23.

> [A]ccountants are not to be rendered immune from the consequences of their own negligence merely because those who employ them may have conducted their own business negligently. Allowing such a defense would render illusory the notion that an accountant is liable for the negligent performance of his duties.

*Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 190 (Tex. App.—Waco 1987, writ denied) (internal quotations omitted).

### 2. *State Street cannot transfer its liability to HPOPS's participants.*

State Street argues that ERISA case law does not help determine how Texas pension law applies to essentially identical circumstances. Although HPOPS agrees that the analysis employed by courts that have grappled with ERISA is not controlling, HPOPS disagrees that it is not instructive to the interpretation of § 802.203(c),[25] as the logic employed by those federal courts is both sound and persuasive. In particular, among the most salient points made in those decisions is that beneficiaries should not be punished for the purportedly imprudent acts of trustees. *See* MSJ Mem. at 42-44 (citing cases). Moreover, this sound policy finds root even outside ERISA. To begin with, as discussed above, § 802.203(c) immunizes the Trustees from liability for mismanagement with respect to assets entrusted to State Street. In addition, § 802.203 makes clear that both State Street and the Trustees owed their duties to the Plan and its beneficiaries, who are the real parties in interest. *See* TEX. GOV'T CODE ANN. § 802.203(a). This lawsuit was brought on behalf of the Plan, and any recovery will go to the Plan. Thus, it would be inequitable to allow a culpable defendant, such as State Street, to foist its liability onto others at the expense of the Plan where those others (here, the Trustees) are immune and would not be required to contribute to the Plan's losses even if they had been sued by its participants.

---

[25] For example, State Street notes that ERISA, a comprehensive statute creating a federal cause of action, does not provide for affirmative defenses. *See* Opp. at 18-20. In making this argument, State Street ignores the fact that the language of § 802.203(c)—which absolves the Trustees of responsibility with respect to the management of assets entrusted to the investment manager—is verbatim of the language in the federal scheme. *Compare* 29 U.S.C. §1105(d)(1).

### 3.      *Texas proportionate responsibility law is inapplicable in this case.*

State Street contends that HPOPS's interpretation of § 802.203(c) is inconsistent with Texas

proportionate responsibility law. *See* Opp. at 20. Texas proportionate responsibility law, as codified in

Chapter 33 of the Texas Civil Practices & Remedies Code, allows defendants, in certain instances, to

place the appropriate amount of responsibility on the shoulders of codefendants or responsible third

parties who may not necessarily have been named as defendants (RTPs). *See* TEX. CIV. PRAC. & REM.

CODE ANN. § 33.003. But as State Street concedes, the responsibility-shifting regime of Chapter 33

does not apply where there is a "'***separate and conflicting*** legislative fault-allocation scheme.'" Opp.

at 20-21. Here, § 802.203 is such a conflicting scheme because it provides that the Trustees are not

liable for State Street's conduct or in any way responsible for investing or managing the assets entrusted

to State Street. *See* TEX. GOV'T CODE ANN. § 802.203(c). Thus, Chapter 33 does not apply to

HPOPS's claims against State Street.[26]

Moreover, even if Chapter 33 did apply to HPOPS's claims, and even had State Street named

the Trustees as third-party defendants, State Street could not pin liability on them because they are

protected by governmental immunity and thus cannot be liable to HPOPS (absent a finding of bad faith,

which has not been alleged). *See Tex. A & M Univ. v. Bading*, 236 S.W.3d 801, 802-03 (Tex. App.—

Waco 2007, pet. denied); *Williams v. Houston Firemen's Relief & Ret. Fund*, 121 S.W.3d 415, 436 (Tex.

App.—Houston [1st Dist.] 2003, no pet.) ("Public officials are entitled to official immunity from

personal liability in performing (1) discretionary duties (2) in good faith (3) within the scope of their

---

[26] State Street argues that it can designate the Trustees as RTPs under § 33.004 (something it has not yet
tried to do). If and when State Street tries to invoke § 33.004 in an effort to deflect its own liability to
others, its efforts will meet the same demise. Again, because § 802.203(c) is a "conflicting legislative
fault-allocation scheme," any effort to shift responsibility away from State Street to others, when and if
it is raised, will fail under Chapter 33. Texas pension plan law simply does not permit an investment
manager to do an end run around the investment management delegation protections afforded under §
802.203(c) by appending to a Plan's lawsuit claims of negligent hiring/oversight on the part of the
governing body (e.g., the Trustees). And as noted above, cases involving claims of professional
malfeasance on the part of other professionals (e.g., accountants) are in accord. *See supra* Part III.A.1.

authority."); *Bowen v. Comstock*, No. 10-05-00295-CV, 2008 WL 2209722, at *3 (Tex. App.—Waco 2008, pet. dism'd).[27]

### B.    The governmental function doctrine bars State Street's defenses

State Street contends that (1) HPOPS was not engaged in a governmental function when it hired State Street as an Investment Manager and (2) the governmental function doctrine does not apply to defenses that "only diminish the amount of monetary damages recovered by a governmental litigant." *See* Opp. at 24-26. State Street is wrong on both fronts.

As a threshold matter, State Street agrees with HPOPS's argument that "the general administration, management, and operation of the pension system" are governmental functions enjoined on the HPOPS Board. *See* MSJ Mem. at 45 (quoting TEX. REV. CIV. STAT. art. 6243g-4, § 3(a)); *see* Opp. at 25 (acknowledging that "the HPOPS Board is ***required*** by statute to administer the pension fund"). The Texas Legislature ***also*** mandated that the Board invest the System's surplus funds: "If the board determines that a surplus of funds exists in an amount exceeding the current demand on the pension system, the board ***shall*** invest the surplus funds[.]" TEX. REV. CIV. STAT. art. 6243g-4, § 10(a). Thus, there can be no dispute that the investment of such funds is "enjoined" on HPOPS by statute.

In turn, Texas courts "repeatedly have recognized that governmental functions encompass activities that are closely related to or necessary for performance of the governmental activities designated by statute." *City of Houston v. Petroleum Traders Corp.*, 261 S.W.3d 350, 356 (Tex. App.— Houston [14th Dist.] 2008, rule 53.7(f) motion granted).[28] Because hiring an investment manager is

---

[27] *See also City of El Paso v. Heinrich*, 284 S.W.3d 366, 369-372 (Tex. 2009) ("To fall within this *ultra vires* exception [to governmental immunity], a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.").

[28] *See also Tex. River Bargers v. City of San Antonio*, 21 S.W.3d 347, 357 (Tex. App.—San Antonio 2000, pet. denied) ("Because the City's actions were encompassed within the governmental functions listed in the Act, we have no discretion to declare the actions propriety, regardless of the City's motives."); *Gordon v. San Antonio Water Sys.*, No. 04-06-00699-CV, 2007 WL 748692, at *1 (Tex.

closely related to HPOPS's governmental function of investing surplus funds, that activity is a governmental function.[29]

State Street's only response is that because Texas law provides HPOPS with discretion in carrying out this governmental function (with respect to the hiring of an investment manager), that aspect of HPOPS's governmental function somehow becomes a proprietary function. *See* Opp. at 25-26. But this argument ignores well-established Texas law that "[i]n considering whether the [governmental entity] was engaged in a governmental or proprietary function, a plaintiff may not 'split various aspects of [the entity's] operation into discrete functions and recharacterize certain of those functions as propriety.' " *City of Plano v. Homoky*, 294 S.W.3d 809, 815 (Tex. App.—Dallas 2009, no pet.); *see City of San Antonio v. Butler*, 131 S.W.3d 170, 178 (Tex. App.—San Antonio 2004, pet. denied) ("Neither [the City's] discretion nor the existence of a profit motive reclassifies one aspect of a governmental function into proprietary conduct.").[30]   State Street's "proprietary function" argument should therefore be rejected.[31]

State Street separately asserts the governmental function doctrine does not apply to affirmative defenses which offset State Street's liability to the Plan, citing *Reata Construction Corp. v. City of*

---

App.—San Antonio Mar. 14, 2007, pet. denied) ("The sale of surplus property by SAWS that was previously used in the provision of water service is an activity associated with the operation of a governmental function. Accordingly, SAWS is entitled to governmental immunity.").

[29] Moreover, HPOPS limited staffing requires the hiring of investment managers in a "complex[ ] . . . investment environment." Ex. 11 (IMA) at Ex. E § 402.04.

[30] *See also Gordon*, 2007 WL 748692, at *1.

[31] In *Dallas v. Arnett*, 762 S.W.2d 942 (Tex. App.—Dallas 1988, writ denied), the court held that a municipality's provision of pension benefits was a proprietary function by analogizing that function to a self-insured municipality's provision of health insurance to its employees. *Arnett*'s reasoning has since been rejected, however. *See Williams*, 121 S.W.3d at 439 ("[T]he analogy drawn in *Arnett* is false. There is no statutory 'enjoinder' that a self-insured municipality provide health benefits to municipal employees, while there is an express statutory obligation under article 6243e.2(1) for the City to manage the Fund for the benefit of firefighters.").   Likewise, as in *Williams*, there is an express statutory obligation for HPOPS to administer and manage the Fund and to invest the surplus funds for the benefit of police officers. *See* TEX. REV. CIV. STAT. art. 6243g-4, §§ 3(a), 10(a). Indeed, the System was created for that reason alone. *See id.* § 3(a).   For the same reason, State Street's citation to *Herschbach v. City of Corpus Christi*, 883 S.W.2d 720 (Tex. App.—Corpus Christi 1994, writ denied) is similarly unhelpful.

*Dallas*, 197 S.W.3d 371, 376-77 (Tex. 2006). *See* Opp. at 24. But *Reata* only held that a litigant could

pursue an ***affirmative*** claim against an otherwise-protected sovereign who had sued the litigant. Here,

however, State Street has asserted no affirmative claims against either HPOPS or the Trustees.

Moreover, *Reata* recognized the right of a litigant to pursue affirmative claims only when those claims

were "offsets" that merely sought to reduce the amount of damages recovered by the governmental

litigant. Here, however, State Street's affirmative defenses of unclean hands, in pari delicto, ratification,

waiver, laches, and estoppel do not merely seek "offsets"; they seek to bar HPOPS's claims completely.

Furthermore, *Reata* is distinguishable for the additional reason that, there, a governmental entity (the

City of Dallas) intervened in the lawsuit and was suing on its own behalf to recover damages for its

own account. *See* 197 S.W.3d at 373. In contrast, here, the Trustees are not pursuing this lawsuit on

their own behalf. Instead, they have sued State Street on behalf of the Plan to recover damages owed to

the Plan. For these reasons, *Reata* is distinguishable and inapposite.

### C. State Street's assertion that Texas law recognizes a duty to mitigate damages resulting from fraud is directly contrary to a 112-year-old axiom of Texas law.

State Street accuses HPOPS of "misstat[ing] . . . Texas law." Opp. at 27. But it is State Street

who misunderstands Texas law. For 112 years, it has been black-letter law in Texas that "[a] party

cannot voluntarily inflict an injury upon another, and then claim that the party injured owes him the

duty to exercise ordinary care to protect him from the consequences of his act." *Galveston, Harrison &*

*San Antonio Ry. Co. v. Zantzinger*, 48 S.W. 563, 566-67 (Tex. 1898).[32]

---

[32] The cases to which State Street cites to support its erroneous argument that "[t]he Texas Supreme Court has consistently applied the common law duty to mitigate damages in cases involving fraud" do not even involve fraud—they involve claims under the Texas Deceptive Trade Practices Act (DTPA), which is a consumer protection statute. *See* Opp. at 27. In *Arthur Andersen & Co. v. Perry Equipment Corp.*, although the jury found that the defendant committed fraud, DTPA violations, and breach of warranty, the plaintiff elected to recover solely under the DTPA. *See* 945 S.W.2d 812, 814 (Tex. 1997). On review, the Texas Supreme Court addressed the defense of mitigation ***only*** with respect to the DTPA claim; fraud was no longer a relevant issue in the case. *See id.* at 817; *see also Great Am. Homebuilders, Inc. v. Gerhart*, 708 S.W.2d 8, 10-11 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (explaining that proof of fraud or intent is not required under the DTPA). Similarly, *Gunn*

State Street claims that the Texas Supreme Court vacated *Meadolake Foods, Inc. v. Estes*, a case upon which HPOPS relied in its motion. *See* 218 S.W.2d 862, 868, 872 (Tex. Civ. App.—El Paso 1948, writ ref'd n.r.e.) ("*Meadolake I*"); Opp. at 27. But State Street's claim is patently false and highlights State Street's unfamiliarity with Texas law. The Texas Supreme Court did not vacate the ***appellate*** court's decision: it refused the ***defendant's*** application for a writ of error ("writ ref'd") because there was no reversible error in the appellate court's analysis ("n.r.e."). *See Meadolake Foods, Inc. v. Estes*, 219 S.W.2d 441, 441 (Tex. 1949) ("*Meadolake II*").[33]

Consistently, Texas courts as recently as 2006—and Texas treatises as recently as 2010—have embraced the reasoning of *Meadolake I*. *See, e.g., Formosa Plastics Corp. v. Kajima Int'l, Inc.*, 216 S.W.3d 436, 459 (Tex. App.—Corpus Christi 2006, pet. denied) (en banc) (relying on *Meadolake I* in holding that "an injured party is not required to minimize damages resulting from the fraud")[34]; *New Process Steel Corp. v. Steel Corp. of Tex., Inc.*, 703 S.W.2d 209, 215 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (citing *Meadolake I* for the proposition that a fraud victim has no obligation to act with care to mitigate its damages). The lesson of the cases sets a clear standard of Texas law: "An injured person owes no duty to the perpetrator of a fraud to exercise ordinary care to prevent or minimize the damages that result from the fraud." 28 TEX. JUR. 3D Damages § 196 (2010).[35]

---

*Infiniti, Inc. v. O'Byrne* involved only a plaintiff's duty to mitigate with respect to a DTPA claim. *See* 996 S.W.2d 854, 855, 857-58 (Tex. 1999). Neither case involved an analysis regarding whether a victim of fraud has any duty to mitigate damages.

[33] *See also Helms v. S.W. Bell Tel. Co.*, 794 F.2d 188, 193 & n.14 (5th Cir. 1986) ("writ ref'd n.r.e" indicates "favorable" treatment by the Texas Supreme Court).

[34] State Street attempts to distinguish *Formosa Plastics* by stating that its "ultimate holding . . . was based on the defendant's 'fail[ure] to meet its burden.'" Opp. at 28 (quoting *Formosa Plastics*). However, *Formosa Plastics* reached its holding on two grounds—factual ***and*** legal insufficiency. *See* 216 S.W.3d at 459.

[35] State Street's citation to *Thomas v. Callaway*, 251 S.W.2d 921 (Tex. Civ. App.—San Antonio 1952, writ ref'd n.r.e.) to argue that *Meadolake I* stands for the proposition that a defendant can prove failure to mitigate so as to reduce its damages for fraud continues to demonstrate State Street's fundamental misunderstanding of Texas law. *See* Opp. at 28. First, *Thomas* did not involve a claim of fraud; it was a trespass-to-try-title case. *See Thomas*, 251 S.W.2d at 922. Second, the court did not cite *Meadolake II* for the rule that a defendant can minimize its damages based upon the plaintiff's failure to mitigate.

**D.      HPOPS had no duty to mitigate because State Street had an equal or greater opportunity to avoid such damages.**

In its motion, HPOPS cited the Texas Supreme Court's ruling in *Walker v. Salt Flat Water Co.* for the rule that a plaintiff is not required to mitigate its damages when the defendant had an equal opportunity to do so. *See* 96 S.W.2d 231, 232-33 (Tex. 1936); *see also* MSJ Mem. at 47.[36]   State Street attempts to distinguish *Walker* by arguing that the decision "focused on the fact that the plaintiff's decision not to mitigate was reasonable in light of the defendant's relative expertise and opinion that no mitigation was necessary." Opp. at 29.   State Street misreads *Walker*:  Whether the plaintiff took reasonable steps to mitigate was not the basis of that decision.   Indeed, *Walker* noted that there was at least a jury question as to whether the plaintiff *did not take reasonable steps to mitigate its damages*. *See* 96 S.W.2d at 232-33.   Nonetheless, *Walker* announced a *new* and *additional* rule of law that abrogates a plaintiff's duty to mitigate when a defendant has an equal opportunity to act to avoid such damages. *See id.* at 232.

State Street attempts to distance itself from *Walker* by claiming that it—in contrast to the defendant in *Walker*—warned HPOPS of the LDBF's composition and dramatic underperformance. *See* Opp. at 29.   While HPOPS certainly takes issue with State Street's characterization of the factual record, it is irrelevant to the rule in *Walker*.   Indeed, the undisputed evidence in *Walker* was that the plaintiff (1) knew all of the material facts necessary to give rise to a duty to mitigate, (2) could have mitigated with little expense, and (3) failed to mitigate—hence the Court's reference to "an equal opportunity."   *See* 96 S.W.2d at 232.   As noted above, because the IMA vested State Street, as the

---

Instead, the court relied upon *Meadolake II* for the proposition that "[t]he burden of pleading and proving the defense of mitigation of damages rested upon appellant and it was his duty to request proper issues and instructions concerning this matter if he desired to have same submitted to the jury." *Id.* at 926.   As in *Meadolake II*, because the defendant failed to request such instructions at trial, it failed to sustain its burden, and thus, there was no reversible error. *See id.*

[36] The Second Circuit has a similar rule: a plaintiff is not required to take steps in mitigation that should have been taken by the breaching defendant. *See Travelers Indem. Co. v. Maho Mach. Tool Corp.*, 952 F.2d 26, 30 (2d Cir. 1991).

Investment Manager, with "full and absolute" discretion over HPOPS's account, State Street was *at least equally* capable of mitigating the losses—no matter what it contends it told HPOPS. In fact, State Street's entire argument is premised on the claim that the information known to State Street, which it claims it conveyed to HPOPS, was sufficient to put HPOPS on notice of the need to mitigate. If so, State Street had at least equal access to that same information. Accordingly, under *Walker*, State Street cannot now assert that HPOPS failed to do that which State Street also could have done. *See id.* at 232-33.[37] It cannot, therefore, raise the defense of mitigation against HPOPS's claims.

## CONCLUSION

For the above reasons and those previously presented, HPOPS's Motion for Partial Summary Judgment should be granted. HPOPS also respectfully requests all such other and further relief to which it may be entitled.

Dated: July 30, 2010

---

[37] State Street also contends that HPOPS was a sophisticated investor that made a knowing decision to remain invested and "thereby speculate on the market." Opp. at 30. In support of this contention, State Street cites *Saboundjian v. Bank Audi (USA)*, 556 N.Y.S.2d 258 (N.Y. App. Div. 1990). But *Saboundjian* was decided under New York law, not Texas law; does not discuss the rule of *Walker*—or *Travelers Indemnity*, which applies a similar rule in the Second Circuit; omits any discussion regarding whether the defendant had an equal opportunity to mitigate the plaintiff's damages; and has been limited to its facts, which are radically different from those here. *See, e.g., Korea Life Ins. Co. v. Morgan Guar. Trust Co.*, No. 99 Civ. 12175(AKH), 2004 WL 1858314, at *8 (S.D.N.Y. Aug. 20, 2004) (citing *Travelers Indemnity* for the rule that "[the plaintiff] should not bear the responsibility and the expense of [mitigation] when [the defendant] had an equal opportunity, greater market experience, and the contractual obligation to do so").

Respectfully submitted,

**BURFORD & MANEY, L.L.P.**

By:    */s/ Robert R. Burford*
       Robert R. Burford
       TBA No. 03258500
       Andrew Meade
       TBA No. 24032854
       1221 McKinney, Ste. 3150
       Houston, Texas 77010
       Telephone: (713) 658-9001
       Facsimile: (713) 658-9011

**GIBBS & BRUNS, L.L.P.**

By:    */s/ Grant J. Harvey*
       Grant J. Harvey
       TBA No. 09177700
       Caren S. Sweetland
       TBA No. 24001333
       Laura Hanley Carlock
       TBA No. 24027221
       1100 Louisiana, Suite 5300
       Houston, Texas 77002
       Telephone: (713)650-8805
       Facsimile:  (713)750-0903

**ATTORNEYS FOR PLAINTIFF HOUSTON
POLICE OFFICERS' PENSION SYSTEM**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record via electronic mail on July 30, 2010 as set forth below:

Harvey J. Wolkoff
Robert A. Skinner
Olivia S. Choe
Lila A. Palmer
**Ropes & Gray LLP**
One International Place
Boston, MA 02110
Tel: 617.951.7000
Fax: 617.951.7050
Harvey.Wolkoff@ropesgray.com
Robert.Skinner@ropesgray.com
Olivia.Choe@ropesgray.com
lila.palmer@ropesgray.com

Jerome C. Katz
**Ropes & Gray LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Tel: 212.841.5700
Fax: 212.841.5725
Jerome.Katz@ropesgray.com

*Attorneys for Defendant State Street Bank and Trust Company*

John D. Donovan, Jr.
**Ropes & Gray LLP**
One International Place
Boston, MA 02110
Tel: 617.951.7000
Fax: 617.951.7050
jdonovan@ropesgray.com

*Attorneys for Defendant SSGA Funds*

Edwin G. Schallert
Steven Klugman
Matthew D. Siegel
**DeBevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
Tel: 212.909.6000
Fax: 212.909.6836
egschall@debevoise.com sklugman@debevoise.com mdsiegel@debevoise.com

*Counsel for Plaintiff Prudential Retirement Insurance and Annuity Company*

27

William C. Fredericks
Jerald D. Bien-Willner
Avi Josefson
**Bernstein Litowitz Berger & Grossman LLP**
1285 Avenue of the Americas
New York, NY 1019
Tel: 212.554.1400
Fax: 212.554.1444
avi@blbglaw.comWfredericks@blbglaw.comJerryB@blbglaw.com

*Counsel for Lead Plaintiff Warren Cohen, Trustee of the Unisystems Plan, and Interim Lead Counsel for the Class*

George M. Gowen III
**Cozen O'Connor**
1900 Market Street, Fourth Floor
Philadelphia, PA 19103
Tel: 215.665.2000
Fax: 215.665.2013
ggowen@cozen.com

*Counsel for Defendants Cambridge Financial Services, Inc. and Ernest A. Liebre*

Jeffrey C. Block
Patrick T. Egan
Kristen D. Tremble
Abigail A. Romero
**Berman Devalerio Pease Tabacco Burt & Pucillo**
One Liberty Square
Boston, MA 02109
Tel: 617.542.3800
Fax: 617.542.1194
jblock@bermanesq.compegan@bermanesq.comktremble@bermanesq.comaromeo@bermanesq.com

*Counsel for Plaintiffs Nashua Corporation Plan Committee, John L. Patenaude, Margaret Callan, and Karen Adams*

Anne F. O'Berry
**Berman Devalerio Pease Tabacco Burt & Pucillo**
Esperante Building
222 Lakeview Avenue, Ste. 900
West Palm Beach, FL 33401
Tel: 561.835.9400
Fax: 561.835.0322
aoberry@bermanesq.com

*Counsel for Lead Plaintiffs John L. Patenaude and Margaret Callan, Fiduciaries of the Nashua Plan and Interim Lead Counsel for the Class*

Clinton Krislov
Jeffrey Salas
Krislov & Associates, Ltd.
20 North Wacker Drive
Chicago, IL 60606
Tel: 312.606.0500
Fax: 312.606.0207
clint@krislovlaw.comjeff@krislovlaw.com

**Counsel for Sisters of Charity of the Blessed Virgin Mary**

William F. Lee
John J. Butts
Felicia H. Ellsworth
Kevin S. Prussia
**Wilmer Cutler Pickering Hale and Dorr LLP**
60 State Street
Boston, MA 02109
617.526.6000
william.lee@wilmerhale.comjohn.butts@wilmerhale.comfelicia.ellsworth@wilmerhale.comkevin.prus
sia@wilmerhale.com
Steven F. Cherry
**Wilmer Cutler Pickering Hale and Dorr LLP**
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
202.663.6000
steven.cherry@wilmerhale.com

**Counsel for ING Institutional Plan Services LLC f/k/a CitiStreet, LLC**

David E. Lurie
Thomas E. Lent
Sara A. Laroche
**Lurie & Krupp, LLP**
One McKinley Square
Boston, MA 02109
Telephone: 617.367.1970
Facsimile: 617.367.1971
dlurie@luriekrupp.comtlent@luriekrupp.comslaroche@luriekrupp.com

**Counsel for Plaintiffs F.W. Webb, Robert A. Mucciaarone, Charles Slattery III and Edward Welch,
as Members of the F.W. Webb Company Savings & Profit Sharing Plan Committee, and the F.W.
Webb Company Savings and Profit Sharing Plan, on Behalf of the Plan and the Participants
Thereof**

Leif T. Simonson
**Faegre & Benson LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Tel: 612.766.7000
Fax: 612.766.160
lsimonson@faegre.com
*Counsel for Apogee Enterprises, Inc.*

Michele Bryant
Thomas J. Kimpel
**Bamberger, Foreman, Oswald & Hahn LLP**
20 N.W. 4th Street, Seventh Floor
P.O. Box 657
Evansville, IN 47707-0657
Tel: 812.425.1591
Fax: 812.421.4936
mbryant@bamberger.comtkimpel@bamberger.com

Richard B. Walsh, Jr.
David B. Helms
R. Bradley Ziegler
**Lewis, Rice, Fingersh, L.C.**
500 N. Broadway, Suite 2000
St. Louis, MO 63102
Tel: 314.444.7600
rwalsh@lewisrice.comdhelms@lewisrice.combziegler@lewisrice.com

*Counsel for Plaintiff Welborn Baptist Foundation, Inc.*

Lynn Sarko
Derek W. Loeser
Karin B. Swope
Gretchen Freeman Cappio
Laura R. Gerber
**Keller Rohrback LLP**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: 206.623.1900
Fax: 206.623.3384
lsarko@kellerrohrback.comdloeser@kellerrohrback.comkswope@kellerrohrback.comgcappio@kellerr
ohrback.comlgerber@kellerrohrback.com

*Counsel for Lead Plaintiff Alan Kober, Trustee of the Andover Plan, and Interim Lead Counsel for the Class*

David Avi Rosenfeld
Evan Jay Kaufman
Samuel Howard Rudman
**Coughlin, Stoia, Geller, Rudman & Robbins, LLP**
58 South Service Road, Suite 200
Melville, NY 11747
drosenfeld@csgrr.comekaufman@csgrr.comsrudman@csgrr.com

*Counsel for Plumbers and Steamfitters Union Local No. 10 Health & Welfare Fund*

Jeffrey A. Berens
Darby Kennedy
**Dyer & Berens LLP**
303 East 17th Avenue, Suite 300
Denver, CO 80203
Tel: 303.861.1764
Fax: 303.395.0393
Jeff@dyerberens.comdarby@dyerberens.com
*Counsel for Securities Class Plaintiffs*

Geoff Gannaway
**Beck, Redden & Secrest**
One Houston Center
1221 McKinney Street, Suite 5400
Houston, TX 77010-2010
Tel: 713.951.3700
Fax: 713.951.3720
ggannaway@brsfirm.com

Charles R. Parker
**Locke Lord Bissel & Liddell LLP**
600 Travis, Suite 3400
Houston, TX 77002-2095
Tel: 713.226.1200
Fax: 713.223.3717
cparker@lockelord.com

John R. Nelson
**Locke Lord Bissel & Liddell LLP**
100 Congress Avenue, Suite 300
Austin, TX 78701
Tel: 512.305.4700
Fax: 512.305.4800
jnelson@lockelord.com

*Counsel for Plaintiffs Memorial Hermann Healthcare System and the Health Professionals Insurance Co., Ltd.*

Douglas Spaulding
**Reed Smith LLP**
1301 K Street NW
Suite 1100 - East Tower
Washington, D.C. 20005
Tel: 202.414.9200
Fax: 202.414.9299
dspaulding@reedsmith.com

*Counsel for Defendant Yanni Partners, Inc.*

_____/s/Caren Sweetland_____
Caren Sweetland