UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────

IN RE STATE STREET BANK AND
TRUST CO. FIXED INCOME FUNDS                    MDL No. 1945
INVESTMENT LITIGATION

───────────────────────────────

PRUDENTIAL RETIREMENT INSURANCE
AND ANNUITY COMPANY,

     Plaintiffs,

v.                                              No. 07 Civ. 8488 (RJH)

STATE STREET BANK & TRUST
COMPANY and  STATE STREET GLOBAL
ADVISORS, INC.,

     Defendants.

───────────────────────────────

**STATE STREET'S REPLY MEMORANDUM IN SUPPORT OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

1.   STATE STREET'S MITIGATION AND CAUSATION DEFENSES WILL
     NOT DIMINISH THE PLANS' RECOVERY, AS THE PLANS HAVE
     ALREADY BEEN MADE WHOLE. ...............................................................................3

2.   STATE STREET IS ENTITLED TO ASSERT A MITIGATION DEFENSE
     AGAINST PRIAC BASED UPON PRIAC'S OWN FIDUCIARY BREACHES. ............5

     A.   Mitigation Is a Valid Affirmative Defense Under ERISA, Which
          State Street Pled. .....................................................................................................5

     B.   Unlike PRIAC, State Street did all that it could to Mitigate the Plans' Losses.........9

3.   PRIAC'S FIDUCIARY BREACHES WERE A SUPERSEDING CAUSE
     OF THE PLANS' LOSSES, WHICH ESTABLISHES A FAILURE OF
     PROOF ON PRIAC'S CLAIM AND A VALID DEFENSE UNDER ERISA. ..............12

     A.   Lack of Causation Need Not be Pleaded as Affirmative Defense.........................12

     B.   Superseding Cause is a Valid Affirmative Defense Under ERISA. ........................14

     C.   PRIAC's Fiduciary Breaches were a Superseding Cause of the Plans'
          Losses. ...................................................................................................................15

4.   THE SAME UNDISPUTED FACTS ESTABLISH STATE STREET'S
     ENTITLEMENT TO SUMMARY JUDGMENT ON ITS CONTRIBUTION
     COUNTERCLAIM. ...............................................................................................20

5.   THERE ARE NO DISPUTED ISSUES OF MATERIAL FACT PREVENTING
     ENTRY OF SUMMARY JUDGMENT FOR STATE STREET. ...................................21

     A.   PRIAC's Duty to Provide Interim Reports to the Plans is Undisputed. .................22

     B.   PRIAC's Failure to React to State Street's Correction of the IBF's Name is
          Undisputed...............................................................................................................22

     C.   PRIAC's Failure to Provide the Plans with Information about the Bond
          Funds' Leverage and Concentration in ABS is Undisputed....................................23

     D.   The Additional Facts Identified by PRIAC are Immaterial.....................................25

     E.   The Evidence Shows that the Plans Would Have Redeemed if PRIAC
          had Provided them with State Street's Disclosures. ................................................26

     F.   PRIAC Misconstrues State Street's Discussion of Damages. ................................28

CONCLUSION...................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cases

*Astor Holdings, Inc. v. Roski*,
   325 F. Supp. 2d. 251 (S.D.N.Y. 2003)..................................................................13

*Chemung Canal Trust Co. v. Sovran Bank/Maryland*,
   939 F.2d 12 (2d Cir. 1991)..................................................................5, 20

*Derdiarian v. Felix Contracting Corp.*,
   414 N.E.2d 666 (N.Y. 1980)..................................................................19

*Fed. Deposit Ins. Corp. v. Ornstein*,
   73 F. Supp. 2d 277 (E.D.N.Y. 1999) ..................................................................6

*Gallup v. Omaha Prop. & Cas. Ins. Co.*,
   282 Fed. Appx. 317 (5th Cir. 2008)..................................................................6

*Gordon v. E. Ry. Supply, Inc.*,
   626 N.E.2d 912 (N.Y. 1993)..................................................................19

*Haddock v. Nationwide Fin. Servs. Inc.*,
   570 F.Supp.2d 355 (S.D.N.Y. 2008)..................................................................4

*Hamilton v. Niagra Frontier Transp. Auth.*,
   Nos. 00-CV-300SR, 00-CV-863SR, 2008 U.S. Dist. LEXIS 86739 (W.D.N.Y. Oct.
   24, 2008) ..................................................................6

*Harris v. Am. Inv. Co.*,
   523 F.2d 220 (8th Cir. 1975) ..................................................................19

*Higazy v. Templeton*,
   505 F.3d 161 (2d Cir. 2007)..................................................................19

*Hunt v. Magnell*,
   758 F. Supp. 1292 (D. Minn. 1991)..................................................................15

*In re State Street Bank and Trust Co. ERISA Litig.*,
   579 F. Supp. 2d 512 (S.D.N.Y. 2008)..................................................................3

*In re WorldCom, Inc. ERISA Litig.*,
   263 F. Supp 2d 745 (S.D.N.Y. 2003)..................................................................7

*In re: State Street Bank and Trust Co. Fixed Income Funds Inv. Litig.*,
   560 F.Supp.2d 1388 (J.P.M.L. 2008)..................................................................27

*Ironworks Local No. 272 v. Bowen*,
   695 F.2d 531 (11th Cir. 1983) ............................................................................14

*Kush v. Buffalo*,
   449 N.E.2d 725 (N.Y. 1983) ...............................................................................19

*Lee v. Mfrs. & Traders Trust Co.*,
   219 F.R.D. 265 (W.D.N.Y. 2004) ..........................................................................4

*LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*,
   173 F.3d 454 (2d Cir. 1999)...................................................................... *passim*

*Moothart v. Bell*,
   21 F.3d 1499 (10th Cir. 1994) ...............................................................................8

*Morrissey v. Curran*,
   567 F.2d 546 (2d Cir. 1977).....................................................................................7

*Nat'l. Comm. Assoc. v. AT&T*,
   2001 U.S. Dist. LEXIS 951 (S.D.N.Y. Feb. 6, 2006) ..........................................10

*National Market Share, Inc. v. Sterling National Bank*,
   392 F.3d 520 (2d. Cir. 2004)..................................................................12, 13, 15

*Nordwind v. Rowland*,
   584 F.3d 420 (2d Cir. 2009)........................................................................14, 15

*Nye v. Blyth Eastman Dillon & Co., Inc.*,
   588 F.2d 1189 (8th Cir. 1978) .............................................................................19

*Resolution Trust Corp. v. KPMG Peat Marwick*,
   845 F.Supp. 621 (N.D.Ill. 1994) .........................................................................13

*Roberts v. Xtra Lease, Inc.*,
   No. 98 CV 7559, 2001 U.S. Dist. LEXIS 12161 (E.D.N.Y. June 25, 2001) .........20

*Schleibaum v. Kmart Corp.*,
   153 F.3d 496 (7th Cir. 1998) .................................................................................8

*Steinberg v. Columbia Pictures Indus., Inc.*,
   663 F. Supp. 706 (S.D.N.Y. 1987).......................................................................14

*TD Waterhouse Investor Services, Inc. v. Integrated Fund Service, Inc.*, 01 Civ. 8986,
   2005 WL 13560, (S.D.N.Y. 2005) *e* ...................................................................13

*Trs. of the Auto Mechs. Local No. 701 Pension & Welfare Funds v. Union Bank of Cal.*,
   630 F. Supp. 2d 951 (N.D. Ill. 2009) ......................................................................4

*Trustees of the Local 464A United Food and Commercial Workers Union*

*Pension Fund v. Wachovia Bank, N.A.*,
  Civ. No. 09-668, 2009 WL 4138516 (D.N.J. Nov. 24, 2009) ...............................................7, 9

*Wachovia Bank of Georgia, N.A. v. Namik*,
  620 S.E.2d 470 (Ga. Ct. App. 2005) ....................................................................................7, 9

*Williams v. Provident Inv. Counsel, Inc.*,
  279 F. Supp. 2d 894 (N.D. Ohio 2003)........................................................................4, 7, 8, 9


**OTHER AUTHORITIES**

Restatement (Second) of Torts......................................................................................................15

Defendants State Street Bank and Trust Company and State Street Global Advisors, Inc. (collectively, "State Street") respectfully submit this reply brief in further support of State Street's Motion and Cross-Motion for Summary Judgment.[1]

In its opposition to State Street's motion ("PRIAC Opp."), Plaintiff Prudential Retirement Insurance and Annuity Company ("PRIAC") unveils the anticipated fruits of its creative strategy in this case:  by paying the Plans for all of their investment losses with "loans" that the Plans need never repay, and then bringing claims against State Street purportedly on the Plans' behalf, PRIAC seeks to immunize itself from any liability for its own fiduciary breaches.  State Street's motion, however, is not based on the conduct of the Plans or their trustees, but rather on the failure of PRIAC to pass along critical information about the Bond Funds to their investors in the midst of a crisis, and the mounting investment losses that resulted.  Because any recovery of the Plans' investment losses in this action will go into PRIAC'S pocket, not to the Plans, PRIAC cannot shield itself from defenses and counterclaims based on its *own* responsibility for the losses it seeks to recover for its *own account* by relying on ERISA principles designed to protect the *Plans*.  The Plans will have no diminished recovery by reason of State Street's motion; only PRIAC will, and deservedly so.

---

[1] Pursuant to Local Civil Rule 56.1, State Street cites herein to its previously submitted statement of undisputed material facts in support of its Motion for Summary Judgment ("R. 56.1 Stmt."), its response to PRIAC's statement of undisputed materials facts in support of PRIAC's Motion for Partial Summary Judgment ("Opp. R. 56.1 Stmt."), and its statement of undisputed material facts in support of its Cross-Motion for Summary Judgment ("Cross. Mot. R. 56.1 Stmt.").  Copies of documents referred to in each statement are found in separately submitted volumes of exhibits to the previously submitted declarations of Lila A. Palmer, dated June 2, 2010 ("Palmer Decl."), and Daniel J. Maher, dated July 2, 2010 ("Maher Decl.").  State Street separately submits herewith a second declaration of Daniel J. Maher in Further Support of its Motion for Summary Judgment ("2nd Maher Decl."), and an accompanying volume of exhibits, in order to respond to certain points raised more recently by PRIAC in its opposition to State Street's motion.  State Street also cites to documents submitted by PRIAC ("PA") in opposition to State Street's motions and to PRIAC's response to State Street's opening Rule 56.1 statement ("PRIAC Resp. to R. 56.1 Stmt.").

PRIAC is therefore incorrect as a matter of law that the defense of mitigation is not available to State Street in this case.  As indicated, the application of this defense would not reduce the Plans' recovery, as PRIAC asserts, but would merely allocate to PRIAC the portion of those losses for which it bears responsibility.  PRIAC's citation to case law regarding the *Plans'* duty to mitigate is beside the point, and PRIAC's attempt to construe State Street's argument as one of "mitigation prevention" is pure misdirection.  State Street's motion is based upon PRIAC's failure to comply with its own fiduciary obligations to minimize the Plans' losses.

PRIAC also misconstrues ERISA as shielding it from responsibility for its actions that served as a superseding cause of the Plans' losses.  Causation is an element of PRIAC's affirmative claim, and its own conduct breaking the causal chain thus gives rise to both a failure of proof on PRIAC's part and an affirmative defense.

PRIAC's failure to mitigate also proves State Street's counterclaim for contribution, the subject of State Street's cross-motion.  Both the defense and the counterclaim arise from the same conduct – PRIAC's failure to provide material information to its clients regarding the subprime mortgage exposure of the Bond Funds in the midst of the 2007 liquidity crisis in that market, which led directly to additional losses for which PRIAC cannot recover.  State Street is equally entitled to summary judgment on this basis.

Finally, PRIAC fails to raise any disputed factual issues that bar entry of summary judgment.  State Street's motion is based upon the well-established record of the services that PRIAC undertook to perform for the Plans as intermediary, the information that PRIAC received from State Street regarding the Bond Funds, the information that PRIAC failed to pass along to its clients regarding the Bond Funds' composition and performance during the subprime market event in 2007, and the actions of the one PRIAC client (CIGNA) that did receive the

information.  There is no material dispute over what was and was not communicated, or the

consequences of those communications.  Where, as here, a reasonable trier of fact reviewing the

undisputed record of these communications could only conclude that PRIAC's own failures

substantially contributed to the Plans' additional losses, summary judgment is appropriate.

Having already recovered over $48 million via the Fair Fund – a sum equal to the Plans' losses

in the Bond Funds through mid-August 2007 – PRIAC is not entitled to more.

1.    **State Street's Mitigation and Causation Defenses Will Not Diminish the Plans'
      Recovery, As the Plans Have Already Been Made Whole.**

      PRIAC asserts that State Street cannot raise mitigation or superseding cause as

affirmative defenses under ERISA, because they would "reduce[] the amount that the Plans can

recover."  PRIAC Opp. at 5.  In its own motion for partial summary judgment ("PRIAC Mot."),

PRIAC argues that State Street's contribution counterclaim is similarly unavailable as a matter of

law.  PRIAC Mot. at 28-29.  However, while PRIAC purportedly seeks recovery "on behalf of"

the Plans under Sections 404 and 409 of ERISA, the Plans have fully recovered their alleged

losses by virtue of non-repayable loans from PRIAC.[2]  Those loan arrangements, moreover,

"require the Plans to repay Prudential the Loan amount from any recovery obtained in this

litigation."  *In re State Street Bank and Trust Co. ERISA Litig*., 579 F. Supp. 2d 512, 518

(S.D.N.Y. 2008).  In reality, what is at issue in this case is PRIAC's own recovery of the funds it

voluntarily paid out to the Plans.  Thus, PRIAC's argument that State Street's defenses will

reduce the Plans' recovery is a red herring.

---

[2]  PRIAC asserts that State Street is ignoring the Court's earlier ruling, in denying State Street's
Motion to Dismiss, that the Plans had a legally cognizable claim despite the "loan" payments
from PRIAC.  PRIAC Opp. at 4 n.2.  This is flatly incorrect.  The earlier ruling – that the claim
was legally cognizable and could proceed – does not address the issue presented on summary
judgment, namely, whether PRIAC can shield itself from affirmative defenses and counterclaims
based on its own conduct by bringing claims "on behalf of" the Plans, where any recovery
would go to PRIAC.

PRIAC cannot seek shelter from State Street's defenses and counterclaims – which are based on PRIAC's *own* responsibility for the losses it seeks to recover *for itself* – using ERISA principles meant to protect the *Plans* from diminished recovery.  PRIAC contends that State Street's contribution counterclaim and affirmative defenses are unavailable as a matter of law in all ERISA cases, whether asserted against plans or their fiduciaries.  PRIAC Opp. at 6, 13; PRIAC Mot. at 28.  Indeed, as PRIAC would have it, plan fiduciaries like PRIAC could exploit Section 502 of ERISA to inoculate themselves against any and all liability for retirement plan losses – no matter the extent of their culpability – by initiating claims against other fiduciaries "on behalf of" the plans, and paying the plans for the right to keep whatever they recover.  However, courts have allowed contribution claims and affirmative defenses in Section 502 cases in order to prevent that very result.  *See e.g., Haddock v. Nationwide Fin. Servs. Inc.,* 570 F. Supp. 2d 355, 360 (S.D.N.Y. 2008) ("[E]ven a breaching fiduciary should be entitled to the protection of contribution that has traditionally been granted fiduciary defendants under the equitable provisions of trust law.") (internal quotations and citations omitted); *Williams v. Provident Inv. Counsel, Inc.*, 279 F. Supp. 2d 894, 909 (N.D. Ohio 2003) (denying motion to strike certain affirmative defenses, including mitigation, asserted by investment manager defendant to Section 409 claim brought by trustees of a retirement plan, because trustees were allegedly the primary beneficiaries of the plan and so "they alone, rather than other beneficiaries, would benefit from [the] lawsuit").  *See also infra* Part 2(A).

Indeed, none of the authority cited by PRIAC considers State Street's affirmative defenses in a situation similar to the present case, where a plan fiduciary is the only party standing to benefit from a recovery in the litigation.  *See, e.g.*, *Lee v. Mfrs. & Traders Trust Co.*, 219 F.R.D. 265, 266 (W.D.N.Y. 2004); *Trs. of the Auto Mechs. Local No. 701 Pension &*

*Welfare Funds v. Union Bank of Cal.*, 630 F. Supp. 2d 951, 952 (N.D. Ill. 2009). By contrast, the facts here amply illustrate why PRIAC's argument seeking to strip State Street of its affirmative defenses is untenable. As the multiple complaints lodged against PRIAC by its clients establish, PRIAC's clients would have made PRIAC a co-defendant in this action had PRIAC not chosen to pay its clients for their alleged losses. For example, prior to bringing this action, PRIAC received demand letters from its largest client, CIGNA; its second largest client, Gannet Flemming, expressed severe displeasure at PRIAC and threatened to sue, and others joined in, with many complaining about PRIAC's misinformation and failure to provide timely information about the Bond Funds. R. 56.1 Stmt ¶ 15, 21, 22, 63 (citing Palmer Decl. Ex. 26 at 4683050; Ex. 27 at 4051712; Ex. 11 at 11572; Ex. 10 at 5280254). PRIAC's argument that it can simply shed its proportionate liability by fully repaying the Plans, proceeding against State Street under Section 502, and then raising the inaccurate specter of diminished Plan recovery as a shield to its own liability, has no basis in precedent.

State Street's mitigation and superseding cause defenses – like its contribution counterclaim – do not seek to limit the Plans' recovery. Rather, State Street's defenses and contribution counterclaim seek merely to allocate responsibility "proportionally . . . without regard to which particular persons plaintiff chose to sue in the first instance." *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 15-16 (2d Cir. 1991). Thus, PRIAC is subject to State Street's defenses just as it is subject to State Street's counterclaim for contribution.

**2.     State Street is Entitled to Assert A Mitigation Defense Against PRIAC Based Upon PRIAC's Own Fiduciary Breaches.**

**A.     Mitigation Is a Valid Affirmative Defense Under ERISA, Which State Street Pled.**

PRIAC is incorrect in asserting that the defense of mitigation is not available to State Street as a matter of law. PRIAC Opp. at 8. As a preliminary matter, State Street pled a

mitigation defense in its answer.  Answer & Countercl. at 8.  PRIAC's branding of State Street's argument as "mitigation prevention" is nothing more than a sleight of hand.  State Street is not asserting a novel defense against PRIAC based upon the Plans' misconduct.  Rather, State Street's motion is based upon *PRIAC's own* failure to do its part to mitigate the investment losses that PRIAC – the plaintiff – now seeks to recover *for itself*.  Accordingly, State Street's mitigation defense is valid and supported by ERISA case law, which PRIAC misstates.  According to that case law, PRIAC cannot avoid its own substantial responsibility for the Plans' losses by relying on ERISA principles designed to protect the Plans.  Section 502 was never intended to be a shelter for plan fiduciaries like PRIAC who breached their own fiduciary responsibilities.

PRIAC argues that the mitigation of damages doctrine is traditionally limited to suits in tort and contract, and that it does not exist as a defense to claims based in ERISA or trust law. PRIAC Opp. at 8.  Not so.  Mitigation exists as a defense to virtually all types of claims, whether they are based in statute, contract, breach of fiduciary duty, or other torts.  *See, e.g., Fed. Deposit Ins. Corp. v. Ornstein*, 73 F. Supp. 2d 277, 287 (E.D.N.Y. 1999) ( "[T]he duty to mitigate is the default rule in New York.  Absent a New York opinion declining to apply the duty . . . the requirement holds."); *Hamilton v. Niagara Frontier Transp. Auth.,* Nos. 00-CV-300SR, 00-CV-863SR, 2008 U.S. Dist. LEXIS 86739, at *2 (W.D.N.Y. Oct. 24, 2008) ("[T]he duty to mitigate damages exists independently of statute . . . ."); *Gallup v. Omaha Prop. & Cas. Ins. Co.*, 282 Fed. Appx. 317, 321 (5th Cir. 2008) ("[B]ecause the duty to mitigate is a common law duty, it exists in the absence of an explicit policy provision or statutory provision imposing such a duty.") (internal citation and quotation marks omitted).  Contrary to PRIAC's assertion, mitigation is available in the law of trusts, which courts look to in developing the federal

common law of ERISA.  *See Wachovia Bank of Georgia, N.A. v. Namik*, 620 S.E.2d 470, 473

(Ga. Ct. App. 2005) (holding that beneficiaries of an estate trust were "bound to reduce their

damages as far as is practicable by the use of ordinary care and diligence") (internal citations and

quotation marks omitted).  Indeed, the common law duty to mitigate is the rule, not the

exception.

There is no reason to set aside that rule here.  Indeed, the law of ERISA should promote

the requirement that advisors like PRIAC timely communicate material information to their

clients in a crisis, not shield them from having to perform their responsibilities.[3]  Not

surprisingly, then, PRIAC does not cite a single case rejecting a mitigation defense asserted

against a retirement plan fiduciary, like PRIAC, suing to recover for its own account.  Because

State Street's defense is based on PRIAC's conduct, PRIAC's citation to cases questioning the

Plans' duty to mitigate is beside the point.[4]  Moreover, and quite tellingly, PRIAC misstates the

holdings of the cases it does cite.  Specifically, PRIAC represents that two ERISA cases,

*Trustees of the Local 464A United Food and Commercial Workers Union Pension Fund v.*

*Wachovia Bank, N.A.*, Civ. No. 09-668, 2009 WL 4138516 (D.N.J. Nov. 24, 2009) and *Williams*,

279 F. Supp. 2d at 894, refused to permit an investment manager's attempt to assert mitigation as

---

[3] Accordingly, Courts in the Second Circuit have imposed a duty on plan fiduciaries to disclose
information about plan investments wherever there is reason to know that silence might be
harmful.  *See, e.g., In re WorldCom, Inc. ERISA Litig*., 263 F. Supp 2d 745, 765 (S.D.N.Y. 2003)
(holding that 401(k) plan investors in company stock fund stated ERISA claim against company
officer for failing to disclose deteriorating financial condition of company).

[4] As noted above, and as would be expected, the policies underlying trust and ERISA principles
requiring fiduciaries to take action to prevent plan losses fully support the availability of the
mitigation defense to claims, like PRIAC's, brought by fiduciaries under Section 502.  *See*, e.g.,
Handbook on ERISA Litigation (3d ed. Supplement 2010), pp. 104-105 ("[S]ome courts have
read into [ERISA] § 405(a)(3) a duty to remedy breaches of fiduciary duty by prior fiduciaries. . .
."); *Morrissey v. Curran,* 567 F.2d 546, 549-550 (2d Cir. 1977) ( "[T]he trustee's obligation to
dispose of improper investments within a reasonable time is well established in common law.").

an affirmative defense against a pension plan's action brought pursuant to Section 502.  PRIAC

Opp. at 9-10.  That is demonstrably not so.[5]

First, *Williams* actually supports State Street's motion.  In fact, the court *denied* the

plaintiffs' motion to strike the defendant's mitigation defense in *Williams*.  There, the trustees of

a retirement plan sued an investment manager pursuant to Section 502.  The defendant asserted a

mitigation defense against the trustees as fiduciaries, alleging that they failed to minimize the

plan's losses.  Significantly, the defendant also alleged that the trustees were the primary

beneficiaries of the plan.  Thus, despite having brought their claims formally "on behalf of" the

plan, in reality the trustees were the ones who stood to benefit from their lawsuit.  The defendant

argued that the trustees "should not reap a potential windfall where the Plan's losses were caused

by their own actions, and they alone, rather than other beneficiaries, would benefit from this

lawsuit."  *Williams*, 279 F. Supp. 2d at 909.  The court agreed, denied the plaintiffs' motion to

strike the defendant's mitigation defense, and allowed discovery on the issue of whether the

trustees were indeed the primary beneficiaries of the plan.  The court stated in connection with

the defendant's mitigation defense: "I agree that [the defendant] should be able to proceed with

these claims. . . ."  *Id*.

---

[5] All of the other cases that PRIAC cites for the proposition that a mitigation defense is
unavailable to State Street under ERISA concern the duty of the plans to mitigate, and so are
irrelevant.  Nevertheless, PRIAC misstates the holdings of those cases as well.  In *Schleibaum v.
Kmart Corp.*, 153 F.3d 496, 501 (7th Cir. 1998), the court observed that "[w]hether plaintiffs are
even required to mitigate their damages in the ERISA context is not a settled matter of law," but
assumed that the plaintiffs were so required for the purpose of ruling that the mitigation defense
could not apply to the specific facts of that case.  In *Moothart v. Bell*, 21 F.3d 1499, 1506-07
(10th Cir. 1994), the court held that the mitigation of damages doctrine did not apply to claims
under section ERISA Section 1132(c), specifically because Section 1132(c) is a *penalty* statute.
The court in *Moothart* did not consider the viability of a mitigation defense in the context of a
claim for *compensatory* damages under Sections 404 or 409, such as PRIAC's claim here.

The circumstances of this case are analogous to *Williams*.  Here, as in *Williams*, the fiduciary who failed to fulfill its duty to minimize plan losses – PRIAC – is the same party who stands to benefit from this lawsuit.  *Williams* confirms that a plaintiff's failure to mitigate is a valid affirmative defense in a section 502 case like this one.

Second, in *Wachovia*, the validity of the defendant's mitigation defense was not before the court.  There, the plaintiff had moved to strike the defendant's affirmative defenses numbered one, four, five, six, eight, nine, eleven, twelve, fourteen, fifteen, and seventeen.  *Wachovia Bank, N.A.*, Civ. 2009 WL 4138516 at *1-6.  But the defendant had raised the plaintiff's failure to mitigate as his tenth affirmative defense, which the plaintiff did not move to strike.  Answer to Complaint and Affirmative Defense by Defendant, Docket No. 25, at 17, *Wachovia Bank, N.A.*, Civ. No. 09-668, 2009 WL 4138516 (filed Aug. 11, 2009).  State Street cited *Wachovia* in its opening brief (at 13 n.9) only to point out that *Wachovia* did not involve a third-party intermediary like PRIAC, who breached a fiduciary duty to provide important investment information and analysis to retirement plans.  Thus, *Wachovia*'s rationale is inapplicable to State Street's counterclaims and defenses.  Furthermore, because the *Wachovia* court did not examine the validity of the defendant's mitigation defense, PRIAC's contention that *Wachovia* "*reject*[ed] an investment manager's attempt to assert mitigation as an affirmative defense against a pension plan" is simply wrong.  PRIAC Opp. at 9 (emphasis in original).

### B.   Unlike PRIAC, State Street did all that it could to Mitigate the Plans' Losses.

Additionally, PRIAC argues that it had no obligation to mitigate because State Street had the same opportunity to avoid damages by simply selling the Bond Funds' underlying holdings.  PRIAC Opp. at 11.  PRIAC again ignores its own important role as an intermediary between the Plans and State Street.  As an intermediary, PRIAC was in a unique position to avoid losses

because PRIAC served as the sole source of the Plans' information about the Bond Funds.  R. 56.1 Stmt. ¶ 17.  Unlike PRIAC, State Street could not reach out to the Plans directly.  *Id.*

  PRIAC's argument that State Street could have mitigated the Bond Funds' losses by limiting their exposure to imprudent investments fails because it misapplies the mitigation doctrine.  PRIAC's argument is nothing more than an assertion that State Street "could have mitigated the damages caused by its breach by not breaching."  *Nat'l. Comm. Assoc. v. AT&T*, 2001 U.S. Dist. LEXIS 951, at *22 (S.D.N.Y. Feb. 6, 2006).  In *National Communication Association.*, the plaintiff alleged that the defendant had caused him to incur damages by withholding telecommunications services to which the plaintiff was entitled by statute and unlawfully demanding a substantial monetary deposit in exchange for those services.  When the defendant asserted a mitigation defense, the plaintiff argued that it was absolved of its duty to mitigate by the defendant's failure to mitigate.  Specifically, the plaintiff argued that the defendant could have mitigated by waiving the deposit and ceasing its withholding of services.  The court rejected the plaintiff's argument as "an inaccurate and illogical application" of the mitigation doctrine.  *Id.*  PRIAC makes the same argument here: State Street could have mitigated the Bond Funds' losses – which resulted from exposure to ABS backed by subprime mortgages – by limiting their exposure to ABS backed by subprime mortgages.  As *National Communication Association* confirms, PRIAC cannot shield itself against State Street's mitigation defense by pointing in circular fashion to the same State Street investment decisions that form the basis for PRIAC's affirmative claims.

  In any event, it is undisputed that State Street took affirmative steps in July and August of 2007 to reduce the Plans' investment losses.  First, State Street sold over $800 million in AAA-rated securities in order to reduce leverage and increase liquidity in the Bond Funds.  R.

56.1 Stmt ¶ 16 (citing Palmer Decl. Ex. 12, ¶¶ 142-143). Because of severe illiquidity problems in the subprime ABS market at the time, State Street could not simply dispose of the funds' other assets, as PRIAC suggests, without monetizing even more severe losses. Second, State Street also supplied PRIAC with important information to pass on to the Plans regarding the Bond Funds' concentration in subprime ABS, leverage, and severe performance problems, specifically to allow PRIAC to take action to minimize the Plans' losses.

Unlike State Street, PRIAC did nothing to minimize the Plans' losses. PRIAC was in a unique position to help the Plans during the subprime crisis. Pursuant to PRIAC policy, information was to flow from State Street to PRIAC to the Plans. *See* R. 56.1 Stmt. ¶ 17. PRIAC was highly paid to undertake its fiduciary duty of monitoring the Funds and keeping the Plans informed with, among other things, interim reports on important developments. *Id.* at ¶ 11. PRIAC even undertook a duty to "deselect" the Bond Funds under "extenuating circumstances," which included redeeming the Plans' investments. *Id.* at ¶ 14.

Yet, despite numerous unique opportunities to do so, PRIAC failed to do anything to mitigate the Plans' losses. Incredibly, PRIAC even held face-to-face meetings with clients and consultants in late July and early August 2007 at which it specifically reviewed their investments in the Bond Funds, but said nothing about the information that State Street had provided. For example, on August 2, 2007, PRIAC met with its client Lawrence Hall, an investor in IBF. 2nd Maher Decl. Ex. 1. At that meeting, PRIAC did not disclose IBF's subprime exposure, leverage, severe underperformance, active nature, or correct name. *Id.* Similarly, on August 3, PRIAC met with Hunter Capital Advisors ("HCA"), an independent consultant to the PRIAC client IMS Health. R. 56.1 Stmt ¶ 58 (citing Palmer Decl. Ex. 78). At that meeting, "PRIAC did not indicate any particular concerns or substantive issues with regards to the [GCBF]." *Id.* This was

- 11 -

quite remarkable, given that just a day prior, State Street had warned PRIAC of the impact of the subprime market on the Bond Funds, and delivered a dire report on the state of the Bond Funds' subprime investments.

PRIAC's clients were shocked to discover in late August that PRIAC had been receiving important information from State Street all along, and credited State Street with providing information once they took it upon themselves to contact State Street directly. R. 56.1 Stmt ¶ 22, 58 (citing Palmer Decl. Ex. 28, at p. 258:19-263:24; Ex. 78). For instance, according to PRIAC's client HCA, it "was able to connect directly with SSGA and through a series of calls determined that . . . underperformance was driven primarily by . . . [a] leveraged position." R. 56.1 Stmt ¶ 58 (citing Palmer Decl. Ex. 78 at 227-28). In contrast, HCA noted that "Prudential was unable to provide substantive information." *Id.* Thus, PRIAC failed to mitigate the losses that the Plans experienced after State Street had fully informed PRIAC regarding the Bond Funds by no later than July 18, 2007, and its claim that State Street failed to mitigate those losses is a red herring. PRIAC has already recovered more than those losses pursuant to the Fair Fund payment, making summary judgment appropriate.

**3.      PRIAC's Fiduciary Breaches were a Superseding Cause of the Plans' Losses, Which Establishes a Failure of Proof on PRIAC's Claim and a Valid Defense Under ERISA.**

**A.      Lack of Causation Need Not be Pleaded as Affirmative Defense.**

State Street has not waived its defense based on causation, and the Second Circuit has previously rejected PRIAC's argument to the contrary. In *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 526-27 (2d. Cir. 2004), the court held that because proximate causation is a material element of the plaintiffs' prima facie claim, the defendants need not have separately pleaded intervening cause as a defense. In particular, the court held that:

'intervening cause,' was part of plaintiffs' prima facie case.  Having alleged in
their pleadings that [defendant's] breach caused [plaintiffs] to go out of business,
plaintiffs necessarily consented to the included issue of Goldberg's intervening
cause.

*Id*. at 527; *see also TD Waterhouse Investor Services, Inc. v. Integrated Fund Service, Inc*.,  01

Civ. 8986, 2005 WL 13560, *6 (S.D.N.Y. 2005) ("An intervening cause is not an affirmative

defense.") (citing *Nat'l Mkt. Share, Inc*, 392 F.3d at 520); *Resolution Trust Corp. v. KPMG Peat

Marwick*, 845 F. Supp. 621, 622, 625 (N.D. Ill. 1994) (observing that the defense of superseding

cause "is an assertion that [the plaintiff] cannot prove a necessary element of his claim").

Just as in *National Market Share*, the fact that PRIAC must establish proximate causation

as a material element of its ERISA claim forecloses any assertion that State Street waived

causation as a defense.  Nevertheless, PRIAC struggles to distinguish *National Market Share* by

artificially limiting its holding to apply only where the facts supporting proximate causation as

an element of a plaintiff's affirmative claim are "identical to those required to rebut the

[defendant's] intervening cause defense."  PRIAC Opp. at 13.  The *National Market Share* court,

however, addressed no such limitation – the identical-fact limitation is simply a creation of

PRIAC's.  Moreover, PRIAC's proposed artificial distinction further supports application of

*National Market Share* to this case.  Here, as in *National Market Share*, PRIAC cannot establish

that State Street proximately caused the alleged damages without refuting State Street's assertion

that PRIAC is primarily responsible for the losses.  Furthermore, State Street's well-pleaded

counterclaim for contribution likewise encompasses the allegation that PRIAC caused the losses

in the Funds.  Answer & Countercl. at ¶¶ 61-64.  Consequently, PRIAC's assertion that State

Street has waived the defense is baseless.

Furthermore, it is well-established that "a district court may consider the merits of an

affirmative defense . . . raised for the first time at the summary judgment stage." *Astor Holdings,*

*Inc. v. Roski*, 325 F. Supp. 2d. 251, 260-61 (S.D.N.Y. 2003); *see also Steinberg v. Columbia Pictures Indus., Inc.*, 663 F. Supp. 706, 715 (S.D.N.Y. 1987) ("Absent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion for summary judgment for the first time.") (internal citation and quotation marks omitted).  PRIAC cannot plausibly assert prejudice in this instance given that proximate causation of damages is a material element of both PRIAC's own claim as well as State Street's counterclaim for contribution.  PRIAC has been on notice at all times of State Street's position that PRIAC caused the additional alleged losses.

### B.   Superseding Cause is a Valid Affirmative Defense Under ERISA.

As a matter of law, PRIAC is simply incorrect that superseding cause is not an affirmative defense to claims brought under Sections 404 and 409 of ERISA.  Proximate cause is an element of an ERISA claim, and superseding cause is merely the flip side of that same coin.  PRIAC argues that the doctrine of superseding cause is inconsistent with the language of Section 409, which requires a defendant to pay for "losses . . . resulting from" its alleged breach.  PRIAC Opp. at 13.  But that is the very point of the "superseding cause" doctrine, that State Street need not pay if the losses did not "result[] from" the breach alleged.

Plaintiff must establish loss causation as part of its *prima facie* claim for damages under ERISA.  *See Handbook on ERISA Litigation*, J. Jorden, W. Pflepsen Jr., S. Goldberg, eds., § 4.05[D][3] ("[L]oss or profits causation is a required element for recovery of damages under ERISA § 409 . . . .").  Likewise, in the law of trusts that informs the federal common law of ERISA, a "plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability."  *See LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999); *Nordwind v. Rowland*, 584 F.3d 420, 433 (2d Cir. 2009) (same); *see also Ironworks Local No. 272 v. Bowen*, 695 F.2d 531, 536 (11th Cir. 1983) (holding that

- 14 -

defendant was not liable where breach of fiduciary duty did not cause the plaintiff's loss).[6]  And

as noted above, in the Second Circuit, the doctrine of superseding cause is inseparable from

proximate cause.  It is not an affirmative defense that the defendant must plead.  *National Mkt.*

*Share,* 392 F.3d at 526-27.

Thus, PRIAC's suggestion that superseding cause is unavailable as a matter of law as a

defense to its claim is simply off the mark.  PRIAC Opp. at 13-14.  In the one case cited by

PRIAC for the proposition, *Hunt v. Magnell*, 758 F. Supp. 1292 (D. Minn. 1991), the court

assumed that the defense *was* available under ERISA before denying the defendant's motion for

summary judgment on the merits.  Because State Street's superseding cause defense establishes

that PRIAC cannot prove the causation element of its claim as to that portion of the Plans' losses

that occurred after July 18, 2007, State Street is entitled to press this defense.

**C.   PRIAC's Fiduciary Breaches were a Superseding Cause of the Plans' Losses.**

PRIAC argues that State Street's superseding cause defense fails to meet the standards set

forth under Sections 441 and 442 of the Restatement (Second) of Torts.  PRIAC Opp. at 14-18.

PRIAC fails to mention that the plain language of Section 442 makes clear that State Street's

defense need not satisfy all of the conditions listed there.  That section simply lists

"considerations [that] are of importance in determining whether an intervening force is a

superseding cause of harm to another."  Restatement (Second) of Torts § 442 (1965).  Therefore,

Section 442 on its face does not purport to set forth a list of essential elements or mandatory

---

[6] PRIAC faults State Street for citing *LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*,
173 F.3d 454, 465 (2d Cir. 1999) and *Nordwind v. Rowland*, 584 F.3d 420, 433 (2d Cir. 2009),
both of which involved breach of fiduciary duty claims against trustees, because they were not
ERISA cases.  State Street did not intend to represent that those are ERISA cases.  State Street
only suggested that they were instructive with regard to ERISA claims because the law of trusts
informs courts' opinions regarding the federal common law of ERISA, as PRIAC concedes.

requirements to establish superseding cause.[7]  Moreover, the section does not suggest that any one consideration is more important than the others, as PRIAC also contends.  Nevertheless, State Street has in fact submitted uncontroverted evidence that its superseding cause defense meets the considerations set forth in both Sections.

Contrary to PRIAC's assertions, PRIAC's misconduct was indeed "antecedent" to State Street's, as that term is defined in Section 441.  PRIAC Opp. at 15.  Once State Street indisputably disclosed to PRIAC the Bond Funds' subprime investments, leverage, and serious performance issues by no later than July 18, 2007, the ball was in PRIAC's court; State Street had "lost control of the situation."  Restatement (Second) of Torts § 441, cmt a.  As set forth in Part 2.B., *supra*, State Street took additional steps to prevent the Plans' losses by selling AAA-rated securities to retain liquidity.  But State Street could do no more, because illiquidity problems in the bond market prevented State Street from reasonably selling off additional securities and State Street could not contact PRIAC's clients directly to help them minimize losses.  Thus, after providing the information to PRIAC, State Street had no choice but to rely on PRIAC to fulfill its fiduciary duty to keep the Plans informed regarding their investments.  That was, after all, what PRIAC intended when it refused to allow State Street direct access to clients.

---

[7] The considerations listed in the Restatement are: "(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence; (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation; (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation; (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act; (e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him; (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion." Restatement (Second) of Torts § 442.

PRIAC concedes that State Street's defense meets two of the additional considerations listed in Section 442, namely, that the superseding cause was due to a third party's act and was committed wrongfully.  PRIAC Opp. at 15.  Tellingly, PRIAC does not mention or challenge the applicability of another of the six considerations listed in Section 442:  the degree of culpability of the third person – here PRIAC – who committed the intervening act.  In fact, not a single PRIAC expert has disputed Dr. Carron's opinion that PRIAC's actions caused over 50% of the Bond Funds' losses.  R. 56.1 Stmt. ¶ 16.  Even using the methodology proposed by PRIAC's proposed expert, Mr. Fischel, the Plans experienced only $11.1 million of their $79.49 million in alleged losses as of July 18, 2007.  *Id.* at ¶ 75.  Even as late as August 16, after State Street had provided additional information, the Plans had incurred far fewer losses than the $48 million that PRIAC has already received from the Fair Fund.  *Id.* at ¶¶ 69. 70, 75.  Many other State Street investors (not with PRIAC) to whom State Street was able to provide the same information *directly* elected to redeem their investments in late July and early August 2007.  State Street has already reimbursed PRIAC for all losses that occurred before those dates.

PRIAC only disputes the remaining three considerations.  PRIAC Opp. at 16-17.  However, State Street's defense meets those considerations as well.  <u>First</u>, PRIAC's actions were extraordinary and unforeseeable in view of the circumstances.  State Street disclosed to PRIAC the Bond Funds' substantial underperformance due to ABS backed by subprime mortgages so that PRIAC could provide that information to the Plans, as was its utmost fiduciary duty.  In fact, PRIAC nowhere disputes that it charged the Plans a standard fee several times the size of State Street's in exchange for performing *that very function*.  Never could there have been a time when PRIAC's duty to keep the plans informed was more important: the height of the subprime crisis

- 17 -

and the onset of the largest financial catastrophe since the Great Depression.  But remarkably, PRIAC withheld that information from the Plans for over a month.

Second, nothing State Street did precipitated PRIAC's withholding of information from the Plans or forced PRIAC to act as it did.  In fact, the opposite is true; State Street kept PRIAC informed so that PRIAC would perform its fiduciary duties and pass the information along to the Plans.  PRIAC, as a third party intermediary, decided separately not to alert the Plans, but instead to wait, and then pepper State Street with dozens of irrelevant questions with many subparts, asking for volumes of irrelevant minutiae going back five or more years, and then blame State Street to its clients for not providing all the information requested.  Opp. R. 56.1 Stmt ¶¶ 146-150, 189.  Other State Street clients who received information directly from State Street largely avoided losses.  R. 56.1 Stmt ¶ 68.

Third, the losses caused by PRIAC's breaches were of a different nature than those allegedly caused by State Street's investment decisions.  While State Street's management of the Bond Funds exposed the Plans' investments to ordinary market risks (which State Street disclosed so that the Plans could avoid greater risk), PRIAC's prolonged withholding of information regarding the developing subprime turmoil affecting the Bond Funds subjected the Plans to the full force of an unprecedented market dislocation of an entirely different nature.  *See* R. 56.1 Stmt ¶ 16 (citing Ex. 12, at ¶¶ 107-120).

To support its argument, PRIAC cites irrelevant cases involving malfunctioning sandblasters, car accidents, arrestee rights, and dangerous chemicals stored in high school science laboratories.  PRIAC Opp. at 15-18.  Not one of those cases relates remotely to retirement plans, their fiduciaries, trustees, investment managers, intermediaries, or the securities industry more generally.  Furthermore, in each of those cases, the court suggested that the

intervening act alleged was little more than a technicality, and merely the mechanism that brought about the harm caused by the defendant's purported negligence. *See Gordon v. E. Ry. Supply, Inc.*, 626 N.E.2d 912, 916 (N.Y. 1993); *Derdiarian v. Felix Contracting Corp*., 414 N.E.2d 666, 670-71 (N.Y. 1980); *Higazy v. Templeton*, 505 F.3d 161, 177-78 (2d Cir. 2007); *Kush v. Buffalo*, 449 N.E.2d 725, 728-29 (N.Y. 1983).  As described above, that is not the case here, where PRIAC's independent failure to perform its fiduciary duties was a superseding cause of the additional losses after July 18, which investors to whom State Street could directly deliver information largely avoided.

Case law examining loss causation principles in the securities context is more instructive than the cases cited by PRIAC.  When a party fails to take action to avoid loss after discovering negative information about his investment, "[he] has, in effect, made a second investment decision unrelated to his initial decision to purchase the stock," and he "will not be able to avail himself of any further decrease in the value of the security after that date." *Harris v. Am. Inv. Co.*, 523 F.2d 220, 228 (8th Cir. 1975) (quoting *Cant v. Becker & Co.*, 379 F. Supp. 972, 975 (N.D. Ill. 1974) ("[T]he key date [after which damages are unrecoverable] is the date the plaintiff discovered or should have discovered that he was 'defrauded.'")).  Such a decision "involve[s] precisely that weighing of risk that constitutes an investment decision" and "[a]ny increase or decrease in the value of the stock after a reasonable time is causally unrelated to the initial decision to purchase and can serve to neither decrease nor increase the amount of damages." *Nye v. Blyth Eastman Dillon & Co., Inc.*, 588 F.2d 1189, 1198-99 (8th Cir. 1978).  PRIAC's decision to withhold information and blame State Street broke the causal chain, and relieves State Street from liability for the losses that PRIAC has not yet recovered pursuant to the Fair Fund payment.

4.     **The Same Undisputed Facts Establish State Street's Entitlement to Summary Judgment on its Contribution Counterclaim.**

As set forth in State Street's cross-motion for summary judgment, the same facts that give rise to State Street's mitigation defense also give rise to State Street's contribution claim.  In the unique circumstances of this case, both theories achieve the same result:  allocating to PRIAC responsibility for the losses caused by its own fiduciary breaches.  It is beyond dispute that summary judgment in State Street's favor on its contribution claim is ripe.  First, State Street's contribution claim will not reduce the Plans' recovery because PRIAC has already made them whole.  Thus, the amount of the Plans' compensation has already been determined.  Second, as discussed below in Part 5, *infra*, PRIAC fails to raise any material issues regarding the key facts supporting State Street's claim.  Instead, PRIAC merely attempts to dispute the legal significance of the information that it failed to provide to its clients.  Accordingly, there is no reason for the Court to wait to allocate proportionate responsibility for the Plans' losses to PRIAC, and summary judgment is warranted in favor of State Street's contribution claim now.

A contribution claim is ripe once the injured party has been repaid.  *See, e.g., Roberts v. Xtra Lease, Inc.,* No. 98 CV 7559, 2001 U.S. Dist. LEXIS 12161 (E.D.N.Y. June 25, 2001) ("[A] claim for indemnification or contribution is premature where there has been neither entry of judgment *nor payment*.") (emphasis added).  Here, PRIAC has already made the injured parties whole by making "loan" payments to the Plans that they need never repay.  Thus, the injured parties – the Plans – have been repaid, and the amount of their recovery has been established.  State Street's contribution claim is designed only to allocate that amount proportionately between State Street and PRIAC.  *See Chemung*, 939 F.2d at 15-16 (holding that contribution exists in ERISA cases to allocate losses "proportionally among those responsible . . . without regard to which particular persons plaintiff chose to sue in the first instance").  In fact, a portion

- 20 -

of that responsibility has already been effectively allocated to State Street, because PRIAC has

been repaid for a substantial portion of its loan payments by the Fair Fund.  Thus, State Street's

cross-motion for summary judgment on its counterclaim is ripe for consideration.

Furthermore, State Street's cross-motion for summary judgment is appropriate for

granting now because no material dispute of fact exists regarding any element of State Street's

claim.  <u>First</u>, PRIAC's own expert agrees that PRIAC owed the Plans a fiduciary duty to report –

both regularly and on an "ad hoc" basis – important market developments affecting the Funds.

Cross Mot. R. 56.1 Stmt. ¶ 5.  <u>Second</u>, State Street provided information in April, June, July and

early August 2007 regarding very high subprime exposure, substantial leverage, and severe

performance problems affecting the Bond Funds.  R. 56.1 Stmt. ¶¶30, 35, 36, 37, 42, 44,56.

<u>Third</u>, PRIAC provided that information to CIGNA, which decided as a result to initiate its

redemption process on July 30.  *See* PRIAC Mot. at 20 n.6.  <u>Fourth</u>, PRIAC failed to provide the

same information to other clients for an additional month at the height of the subprime crisis.

<u>Fifth</u>, and finally, had PRIAC's other clients been able to act on July 30, 2007 or even within two

weeks thereafter to redeem out of the Bond Funds, their total market losses would have been less

than what PRIAC has recovered through the Fair Fund.  R. 56.1 Stmt. ¶ 69, 70, 75.  Thus, State

Street has established that it is entitled to judgment as matter of law.

**5.      There are No Disputed Issues of Material Fact Preventing Entry of Summary Judgment for State Street.**

PRIAC also fails to identify a dispute concerning the material facts.  While PRIAC seizes

on irrelevant or relatively trivial details, it cannot dispute the core facts that underlie State

Street's motion.  Distilled to its essence, PRIAC's argument is a legal one:  PRIAC had no duty

to provide the Plans with an interim report on the extraordinary information it learned about the

Bond Funds in the summer of 2007, outside of PRIAC's normal reporting cycle.  Contrary to

PRIAC's contention that there is a dispute about State Street's disclosures, PRIAC witnesses have conceded that they were fully informed regarding the Bond Funds' subprime exposure, leverage, and active management (including the correct name of IBF) by no later than July 18, 2007.  Moreover, CIGNA's July 30, 2007 decision to redeem from IBF shows that the information was irrefutably material.

### A.   PRIAC's Duty to Provide Interim Reports to the Plans is Undisputed.

PRIAC claims that its only role with respect to the Bond Funds was to provide the Plans with DDA reports and Fact Sheets on the established schedule.  PRIAC Opp. at 21.  PRIAC ignores its role as the intermediary between State Street and the Plans, and its duty to convey information about the funds from the investment managers to the Plans.  PRIAC Mot. at 3. PRIAC's own expert, Dr. Logue, conceded in his report that PRIAC had a duty to analyze and pass material information from State Street to the Plans and assist the Plans in making informed decisions regarding their investments, including what actions to take during a market crisis.  *See* R. 56.1 Stmt. at ¶ 29 (citing Palmer Decl. Ex. 8, ¶ 28).  PRIAC's brief is silent on these duties because PRIAC does not, and cannot, dispute that it had a duty to provide interim reports to the Plans.

### B.   PRIAC's Failure to React to State Street's Correction of the IBF's Name is Undisputed.

Despite its protestations that State Street has "omitted or downplayed facts," PRIAC fails to establish that any dispute exists concerning the sequence of events surrounding IBF's name. PRIAC Opp. at 22-23.  It is undisputed that State Street mistakenly told PRIAC that IBF's name had been changed to the Passive Intermediate Bond Index Securities Lending Series Fund in 2005, and it is undisputed that State Street also told PRIAC that no change had been made to the investment strategy of the fund at that time.  R. 56.1 Stmt. ¶ 18.  It is also undisputed that

CIGNA – and not PRIAC – first noticed that the name was incorrect in June, 2007, and that Mark Flinn of State Street informed Robert Frascona of PRIAC that the name PRIAC had been using for IBF was incorrect on July 12, 2007.  *Id*. at ¶¶ 33, 46.  Finally, PRIAC admitted in its interrogatory response that it did not affirmatively tell the Plans about this correction until August 20, 2007, more than a month after learning of this fact. *Id.* at ¶ 54.  PRIAC cannot point to additional material facts that would alter this calculus.

### C.    PRIAC's Failure to Provide the Plans with Information about the Bond Funds' Leverage and Concentration in ABS is Undisputed.

PRIAC argues that the facts surrounding State Street's disclosures are in dispute.  PRIAC Opp. at 19.  Again, PRIAC embraces a series of trivial facts divorced from the matters at issue in State Street's memorandum.  By July 18, 2007 at the latest, PRIAC was "completely aware of the Intermediate Bond Fund, its holdings, how it ran, how it operated, that it was invested materially in sub-prime and that it had a significant leveraged position."  R. 56.1 Stmt. at ¶ 44 (citing Palmer Decl. Ex. 18 at pp. 150:18-151:3).  Because it cannot reasonably dispute the content of these disclosures, PRIAC premises its argument on the information it claims to have not received, without explaining how this information would be material in light of PRIAC's failure to provide the information in its possession to the Plans.

Throughout 2007, PRIAC received commentaries and client updates that discussed the impact of the subprime housing market on the Bond Funds.  PRIAC acknowledges that it received these disclosures, and admits that it did not send them to any Plan other than CIGNA.  PRIAC Resp. to R. 56.1 Stmt. ¶¶ 38, 35, 57.  For example, PRIAC received the July 6 commentary underscoring the impact of the subprime housing market on State Street's active bond funds and State Street's intention to maintain its subprime exposure.  R. 56.1 Stmt. ¶ 35.  State Street also sent PRIAC the August 2 "SSgA Subprime Update" concerning the negative

impact of the subprime housing market on State Street's active bond funds.  *Id.* at ¶¶ 55-57.

PRIAC did not share the content of either document with any of the Plans, other than CIGNA.

*Id.* at ¶¶ 35, 57.  PRIAC cannot dispute its possession of this important information, or its failure

to provide the information to its clients.

Moreover, PRIAC cannot dispute that State Street disclosed the Bond Funds' use of

leverage.  PRIAC contends that its July 12 holdings report – which listed every security held by

IBF – was somehow "truncated," and that PRIAC employees did not understand the holdings

report.  PRIAC Opp. at 27-28.  But PRIAC's own senior executive, Dean Molinaro, reviewed the

holdings report during his deposition and acknowledged that it indicated that IBF was leveraged

4 to 1.  R. 56.1 Stmt. ¶ 37.  PRIAC has no evidence to dispute this fact, and in fact acknowledges

Mr. Molinaro's testimony in its memorandum.  PRIAC Opp. at 28.

PRIAC was provided with additional information about IBF's use of leverage on the July

18th conference call among PRIAC, State Street, and CIGNA.  R. 56.1 Stmt. ¶ 42.  PRIAC

contends that "none of the participants in the call has testified to a detailed recollection of what

was said."  PRIAC Opp. at. 28.  PRIAC ignores the fact that Mr. Molinaro specifically recalled

that leverage was discussed on this call:

> **Q.** Do you recall that Tracy LaBonte had asked for the call because she had concerns
> with leverage, correct?
> **A.** Correct.
> **Q.** You recall leverage being discussed in the phone call, correct?
> **A.** I do.

R. 56.1 Stmt. at ¶ 44 (citing Palmer Decl. Ex. 18 at p. 142:22-143:4).  Mr. Molinaro further

agreed that CIGNA was "absolutely" aware of the 4 to 1 leverage after the call.  *Id.* (citing

Palmer Decl. Ex. 18 at p. 150:12-150:17).

To support its contention, PRIAC relies on Mr. Dingee's professed failure to recall a discussion of leverage on the call. PRIAC Opp. at 29. This is quite remarkable because Mr. Dingee testified several times that he could not hear the conference call, despite sitting next to Mr. Molinaro for 45 minutes and not raising the issue. 2nd Maher Decl. Ex. 2 at pp. 201:9-204:2, 204:20-205:10. In striking contrast, Mr. Molinaro testified that he heard everything clearly, and when asked at his deposition, said there was no trouble in hearing what was said. 2nd Maher Decl. Ex. 3 at pp. 340:4-341:18, 344:9-344:12.

### D. The Additional Facts Identified by PRIAC are Immaterial.

PRIAC claims that other "critical information about State Street's management of the Bond Funds" was not provided to it. PRIAC Opp. at 36-40. PRIAC fails to specify how any of this allegedly withheld information would have altered history and caused it to issue an interim report to the Plans. These additional "facts" identified by PRIAC are immaterial for purposes of State Street's motion, and should be recognized for what they are: mere pre-trial posturing. The material information provided by State Street to PRIAC, which PRIAC provided only to CIGNA, caused CIGNA to decide by July 30, 2007 to exit IBF. Other disclosures made by State Street, such as the August 2 client update, were not shared by PRIAC with any of the Plans. Even if PRIAC's distortions of the record were to be accepted, PRIAC cannot reasonably claim that it would have made earlier disclosures to the Plans other than CIGNA, particularly given its insistence even now that it was under no obligation to do so.

In any event, PRIAC mischaracterizes the record in a futile attempt to create an issue of material fact. PRIAC Opp. at 36-40. First, PRIAC conflates marketing with management. In 2006 and 2007, State Street sought to grow its assets under management by attracting investors to *new* strategies. This marketing goal had nothing to do with the investment goals of State Street's current products, and PRIAC establishes no connection other than by overreaching

inference.  Second, PRIAC claims that State Street "changed the investment strategy of the Bond

Funds."  PRIAC Opp. at 38.  The Bond Funds were actively managed, and had ABS investments

and leverage that were consistent with their investment objectives.  R. 56.1 Stmt. ¶¶ 23-28.  The

methods for meeting the Bond Funds' investment objectives were entirely consistent with the

Fund Declarations for the Bond Funds, a fact PRIAC consistently ignores.  *Id.* at ¶ 68 (citing

Palmer Decl. Ex. 12, at ¶ 161).  Third, and finally, PRIAC argues that State Street misled PRIAC

by not disclosing that it violated its risk policies.  PRIAC Opp. at 38-39.  This argument is built

on a faulty premise; State Street fully complied with its risk management policies.  In any event,

PRIAC has established no link between this supposed failure and any of the Plans' losses, as

conceded by PRIAC's own expert witness on the topic.  2nd Maher Decl. Ex. 4 at pp. 42:4-

43:25.  *See also* R. 56.1 Stmt. ¶ 74 (citing Palmer Decl. Ex. 91, at ¶¶ 43-45).

> **E.     The Evidence Shows that the Plans Would Have Redeemed if PRIAC had
>          Provided them with State Street's Disclosures.**

As PRIAC concedes, the actions of CIGNA are evidence of how the other Plans may

have acted if they had received the information provided by State Street to PRIAC.  *See* PRIAC

Opp. at 33.  On July 31, 2007, Richard Forde of CIGNA held a meeting with John Kalamarides

of PRIAC in which he indicated that CIGNA wished to begin exiting IBF.  R. 56.1 Stmt ¶ 50.  In

its papers supporting its own Motion for Partial Summary Judgment, PRIAC concedes this point.

PRIAC Mot. at 20 n.6.  CIGNA made this decision after receiving material information about

subprime exposure, leverage, and performance problems affecting the Bond Funds.  This

information, provided by State Street to PRIAC, led CIGNA to initiate its redemption process on

July 30, nearly a month before PRIAC issued its belated disclosures to the other Plans.  PRIAC

places great weight on the fact that CIGNA's redemption was not finalized until August 20.

PRIAC Opp. at 33.  Yet PRIAC itself stated at the time that CIGNA did not exit earlier because

it was "dragging its feet."  Opp. R. 56.1 Stmt. ¶ 162.  Fundamentally, the information State Street

provided CIGNA and PRIAC by July 30, 2007 caused CIGNA to decide to redeem its

investment, demonstrating the materiality of that information.

The actions of State Street's clients who received information directly from State Street

also illustrate the materiality of State Street's disclosures.  Throughout the summer of 2007, State

Street provided information to its other clients similar to the information that State Street

provided to PRIAC.  As a result, State Street's actively managed bond funds experienced a

seven-fold increase in redemptions.  R. 56.1 Stmt ¶ 68.

PRIAC identifies three main reasons for the court to ignore this compelling evidence of

the materiality of State Street's disclosures to PRIAC.[8]  PRIAC Opp. at 34-36.  <u>First</u>, PRIAC

states that these investors were not all invested in the Bond Funds.  But, the funds at issue were

all invested in LDBF or had similar subprime investments, which posed a common issue.  *See In*

*re: State Street Bank and Trust Co. Fixed Income Funds Inv. Litig.*, 560 F. Supp. 2d 1388,

1389 (J.P.M.L. 2008) (holding that consolidated "actions revolve around same core of factual

issues relating to State Street's representations regarding its investment strategy . . . .").

As such, investors in State Street's active bond funds received common communications, such as

State Street's July 6 and August 2 client alerts.[9]  PRIAC, as an intermediary, prevented these

communications from going directly to the Plans.  *See* R. 56.1 Stmt. ¶ 55-57; PA 2384.

---

[8] PRIAC's fourth reason is specious.  PRIAC Opp. at 36.  The August 14 client communication, which PRIAC received and provided to its clients after a six day delay, discussed the "unprecedented" and "extreme"  market turmoil. PA 1352. This letter echoed the points raised in the August 2 letter.  PRIAC's discussion of communications in October, made long after PRIAC's redemption, is mere posturing.

[9] PRIAC misrepresents the July client communication, which does not say that the performance of the funds would not recover for 18 months.  PRIAC Opp. at 35-36.  Rather the letter stated that  "we will continue to see reverberations in the *credit markets* over the next 18 months." PA2384.

Second, PRIAC argues that State Street does not present evidence about the motivation for investment decisions made by each of the 36 clients. PRIAC Opp. at 34-35. But the inference is unassailable: by August 16, State Street had repeatedly notified its clients that its active bond funds were materially exposed to the deteriorating subprime-mortgage market, and consequently, they liquidated their investments. *See* PA 2384-86. PRIAC has submitted no evidence that they redeemed for other reasons, nor can it suggest any plausible alternative reason.

Third, PRIAC argues that the 36 plans received different information than PRIAC. In fact, PRIAC received *more* information than many of the State Street clients that liquidated their investments before August 16. PRIAC, for example, received a complete holdings report for IBF. R. 56.1 Stmt. ¶¶ 36-38. Moreover, PRIAC again ignores the uncomfortable fact that many of these investors received the exact same information as PRIAC, including the August 2 client communication from State Street. PA2384; R. 56.1 Stmt. ¶¶ 55-57. It is irrational to think that PRIAC's clients, the Plans, would have acted differently than the 36 State Street clients who liquidated their investments before August 16, and PRIAC gives no factual basis for its *ipse dixit* assertion to the contrary.

### F.   PRIAC Misconstrues State Street's Discussion of Damages.

PRIAC's entire discussion of damages is irrelevant for purposes of State Street's motion. PRIAC Opp. at 40-41. In its motion, State Street uses Mr. Fischel's methodology to demonstrate that PRIAC is not entitled to any further recovery in addition to what it has already received from the Fair Fund. Dr. Carron's affidavit uses Mr. Fischel's flawed methodology to calculate the losses that the Plans would have experienced if they had liquidated their investment on any day between July 18, 2007 and August 16, 2007. PRIAC does not dispute the accuracy of this calculation.

Furthermore, PRIAC acknowledges that State Street is entitled to a credit for the payments PRIAC received from the Fair Fund.  PRIAC Opp. at 40-42.  The payment from the Fair Fund has already reimbursed PRIAC for losses incurred by the Plans through mid-August. The undisputed evidence shows that PRIAC is responsible for the Plans' losses after that point, at the latest.  PRIAC's arguments concerning the correct calculation of the credit are legally incorrect.  PRIAC ignores the language of State Street's settlement agreement with the SEC and state regulators, and incorrectly fails to consider the total compensation paid to investors.[10]  But even if the Court were to adopt PRIAC's incorrect methodology for calculating the credit, the fact remains that PRIAC nonetheless remains responsible for the Plans' investment losses. PRIAC concedes that State Street is entitled to at least a $44.176 million credit.  PRIAC Opp. at 41-42.  As of August 10, the Plans had incurred only $37.415 million in losses.  R. 56.1 Stmt. ¶ 75.  Because PRIAC is responsible for the Plans losses on and after July 18, 2007, summary judgment in favor of State Street is warranted.

---

[10] PRIAC was paid $52,552,696.77 through a Fair Fund established in State Street's February 2010 settlement agreement with the SEC and state regulators.  R. 56.1 Stmt. ¶ 69-71.  As the SEC noted, State Street's "total compensation to injured investors" was $663,191,540, $340 million of which had already been paid in prior private settlements, and $50 million of which was a civil penalty.  The parties agree that State Street is entitled to a credit for the portion of the payment that is not attributable to the $50 million civil penalty that was included in the regulatory settlement, but PRIAC contends that the penalty should be assessed against the $313 million that State Street was required to pay on top of the amounts it was credited by the SEC for prior private settlements.  PRIAC Opp. at 41-42.  This position runs counter to the SEC's statement in announcing the settlement that "State Street also gets credit" for the prior private settlements.  *See* http://www.sec.gov/litigation/litreleases/2010/lr21408.htm.  Moreover, the allocation of settlement payments to individual investors accounted for the prior private settlements, and discounted the amounts received by investors who had already been compensated through private settlements, proportionally increasing payments to PRIAC and other investors who had not settled.  R. 56.1 Stmt. ¶ 69-71.  As a result, the allocation of PRIAC's payment was based on the total $664 million settlement amount, rather than the $313 million identified by PRIAC.  It necessarily follows that $664 million is the correct amount against which to deduct the $50 million penalty.  As set forth in State Street's Rule 56.1 Statement, State Street is entitled to a credit of 92.46% of the $52,552,696.77 that PRIAC received through the Fair Fund, or $48,590,223.  *Id.*

## CONCLUSION

For the foregoing reasons, State Street respectfully requests that the Court grant State Street's Motion and Cross-Motion for Summary Judgment.

Dated:  July 30, 2010                              Respectfully submitted,

                                                   ROPES & GRAY LLP


                                                   By: /s/ Harvey J. Wolkoff
                                                   Harvey J. Wolkoff
                                                   Robert A. Skinner
                                                   Daniel J. Maher
                                                   One International Place
                                                   Boston, MA  02110
                                                   Tel: (617) 951-7000
                                                   Fax: (617) 951-7050
                                                   harvey.wolkoff@ropesgray.com
                                                   robert.skinner@ropesgray.com
                                                   daniel.maher@ropesgray.com
                                                   *Attorneys for Defendant State Street Bank and Trust Company and State Street Global Advisors, Inc.*

- 30 -

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2010, I caused a true and correct copy of State Street's Reply Memorandum in Further Support of Motion and Cross-Motion for Summary Judgment, Declaration of Daniel J. Maher in Further Support of State's Motion for Summary Judgment (to be filed under seal), and Exhibits to the Declaration of Daniel J. Maher in Further Support of State's Motion for Summary Judgment (to be filed under seal) to be served upon the following counsel of record by e-mail.

/s/ Allison Boscarine

Edwin G. Schallert
Jeremy Klatell
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

John R. Nelson
LOCKE LORD BISSELL & LIDDELL LLP
100 Congress, Suite 300
Austin, TX 78701

Caren S. Sweetland
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002

Robert Burford
BURFORD & MANEY PC
700 Louisiana, Suite 4600
Houston, TX 77002

John J. Butts, Esq.
Steven Cherry
Felicia Ellsworth
Kevin Prussia
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109

Thomas J. Dougherty
Peter Simshauser
Michael S. Hines
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts  02108

Lewis R. Clayton
Jonathan Hurwitz
Aliza Balog
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON
1285 Avenue of the Americas
New York, NY  10019-6064

Steven L. Severson
Justin Krypel
Debbie Ellingboe
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

David E. Lurie
Thomas Lent
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109

Samuel H. Rudman
David A. Rosenfeld
Evan J. Kaufman
Carolina Torres
Mark Reich
ROBBINS GELLER RUDMAN & DOWD
LLP
58 S. Service Road, Ste. 200
Melville, NY 11747