| | |
|---|---|
| IN RE STATE STREET BANK AND TRUST CO. FIXED INCOME FUNDS INVESTMENT LITIGATION | MDL No. 1945 |

| | |
|---|---|
| HOUSTON POLICE OFFICERS' PENSION SYSTEM, | |
| Plaintiffs, | |
| v. | No. 08 Civ. 5442 (RJH) |
| STATE STREET BANK & TRUST COMPANY and  STATE STREET GLOBAL ADVISORS, INC., | |
| Defendants. | |

## STATE STREET'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

1. HPOPS Has Not Raised A Valid Legal Bar Or Disputed Issue Of Material Fact Regarding Its Failure To Mitigate ..................................................................1

    A.    HPOPS Had A Duty To Mitigate ............................................................2

    B.    HPOPS Fails To Raise A Disputed Issue Of Material Fact Regarding Its Failure To Mitigate ....................................................................................3

            i.    HPOPS's Purported Issues Of Fact Are Immaterial Or Irrelevant ................4

            ii.    HPOPS Failed To Act Reasonably And Promptly Given The Circumstances ..............................................................................7

2. State Street's Conduct Did Not Cause HPOPS's Investment Losses That Post-Date Mid-August, 2007 ..........................................................................................10

3. HPOPS's Fraud In The Inducement Claims Are Not Supported By Record Evidence .........................................................................................................12

    A.    The August 2005 Presentation Accurately Disclosed LDBF's Sector Allocation ....................................................................................................12

    B.    HPOPS's New Argument That It As Misled About Leverage In 2005 Is Meritless ....................................................................................................15

    C.    HPOPS's New Argument That It Was Misled About LDBF's Alpha Target Is Meritless ....................................................................................16

    D.    Alleged Omissions Identified By HPOPS In Its Brief Do Not Support Its Fraud Claims ........................................................................................17

            i.    None Of The Alleged Omissions Was Material ...........................................18

            ii.    State Street Did Not Have A Duty To Disclose These Immaterial Facts ..............................................................................22

    E.    There Is No Evidence Of Scienter With Respect To The Misrepresentations And Omissions That HPOPS Relies Upon .............................23

4. State Street Cannot Be Liable To HPOPS Under The Texas Securities Act Because It Made No Misrepresentations In Connection With The Sale Of A Security, And Was Never HPOPS's Investment Advisor ..............................................24

    A.    State Street Made No Pre-Investment Misrepresentations, As Required Under The TSA ..............................................................................................24

    B.    State Street Does Not Fall Within The TSA's Definition Of "Investment Advisor" ...............................................................................................26

CONCLUSION ...................................................................................................29

25034981_16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Cavanaugh Communities Corp.,*
    847 F. Supp. 1390 (N.D. Ill. 1994) ........................................................25

*Agri-Mark, Inc. v. Niro, Inc.,*
    233 F. Supp. 2d 200 (D. Mass. 2002) ....................................................15

*Am. Indus. Supply Corp. v. Int'l Valve Suppliers,*
    No. 07-96-0357 CV, 1997 WL 528744 (Tex. App. Aug. 26, 1997).........23

*Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    651 F.2d 615 (9th Cir., 1981) ................................................................11

*Arthur Andersen & Co. v. Perry Equip. Corp.,*
    945 S.W.2d 812 (Tex. 1997).............................................................10, 11

*Denny v. Barber,*
    576 F.2d 465 (2d Cir. 1978)..................................................................18

*Duperier v. Texas State Bank,*
    28 S.W.3d 740 (Tex. App. 2000).....................................................15, 18

*Finkel v. Stratton Corp.,*
    962 F.2d 169 (2d Cir. 1992)..................................................................25

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors,*
    960 S.W.2d 41 (Tex. 1998).............................................................21, 22

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000)..................................................................18

*Gunn Infiniti v. O'Byrne,*
    996 S.W.2d 854 (Tex. 1999)....................................................................7

*Hawana v. City of New York,*
    230 F. Supp. 2d 518 (S.D.N.Y. 2002)...................................................15

*In re Westcap Enters.,*
    230 F.3d 717 (5th Cir. 2002) ................................................................18

*Ins. Co. of N. Am. v. Morris,*
    981 S.W.2d 667 (Tex. 1998)..................................................................22

*Nye v. Blyth Eastman Dillon & Co., Inc.,*
    588 F.2d 1189 (8th Cir. 1978) ...............................................................11

*Otto Goedecke, Inc. v. Henderson,*
    388 S.W.2d 728 (Tex. Civ. App. 1965) ..............................................................3

*Pitman v. Lightfoot,*
    937 S.W.2d 496 (Tex. App. 1996) ...................................................................24

*Pulaski Bank & Trust Co. v. Texas Am. Bank/Fort Worth,*
    759 S.W.2d 723 (Tex. App. 1988) ..................................................................2, 7

*Radiation Dynamics, Inc. v. Goldmuntz,*
    464 F.2d 876 (2d Cir. 1972)............................................................................25

*Reed v. Prudential Secs.,*
    875 F.Supp. 1285 (N.D. Tex. 1995) ...............................................................26

*Robinson v. Reliable Life Ins. Co.,*
    554 S.W.2d 231 (Tex.Civ.App. 1977) ............................................................18

*Schlumberger Tech. Corp. v. Swanson,*
    959 S.W.2d 171 (Tex. 1997)...........................................................................22

*Si Kyu Kim v. Harstan, Ltd.,*
    286 S.W.3d 629 (Tex. App. 2009)...................................................................10

*Swank v. Cunningham,*
    258 S.W.3d 647 (Tex. App. 2008)...................................................................11

*Walker v. Salt Flat Water Co.,*
    96 S.W.2d 231 (Tex. 1936)...............................................................................3

*Yu v. State Street,*
    No. 08 MDL 1945, slip op. (S.D.N.Y. July 14, 2010).......................................15

**STATUTES**

15 U.S.C. § 80a-3(c)(3)............................................................................................27

Tex. Rev. Civ. Stat. Ann. art. 581-4(N)(1) ......................................................27, 29

Tex. Rev. Civ. Stat. Ann. art. 581-33 cmt. .............................................................26

Chapter 33 of the Texas Civil Practice and Remedies Code .....................................11

Texas Government Code § 802.203(c) ......................................................................11

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 529..........................................................................23

Defendants State Street Bank and Trust Company and State Street Global Advisors, Inc. (collectively, "State Street") respectfully submit this reply brief in further support of State Street's Motion for Summary Judgment (the "Motion").

A focused set of *material* undisputed facts entitle State Street to summary judgment – specifically, State Street's accurate pre-investment disclosures to HPOPS regarding the State Street funds; State Street's disclosure to HPOPS by no later than mid-August 2007 of the Limited Duration Bond Fund's ("LDBF") substantial subprime exposure, use of leverage, and mounting subprime-related losses; and HPOPS's informed decision to remain invested in LDBF. HPOPS's opposition does not create any issues with respect to those facts.[1]

**1.     HPOPS Has Not Raised A Valid Legal Bar Or Disputed Issue Of Material Fact Regarding Its Failure To Mitigate**

It is undisputed that by August 9, 2007, HPOPS knew that 90% of LDBF consisted of bonds backed by subprime mortgages, R. 56.1 Stmt. ¶¶ 52, 56, and that those securities were facing a liquidity crisis and causing LDBF to experience serious underperformance.  R. 56.1 Stmt. ¶¶ 43-45, 49-50.  It is undisputed that prior to August 9, State Street had invited HPOPS to redeem from the fund more than once, and had informed HPOPS that other funds that it managed would be redeeming from LDBF, and that LDBF was selling some of its AAA rated securities. R. 56.1 Stmt. at ¶¶ 46-47, 49.  It is undisputed that the only reason it took until August 9 for HPOPS to meaningfully assess these facts is because Pat Franey – having received a series of communications from State Street beginning in late July – did not timely check his email or

---

[1] State Street submits herewith a small number of Exhibits (attached to the Declaration of Harvey J. Wolkoff, dated July 30, 2010 ("Reply Wolkoff Decl.")) in order to respond to issues raised by HPOPS in its Opposition that were beyond the scope of the relevant allegations in HPOPS's complaint, and therefore not included in State Street's opening papers.  State Street also cites herein to its statement of undisputed material facts, filed with its opening brief pursuant to Local Rule 56.1 ("R. 56.1 Stmt."), and to the supporting declaration of Harvey J. Wolkoff ("Wolkoff Decl."), both dated June 2, 2010.

check his voicemail at all while on vacation.  R. 56.1 Stmt. at ¶¶ 48.  It is undisputed that, after consulting with numerous investment advisors, and informing at least one advisor that it wanted to exit LDBF as quickly as possible, HPOPS chose to remain in LDBF in the hope that the market would recover.  R. 56.1 Stmt. ¶¶ 47, 52, 54, 58, 60-61.

HPOPS was entitled to make this choice, but it is barred as a matter of law from transferring to State Street the risks it assumed.  State Street cannot be required to insure HPOPS for the consequences of its decision.  And HPOPS has already received compensation for its losses through August 28, 2007, more than two weeks after it became fully apprised of the pending crisis – an ample time period during which it could and should have acted reasonably to protect its assets.[2]

### A.    HPOPS Had A Duty To Mitigate

The law required HPOPS to mitigate its damages when it obtained "knowledge of the fact which makes avoidance of the consequences necessary, and if the damages can be avoided with only slight expense and reasonable effort." *Pulaski Bank & Trust Co. v. Texas Am. Bank/Fort Worth*, 759 S.W.2d 723, 735 (Tex. App. 1988).

---

[2]  While the parties agree that State Street is entitled to a credit for the portion of the payment that is not attributable to the $50 million civil penalty that was included in the regulatory settlement, HPOPS incorrectly contends that "the penalty was assessed against the $313 million" that State Street was required to pay on top of the amounts it was credited by the SEC for prior private settlements, rather than the full $664 million settlement credit.  R. 56.1 Counter Statement at ¶ 69.  This position runs counter to the SEC's statement in announcing the settlement that "State Street also gets credit" for the prior private settlements. http://www.sec.gov/litigation/litreleases/2010/lr21408.htm.  Moreover, the allocation of the Fair Fund payments to individual investors, including HPOPS, accounted for the prior private settlements, discounting the amounts received by investors who had already been compensated through private settlements, and proportionally increasing payments to HPOPS and other investors who had not settled.  See Wolkoff Decl., Ex. 30, Attachment A.  It necessarily follows that $664 million is the correct amount against which to deduct the $50 million penalty.  R. 56.1 Stmt. ¶ 69.

State Street's earlier briefs establish that mitigation is an available defense to HPOPS's claims.  In its opposition to this motion, HPOPS now argues that it had no duty to mitigate damages arising from a breach of contract unless State Street repudiated the contract.  *See* HPOPS Opp. at 35.  This rule finds no support in Texas case law:  a duty to mitigate is triggered once the plaintiff has "notice of the breach of contract."  *Otto Goedecke, Inc. v. Henderson*, 388 S.W.2d 728, 730 (Tex. Civ. App. 1965).  Undisputed facts establish that HPOPS knew the information underlying its breach of contract claim, including the nature of its investment and the perilous market conditions, had ample opportunity to take action to prevent further investment losses, and thus had a duty to mitigate under Texas law.  HPOPS was similarly on notice of the central facts underlying its claims for breach of fiduciary duty, fraud and negligent misrepresentation, and failed to mitigate damages pertaining to those claims.[3]

**B.      HPOPS Fails To Raise A Disputed Issue Of Material Fact Regarding Its Failure To Mitigate**

HPOPS argues it did not have sufficient information to trigger a duty to mitigate its damages, and that the actions it took – continuing to assess and reassess its options – were reasonable under the circumstances.  HPOPS Opp. at 39-47.  Yet it is undisputed that HPOPS fully understood the nature of its investment and the risks of maintaining that investment no later than early to mid-August, 2007, but chose to stay in the fund.

---

[3] HPOPS relies on inapplicable case law from other jurisdictions and legal contexts, such as ERISA, to contend that it did not have a legal duty to mitigate its damages.  But "[t]he rule has ever been in Texas that no recovery may be had for losses or damages, whether from tort or breach of contract, which might have been prevented, or the consequences avoided by reasonable efforts or expenditures by the person damaged."  *Walker v. Salt Flat Water Co.*, 96 S.W.2d 231, 232 (Tex. 1936).

###### i.        HPOPS's Purported Issues Of Fact Are Immaterial Or Irrelevant

HPOPS contends that its efforts to analyze additional information, such as LDBF's precise leverage ratio and the identities of the specific bonds that it held, HPOPS Opp at p. 40-41, raise material issues of fact regarding the reasonableness of its mitigation efforts.  In truth, HPOPS knew in early August that LDBF was suffering unprecedented volatility, and was incurring losses each day it remained invested in the fund.  R. 56.1 Stmt. at ¶ 50. Waiting to redeem pending receipt of a specific holdings list or leverage ratio during this time was no more reasonable than remaining in a burning building to determine if the third floor was burning as quickly as the first and second.

HPOPS argues that State Street's August 14, 2007 letter stating that "many judicious investors will hold the positions in anticipation of greater liquidity in the months to come," encouraged it to remain invested in LDBF.  HPOPS Opp. 40-41.  This position is at odds with the very language of the letter, which conveyed a strong sense of crisis.  *See* Burford Decl. Ex. 103.  Foremost the letter indicated that LDBF was subject to liquidity freezes, which does not suggest that an investor with an immediate need for liquidity should remain invested. *Id*. Moreover, this letter stated that the "market situation was extreme and challenging to manage;" that "[b]oth the level of this underperformance and the degree of market turmoil are unprecedented in our 30-year-history as a fixed income manager;" that "[r]ecent market events were "chaotic;" that "the scope and the magnitude of the downgrades and watch-listings were unprecedented even during the bond market crisis in 1998;" that "a full-fledged contraction of the segment" occurred; and that "this market segment faces a magnitude of risk not previously anticipated."  *Id*.  The letter also forecasted the ongoing nature of the crisis because "[t]raditional methods of estimating defaults may not yet fully capture the implications" of the housing market crisis, and "recent market events may have repriced the risk of these assets for the foreseeable

future and it is unlikely that they will swiftly retrace to values at the turn of the year." *Id.*  The

"total mix" of information in the August 14, 2007 letter strongly advised that LDBF would

continue to present a profound investment risk.

      HPOPS also claims that statements by State Street in late August through October, 2007,

that the subprime problems were "technical" rather than "fundamental" amounted to "comfort

language" about its LDBF investment, during the time that HPOPS was still "gathering

information and evaluating its options."  HPOPS Opp. at 39-47.  By mid-August, 2007, it was

unreasonable for HPOPS to believe that additional "information gathering" was a reasonable

reaction to the crisis.  Moreover, no reasonable investor would view these statements as "comfort

language," particularly in the context of other warnings, given that "technical factors" can cause

substantial market volatility that is entirely at odds with HPOPS's professed investment goals of

preserving liquidity and capital.  *See, e.g.,* R. 56.1 Stmt. at ¶ 43 (July 26 letter stating that

"technical forces can often drive the market to extreme valuations.")

      HPOPS also makes much of the redemption activity of State Street's other funds,

observing that other funds managed by State Street redeemed from LDBF on or prior to August

10, 2007.  HPOPS Opp. at 42.  HPOPS portrays the LDBF redemptions as self-dealing by State

Street, repeatedly calling these "State Street's funds," despite the undisputed fact that the

investors were all external institutional investors – and that none of State Street's own money

was invested in these funds.  Wolkoff Decl. Ex. 39, at Carron Rebuttal p. 32 ("State Street's

proprietary money was not invested in LDBF.");  *see also* Reply Wolkoff Decl. Ex. 3, at Bayley

Tr. 90:17 – 91:11, 95:18-24, 147:24 – 148:5.[4]  This pattern of redemptions merely reflects that

---

[4] In stark contrast to divesting from subprime while continuing to manage subprime investments
of its clients, State Street's parent company State Street Corporation held $5.8 *billion* in
subprime investments on its own books, which it continued to hold until at least 12/31/08.

other clients reacted far more promptly to the subprime crisis than HPOPS, redeeming from the

other State Street funds as a result of their exposure to subprime through LDBF, and in turn

requiring those funds to redeem assets from LDBF. Wolkoff Decl. Ex. 38, at Carron Report

Ex. 29.

HPOPS also contends that "the mitigation window was closed" by August 10-13, because

other State Street funds had redeemed from LDBF by then, HPOPS Opp. at 42, and that there is

a factual dispute regarding HPOPS's losses had it acted reasonably by redeeming by mid-

August. These arguments are not supported by the unrebutted evidence of record. The fact that

State Street funds had redeemed from LDBF did not prevent HPOPS from redeeming – as it did

to meet every prior redemption, State Street would simply have used the existing millions of

dollars in available cash and if necessary sold more of the underlying securities, and – as it did

with everyone else – paid the stated NAV. *See* Wolkoff Decl. Ex. 46, at Bayley Report Ex. 24

(showing at least $7 million in cash every day from August 10-17, when the analysis ends); *see

also* Wolkoff Decl. Ex. 38, at Carron Exs. 11 and 17 (showing that LDBF held over $20 million

in cash bonds and that over 90% of the funds assets continued to be rated AA or higher through

the end of August 2007); *Id.* at Carron Ex. 24 (showing that the fund held $13 million in cash on

August 17).

HPOPS relies on the opinion of its accounting expert Scott Bayley that the illiquid market

rendered State Street's NAV calculations unreliable, and that it was therefore impossible to

calculate the price HPOPS would have received upon redemption. HPOPS Opp. at 47-48.[5] But

---

Wolkoff Decl. Ex. 39, at Carron Rebuttal p. 28. HPOPS's insinuations of self dealing are
misplaced.

[5] As set forth in State Street's Motion to Strike Mr. Bayley's expert report, Mr. Bayley offers no
foundation on which to support his opinion regarding the liquidity of securities held by LDBF or
State Street's pricing of such securities. *See* Mem. In Support of Motion to Strike, p. 10-17.

Mr. Bayley conceded at his deposition that State Street redeemed investors at its reported NAV throughout August 2007, and that HPOPS would have received the NAV upon redeeming.  R. 56.1 Stmt. ¶¶ 68 (Wolkoff Decl. Ex. 47, at Bayley Tr. 186:2-5; 187:25 – 188:3).[6]  Nor is it relevant that HPOPS's redemption could have prompted a "controlled redemption."  This simply means that LDBF would have closed sooner than it actually did, and that HPOPS may not have promptly received the check for its redemption.  *See* R. 56.1 Stmt. at ¶ 65.  There is no evidence that the controlled redemption process itself had any effect on the value of HPOPS's holdings. Rather, HPOPS redeemed for less than other LDBF investors, including other State Street funds, for the simple reason that the market continued to deteriorate while HPOPS watched and waited.

### ii.    HPOPS Failed To Act Reasonably And Promptly Given The Circumstances

Having knowledge sufficient to make "avoidance of the consequences necessary," by August 9, HPOPS was required to act reasonably and promptly given the circumstances. *Pulaski*, 759 S.W.2d. at 735-36.  Those circumstances, including a market meltdown and large investor redemptions, called for profound urgency.[7]  HPOPS was a sophisticated investor[8] with numerous advisors on hand,[9] and was in a position to preserve assets with "trifling expense or with reasonable exertions."  *Gunn Infiniti v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999) (internal

---

[6] Based upon these daily reported values and an actual analysis of pricing and security sales, HPOPS has already been compensated for its losses through August 28, 2007 – a date well after it should have insulated itself from further losses.  R. 56.1 Stmt. ¶¶ 68-69.

[7] That Mr. Franey did not act with proper urgency is obvious from his conduct in late July and early August, when State Street sent numerous communications to him about subprime issues in the fund, in the context of his general knowledge of the subprime crisis – only to have Mr. Franey disappear on a vacation for three weeks without designating a responsible substitute or providing alternative ways to be reached.  R. 56.1 Stmt. ¶¶ 32-35, 41-42, 44-45, 47-48.

[8] R. 56.1 Stmt. at ¶¶ 5, 29 (Wolkoff Decl. Ex. 31, at Franey Tr. 38:24-39:3).

[9] Wolkoff Decl. Ex. 1, at 41 (HPOPS 2007 annual financial statement listing three consultants, thirteen money managers, and other custodians, actuaries, attorneys and auditors).

quotation marks omitted).  As State Street suggested to HPOPS on August 3, it could have moved its investment into a money market fund at any time simply by signing a fax.  R. 56.1 Stmt. at ¶ 47.  It could also have terminated State Street.  R. 56.1 Stmt. at ¶ 21 (Wolkoff Decl. Ex. 11, HPOPS IMA at p. 10) (stating "the Trustees may terminate this Agreement at any time").  Mr. Franey never listened to the August 3, 2007 voicemail regarding the opportunity to move to a new cash collateral fund, and did not read the letter provided to him on August 2, 2007 until a week later.  R. 56.1 Stmt. at ¶¶ 47-48.

Despite its professed interest in investing in LDBF to seek daily liquidity, "preservation of capital" and minimal risk, HPOPS elected to stay in LDBF upon learning of the circumstances and extent of its underperformance.  Wolkoff Decl. Ex. 44, at 25-26, 29.  When Mr. Franey finally tuned in to LDBF's performance crisis on August 8 and discussed it with his boss, John Lawson, Mr. Lawson said he wanted to terminate State Street and get out right away, by moving the funds to another manager.  R. 56.1 Stmt. at ¶ 57.  Mr. Franey also actively evaluated the risks of remaining in LDBF in discussions with multiple investment advisors (but never once with State Street).  R. 56.1 Stmt. at ¶¶ 52, 54, 58, 60-61.  On August 8, 2007, Mr. Franey informed Jerry Woodham of Hammond Associates that LDBF had "lots of subprime," and that other investors were exiting the fund such that "he who leaves last gets hurt the most."  R. 56.1 Stmt. ¶ 52.  On August 9, 2007, Mr. Franey called Shenkman Capital, another asset manager for HPOPS, and reported that LDBF was invested 90% in subprime, and that he wanted assistance to get out of the Fund "as quickly as possible."  R. 56.1 Stmt. ¶ 58.  After Northern Trust informed Mr. Franey that "the least expensive option" for HPOPS was to replace the fund with one that did not have "any sort of subprime exposure," Mr. Franey expressed a contrary view, asking "why not hold to maturity?"  R. 56.1 Stmt. ¶ 60.  Northern Trust responded that holding to

- 8 -

maturity would extend HPOPS's exposure to higher-risk assets and that the subprime market

would worsen.  *Id.*  Yet HPOPS hewed to Mr. Franey's decision for months, and did not

terminate State Street until November, 2007.  R. 56.1 Stmt. ¶¶ 62-63, 65.

      This back and forth reflects the fact that Mr. Franey made an informed decision to ride

out the market turmoil.  Nor can there be any doubt that HPOPS's decision was fully considered.

Mr. Franey and the HPOPS staff oversaw a $3.5 billion investment fund that invested in a variety

of complex, high risk investments, including hedge funds, private equity funds, foreign currency

exchanges, and "structured beta."  *See* Wolkoff Decl. Ex. 31, at Franey Tr. 38:24 – 39:3; R. 56.1

Stmt. ¶¶ 5, 29.  Indeed, when he finally redeemed out of LDBF, Mr. Franey took the proceeds

and invested in speculative commodities, losing half the investment.  Reply Wolkoff Decl. Ex. 2,

at Ferguson Ex. 207, p. 51 (HPOPS 2009 Annual Report). Mr. Franey was a Chartered Financial

Analyst with twenty-seven years of financial industry experience, who had worked at HPOPS for

sixteen years, rising to Chief Investment Officer.  Reply Wolkoff Decl. Ex. 1, at Franey Tr. 17:6-

12, 14:15-23.  HPOPS's "enhanced" investment with State Street reflects this sophistication – far

from a registered mutual fund for retail investors, it involved commodities swaps in which

HPOPS was a direct counterparty with AIG.  Mr. Franey and HPOPS were fully able to

appreciate State Street's warnings that a major liquidity crisis in the subprime market to which

they were substantially exposed would entail significant ongoing risk.  HPOPS argues that Mr.

Franey was not a "securitized investment" expert, but this straightforward problem – LDBF's

performance and exposure to a market crisis – did not require specialized expertise in the type of

security at issue.

      The  reasonable course of conduct for a sophisticated investor in LDBF during early to

mid-August 2007 was not only to redeem from LDBF, but to do so quickly, as virtually everyone

else did given the speed with which the fund was losing value.  Wolkoff Decl. Ex. 38, at Carron

Ex 29 (showing Redemptions by Client from LDBF).  By ignoring its duties and then deciding to

maintain its investment, HPOPS fell far short of this standard.

**2.     State Street's Conduct Did Not Cause HPOPS's Investment Losses That Post-Date Mid-August, 2007**

HPOPS misconstrues State Street's causation argument as an "inferential rebuttal

defense" based on "superseding cause" of a third party.  HPOPS Opp. at 49.  As established in

State Street's opening brief, it is an essential element of any tort or contract claim, including all

of HPOPS's claims, that the defendant "caused" the plaintiffs' damages.[10]  HPOPS has the

burden, as part of its case in chief, to prove that State Street caused all of its alleged damages.

For reasons similar to those that establish HPOPS's failure to mitigate damages, HPOPS's

investment losses following mid-August 2007 were not proximately caused by State Street's

conduct because, by that time, HPOPS had made the informed decision to remain invested in

LDBF, despite the known ongoing risks.

State Street cannot be held liable for investment "risks that the plaintiff accepted

knowingly or losses that occurred through no fault of the defendant." *Arthur Andersen & Co. v.

Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997).  "Without this limitation, an investor

could shift the entire risk of an investment to a defendant who made a misrepresentation, even if

---

[10] State Street's Mem. of Law in Supp. of Mot. for Summ. J. ("State St. Br.") at 17-20, citing *Employees Ret. Sys. v. Putnam, LLC*, 294 S.W.3d 309, 315-318 (Tex. App. 2009) (holding that plaintiff could not recover damages under its common law fraud, negligent misrepresentation and breach of contract claims because the "damages did not result from [defendant's] alleged wrongful act"); *Si Kyu Kim v. Harstan, Ltd*., 286 S.W.3d 629, 635 (Tex. App. 2009) (affirming grant of summary judgment for failure to show causation with respect to fiduciary duty, fraud, and negligent misrepresentation claims, and noting that "[b]reach of fiduciary duty requires a showing that the breach caused damages").

- 10 -

the loss were unrelated to the misrepresentation." *Id.*[11]  As set forth in State Street's opening brief, federal courts have consistently applied loss causation principles to limit damages by excluding investment losses that accrued after the date when information that rectified prior misrepresentations or omissions was disclosed to the plaintiff.  State St. Br. at 18-19; *see, e.g., Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 620 (9th Cir., 1981) (applying "ordinary causation and mitigation principles," to limit plaintiffs' damages "by what they would have realized had they acted to preserve their assets or rights when they first learned of the fraud or had reason to know of it").  HPOPS fails to address this precedent, which does not require independent outside conduct, as HPOPS contends.[12]

HPOPS argues that Texas Government Code § 802.203(c) precludes State Street from reducing its liability to HPOPS based on HPOPS's breach of fiduciary duty, and that Chapter 33 of the Texas Civil Practice and Remedies Code "eliminates the defense of superseding cause based on the plaintiff's acts or omissions."  HPOPS Opp. Br. at 49-50.  These arguments, however, overlook the important distinction between a plaintiff's burden to establish proximate cause as an element of its prima facie case, and apportionment of responsibility for damages after a defendant's liability has been established by the trier of fact.  HPOPS's failure to establish proximate cause does not merely "reduce or eliminate" the amount of HPOPS's potential

---

[11] *See also Swank v. Cunningham*, 258 S.W.3d 647, 667 (Tex. App. 2008) (holding that breach of fiduciary duty claim for actual damages requires a showing of proximate cause "that establishes a direct causal link between the damages awarded, the actions of the defendant, and the injury suffered").

[12] *See Nye v. Blyth Eastman Dillon & Co., Inc.*, 588 F.2d 1189, 1198-99 (8th Cir. 1978) (stating that a plaintiff's decision to remain invested in a security after a curative disclosure "involve[s] precisely that weighing of risk that constitutes an investment decision," and thus "[a]ny increase or decrease in the value of the stock after a reasonable time is causally unrelated to the initial decision to purchase").

damages, but instead compels a determination that State Street is not liable in the first instance for HPOPS's investment losses after mid-August.

**3.      HPOPS's Fraud In The Inducement Claims Are Not Supported By Record Evidence**

HPOPS acknowledges that, to prove fraud, it must show that a particular representation was "false."  HPOPS Opp. at 21.  Yet HPOPS concedes that certain of the representations upon which it claims reliance were not false.  The record evidence demonstrates that State Street's other pre-investment representations were also accurate, and that the omissions alleged by HPOPS relate to information that was immaterial as a matter of law.  As a result, State Street is entitled to judgment on HPOPS's fraud in the inducement claims under the common law and the TSA.[13]

**A.      The August 2005 Presentation Accurately Disclosed LDBF's Sector Allocation**

First, HPOPS argues that the August 2005 presentation misled HPOPS by stating that 75.8% of LDBF was invested in "ABS," or asset-backed securities.  HPOPS Opp. at 24.  That was of course completely true; as HPOPS concedes, "a security backed by a subprime mortgage can be classified as ABS or MBS because a mortgage is an asset."[14]  *Id.*  HPOPS complains only

---

[13] State Street's Motion focuses on the lack of evidentiary basis for HPOPS's fraud in the inducement claims based upon pre-investment disclosures, while the post-investment time period is the subject of State Street's mitigation and causation arguments.  HPOPS's suggestion that State Street somehow concedes an evidentiary basis for claims relating to the post-investment time period is not so.  State Street denies that it *ever* misrepresented or omitted to disclose any material facts to HPOPS at any point in time, as it will prove in the event trial is necessary.

[14] In fact, the industry norm was to classify bonds backed by subprime mortgages as ABS, because such bonds are structured differently than those backed by conventional mortgages. Wolkoff Decl. Ex. 38, at Carron Report, at 8-10, 19.  HPOPS's own expert, Philip Ferguson, worked as the Chief Investment Officer of AIM Investments, and acknowledged that his own firm classified bonds back by mortgage backed securities as ABS. Reply Wolkoff Decl. Ex. 4, at Ferguson Tr., 52:16-53:3 ("Did AIM have any funds that were invested in bonds collateralized by subprime, sir, while you were there? A. Yes, we did. Q. And did AIM refer to those bonds

that State Street ought to have disclosed the specific type of underlying asset collateralizing the securities in this category.  But that lack of additional detail does not make the sector allocation false, or even misleading.  State Street provided information consistent with industry norms to a sophisticated client who not only knew that mortgage receivables could support ABS, but had the ability to request greater detail from State Street or call upon its own advisors.  HPOPS does not allege that it was foreseeable in 2005 that highly-rated subprime collateral would experience dramatic underperformance due to an unprecedented liquidity crisis, as unfolded in 2007.  HPOPS's assertion in the wake of these market events that State Street's description misleadingly failed to focus more specifically on the mortgage component of the ABS sector is simply argument by hindsight; it is not any sort of proof that State Street was untruthful.  The sector allocation representation was neither false nor misleading.  R. 56.1 Stmt. ¶ 19.  As a matter of law, it cannot support HPOPS's fraudulent inducement claims.

HPOPS contends that accurately categorizing subprime mortgages as ABS confused its Chief Investment Officer, Pat Franey, speculating that "one would reasonably expect subprime (if any) to be contained in the MBS category."  HPOPS Opp. at 24.  But Mr. Franey acknowledged that he *knew* ABS included subprime, while the record and HPOPS's experts confirm that such disclosure comports with industry practice.  *See* R. 56.1 Stmt. ¶¶ 5, 29 (Wolkoff Decl. Ex. 31, at Franey Tr. 38:24 – 39:3).  HPOPS cannot support a fraud claim with

---

collateralized by subprime as asset-backed securities, sir? A. Well, bonds collateralized by subprime mortgages are, indeed, within the overall category of ABS because they are backed by a mortgage and a mortgage is an asset.  Q. So is the answer yes?  A. The answer is yes."); *Id.* at 117:15-21 ("Does AIM refer in this prospectus to this bond as a subprime bond?  A. This is an annual report to shareholders.  Q. Does it use the word "subprime"?  A. I don't see the word "subprime."  Q. But it does call it an ABS bond, correct?  A. It calls it an asset-backed security.") *Id.* at 121:2-5 ("Q. What -- was it appropriate not to use the word "subprime"?  A. I feel like they adequately described the investment.").

- 13 -

after-the-fact editorial suggestions to State Street's investment presentation in light of subsequent events.[15]

Mr. Franey testified that he knew ABS also included bonds backed by student and auto loans and credit card debt.  R. 56.1 Stmt. at 29.  Indeed, the SEC in 2005 published rules and definitions concerning ABS, noting that the sector consisted of bonds backed by mortgages (52%), automobile receivables (19%), credit card receivables (16%), and student loans (9%). Reply Wolkoff Decl. Ex. 5, Final Rule:  Asset-Backed Securities, Release No. 33-8518, at n. 30 (March 8, 2005), *available at* http://www.sec.gov/rules/final/33-8518.htm (noting that "residential mortgages were the first financial assets to be securitized").  HPOPS has submitted nothing to rebut State Street experts' opinions (and common sense) that in 2005, investors did not view ABS backed by credit cards, or auto and student loans, as any more conservative than subprime mortgages—and likely far less so.  R. 56.1 Stmt. ¶¶ 29 (Wolkoff Decl. Ex. 38, at Carron Report, at 20-21) ("In January of 2006, Moody's Investor Services commented that borrowers historically defaulted on mortgages only after defaulting on other forms of debt, such as credit cards, auto loans, and student loans.").  The record thus shows that Mr. Franey was fully aware of the 75.8% investment in the single sector ABS, and additional detail about whether the ABS was backed by mortgages or consumer debt like credit cards and student and auto loans is not a material fact that, *at the time*, "would have been viewed by a reasonable investor as

---

[15]   Nor does the testimony of a few State Street witnesses (out of over 40 who were deposed) regarding the differences between ABS and MBS render a concededly accurate disclosure false or untrue. HPOPS Opp. at 25.  That testimony resulted from a deposition pop quiz of employees who lacked foundation for their testimony, since they were far removed from the circumstances and investments  relevant to this case.  In contrast, Pat Franey was a CIO and fiduciary, with an array of analysts and advisers to call upon.  Indeed, if he had questions about what more than three quarters of the fund was invested in by use of the term "ABS," he should have asked. Although he now challenges the merit of the industry norm  (despite acknowledging his familiarity with it), that does not make State Street's representation false.

significantly altering the total mix of information made available." *Duperier v. Texas State Bank*, 28 S.W.3d 740, 745 (Tex. App. 2000).  Indeed, this Court's recent decision in the *Yu* securities class action, although in the context of a mutual fund prospectus, frames the relevant analysis and explains why this issue may be apt for summary judgment:

> [Q]uestions of proof remain about the materiality of the alleged mis-categorization. Without the benefit of hindsight—*i.e.*, the knowledge that mortgage-backed securities (instead of securities backed by credit card debt, for example) would eventually plummet in value and precipitate the Fund's liquidation—the conclusion that correct figures showing more mortgage-backed and fewer asset-backed securities would have affected a reasonable investor's decision to purchase shares is far from obvious.  Further, the Annual Reports listed every security in the portfolio, so regardless of the inaccuracy in the percentage table, plaintiff could ascertain the exact composition of the Fund's holdings.  But these arguments are better made at the summary judgment stage.

*Yu v. State Street*, No. 08 MDL 1945, slip op. at 6 (S.D.N.Y. July 14, 2010).  Here, State Street has demonstrated that there was no reason to view bonds backed by subprime mortgages as riskier than other types of ABS like credit cards and student and auto loans without the benefit of hindsight, and HPOPS has produced no credible evidence to the contrary.  HPOPS's complaints about the lack of additional detail in the August 2005 presentation are thus immaterial.

**B.     HPOPS's New Argument That It As Misled About Leverage In 2005 Is Meritless**

HPOPS now asserts, though not mentioned in its Second Amended Complaint, that the August 2005 presentation's description of the Enhanced Dow Jones-AIG Commodities Futures Strategy as "[u]nleveraged" was a misrepresentation.  HPOPS Opp. at 26.  However, because HPOPS does not make this allegation in its complaint, HPOPS cannot now rely upon it to defeat summary judgment.  *Agri-Mark, Inc. v. Niro, Inc.*, 233 F. Supp. 2d 200, 207 (D. Mass. 2002) ("It is well-settled that plaintiffs are generally not permitted to raise brand new theories of their case in opposition to a motion for summary judgment."); *Hawana v. City of New York*, 230 F. Supp.

2d 518, 534 (S.D.N.Y. 2002) ("The plaintiff cannot raise new claims in response to a motion for summary judgment.").

HPOPS's assertion must also fail on the merits, for two reasons. First, LDBF was not leveraged at the time of the State Street presentation, making the statement true. HPOPS Opp. at 26 ("[T]he LDBF was not leveraged in September 2005."); Burford Decl. Ex. 147 (showing LDBF's leverage ratio as 0.9 or 1.0 for 10 of 12 months in 2005). Moreover, the statement about leverage in the written presentation does not even pertain to LDBF. Wolkoff Decl. Ex. 7 at HPOPS 004248. Rather, it clarifies that the investment in "commodity futures and swaps" was unleveraged, because the value of those derivative investments is matched by a corresponding investment of underlying cash, 25% in a money market fund and the rest in LDBF. Reply Wolkoff Decl. Ex. 13, Weiner Tr. 286:12-287:2; Compl. ¶ 15. The written presentation upon which HPOPS relies does not say LDBF would not be leveraged and, indeed, the fact that it explicitly said the commodities and swaps would not be leveraged, but did not say the same about LDBF, just as easily conjures up the opposite inference to the one HPOPS now asserts.

### C. HPOPS's New Argument That It Was Misled About LDBF's Alpha Target Is Meritless

HPOPS also contends for the first time in its opposition that State Street misrepresented LDBF's excess return goal, or "alpha target." HPOPS Opp. at 23, 27-28. This argument cannot defeat summary judgment, both because it is a new theory of liability not found in the complaint, *see supra*, and because it is unsupported by the unrebutted facts of record.

HPOPS asserts that State Street's August 2005 presentation described the excess return target as 50 basis points above the index, when the target was in fact secretly higher. But as HPOPS expert Lawrence Weiner conceded, the presentation refers both to a 50 basis point target (on page 13), and 70 basis point target (on page 22). Wolkoff Decl. Ex. 7; Ex. 37, Weiner Tr.

39:8-22.  These numbers track State Street documents indicating that LDBF's alpha target was a range of 50-75 basis points.  Reply Wolkoff Decl. Ex. 6, at Pickett Ex. 1 at SS007934930; Burford Decl. Ex. 20 at SS008941538 (stating that LDBF targeted a "return over LIBOR of 50-75 basis points").  The disclosure was also consistent with the testimony of the LDBF portfolio manager, Bob Pickett, that the alpha target was a range:

> Q.     Well, which was it?  Was it a target of 50 basis points or a target of 75 basis points?
>
> A.     It was a range.  It wasn't exact.

Reply Wolkoff Decl. Ex. 11, at Pickett Tr. 114:7-9.

Mr. Pickett's testimony is uncontradicted, and is consistent with the written presentation.  HPOPS relies exclusively on an isolated entry in a spreadsheet that Mr. Pickett used to track the fund's analytics, which simply states "Alpha Target (annual) – 75.0."  Burford Decl. Ex. 56. Of course, that figure is consistent with the range Mr. Pickett testified to, and materially indistinguishable from the figures in the presentation.  There is also no foundation for the significance of this number within the spreadsheet, which Mr. Pickett could not recall ever referring to when making his investment decisions.  HPOPS's new but ineffective argument is further belied by HPOPS's own exhibits, which depict the alpha target as a 50-75 basis point range.  See Burford Decl. Ex. 20, at SS008941538 (stating excess return target of "50-75 basis points").

### D.    Alleged Omissions Identified By HPOPS In Its Brief Do Not Support Its Fraud Claims

Finally, HPOPS asserts a number of alleged omissions from State Street's pre-investment disclosures.  These alleged omissions are, however, immaterial as a matter of law.  HPOPS has presented an after-the-fact wish list of information it now claims it should have been given in

- 17 -

2005 in light of the unprecedented market events that unfolded in 2007.  Such assertions cannot prevent entry of summary judgment on HPOPS's fraud in the inducement claims.

**i.      None Of The Alleged Omissions Was Material**

An omission or misrepresentation is material if there is "a substantial likelihood that proper disclosure would have been viewed by a reasonable investor as significantly altering the total mix of information made available."  *Duperier*, 28 S.W.3d at 745 (citations omitted).[16] Significantly, materiality requires that the representation or omission "concerned a matter which was material to the risk at that time."  *Robinson v. Reliable Life Ins. Co.*, 554 S.W.2d 231, 234 (Tex.Civ.App. 1977).  The law does not expect "clairvoyance."  *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978).  Rather, "[t]he determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20-20 hindsight view long after the event." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 165 (2d Cir. 2000) (quoting *Spielman v. General Host Corp.*, 402 F.Supp. 190, 194 (S.D.N.Y.1975)).

Absent the benefit of hindsight in the wake of the unprecedented market events of 2007, none of the alleged omissions would have significantly altered the "total mix of information" available to HPOPS.  For example, HPOPS claims that it was a material omission for State Street not to explain that the fund was primarily invested in subprime, and that it was not diversified. HPOPS Opp. at 23-26, 28.  But, as discussed above, State Street explicitly disclosed in the August 2005 presentation that 75.8% of the fund was concentrated in ABS, R. 56.1 Stmt. ¶ 19, and Mr. Franey testified that he was aware of it.  R. 56.1 Stmt. ¶ 29.  Mr. Franey also knew this sector contained bonds backed by subprime mortgages, along with other forms of consumer debt.

---

[16] *See also In re Westcap Enters.*, 230 F.3d 717, 726 (5th Cir. 2002) (defining materiality as requiring "an appreciable likelihood that it could have significantly affected the investment decision of a reasonable investor" (quoting *Beebe v. Compaq Computer Corp.*, 940 S.W.2d 304, 306 (Tex. App. 1997)).

- 18 -

As mentioned supra at pp. 12-15, HPOPS has not come forward with any evidence to rebut State Street's experts' opinions that neither Mr. Franey nor any reasonable investor would have perceived the risk of ABS backed by mortgages to be any riskier in 2005 than ABS backed by student or auto loans, or credit card debt.

The other supposed omissions listed by HPOPS at pages 28-29 of the Opposition are subject to a similar analysis:

- "LDBF was essentially a subprime fund from its inception," and "LDBF was not diversified."  As discussed above, State Street disclosed LDBF's actual sector allocation to HPOPS, showing that 75.8% of its funds was invested in one sector, ABS, R. 56.1 Stmt. ¶ 19, thus disclosing the extent of its diversification.  Given Mr. Franey's knowledge that ABS included bonds backed by subprime mortgages, R. 56.1 Stmt. ¶ 29, and unrefuted evidence that subprime mortgages were not perceived as riskier than other forms of consumer debt, additional subprime disclosures were not material.

- "LDBF was a portable alpha vehicle for State Street's funds that could invest no more than 25% of their capital into the fund in order to maintain diversity."  HPOPS fails to explain why the use of LDBF as a "portable alpha vehicle" would in any way be a material disclosure or relevant to HPOPS.  Indeed, HPOPS was itself using LDBF as a "portable alpha vehicle," to provide the excess returns needed to make its commodities investment "enhanced." R. 56.1 Stmt. ¶¶ 7, 12, 17-18, 24; *see also* Wolkoff Decl. Ex. 38, at Carron Report, pp. 4, 10.  Moreover, HPOPS invested less than 3% of its portfolio with State Street, far below the 25% level established by State Street for certain of its other funds.  Wolkoff Decl. Ex. 1, at  45, 49

- "The Commodities Strategy could and would use leverage through its exposure to the LDBF."  As HPOPS admits, LDBF was not leveraged at the time of the August 2005 presentation, HPOPS Opp. at 26-27, and, in any event, State Street never made any representation that LDBF would never use leverage, as discussed above.

- "The LDBF was managed as an 'Absolute Return Strategy' that was **required** to meet 75 bps over its benchmark."  HPOPS does not explain what significance it could have hypothetically attached to LDBF being an "Absolute Return Strategy."  Its contention about LDBF's excess return target is contravened by the evidence, as discussed above. R. 56.1 Stmt. ¶¶ 17-18; Wolkoff Decl. Ex. 37, at Weiner Tr. 39:8-22.  Moreover, to the extent State Street was required to seek to earn 50 to 75 basis points of excess returns, it was because the terms of the IMA between State Street and HPOPS required State Street to attempt to beat the commodities benchmark – which State Street explained to HPOPS meant trying to earn excess returns of 70 bps in LDBF.  R. 56.1 Stmt., ¶¶ 17-18, 24

- "The deteriorating fundamentals of subprime mortgages were known to State Street before HPOPS signed the First Amendment.  Indeed, the Cash Management section of the bank had already stopped buying subprime by June 16, 2006."  The uncontroverted record shows that (1) the State Street cash group managed different types of funds than the Active Fixed Income team and thus had a far more conservative mandate, and in any event did not sell their existing subprime holdings; (2) the Active Fixed Income group had a perfectly valid basis for continuing to invest in subprime-backed bonds, as articulated by numerous industry professionals and asset managers.[17]  Moreover, State

---

[17] Wolkoff Decl. Ex. 38, at Carron Report at 36-38 ("In addition to reviewing credit and other information about securities prior to investment, the Structured Products group had an ongoing surveillance process, which was used to review all securities at the tranche level."); *see also*

Street is not required to disclose every factor it weighs in making various investment decisions in distinct funds, especially where as here, numerous other considerations supported State Street's long-term conviction.

- "The portfolio managers of State Street's internal funds had unrestricted access to inside information about the LDBF."  HPOPS provides no evidence or explanation that the "access" was ever used, or what data State Street portfolio managers had that gave them an informational advantage over HPOPS, or how such information would have affected the total mix of information HPOPS relied upon in making its investment decision.

- "John Tucker and State Street would not exercise any discretion over the investment of HPOPS's cash collateral, no matter what the consequences, even though the IMA vested in State Street the sole discretion to manage the cash collateral portion of the Commodities Strategy . . . ."  This supposed omission is nothing but a restatement of HPOPS's contract-based argument that is both wrong and in an amendment not negotiated until well *after* the August 2005 presentation and HPOPS's decision to invest with State Street.  Even if the IMA could be read to support HPOPS's claims, such assertions pertaining to State Street's later breach of its alleged contractual obligations has no bearing on HPOPS's fraud claims.  "[T]he mere failure to perform a contract is not evidence of fraud."  *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41, 48 (Tex. 1998).

- "The LDBF's ability to invest in complex, new and unproven securities."  HPOPS Opp. at 29.  Here again, HPOPS offers no evidence about how LDBF's investments in "complex" or "new" securities would have been material or relevant to its investment

---

Reply Wolkoff Decl. Exs. 7-10 (Gianatasio Exs. 32, 45, 49, and 50; (showing credit analyst review of the securities in LDBF)).

decision, particularly in light of what was known at the time.  The media attention given to various types of derivative securities *since* the subprime and broader credit crises of 2007-2008 does not stand as evidence that the use of such securities in LDBF would have been material to an investor like HPOPS in 2005, which had willingly decided to invest in derivatives, for example, in the commodities context.

      **ii.**       **State Street Did Not Have A Duty To Disclose These Immaterial Facts**

In addition to the immateriality of the alleged omissions, State Street did not have a duty to disclose the peripheral facts forming the basis of HPOPS's omission claims.  A fraud claim can only be supported by material omissions where the defendant was under a heightened duty of disclosure.  *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) ("Generally, no duty of disclosure arises without evidence of a confidential or fiduciary relationship.").  When State Street and HPOPS were *negotiating* the terms of an eventual investment arrangement, there was by definition no fiduciary relationship.  *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997) ("[T]o impose such a relationship in a business transaction, there must be a fiduciary relationship before, and apart from, the agreement made the basis of the suit." (internal quotation marks omitted)).

HPOPS concedes that any fiduciary relationship was launched by the signed contract, well after the presentation.  HPOPS Opp. at 21.  Omissions that post-date the contract clearly have nothing to do with HPOPS's claims of fraud in the inducement – which pertains to the formation of the contract itself.  *Formosa Plastics*, 960 S.W.2d at 46.  The fraudulent inducement claim is the only one for which State Street has moved for summary judgment; only the pre-contractual, non-fiduciary statements or omissions matter.

The other instances that trigger a duty to disclose arise where a party makes a partial disclosure that is in some respect false or misleading, and – knowing that the partial disclosure

may have misled the plaintiff – fails to amend it.  *See Am. Indus. Supply Corp. v. Int'l Valve Suppliers*, No. 07-96-0357 CV, 1997 WL 528744 at *4 (Tex. App. Aug. 26, 1997) ("[A]n affirmative duty of disclosure exists where . . . a party later learns that a previous affirmative representation was false."); *see also* Restatement (Second) of Torts § 529 ("A representation stating the truth so far as it goes but which the maker *knows or believes* to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation." (emphasis added)).  Not only is the August 2005 presentation true, but there is no evidence that State Street knew or believed that HPOPS was potentially misled.  Moreover, the presentation was made to a sophisticated investor[18] able to analyze complex and potentially risky investments.  The presentation was not a prospectus.  Considering its narrow scope, there is no evidentiary basis to support HPOPS's argument that this presentation, standing by itself, created some broader obligation to subsequently disclose additional facts.

  **E. There Is No Evidence Of Scienter With Respect To The Misrepresentations And Omissions That HPOPS Relies Upon**

  Finally, HPOPS identifies no evidence of scienter with respect to the misrepresentations or omissions that it now asserts.  State Street's pre-investment communications with HPOPS were limited to a single presentation containing accurate, high level disclosures regarding LDBF and the Enhanced Commodities Strategy.  HPOPS cannot seriously contend that when State Street informed a sophisticated institutional investor like Mr. Franey that LDBF had more than

---

[18] R. 56.1 Stmt. ¶¶ 5 (Wolkoff Decl. Ex. 31, at Franey Tr. 20:8-11).

  Q:  Do you consider yourself an expert with regard to investments?

  A:  I would be a – I think I have a – a considerable amount of expertise, yes, sir.

*See also Id.* at Franey Tr.18:11 – 19:15 (stating Franey has been a Certified Financial Advisor since 1995 and has been a Certified Public Accountant for over 20 years); *Id.* at Franey Tr. 38:24 – 39:3 (stating HPOPS was a $3.5 billion pension fund); R. 56.1 Stmt. ¶¶ 5, 29.

three quarters of its funds invested in ABS, State Street's intent was to mislead him into thinking that the fund was diversified across a number of sectors, or that LDBF had conservative investments. Nor, pointedly, has Mr. Franey ever asserted that he thought bonds backed by credit cards or consumer loans were safer than the ABS in LDBF. Indeed, there is not a scintilla of evidence suggesting that State Street intentionally omitted or misconstrued any information in the presentation in order to obtain HPOPS's investment[19] or, given the presentation's limited purpose, that State Street was reckless in not including more detail. Because there are neither any facts or contextual reason to infer fraudulent intent, HPOPS's fraudulent inducement claims are meritless.

**4. State Street Cannot Be Liable To HPOPS Under The Texas Securities Act Because It Made No Misrepresentations In Connection With The Sale Of A Security, And Was Never HPOPS's Investment Advisor**

        **A. State Street Made No Pre-Investment Misrepresentations, As Required Under The TSA**

As set forth in State Street's opening brief, the TSA "speaks exclusively to liability for *sales* of a security," necessarily limiting liability to pre-investment misrepresentations. State St. Br. at 21 (quoting *In re Westcap Enters.*, 230 F.3d at 726, n. 11); *see also Pitman v. Lightfoot*, 937 S.W.2d 496, 531 (Tex. App. 1996) ("[T]he plaintiff must show the untrue statements were made before the sale occurred."). Further, liability under the TSA requires an untrue statement of material fact or a material omission. As discussed above, there is no evidence that State Street

---

[19] While HPOPS identifies an email chain where State Street employees made tongue-in-cheek references to "hiding" leverage, this exchange occurred nearly a year after the August 2005 presentation, and has nothing to do with the statement in the presentation. In addition, the participants in the email chain testified that these comments were not based on an actual belief that State Street was "hiding" leverage. HPOPS Opp. at 27 (citing Burford Decl. Exs. 148-49).; Reply Wolkoff Decl. Ex. 11, at Pickett Tr. 214:11-18; Reply Wolkoff Decl. Ex. 12, at Wands Tr. 551:14 – 552:1.

made any "untrue statements of material fact" or some culpable omission before HPOPS invested in LDBF.

HPOPS now contends that while the Investment Management Agreement ("IMA") was amended in June 2006, the "sale" of securities under the statute continued until May, 2007, when HPOPS made its last cash deposit in LDBF.  HPOPS Opp. at 29.  This argument has no support in the law, and HPOPS supplies none.  A "sale" of a security occurs not when previously agreed-upon payments are made, but instead upon the date of a contractual commitment to make future payments.  *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972) ("[T]he time of a 'purchase or sale' of securities . . . is to be determined as the time when the parties to the transaction are committed to one another. . . . 'Commitment' . . . designat[es] the point at which . . . there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time").[20]  The Securities and Exchange Commission has taken the same position in its interpretation of when a "sale" occurs.  *See* 70 Fed. Reg. 44765 n. 391 (Aug. 3, 2005) (defining that term ''sale'' under Securities Act § 2(a)(3) to "include[] any contract of sale," and stating that "[c]ourts have held consistently that the date of a sale is the date of contractual commitment, not the date that a confirmation is sent or received or payment is made." (citing *Radiation Dynamics,* 464 F.2d at 891)).

The timing of a "sale" under the TSA tracks these federal opinions, as the Texas Legislature has made clear that it intended that Article 33(A)(2) be interpreted in accord with the

---

[20] *See also Finkel v. Stratton Corp.,* 962 F.2d 169, 173 (2d Cir. 1992) ("[A] sale occurs for § 12[(a)](2) purposes when the parties obligate themselves to perform what they have agreed to perform even if the formal performance of their agreement is to be after a lapse of time."); *Adams v. Cavanaugh Communities Corp.*, 847 F. Supp. 1390, 1402 (N.D. Ill. 1994) (noting that the Seventh Circuit has followed the *Radiation Dynamics* decision).

Securities Act.  *See* Tex. Rev. Civ. Stat. Ann. art. 581-33 cmt. on § 33A(2) (Vernon Supp. 1991)

(stating that the Texas Legislature amended article 581-33 A(2) in 1977 to "bring this provision

closer to . . . U.S. Securities Act § 12(2)"); *Reed v. Prudential Secs.*, 875 F.Supp. 1285, 1292

(N.D. Tex. 1995) (stating that article 581-33 should be interpreted in accordance with the Federal

Securities Act because "article 581-33 . . . of the [TSA] was modeled after § 12(2)" and there

was "no Texas authority interpreting article 581-33 (A)(2) that contradicts any of [the Fifth

Circuit's] holdings [] with respect to section 12(2)" (citations and internal quotation marks

omitted)).

The primary case cited by HPOPS, *Hill v. Equitable Bank*, explicitly states that a "sale"

of securities occurs when a contract is executed, so long as "[d]efinite amounts of money were

due on definite dates into the future."  655 F. Supp. 631, 638 (D. Del. 1987).  That is precisely

what the IMA provides.  Compl. ¶ 27 ("As set forth in the Amended IMA, the parties agreed that

HPOPS would invest six-million dollars every month for 12 months").  The date of "sale" is thus

no later than June 2006.  The subsequent payment of agreed-upon installments has no bearing on

a TSA claim, and any alleged representations after this date cannot form the basis of a claim.

### B.  State Street Does Not Fall Within The TSA's Definition Of "Investment Advisor"

HPOPS wrongly alleges that State Street is also liable under a subpart of the TSA that

only applies to an investment advisor, Compl. ¶ 109.  The TSA subpart defines investment

advisor as:

> a person who, for compensation, engages in the business of advising another, either
> directly or through publications or writings, with respect to the value of securities or to
> the advisability of investing in, purchasing, or selling securities or a person who, for
> compensation and as part of a regular business, issues or adopts analyses or a report
> concerning securities.

Tex. Rev. Civ. Stat. Ann. art. 581-4(N)(1).  Not only did State Street not "advise" HPOPS as provided under the TSA, but it is expressly excluded from the statutory definition of "investment advisor" pursuant to an exemption for "a bank or a bank holding company."  Tex. Rev. Civ. Stat. Ann. art. 581-4(N)(1) (providing that "investment adviser" does not include "a bank or bank holding company as defined by the Bank Holding Company Act of 1956 (12 U.S.C. Section 1841 et seq.), as amended, that is not an investment company").[21]  There is no dispute that defendant State Street Bank and Trust Company is the entity that executed the IMA and managed HPOPS's investment in the Commodities Strategy and LDBF.

HPOPS contends that because the State Street fact sheets stated that the bank's commingled funds, like LDBF "may pay affiliates of [State Street] for investment advisor services," that State Street is thus an investment advisor.  But this language refers to State Street's affiliates, not the bank itself.  There is no evidence or suggestion that LDBF was in fact managed by a non-bank affiliate.

HPOPS is also incorrect that State Street falls within the "investment company" exception to the exclusion of banks as investment advisors under the TSA.  Simply put, an "investment company" as that term is used in the securities laws is a mutual fund or similar investment *vehicle*, not a company that manages such funds.  That is why, for example, the Investment Company Act of 1940 governs mutual funds, while the Investment Advisors Act of 1940 governs the entities that manage them.  HPOPS tries to skirt this established fact through

---

[21] Similar statutory exemptions apply to State Street and to its unregistered, commingled trust funds such as LDBF and the Commodities Strategy under the federal Investment Advisers Act of 1940 and Investment Company Act of 1940.  *See* 15 U.S.C. § 80b-2(a)(11)(A) (stating that investment advisers do not include "a bank, or any bank holding company as defined in the Bank Holding Company Act of 1956 [12 U.S.C.A. § 1841 et seq.] which is not an investment company"); 15 U.S.C. § 80a-3(c)(3) (excluding from the definition of "investment company," "[a]ny bank or insurance company," and certain common trust funds or similar funds "maintained by a bank").

- 27 -

two misleading and elliptical citations. First, HPOPS selectively cites to an SEC website that explains the function of registered investment companies (*i.e.* mutual funds), but omits the exclusion that applies to unregistered private investment funds like LDBF.[22] HPOPS Opp. at 33-34. In any event, even if LDBF could be construed as an investment company under the TSA, this would not make its manager, State Street, an investment company. Second, HPOPS cites to an excerpt from State Street *Corporation*'s 10-K filing with the SEC stating that a division of the corporation "acts as an investment advisor . . . ." HPOPS Opp. at 33. (citing Burford Decl. Ex. 163). But HPOPS omits the immediately following language from the 10-K, which makes clear that this division "acts as an investment advisor to investment companies registered under the Investment Company Act of 1940." Burford Decl. Ex. 163 at 3. Thus, it is apparent from the face of the disclosure, with the benefit of *all* the language, that State Street is referring here to its registered mutual fund business. The "investment companies" are the mutual funds themselves, which are in turn managed by a State Street subsidiary named State Street Global Advisors *Fund Management*, Inc. ("SSgA FM").[23] The 10-K goes on to distinguish these mutual fund advisory functions from those that are relevant here: "However, a major portion of our investment management activities are conducted by State Street Bank [*i.e.*, defendant State Street Bank and Trust Company], which is subject to supervision primarily by the Federal Reserve with respect to

---

[22] The SEC explains that "private investment funds whose investors each have a substantial amount of investment assets are not considered to be investment companies—even though they issue securities and are primarily engaged in the business of investing in securities. This may be because of the private nature of their offerings or the financial means and sophistication of their investors." *See* Reply Wolkoff Decl. Ex. 14, at SEC, *Investment Companies*, http://www.sec.gov/answers/mfinvco.htm.

[23] *See* Reply Wolkoff Decl. Ex. 15, at https://www.ssgafunds.com/general/legal/ ("SSgA Funds Management, Inc. ("SSgA FM") is a wholly owned subsidiary of State Street Corporation and serves as the investment adviser for the SSgA Funds."). SSgA FM is a subsidiary of State Street Corporation – the entity that files the 10-K, explaining the reference to "*[o]ur* investment management division."

- 28 -

these activities." *Id.* Accordingly, the State Street Corporation 10-K provides absolutely no support for HPOPS's assertion that State Street falls within the "investment company" exclusion; as a bank, State Street is excluded from the "investment advisor" provision of the TSA, Tex. Rev. Civ. Stat. Ann. art. 581-4(N)(1), which cannot form the basis for a claim here.

## <u>CONCLUSION</u>

For all of the foregoing reasons and those stated in its opening brief, State Street respectfully requests that that the Court enter an order dismissing HPOPS's claims in their entirety.

Dated:  July 30, 2010                    ROPES & GRAY LLP


                                         By: <u>/s/ Harvey J. Wolkoff</u>
                                         Harvey J. Wolkoff
                                         Robert A. Skinner
                                         Daniel J. Maher
                                         One International Place
                                         Boston, MA  02110
                                         Tel: (617) 951-7000
                                         Fax: (617) 951-7050
                                         harvey.wolkoff@ropesgray.com
                                         robert.skinner@ropesgray.com
                                         daniel.maher@ropesgray.com

                                         *Attorneys for Defendant State Street Bank and Trust Company*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2010, I caused a true and correct copy of State Street's Reply Memorandum in Support of State Street's Motion for Summary Judgment, Declaration of Robert A. Skinner dated July 30, 2010, and Exhibits to the Declaration of Robert A. Skinner to be served upon the all counsel of record via the ECF system.

<u>/s/ Allison M. Boscarine</u>
Allison M. Boscarine
