UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

————————————————————

IN RE STATE STREET BANK AND
TRUST CO. FIXED INCOME FUNDS             MDL No. 1945
INVESTMENT LITIGATION

————————————————————

MEMORIAL HERMANN HEALTHCARE
SYSTEM AND THE HEALTH
PROFESSIONALS INSURANCE COMPANY,
LTD.,

       Plaintiffs,                              No. 08 Civ. 5440 (RJH)

v.

STATE STREET BANK & TRUST
COMPANY,

       Defendant.

————————————————————

## (*CORRECTED*) STATE STREET'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

**Page**

1. Plaintiffs Have Not Established Any Disputed Issues of Material Fact Regarding Memorial Hermann's Failure to Mitigate .......................................................3

    A.    Ernest Liebre's Knowledge Is Imputed to Memorial Hermann, and Plaintiffs Therefore Had All the Information They Claim To Have Lacked By The End of July 2007 ........................................................5

        i.    Plaintiffs misstate the record in their failed attempt to create disputed issues of fact ...............................................................6

        ii.    Plaintiffs cannot establish a disputed issue of fact regarding Memorial Hermann's knowledge on July 27, 2007 that LDBF was heavily invested in subprime ...........................................7

        iii.    Plaintiffs cannot establish a disputed issue of fact regarding Memorial Hermann's knowledge that there was no liquid market for LDBF's securities in July and August 2007 ..........................8

    B.    State Street Gave Plaintiffs No "False Reassurances".......................................10

    C.    Plaintiffs' Failure to Redeem from LDBF for Months, Including After Filing A Complaint, Was Not a Reasonable Effort to Mitigate Damages as a Matter of Law ..............................................................12

    D.    Memorial Hermann Has Failed to Refute State Street's Loss Calculations..................................................................................15

2. Plaintiffs Have Not Established Any Disputed Issues of Material Fact Precluding Summary Judgment For State Street on Plaintiffs' Fraud/Fraudulent Inducement and Misrepresentation Claims.......................................17

    A.    The Unrebutted Facts Show That LDBF Was Not Marketed to Memorial Hermann as a Conservative Fund Designed to Provide Preservation of Capital and Liquidity ..................................................17

    B.    The Unrebutted Facts Show that State Street Accurately Disclosed LDBF's Concentration in ABS Backed by Home Equity Loans.......................22

    C.    The Unrebutted Facts Show that State Street Did Not Make Any Material Omissions in Marketing LDBF to Memorial Hermann .....................24

CONCLUSION.....................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   651 F.2d 615 (9th Cir. 1981) ............................................................................7, 10

*Barrett Assocs., Inc. v. Aronson*,
   190 N.E.2d 867 (Mass. 1963) ..................................................................................21

*Berry Bros. Buick, Inc. v. Gen. Motors Corp. (Buick Motor Div.)*,
   257 F. Supp. 542 (E.D. Pa. 1966) ...........................................................................16

*Bickerstaff v. Vassar Coll.*,
   196 F.3d 435 (2d Cir. 1999)......................................................................................17

*Burnham v. Mark IV Homes, Inc.*,
   441 N.E.2d 1027 (Mass. 1982) ................................................................................15

*Carmellino v. Dist. 20 of N.Y.C. Dep't of Educ.*,
   No. 03 Civ 5942 PKC, 2006 WL 2583019 (S.D.N.Y. Sept. 6, 2006) .....................15

*Coffel v. Stryker Corp.*,
   284 F.3d 625 (5th Cir. 2002) ...................................................................................19

*County of Suffolk v. Long Island Lighting Co.*,
   907 F.2d 1295 (2d Cir. 1990)......................................................................................8

*Drummond v. Morgan Stanley & Co.*,
   No. 95 Civ. 2011 DC, 1996 ......................................................................................14

*Engstrom v. First Nat'l Bank of Eagle Lake*,
   936 S.W.2d 438 (Tex. App. 1996)..............................................................................4

*Farr v. Shearson Lehman Hutton, Inc.*,
   755 F. Supp. 1219 (S.D.N.Y. 1991).........................................................................11

*Floyd v. Hefner*,
   556 F. Supp. 2d 617 (S.D. Tex. 2008) ..................................................................5, 21

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*,
   960 S.W.2d 41 (Tex. 1998).......................................................................................21

*Goldkrantz v. Griffin*,
   No. 97 CIV. 9075(DLC), 1999 WL 191540 (S.D.N.Y. Apr. 6, 1999) ....................16

*Grant Thornton LLP v. Prospect High Income Fund,*
    No. 06-0975, 2010 WL 2636124 (Tex. July 2, 2010)............................................................19

*Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.,*
    215 F.R.D. 466 (S.D.N.Y. 2003) ........................................................................................12

*Handrahan v. Red Roof Inns, Inc.,*
    680 N.E.2d 568 (Mass. App. Ct. 1997) ..............................................................................15

*Holtz v. W.U. Tel. Co.,*
    3 N.E.2d 180 (Mass. 1936) ...................................................................................................5

*Hutchins v. Cardiac Sci., Inc.,*
    456 F. Supp. 2d 173 (D. Mass. 2006) ..................................................................................4

*Hygeia Dairy Co. v. Gonzalez,*
    994 S.W.2d 220 (Tex. App. 1999)........................................................................................15

*In re Charles Schwab Corp. Sec. Litig.,*
    No. C 08-01510 WHA, 2010 U.S. Dist. LEXIS 51279 (N.D. Cal. Apr. 14,
    2010) ....................................................................................................................................14

*In re Elec. Data Sys. Corp. Sec. and ERISA Litig.,*
    298 F. Supp. 2d 544 (E.D. Tex. 2004) ................................................................................21

*In re Fortune Sys. Sec. Litig.,*
    680 F. Supp. 1360 (N.D. Cal. 1987) ..................................................................................4, 7

*In re Grand Jury Subpoena Dated July 6, 2005,*
    510 F.3d 180 (2d Cir. 2007)................................................................................................12

*LC Capital Partners, LP v. Frontier Ins. Group, Inc.,*
    318 F.3d 148 (2d Cir. 2003)................................................................................................10

*Lewis v. Cmty. First Nat'l Bank, N.A.,*
    101 P.3d 457 (Wyo. 2004)...................................................................................................14

*Mitchell v. Texas Gulf Sulphur Co.,*
    446 F.2d 90 (10th Cir. 1971) ................................................................................................4

*Nye v. Blyth Eastman Dillon & Co.,*
    588 F.2d 1189 (8th Cir. 1978) ..............................................................................12, 13, 14

*Reinhardt v. Gulf Ins. Co.,*
    489 F.3d 405 (1st Cir. 2007)..................................................................................................4

*Riverdale Mills Corp. v. U.S. F.A.A.,*
    417 F. Supp. 2d 167 (D. Mass. 2006) ..................................................................................5

- iii -

*Schwartz v. NMS Indus., Inc.*,
    575 F.2d 553 (5th Cir. 1978) ................................................................................4

*Taft v. Sherman*,
    301 S.W.3d 452 (Tex. App. 2009)..................................................................20, 23

*Zola v. Gordon*,
    685 F. Supp. 354 (S.D.N.Y. 1988)....................................................................10

## OTHER AUTHORITIES

Fed. R. Evid. 702 and 703............................................................................................9

Rule 56.1 ......................................................................................................................9

Defendant State Street Bank and Trust Company ("State Street") respectfully submits this memorandum in further support of its Motion for Summary Judgment and in response to plaintiffs Memorial Hermann Healthcare System's ("MHHS") and the Health Professionals Insurance Company, Ltd.'s ("HePIC") (collectively, "Memorial Hermann") Opposition to State Street's Motion for Summary Judgment ("Opposition").

In opposing summary judgment, Memorial Hermann presents no disputed issues of material fact as to why State Street should be liable for the losses Memorial Hermann incurred after the end of July 2007, by which time Memorial Hermann was fully aware of the substantial and continuing underperformance of the Limited Duration Bond Fund ("LDBF" or the "Fund"), the Fund's material subprime exposure, its investment advisor's opinion to immediately move its investment out of LDBF and into a money market fund, and the precarious market conditions. Had Memorial Hermann redeemed by the end of July 2007, it would have recovered more than its original investment and lost nothing.  Its losses thereafter reflect only its independent, informed decision not to redeem out of LDBF.  With minimal effort – a signature on a fax – those losses would have been stanched.  Memorial Hermann's decision not to redeem, aware of the relevant facts and having been implored to redeem by its investment advisor, forecloses any recovery in excess of the millions it has already received from the Fair Fund established in State Street's settlement with the Securities and Exchange Commission and other regulators.  Hoping for four months, through progressively bleak performance and market reports, that a fund will recover is not, as a matter of law, a reasonable attempt to mitigate; it is simply a decision to undertake a new investment risk.

Memorial Hermann does not dispute that there is a duty to mitigate under the relevant law.  Instead, Memorial Hermann argues that its duty to mitigate was not triggered, if at all, until

some unspecified time after July 2007, and that disputed issues of material fact preclude summary judgment.  But the undisputed record establishes that as of the end of July 2007, State Street had informed Memorial Hermann through its admitted agent, Ernest Liebre, of the material facts relating to LDBF's significant underperformance and the Fund's substantial exposure to a sector in the grip of a market crisis.  Not only was Memorial Hermann under a duty to mitigate as of this time, but its duty continued and intensified through the ensuing months as LDBF's performance deteriorated further, and the market continued to convulse.  Accordingly, because Memorial Hermann failed to mitigate damages and has already been paid $38 million from the Fair Fund – an amount greater than its investment losses in LDBF at the time plaintiffs filed their initial complaint and through the end of November 2007 – plaintiffs are precluded from recovering any additional damages.[1]

Finally, Memorial Hermann has failed to establish any genuine issues of material fact precluding summary judgment on plaintiffs' fraud/fraudulent inducement and negligent misrepresentation claims.  State Street's pre-contractual representations to Memorial Hermann about LDBF's investment objective, strategy and composition were accurate and not misleading.

---

[1] Memorial Hermann's argument concerning the correct calculation of the credit, Pls.' R. 56.1 Resp. ¶ 70, is legally incorrect.  Its position runs counter to the SEC's statement in announcing the settlement that "State Street also gets credit" for the prior private settlements. http://www.sec.gov/litigation/litreleases/2010/lr21408.htm.  Moreover, the allocation of the Fair Fund payments to individual investors, including plaintiffs, accounted for the prior private settlements, discounting the amounts received by investors who had already been compensated through private settlements, and proportionally increasing payments to plaintiffs and other investors who had not settled.  *See* Declaration of Robert A. Skinner, dated June 2, 2010 ("Skinner Decl."), attached to State Street's opening brief, Ex. 43, Attachment A.  It necessarily follows that $664 million is the correct amount against which to deduct the $50 million penalty. R. 56.1 Stmt. ¶ 69.  Even if Memorial Hermann were correct in asserting that State Street is only entitled to a credit of approximately $33.7 million, this amount would still compensate Memorial Hermann for its losses incurred through November 26, 2007.  *See* Declaration of Andrew S. Carron, dated June 2, 2010 ("Carron Decl."), attached to State Street's opening brief, Exs. A & B.

Moreover, Memorial Hermann cannot establish additional requisite elements of these claims, including:  (1) that Memorial Hermann actually relied upon certain isolated statements asserted in plaintiffs' Opposition; and (2) that State Street acted with an intent to deceive Memorial Hermann by intentionally or recklessly making misrepresentations and omissions in order to induce Memorial Hermann to invest in LDBF.

**1. Plaintiffs Have Not Established Any Disputed Issues of Material Fact Regarding Memorial Hermann's Failure to Mitigate**

Memorial Hermann does not dispute that a duty to mitigate exists under either Texas or Massachusetts law.  Memorial Hermann argues instead that its duty to mitigate was not triggered until some unspecified date after the end of July 2007, if at all.  MH Opp. at 7 (arguing that questions of fact exist whether "by late July, Memorial Hermann knew about State Street's misconduct and, therefore, about the true danger of remaining invested in the Fund" (emphasis omitted)).  This argument, which does not say when the duty to mitigate would have been triggered or when the "true danger" was revealed, is entirely without support in the undisputed record, and thus is insufficient to defeat summary judgment.

The undisputed record shows that by the end of July 2007, Memorial Hermann was well aware of the "material facts" triggering its duty to mitigate.  Pls.' R. 56.1 Resp. ¶¶ 44, 46, 49, 51-52.  Plaintiffs claim they were unaware of the subprime concentration in the Fund:  State Street told them that LDBF was heavily invested in subprime.  R. 56.1 Stmt. ¶ 44.  Plaintiffs claim they were unaware of the "risky nature" of the Fund, and believed that the Fund would always preserve capital:  State Street told them that the Fund had a "significant problem" and had lost nearly 5% of its capital in just one month.  R. 56.1 Stmt. ¶¶ 46, 51; Skinner Decl. Ex. 6 at 296-97.  Plaintiffs claim they were unaware that LDBF was left with illiquid securities:  State Street told them that there was no market left for the securities and things were not going to turn around

anytime soon.  R. 56.1 Stmt. ¶ 46, 51.  It is clear that by the end of July 2007, "plaintiffs had, if not actual notice of the nature of defendants' alleged wrongdoing and the accompanying danger to their shares, then at the very least reasonable notice of the type of danger presented to their holdings by defendants' alleged past actions and the nature of those actions."  *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1370 (N.D. Cal. 1987) ("To allow plaintiffs to recover damages after [the date of notice] is to award plaintiffs the opportunity to recover for being unreasonable and for failing to mitigate their damages.").  No reasonable juror could find that plaintiffs lacked sufficient information to recognize that Memorial Hermann's investment in LDBF faced a substantial risk of future losses.[2]  No reasonable juror could find that Memorial Hermann's decision not to redeem out of LDBF throughout August, September, and on past October 2007, constituted a reasonable effort to avoid future losses from its investment in LDBF.[3]  Memorial Hermann failed to mitigate its losses as a matter of law, and its decision not to join other investors in leaving the Fund stands as a superseding cause of all its losses over and above the Fair Fund payment.[4]

---

[2] *See Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90 (10th Cir. 1971) (holding that plaintiffs who fail to act in response to disclosure that eradicated prior misrepresentations "must suffer the consequences of [their] own judgment").

[3] *See Schwartz v. NMS Indus., Inc.*, 575 F.2d 553, 556 (5th Cir. 1978) ("Traditionally, the duty [to mitigate] persists as long as damages are suffered and may reasonably be mitigated."); Mem. at 8 (listing Memorial Hermann's gains/losses on dates from July 27, 2007 to November 26, 2007).

[4] Plaintiffs' assertion that it need not show that State Street's conduct was the proximate cause of its damages for all its claims is simply incorrect.  *See* MH Opp. at 14 (". . . Memorial Hermann is only required to prove 'proximate cause' to recover on its negligent misrepresentation claim."). It is beyond cavil that proximate cause is a required element for all of plaintiffs' claims.  *See Engstrom v. First Nat'l Bank of Eagle Lake*, 936 S.W.2d 438, 444 (Tex. App. 1996) (an "essential element" for a claim of fraud is that "the acts or omissions complained of be a proximate cause of appellants' damages"); *Hutchins v. Cardiac Sci., Inc.*, 456 F. Supp. 2d 173, 183 (D. Mass. 2006) (proximate cause required for Massachusetts fraud claim); *Reinhardt v. Gulf Ins. Co.*, 489 F.3d 405, 412 (1st Cir. 2007) (breach of fiduciary duty) ("Under Massachusetts law, a plaintiff seeking to establish causation must show that defendant's conduct

**A.   Ernest Liebre's Knowledge Is Imputed to Memorial Hermann, and Plaintiffs Therefore Had All the Information They Claim To Have Lacked By The End of July 2007**

At the heart of Memorial Hermann's Opposition is its attempt to distance itself from the testimony of its investment advisor, Mr. Liebre, in its quest to generate questions of fact regarding Memorial Hermann's knowledge of LDBF's subprime exposure by the end of July 2007.  Ignoring Mr. Liebre's sworn testimony entirely, Memorial Hermann instead focuses on what its CFO, Carrol Aulbaugh, supposedly knew at that time.  MH Opp. at 8 (citing Mr. Aulbaugh's testimony for what Mr. Liebre learned from State Street).  This approach, however, is unavailing because Memorial Hermann admits that Mr. Liebre was its agent.  Pls.' R. 56.1 Resp. ¶¶ 5-6; Declaration of Robert A. Skinner, dated July 30, 2010 ("July 30 Skinner Decl."), Ex. 78 at 48:1-6 (Aulbaugh agrees that Mr. Liebre/Cambridge was Memorial Hermann's agent, and one responsibility was "to interface with the outside money fund managers").  As such, any knowledge that Mr. Liebre had is imputed to Memorial Hermann as a matter of law.  *See Riverdale Mills Corp. v. U.S. F.A.A.*, 417 F. Supp. 2d 167, 170 (D. Mass. 2006) ("That an agent's knowledge is imputed to his principal is a general rule of agency law." (citing *Mut. Life Ins. Co. of N.Y. v. Hilton-Green*, 241 U.S. 613, 622 (1916)); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 655 (S.D. Tex. 2008) ("Texas follows the general rule that, except for knowledge obtained confidentially, the knowledge of the agent is the knowledge of the principal irrespective of its source or time of acquisition." (citing *Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.*, 392 S.W.2d 352, 356 (Tex. 1965)).  Mr. Aulbaugh's testimony as to what Mr. Liebre *said* to him on July 31, 2007, does nothing to controvert what Mr. Liebre admitted he *knew* as of July 27.

It is thus clear that Memorial Hermann has adduced no evidence to create a genuine

---

was a but-for cause of [its] injury . . ." (alterations in original) (citation and internal quotation marks omitted)); *Holtz v. W.U. Tel. Co.*, 3 N.E.2d 180, 183 (Mass. 1936) (breach of contract).

dispute that Mr. Liebre – and thus Memorial Hermann – knew the following material information by July 27, 2007:  (1) LDBF was heavily invested in subprime; (2) this exposure caused the Fund to experience significant losses; (3) there was "no market" for the securities; (4) the valuation of the securities was going down; (5) in State Street's view, the situation was "not going to get better and [was] going to get worse"; and (6) State Street "[did not] know if it [would] ever come back."  R. 56.1 Stmt. ¶¶ 44, 46, 51; Skinner Decl. Ex. 6 at 296-97.  Further, Memorial Hermann does not contest that on July 27, in Mr. Aulbaugh's absence, Mr. Liebre called his right-hand man, Lynn DeBlance, and made a "strong and definitive recommendation to terminate" its investment in LDBF and move Memorial Hermann's assets into a conservative money market fund.  Pls.' R. 56.1 Resp. ¶¶ 44, 46, 52; Skinner Decl. Ex. 27 at 195:15-24.

Accordingly, plaintiffs' contention that "[t]here are material fact questions about when Memorial Hermann had reason to know of State Street's wrongdoing and, therefore, when Memorial Hermann had reason to know of the true danger of remaining in the LDBF," MH Opp. at 7, lacks support in the factual record.  Each supposed "material fact" that Memorial Hermann claims that it did not know had been disclosed by State Street and was known, at a minimum, by Memorial Hermann's investment advisor/agent as of the end of July 2007.[5]  R. 56.1 Stmt. ¶¶ 44, 46, 49, 51-52.

### i.   Plaintiffs misstate the record in their failed attempt to create disputed issues of fact

A particularly egregious example of plaintiffs' attempt to cloud the record is their

---

[5] Memorial Hermann pointedly does not assert that it had insufficient information about the possibility of leverage in LDBF at the end of July 2007 that would have supposedly delayed its duty to mitigate losses.  *See* MH Opp. at 9.  This is likely because, among other things, State Street had previously provided Memorial Hermann with LDBF's Audited Financial Statements, which plaintiffs' own expert agreed disclosed leverage of 2:1.  *See* July 30 Skinner Decl. Ex. 79; Ex. 80 at 153-157.

assertion that "[o]n August 3, Liebre sent an email recommending that Memorial Hermann 'stay the course'" with respect to its investment in LDBF, citing an email from Mr. Liebre to a Gary Faccenda of New York Life Investment Management ("New York Life"). MH Opp. at 11; MH Opp. Ex. 57. This assertion brazenly misstates the record evidence. Plaintiffs suggest to the Court that this email was communicated to Memorial Hermann, which it was not, and then fail to disclose to the Court Mr. Liebre's unrebutted testimony about this email, specifically that his recommendation to "stay the course" in fact "[did not] relate to State Street at all," but was a recommendation to stay the course with an entirely different asset manager and fund, New York Life. *See* July 30 Skinner Decl. Ex. 81 at 522:7-524:23. Notably, it was plaintiffs' counsel who questioned Mr. Liebre about this email, asking "[s]o you're saying this is [to] stay the course with New York Life?" Mr. Liebre's response was "yes." *Id.* at 524:21-23.

> ### ii. Plaintiffs cannot establish a disputed issue of fact regarding Memorial Hermann's knowledge on July 27, 2007 that LDBF was heavily invested in subprime

Memorial Hermann claims that it did not know that "99.6% of the Fund was invested in subprime mortgages" on July 27, 2007. MH Opp. at 9. But it is undisputed that on July 27, 2007, Memorial Hermann's agent was aware that the Fund had substantial exposure to subprime, so much so that it had a "major problem" and had lost nearly 5% of its value in one month. R. 56.1 Stmt. ¶ 51; Skinner Decl. Ex. 6 at 296-97. Plaintiffs' argument that it did not know the exact percentage of LDBF's subprime exposure fails to raise a genuine issue of material fact sufficient to defeat State Street's Motion. Rather, in light of State Street's disclosure that the Fund was heavily invested in subprime during a subprime market crisis, it cannot be said that plaintiffs lacked knowledge of "the nature of the danger of holding [the] securities." *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 620 (9th Cir. 1981); *see In re Fortune Sys. Sec. Litig.*, 680 F. Supp. at 1370 (granting partial summary judgment to defendants

because plaintiffs had, "if not actual notice of the nature of defendants' alleged wrongdoing . . . then at the very least *reasonable notice* of the *type* of danger presented to their holdings by defendants' alleged past actions") (emphases added)).

Memorial Hermann's claim that it was unaware that "[t]he Fund's exposure to subprime was *not* limited to the BBB portion of the Fund" is similarly flawed.  MH Opp. at 9.  It is undisputed that State Street communicated to Mr. Liebre on July 27 that the Fund was heavily invested in subprime.  R. 56.1 Stmt. ¶ 44.  Given that the BBB portion of LDBF at the time was just 1.47% as of March 30, 2007, *see* MH Opp. Ex. 46 at SSgA-CIV 854, the Court need not draw the unreasonable inference that plaintiffs assumed that LDBF's heavy exposure to subprime was limited to this one and a half percent of the Fund.[6]  *See, e.g.*, *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990) ("In determining what may reasonably be inferred from [a witness's] testimony, [the non-moving party] 'is not entitled to the benefit of unreasonable inferences, or inferences at war with undisputed facts.'" (citation omitted)).

### iii.   Plaintiffs cannot establish a disputed issue of fact regarding Memorial Hermann's knowledge that there was no liquid market for LDBF's securities in July and August 2007

Memorial Hermann further argues that it had no duty to mitigate because it did not know that "State Street had sold 'a significant piece' of the liquid AAA securities to redeem its own commingled funds from LDBF."  MH Opp. at 9.  Once again, this argument is unsupported by the record.  It is undisputed that State Street *did* inform Memorial Hermann that it had "sold a significant amount of [its] AAA-rated cash positions" on August 2, 2007.  Pls.' R. 56.1 Resp. ¶

---

[6] *See also* July 30 Skinner Decl. Ex. 82 at SS 4284998 (Sept. 30, 2006 LDBF Fact Sheet showing 4.3% of the Fund was BBB); Skinner Decl. Ex. 24 at SS 6630802 (Mar. 31, 2005 Fact Sheet showing 0.3% of the Fund was BBB)).

59.  Memorial Hermann claims that this was a "material fact," asserting in the abstract that this sale of AAA-rated bonds left remaining investors in LDBF with "risky" and "illiquid" securities.[7]  MH Opp. at 9.  But here again, State Street *did* disclose to Mr. Liebre on July 27, 2007, and thus to Memorial Hermann, that "there's no market for anyone who wants to buy these securities" in LDBF and that the valuation of the securities was rapidly deteriorating, without any apparent prospect of a turnaround.  R. 56.1 Stmt. ¶¶ 46, 51.  Memorial Hermann cannot seriously argue that it believed its investment in LDBF entailed non-risky, liquid securities by that time.

Further, Memorial Hermann's assertion assumes facts for which it has provided no record support.  Plaintiffs have presented no evidence – because there is none – that State Street's upper-tier funds, which are other commingled investment vehicles that in turn chose to invest in LDBF, actually reduced their investment in LDBF by 33% at the end of July 2007.  *See, e.g.*, MH Opp. Ex. 54 at SS 001017883 (email stating that proposed plan of action was not yet confirmed).  The analysis of State Street's expert witness, Dr. Andrew Carron, which plaintiffs failed to challenge, shows that the upper-tier funds redeemed nowhere near the 1/3 amount stated in plaintiffs' Exhibit 54 ($156 million).[8]  *See* Skinner Decl. Ex. 18 at Ex. 26.  And Memorial Hermann has presented no evidence that State Street diverted the cash raised by selling LDBF's AAA-rated bonds backed by subprime to its upper-tier funds.

---

[7] Plaintiffs cite the reports and deposition testimony of their putative experts throughout their Opposition and heavily in their Rule 56.1 Response.  Because these experts' reports and testimony are inadmissible under Fed. R. Evid. 702 and 703, the Court need not consider them in deciding this Motion.  *See* State Street's Motions to Strike the Expert Reports of Lawrence J. Weiner and J. Philip Ferguson, filed June 15, 2010 (Doc. Nos. 68 and 70, respectively, in No. 08-cv-5440).

[8] Moreover, there is no evidence that these numbers were reflective of a concerted effort of the upper-tier funds to reduce exposure to LDBF, rather than an attempt to provide liquidity for redeeming outside investors.

- 9 -

**B.      State Street Gave Plaintiffs No "False Reassurances"**

Plaintiffs claim that State Street gave them "false reassurances" that supposedly negated State Street's "storm warnings" that LDBF was heavily invested in subprime and that there was no market for the securities.  MH Opp. at 11 (citing *Bovee v. Coopers & Lybrand*, 320 F. Supp. 2d 646, 655 (S.D. Ohio 2004).  But supposed "reassurances" can negate the "storm warnings" "only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern."  *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148 (2d Cir. 2003).[9]  The two communications that allegedly "comforted" Memorial Hermann, when read in full context, would clearly fail to reassure any reasonable investor, as they in fact communicated the very real risks that were facing the market and the Fund at the time.

First, in its August 2, 2007 letter to clients, State Street said that "[t]he Limited Duration Bond Strategy experienced even more pronounced negative performance in the second quarter of 2007 which continued in July as spread widening moved up the capital structure to AAA and AA-rated securities secured by subprime mortgages."  Skinner Decl. Ex. 37 at MH 011918.  The letter went on to inform Memorial Hermann that LDBF had returned -7.68% year-to-date as of the end of July 2007, in sharp contrast with its benchmark, the J.P. Morgan 1-Month U.S. Dollar LIBOR Index, which had returned 3.20% over the same period – a significant underperformance of more than 1,000 basis points.  *Id.*  State Street's statement that it had "weathered other storms in the past" was hardly a promise of imminent recovery, and indeed would provide cold comfort to the investor who believed that a Fund supposedly akin to a money market fund had underperformed by nearly 5% in just one month.  *Zola v. Gordon*, 685 F. Supp. 354, 366

---

[9] *See also Arrington,* 651 F.2d at 620 ("Even assuming the defendants perpetuated their fraud with false assurances of a rebounding market, the nature of the danger of holding securities on margin in a declining market must have become apparent when plaintiffs received their first maintenance call.").

(S.D.N.Y. 1988) ("[T]he contention that plaintiffs would have justifiably relied on any such statement is, in light of other evidence, incredible.").  Having ignored its paid investment advisors' emphatic recommendation to redeem out of LDBF, Memorial Hermann cannot argue that it was swayed by non-specific notes of optimism within a litany of otherwise dire market news.

The August 14, 2007 communication cited by plaintiffs is even more ominous.  State Street disclosed the following:

- "Both the level of this underperformance and the degree of market turmoil are unprecedented in our 30-year-history as a fixed income manager."

- Recent market events were "chaotic."

- "The already distressed market segment was then further shaken by the failure of a number of hedge funds and the resulting pressure of further waves of forced sales into the liquidity-starved market."

- "Both the scope and the magnitude of the downgrades and watch-listings were unprecedented even during the bond market crisis in 1998."

- "This market situation is extreme and challenging to manage."

- "[T]his market segment faces a magnitude of risk not previously anticipated."

- It warned that the worst might not be over because "[t]raditional methods of estimating defaults may not yet fully capture the implications of the combination of massive refinancing waves amid potential declines in housing values."

- "[R]ecent market events may have repriced the risk of these assets for the foreseeable future and it is unlikely that they will swiftly retrace to values at the turn of the year."

MH Opp. Ex. 58 at MH 011896-7.  In the face of this, State Street's cautiously optimistic statements that "we believe that over time liquidity will slowly re-enter the market" and "we believe that many judicious investors will hold the positions in anticipation of greater liquidity in the months to come," *id.*, cannot overcome the profound negativity of the communication as a whole.  *See Farr v. Shearson Lehman Hutton, Inc.*, 755 F. Supp. 1219, 1228 (S.D.N.Y. 1991)

(holding that "statements of cautious optimism, reiterations of the goal of providing income to investors, and explanations for past poor performance" are insufficient to negate "storm warnings").[10]

### C. Plaintiffs' Failure to Redeem from LDBF for Months, Including After Filing A Complaint, Was Not a Reasonable Effort to Mitigate Damages as a Matter of Law

Tellingly, Memorial Hermann does not argue that it was reasonable for it to stay in LDBF indefinitely; plaintiffs do not even argue that it was reasonable to stay in the Fund at the end of July 2007. Instead, plaintiffs contend only that it is *possible* that a jury could find that Memorial Hermann's decision to remain invested in LDBF at the end of July 2007 was reasonable, MH Opp. at 10, seemingly disregarding that it actually remained in the Fund for several months past that date.[11] In support of its argument, Memorial Hermann cites *Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189 (8th Cir. 1978), for the proposition that an investor has a "reasonable time in which to make a 'second investment decision' to either hold the shares or sell them and reinvest the proceeds elsewhere." *Id.* at 1198; MH Opp. at 10. That case, however, certainly does not support the proposition that investors be given an *unlimited* amount of time to make a second investment decision. Instead, it shows that courts can and do cut off this "reasonable time" and

---

[10] The assertion that Memorial Hermann's concerns were laid to rest by these "reassurances" is further belied by the fact that Memorial Hermann was already seriously anticipating suing State Street by August 21, 2007, as demonstrated by its claims of work-product protection for documents created on that date. *See* July 30 Skinner Decl. Ex. 83. The work product doctrine protects from disclosure only materials that were "prepared by or at the behest of counsel in anticipation of litigation or trial." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007); *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 476 (S.D.N.Y. 2003) ("[A] mere potential for a future dispute is insufficient to show that a party acted in 'anticipation of litigation.'").

[11] Because Memorial Hermann has already been compensated for the equivalent of the losses it incurred through November 26, 2007, the Court need only find that plaintiffs' failure to redeem from LDBF at *any point* prior to that date was unreasonable in order to render summary judgment in favor of State Street.

require investors to make a decision and assume responsibility for any later risk.  The *Nye* court held that two months would be the maximum time allowed given that plaintiff's "relative sophistication" and "constant contact with brokers."  588 F.2d at 1198.

Thus, far from buttressing its argument, *Nye* only underscores the fact that no reasonable juror could disagree that Memorial Hermann, after electing not to redeem from LDBF for four months after State Street disclosed the serious and declining nature of the Fund and the market, made a "second investment decision" to remain in the Fund and voluntarily assumed the risks of this choice.  Just like the plaintiff in *Nye*, Memorial Hermann, a sophisticated investor, was in frequent contact with its investment advisor and State Street throughout the summer and fall of 2007.  R. 56.1 Stmt. ¶ 68.  During and after the numerous conference calls and meetings with its investment advisor and State Street,[12] Memorial Hermann made "the decision to continue in [LDBF] and hope for a rise in price, rather than . . . sell and invest the proceeds elsewhere."  *Nye*, 588 F.2d at 1199.  This "involved precisely that weighing of risk that constitutes an investment decision."  *Id.*

Moreover, no reasonable juror could find that Memorial Hermann's decision to remain invested in LDBF even after it filed its Complaint in this action was a reasonable effort to mitigate losses.  It is unquestionable that by November 5, 2007, Memorial Hermann had

---

[12] Despite Mr. Aulbaugh's and Mr. Liebre's communications with State Street in July and August 2007, no reasonable juror could find that Mr. Aulbaugh's actions were a reasonable process for decisionmaking during the period of time in which Memorial Hermann had to make a "second investment decision."  A member of Memorial Hermann's own Investment Subcommittee testified that Mr. Aulbaugh should have consulted with others prior to making the decision not to redeem from LDBF.  *See* July 30 Skinner Decl. Ex. 84 at 197:5-198:10.  Further, Mr. Aulbaugh failed to bring the Fund's serious issues to the prompt attention of the Investment Subcommittee, waiting until August 13, 2007 to notify them of performance issues (without mentioning the term "subprime").  R. 56.1 Stmt. ¶ 66.  Even then, he did not recommend that the Subcommittee convene immediately to discuss whether or not to hold the LDBF investment, waiting instead until the Subcommittee's next scheduled meeting over three weeks away.  *Id.*

sufficient information about State Street's purported wrongdoing to file a complaint against State Street that alleged an over-concentration in mortgage-related securities and a failure to comply with the Fund's purported investment objective of preserving capital.  *See* Plaintiff's Original Petition filed November 5, 2007, ¶ 14 (Doc. 2, Exhibit A).  As a matter of law, then, the damages at least after this date resulted from Memorial Hermann's new investment decision and failure to mitigate, not from any breach or misrepresentation by State Street.[13]

Memorial Hermann asserts that when "there are disputed fact issues about whether the plaintiff had reason to know of the defendant's wrongdoing and, if so, whether the plaintiff acted 'reasonably under the circumstances,' summary judgment is not appropriate."  MH Opp. at 13-14. However, courts *do* grant summary judgment in cases where no reasonable juror could find that a plaintiff's actions were reasonable in mitigating damages.  *See, e.g.*, *Nye*, 588 F.2d at 1198; *Lewis v. Cmty. First Nat'l Bank, N.A.*, 101 P.3d 457 (Wyo. 2004) (same); *Drummond v. Morgan Stanley & Co.*, No. 95 Civ. 2011 DC, 1996 WL 631723, at *2-3 (S.D.N.Y. Oct. 31, 1996).  Such is the case here.

As discussed above, the undisputed record shows that Memorial Hermann knew that its LDBF investment had substantial exposure to a sector that was undergoing an unprecedented market event, and that the Fund had experienced large losses in the month of July 2007.  R. 56.1 Stmt. ¶¶ 44, 46, 51.  Had Memorial Hermann accepted State Street's offer to move its assets to a conservative money market fund, it would have avoided the overwhelming majority of its losses – if not all of them.  *See* R. 56.1 Stmt. ¶¶ 44-46, 49, 53, 72-73; Carron Decl. Exs. A and B.

---

[13] *See In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2010 U.S. Dist. LEXIS 51279, at *12 (N.D. Cal. Apr. 14, 2010) (holding that under Section 12 of the Securities Act, mutual fund investors are deemed to make a new investment decision "once they learn or should learn, in the exercise of reasonable diligence, the fund's true investment strategy . . . with the outside defaults being the commencement of the action").

Memorial Hermann could have pursued this option with "trifling expense," particularly compared to the tens of millions of dollars that Memorial Hermann ultimately lost. *See Burnham v. Mark IV Homes, Inc.*, 441 N.E.2d 1027, 1034 (Mass. 1982) (stating that, in determining whether an expense is trifling, it must be compared to the "'consequential damages which the plaintiff is seeking to recover'" (quoting *Bear Cat Mining Co. v. Grasselli Chem. Co.*, 247 F. 286, 288 (8th Cir. 1917))). But just as it had in 2004, Memorial Hermann rejected the option of a money market fund and its near-promise of preservation of capital, and chose to remain invested in LDBF in hopes of a market rebound.

### D. Memorial Hermann Has Failed to Refute State Street's Loss Calculations

Memorial Hermann bears the burden of proving the amount of damages proximately caused by any purported wrongdoing by State Street.[14] Yet despite its claims that State Street's loss calculations are "vigorously contested," MH Opp. at 12, Memorial Hermann has adduced absolutely no evidence during the expert discovery period to refute or even cast doubt on these calculations. *See, e.g.*, *Carmellino v. Dist. 20 of N.Y.C. Dep't of Educ.*, No. 03 Civ 5942 PKC, 2006 WL 2583019, at \*48 (S.D.N.Y. Sept. 6, 2006) ("Conjecture or speculation is insufficient to resist a motion for summary judgment. The discovery period in this case was more than ample for plaintiffs to have uncovered such evidence if there had been any."). In their rebuttal reports,

---

[14] To succeed on its mitigation defense, State Street need not prove the exact amount of damages that Memorial Hermann could have avoided, but must merely present "some evidence" supporting its calculation of the losses that occurred because of plaintiffs' failure to mitigate. *Hygeia Dairy Co. v. Gonzalez*, 994 S.W.2d 220, 225-26 (Tex. App. 1999) (rejecting plaintiff's argument that defendant must "prove the exact amount of damages" attributable to plaintiff's failure to mitigate, holding instead that only "some evidence" must exist in the record that allows a "reasoned calculation about losses from failure to mitigate"); *Handrahan v. Red Roof Inns, Inc.*, 680 N.E.2d 568, 576-77 (Mass. App. Ct. 1997) (nothing that trial court, in reducing damages, estimated amount of losses plaintiff could have avoided, taking into account "likelihood" that plaintiff would be able to obtain certain employment, and holding that damages should be even further reduced).

Memorial Hermann's experts entirely fail to challenge Dr. Carron's calculations of what Memorial Hermann's damages would have been had it redeemed at any time prior to November 26, 2007.[15]  Memorial Hermann claims that, should a trial occur, it would cross-examine Dr. Carron on the bases of his conclusions.  MH Opp. at 12.  What Memorial Hermann seems to forget, however, is that it already had an opportunity to do so, at Dr. Carron's deposition. Plaintiffs apparently made a conscious choice not to question Dr. Carron's calculations or methodology, and they should not be granted a *trial* simply because they failed to ask any such questions during the discovery period.  *See Berry Bros. Buick, Inc. v. Gen. Motors Corp. (Buick Motor Div.)*, 257 F. Supp. 542, 545 (E.D. Pa. 1966) ("These claims simply miss the point of a motion for summary judgment.  The non-movant "cannot withhold his evidence until the date of trial but must show by some admissible evidence that there is a genuine issue as to a material fact.").

Memorial Hermann points to a single internal State Street email for the proposition that Dr. Carron's damages calculations might not be correct.  MH Opp. at 12; MH Opp. Ex. 60.  The email states that "[a]n investor takes a known risk when investing in a commingled fund" and that over-the-counter assets "are not priced to liquidation value but to fair market value."  MH Opp. Ex. 60.  Yet this email makes no suggestion that Memorial Hermann could have received anything other than its share of the Fund's stated Net Asset Value had it elected to redeem on any given day, and is thus insufficient to create a triable issue of fact.  *See Goldkrantz*, 1999 WL 191540, at *5 (holding that because "plaintiff has made no case for application of a different confidence level . . . [p]laintiff's conclusory critique of defendants' statistical analysis is

---

[15] *See Goldkrantz v. Griffin*, No. 97 CIV. 9075(DLC), 1999 WL 191540, at *4-5 (S.D.N.Y. Apr. 6, 1999) (granting summary judgment to defendants on affirmative loss causation defense because plaintiff's expert "conducted no independent statistical analysis" to rebut defendant's expert, claiming instead that defendant's expert's analysis was "highly suspect").

insufficient to create a material question of fact").  Thus, without any evidence to support its

position, Memorial Hermann's argument at trial would amount to no more than inviting the jury

to *guess* what amounts Memorial Hermann would have received upon earlier redemption of its

investment.  Mere speculation is not permissible at trial, and "[s]tatements that are devoid of any

specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for

summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir. 1999).

2.     **Plaintiffs Have Not Established Any Disputed Issues of Material Fact Precluding Summary Judgment For State Street on Plaintiffs' Fraud/Fraudulent Inducement and Misrepresentation Claims**

In an attempt to create disputed issues of fact relating to their pre-contractual

misrepresentation claims, plaintiffs focus on isolated phrases in certain materials (RFP response,

quarterly fact sheets, marketing presentations, and a fund declaration) and fail to present them in

their proper context, arguing that State Street represented that LDBF "'would be managed

conservatively to preserve capital and liquidity'" or as a "'diversified, low-risk, conservatively

managed, liquid investment vehicle.'"  MH Opp. at 17, 21.  But the undisputed factual record

does not support that LDBF was represented in any such manner.  Plaintiffs present no evidence

to suggest they can prove multiple elements on these claims, including (1) that State Street made

any material misrepresentations or omissions; (2) that Memorial Hermann relied, let alone

justifiably relied, on any of the isolated statements set forth in plaintiffs' Opposition; and (3) that

State Street acted with an intent to deceive Memorial Hermann by intentionally or recklessly

making misrepresentations to induce Memorial Hermann to invest in LDBF.

A.     **The Unrebutted Facts Show That LDBF Was Not Marketed to Memorial Hermann as a Conservative Fund Designed to Provide Preservation of Capital and Liquidity**

Plaintiffs would have the Court believe that State Street presented LDBF as the

equivalent of a money market fund that would be managed "conservatively to preserve capital

and liquidity."  MH Opp. at 19.  This argument is belied by the factual record and the total mix

of information that State Street provided to Memorial Hermann prior to its LDBF investment.

At the outset, State Street proposed two fund options for Memorial Hermann's

consideration – one, a money market fund, which listed "preservation of capital" as its first core

objective and explicitly offered daily liquidity, and the other, LDBF.  R. 56.1 Stmt. ¶¶ 9, 11-13.

But Memorial Hermann elected not to invest in the money market fund, but chose instead to

invest in LDBF.  R. 56.1 Stmt. ¶ 32.  State Street informed Memorial Hermann that LDBF's

investment philosophy was "structured to maximize risk-adjusted returns," and that LDBF's goal

was to "generate returns of LIBOR + 50-75 bps [basis points]."  R. 56.1 Stmt. ¶¶ 14-15.  State

Street also stated that LDBF was used as a "portable alpha vehicle," a strategy specifically used

to generate excess returns.  R. 56.1 Stmt. ¶ 16.  These representations, all in writing in State

Street's August 2004 presentation, unequivocally conveyed that LDBF was not a conservative

money market fund, but rather a fund with an aggressive return objective that, by definition,

carried material risk.[16]

In support of their argument regarding "preservation of capital," plaintiffs point only to

State Street's draft response to Memorial Hermann's Request for Proposal ("RFP") and one

sentence in a LDBF Fact Sheet, which stated that the Fund seeks to "'maximize income while

preserving capital.'"  MH Opp. at 17-18.  First, while State Street maintains that there are no

material misrepresentations contained in this draft RFP response, there is no evidence that

Memorial Hermann ever was sent or received it, let alone relied upon it, which plaintiffs must

---

[16] In his report, Memorial Hermann's expert, J. Philip Ferguson, described a return objective of
50-75 basis points over LIBOR as "aggressive."  R. 56.1 Stmt. ¶ 25 (citing Skinner Decl. Ex. 16
at 3).

show.  MH Opp. Exs. 61, 62[17]; *see, e.g., Grant Thornton LLP v. Prospect High Income Fund*,
No. 06-0975, 2010 WL 2636124, at *9 (Tex. July 2, 2010) (granting summary judgment for
defendants on fraud claims based on lack of justifiable reliance, finding, among other things, that
"it is undisputed that the [plaintiffs] never received or reviewed the statement [that plaintiffs
alleged gave rise to fraud].").

Second, while State Street also maintains that LDBF's quarterly fact sheets do not
contain any material misrepresentations, there is simply no evidence that Memorial Hermann
relied upon the Fund's Fact Sheet in making its investment decision.[18]  In order to be actionable,
"[i]t is not necessary that the representations were the sole inducement, but the representations
relied upon must have been a material factor in inducing the plaintiff's action." *Coffel v. Stryker
Corp.*, 284 F.3d 625, 636 (5th Cir. 2002) (citation omitted).  Furthermore, plaintiffs fail to
present the quoted statement in the context of the entire Fact Sheet's content.  The Fact Sheet
stated, among other things, that LDBF was subject to more volatility than a traditional money
market fund, that the Fund was "not to be used for daily liquidity," and that LDBF may utilize
"futures, options and swaps," while also showing a heavy concentration in one sector, ABS.  R.

---

[17] The documents cited by plaintiffs would be inadmissible for lack of foundation, and therefore, cannot be relied upon to defeat this Motion.  There is no evidence to establish that State Street's draft response was ever sent, or conversely, that it was ever received.  For a complete treatment of the issues surrounding Memorial Hermann's RFP and the exhibits relied upon by plaintiffs here, State Street refers the Court to Exhibit 1 of State Street's Motion for Leave to File Sur-Reply filed March 3, 2010, at 4-5 (Doc. 52).

[18] Stephen Pouns, a member of Memorial Hermann's Investment Subcommittee, testified that he recalls seeing a one- or two-page document, without specifically identifying a particular Fact Sheet, or recalling anything else from the meeting.  R. 56.1 Stmt. ¶ 30.  However, Mr. Liebre, Mr. Aulbaugh, Mr. DeBlance, and Mr. Montague (another Investment Subcommittee member), all testified that they do not recall seeing any LDBF Fact Sheet prior to Memorial Hermann's LDBF investment.  *Id.*  Also, there is no documentary evidence in State Street's, Memorial Hermann's, or Cambridge Financial Services' files showing that a LDBF Fact Sheet was sent or presented to Memorial Hermann prior to MHHS's investment in LDBF in January 2005.  In point of fact, no one has testified that a LDBF Fact Sheet was relied upon by the Memorial Hermann Investment Subcommittee in deciding to invest in the Fund.

56.1 Stmt. ¶ 31.  In short, the two-page Fact Sheet, offering little more than generalities upon which a sophisticated investor would not reasonably rely as its sole source of information about an investment, nonetheless disclosed that LDBF undertook active risk.

On the subject of the Fund's liquidity, plaintiffs cherry pick phrases that appeared in State Street's written August and November 2004 presentations.  Two bullet points from the August 2004 presentation stated that LDBF would "focus on adding value through high credit quality, structured products" and "maintain portfolio liquidity," while also showing the Fund's significant concentration in one sector, ABS, and calling the Fund a "portable alpha vehicle." Skinner Decl. Ex. 14; R. 56.1 Stmt. ¶¶ 16, 17.  Another phrase appeared in the November 2004 presentation stating that the "underlying portfolio is comprised of high quality, liquid securities," and again showing LDBF's heavy ABS concentration.  Skinner Decl. Ex. 15; R. 56.1 Stmt. ¶ 26. However, plaintiffs have not adduced any evidence to show that State Street was reckless in 2004 in not knowing that AAA and AA bonds would someday become illiquid or lose their value. R. 56.1 Stmt. ¶¶ 18, 27 (showing that LDBF at all material times had an average credit rating of AA).  To the contrary, these statements regarding the portfolio's liquidity were true at the time they were made, and for the ensuing three years until the onset of an unprecedented liquidity crisis.

Even assuming *arguendo* that State Street had marketed LDBF as a conservative fund designed to provide preservation of capital and liquidity, plaintiffs' claim for fraud/fraudulent inducement would still fail because plaintiffs cannot prove that State Street acted with the requisite intent.  *See Taft v. Sherman*, 301 S.W.3d 452, 457 (Tex. App. 2009).  To prove intent, Memorial Hermann must present evidence showing that State Street misrepresented LDBF as being managed conservatively with no actual intent of seeking to preserve capital or provide

liquidity.  *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) ("A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made."); *see also Barrett Assocs., Inc. v. Aronson*, 190 N.E.2d 867, 868 (Mass. 1963) (same); *Floyd*, 2008 WL 1733232, at *2 (affirming grant of defendants' motion for summary judgment as to plaintiff's fraud/fraudulent inducement claims because plaintiff failed to provide evidence that defendants did not intend to perform the promised obligations at the time they entered the contract).  Memorial Hermann has not presented any such evidence, nor could it.

As noted above, in 2004, State Street could not possibly have been aware that three years later in 2007, an unprecedented liquidity crisis would render LDBF's AAA- and AA-rated securities illiquid, causing the Fund to lose substantial capital.  Plaintiffs "may not establish fraud merely by asserting that defendants should have anticipated future events."  *See In re Elec. Data Sys. Corp. Sec. and ERISA Litig.*, 298 F. Supp. 2d 544, 554 n.24 (E.D. Tex. 2004) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).  Fraud by hindsight is not actionable.

Accordingly, based upon the undisputed factual record and the total mix of information provided by State Street to Memorial Hermann, it is clear that (1) LDBF was not represented as a conservative fund intended to preserve capital and liquidity; and even if it were, (2) plaintiffs have not set forth any evidence to prove that State Street intentionally or recklessly misrepresented LDBF in this manner in order to induce Memorial Hermann to invest in the Fund. To the contrary, as discussed in State Street's opening brief and again below, State Street provided Memorial Hermann's investment advisor with a list of LDBF's underlying holdings and the CUSIP numbers to look each of them up – hardly an act indicating any intent to deceive.

**B.    The Unrebutted Facts Show that State Street Accurately Disclosed LDBF's Concentration in ABS Backed by Home Equity Loans**

Plaintiffs also argue that State Street "repeatedly represented that the Fund was invested in a diversified mixture of asset classes."  MH Opp. at 19.[19]  This is yet another argument unsupported by the factual record.  Memorial Hermann was informed in two pre-contractual presentations that LDBF was concentrated in one sector, ABS, and its investment advisor was provided with holdings showing that 75% of these ABS securities were backed by home equity loans.

In its August 2004 presentation, State Street informed Memorial Hermann and Mr. Liebre that a majority of LDBF's assets were concentrated in a single sector, ABS.[20]  R. 56.1 Stmt. ¶ 17. Plaintiffs argue that the disclosure of a concentration in ABS is irrelevant because the term ABS refers to a "wide variety of asset classes" and that ABS is not limited to home equity loans and subprime mortgages.  MH Opp. at 20-21.  Even if so, ABS is a single sector, and LDBF was disclosed as being highly concentrated in it.  Moreover, a week after the August 2004 presentation, "in order to get more insight into the [F]und," Mr. Liebre requested a holdings report for the Fund, which State Street promptly provided.  R. 56.1 Stmt. ¶ 20.  These holdings echoed the Presentation's disclosure that the Fund was concentrated in a single sector, ABS, and further disclosed that 75% of the ABS securities themselves were backed by home equity loans (indicated by an "ABS-HEL" or "ABS-HELIO" classifier next to the security name).  *Id*.  The

---

[19] Here again, plaintiffs mischaracterize State Street's pre-contractual representations to Memorial Hermann.  For example, plaintiffs state that "the [LDBF] Fund Declaration states that *the Fund invests in* a variety of asset classes, including but not limited to [listing various types of securities]."  MH Opp. at 20 (emphasis added).  However, the LDBF Fund Declaration merely set forth the *permitted* classes of assets that the Fund *could invest in*.  R. 56.1 Stmt. ¶ 29.

[20] Plaintiffs cite to general statements from a LDBF Fact Sheet relating to diversification, MH Opp. at 19, but fail to acknowledge that in the very same Fact Sheet, the actual, specific sector allocation is provided, which showed that the Fund was heavily concentrated in the ABS sector. R. 56.1 Stmt. ¶ 31.

holdings report also contained the CUSIP number for each security, which plaintiffs summarily dismiss as unimportant, despite Memorial Hermann's investment advisor's testimony that he was aware he could have used the CUSIP number to determine the subprime exposure in each security.  R. 56.1 Stmt. ¶ 22.

Moreover, as discussed above, plaintiffs must prove that State Street intentionally or recklessly made material misrepresentations to induce Memorial Hermann to invest in the Fund. *Taft*, 301 S.W.3d at 457.  The fact that State Street informed Memorial Hermann that over half of the Fund was invested in ABS, and provided them with the Fund's underlying holdings, complete with CUSIP numbers and a breakdown of the ABS, shows that plaintiffs have not and cannot establish any intent to deceive on the part of State Street.  Indeed, State Street sent this information directly to Memorial Hermann's investment advisor, the head of a sophisticated firm, who could be expected to make full use of the CUSIP numbers and other information or to ask questions about data he did not understand.  State Street also affirmatively offered the investment advisor additional information upon his request.  R. 56.1 Stmt. ¶ 20 (citing Skinner Decl. Ex. 21).

State Street made a second presentation to Memorial Hermann in November 2004, showing a modest increase in the Fund's concentration in the ABS sector, to 56.7%.  R. 56.1 Stmt. ¶ 26.  Further, in December 2004, State Street sent Memorial Hermann a proposed Agreement of Trust for its review.  The Agreement explicitly disclaimed any requirement of diversification.  R. 56.1 Stmt. ¶ 36 (citing Skinner Decl. Exs. 2, 3).  Both Memorial Hermann's CFO and legal counsel reviewed the Agreement prior to executing it in January 2005.  *Id.*; July 30 Skinner Decl. Ex. 78 at 64:3-14.  Accordingly, the undisputed pre-contractual disclosures that State Street made to Memorial Hermann regarding LDBF's investment objective, composition and strategy were more than adequate and in no way misleading – and even if not so, there is no

evidence of any intent to deceive by State Street.

###### C.     The Unrebutted Facts Show that State Street Did Not Make Any Material Omissions in Marketing LDBF to Memorial Hermann

Finally, plaintiffs argue that State Street failed to disclose (1) LDBF's exposure to subprime; and (2) LDBF's use of leverage.[21] MH Opp. at 22-23.  Neither argument is supported by the factual record.  As discussed above, Memorial Hermann and its investment advisor were informed in two presentations that the majority of LDBF was invested in a single sector, ABS.  R. 56.1 Stmt. ¶¶ 17, 26.  Then, Memorial Hermann's investment advisor was provided with LDBF's holdings, which categorized 75% of the Fund's ABS as backed by home equity loans, and provided each security's CUSIP number.  R. 56.1 Stmt. ¶¶ 20, 22.  Mr. Liebre testified that he could have determined the subprime exposure in each security merely by typing the number into a Bloomberg or other financial database.  R. 56.1 Stmt. ¶ 22.

Memorial Hermann's allegation that State Street failed to disclose LDBF's use of leverage is similarly flawed.[22]  First, it is undisputed that LDBF did not contain any leverage when Memorial Hermann invested in the Fund, but State Street nonetheless adequately disclosed the Fund's *ability* to utilize leverage. Skinner Decl. Ex. 19 at 15.  For example, LDBF's Fund

---

[21] Note that plaintiffs' Second Amended Complaint does not contain any disclosure allegations with respect to leverage and accordingly, State Street did not address this issue in its Motion, but will do so here.

[22] Plaintiffs assert that LDBF "'used leverage by design.'" MH Opp. at 23.  That bit of cherry picked evidence is subject to varying interpretations, however.  To the extent that plaintiffs are suggesting that the Fund was designed to be leveraged *at all times*, this is in conflict with the factual record.  As discussed, LDBF was not leveraged at the time that Memorial Hermann invested in LDBF.  *See* Skinner Decl. Ex. 19.  Indeed, plaintiffs' own experts have acknowledged that LDBF was not leveraged for approximately a year after Memorial Hermann's first investment.  *See* July 30 Skinner Decl. Ex. 80 at 149:3-12; Ex. 85 at 136:16-25. Additionally, State Street disclosed to Memorial Hermann (1) before its investment, that LDBF could be leveraged, since the Fund was permitted to hold classes of assets commonly used to achieve leverage (futures, options and swaps); and (2) after its investment, that LDBF was leveraged at various points in time.  *See, e.g.*, R. 56.1 Stmt. ¶ 28; July 30 Skinner Decl. Ex. 79; Ex. 80 at 153-157.

Declaration disclosed that the Fund's permitted classes of assets included financial futures contracts, options and swaps – all instruments commonly used to achieve leverage.  R. 56.1 Stmt. ¶ 29; July 30 Skinner Decl. Ex. 80 at 297:16-298:9.  Additionally, the parties' Agreement of Trust, which was reviewed by Memorial Hermann's counsel, contained no restrictions on the use of derivatives and leverage.  R. 56.1 Stmt. ¶ 37.

In sum, there is no factual dispute that a jury must decide, and these claims are ripe for decision by the Court at the summary judgment stage.  No reasonable jury could find that State Street made material misrepresentations and non-disclosures in marketing LDBF to Memorial Hermann.  The undisputed factual record supports that State Street provided Memorial Hermann with accurate information about LDBF's investment objective, portfolio composition, and strategy.

## CONCLUSION

For the reasons set forth herein, as well as those set forth in State Street's opening brief, State Street respectfully requests that the Court grant State Street's Motion for Summary Judgment.

Dated: July 30, 2010                           ROPES & GRAY LLP
[Corrected version filed August 17, 2010]


                                               By: /s/ Harvey J. Wolkoff
                                               Harvey J. Wolkoff
                                               Robert A. Skinner
                                               Daniel J. Maher
                                               One International Place
                                               Boston, MA  02110
                                               Tel: (617) 951-7000
                                               Fax: (617) 951-7050
                                               harvey.wolkoff@ropesgray.com
                                               robert.skinner@ropesgray.com
                                               daniel.maher@ropesgray.com
                                               *Attorneys for Defendant State Street Bank and Trust Company*

24992834_16

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 17, 2010, I caused a true and correct copy of the foregoing document to be served upon the all counsel of record via the ECF system.

<u>/s/ Allison M. Boscarine</u>
Allison M. Boscarine