**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STATE STREET BANK AND TRUST CO. FIXED INCOME FUNDS INVESTMENT LITIGATION | : : : : : | Civil Action No. 08-md-1945 |
| NING YU, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>STATE STREET CORPORATION, et al.,<br><br>Defendants. | : : : : : : : : : : : : | Civil Action No. 08-cv-08235-RJH<br><br>**ORAL ARGUMENT REQUESTED** |

**STATE STREET'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS SECOND AMENDED CLASS ACTION
SECURITIES COMPLAINT**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .......................................................................................................4

    A.   The Registration Statement Contained Detailed Descriptions of YPF's
Strategies, Risks, and Holdings Specifically Related to the Fund's
Investments in Mortgage-Related Securities .............................................4

    B.   YPF's Periodic Reports Contained Detailed Schedules Of Investments
That Itemized The Fund's Holdings In Mortgage-Related Securities......................7

    C.   YPF's Investment Losses Were Directly Linked To Fully Disclosed Risks............8

ARGUMENT ...........................................................................................................9

I.    THE SAC FAILS TO ALLEGE ACTIONABLE MATERIAL
MISREPRESENTATIONS OR OMISSIONS................................................10

    A.   YPF's Investment Objective Was Not False and Materially Misleading...............11

        1.   The Phrase "High Quality" in the Fund's Investment Objective Was
Not False or Materially Misleading ............................................12

        2.   YPF's Stated Investment Objective of Seeking "Liquidity" Was Not
False or Materially Misleading .......................................14

        3.   The Phrase "Diversified Portfolio" in YPF's Investment Objective
Was Not False or Materially Misleading ......................................16

    B.   YPF Did Not Omit Or Materially Misrepresent Its "Exposure" To
Mortgage-Related Securities .................................................18

II.   PLAINTIFF'S SECTION 11 AND 12(A)(2) CLAIMS ALSO FAIL BECAUSE THE
ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED TO THE ALLEGED
MISSTATEMENTS OR OMISSIONS.............................................................22

    A.   None of Plaintiff's Alleged Registration Statement Misrepresentations
Could Have Caused the Decline of the Fund's NAV ................................22

    B.   Mutual Fund Liability Exists for Misrepresentations in Registration
Statements, But Not in the Circumstances Presented Here .......................27

CONCLUSION........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

Cases

Aaron v. SEC,
    446 U.S. 680 (1980)..................................................................................................30

Akerman v. Oryx Commc'ns, Inc.,
    609 F. Supp. 363 (S.D.N.Y. 1984), aff'd, 810 F.2d 336 (2d Cir. 1987)...................................23

Ashcroft v. Iqbal,
    129 S. Ct. 1937 (2009).......................................................................................9, 19

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d Cir. 2007).......................................................................................9

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)..........................................................................................9, 17

Castillo v. Dean Witter Discover & Co.,
    No. 97-1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998) .....................................................23

Clark v. Nevis Capital Mgmt., LLC,
    No. 04 Civ. 2702, 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) .........................................25, 29

Coronel v. Quanta Capital Holdings, Ltd.,
    No. 07 Civ. 1405 (RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ...............................9, 11

De Jesus v. Sears, Roebuck & Co.,
    87 F.3d 65 (2d Cir. 1996) ........................................................................................9

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
    553 F.3d 187 (2d Cir. 2009)....................................................................................10

Halperin v. eBanker USA.com,
    295 F.3d 352 (2d Cir. 2002)................................................................................10, 15

Harris v. Mills,
    572 F.3d 66 (2d Cir. 2009)......................................................................................16

Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,
    159 F.3d 723 (2d Cir. 1998)....................................................................................12

In re Agria Corp. Sec. Litig.,
    672 F. Supp. 2d 520 (S.D.N.Y. 2009).........................................................................10

*In re Am. Mut. Funds Fee Litig.*,
   No. 04-5593, 2005 WL 3989803 (C.D. Cal. Dec. 16, 2005)...................................................29

*In re Charles Schwab Corp. Sec. Litig.*,
   No. 08 Civ. 01510, 2010 WL 1463490 (N.D. Cal. Apr. 8, 2010) ...........................................26

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
   No. 08-11064, 2010 WL 1253114 (D. Mass. Mar. 31, 2010) .................................................26

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009)...................................................................................10

*In re Initial Pub. Offering Sec. Litig.*,
   358 F. Supp. 2d 189 (S.D.N.Y. 2004).............................................................................10, 22

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   289 F. Supp. 2d 429 (S.D.N.Y. 2003)...................................................................................23

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
   441 F. Supp. 2d 579 (S.D.N.Y. 2006)...................................................................................24

*In re TCW/DW North Am. Gov't Income Trust Sec. Litig.*,
   941 F. Supp. 326 (S.D.N.Y. 1996)........................................................................................12

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
   382 F. Supp. 2d 1173 (N.D. Cal. 2004) ................................................................................25

*In re Vivendi Universal, S.A. Sec. Litig.*,
   634 F. Supp. 2d 352 (S.D.N.Y. 2009)................................................................23, 24, 26, 28

*King County, Wash. v. IKB Deutsche Industriebank AG*,
   Nos. 09 Civ. 8387, 09 Civ. 8822, 2010 WL 1702196 (S.D.N.Y. Apr. 26, 2010)...................26

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
   659 F. Supp. 2d 532 (S.D.N.Y. 2009).............................................................................11, 22

*Leeds v. Meltz*,
   85 F.3d 51 (2d Cir. 1996) .......................................................................................................9

*Lentell v. Merrill Lynch & Co.*,
   396 F. 3d 161 (2d Cir. 2005).............................................................................23, 26, 27, 28

*Lin v. Interactive Brokers Group, Inc.*,
   574 F. Supp. 2d 408 (S.D.N.Y. 2008).............................................................................10, 11

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland*,
   No. 08 CV 5093, 2010 WL 1172694 (S.D.N.Y. March 26, 2010)....................................11, 14

*Phillips v. Kidder, Peabody & Co.*,
　933 F. Supp. 303 (S.D.N.Y. 1996)........................................................................14

*Rubin v. MF Global, Ltd.*,
　634 F. Supp. 2d 459 (S.D.N.Y. 2009).............................................................10, 17

*SEC v. Lee*,
　No. 08-CV-9961, 2010 WL 2594280 (S.D.N.Y. June 18, 2010) ...........................28

*Spielman v. Gen. Host Corp.*,
　402 F. Supp. 190 (S.D.N.Y. 1975), *aff'd per curiam*, 538 F.2d 39 (2d Cir. 1976) ................19

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
　552 U.S. 148 (2008)...............................................................................................28

*Turkmen v. Ashcroft*,
　589 F.3d 542 (2d Cir. 2009).....................................................................................9

*Yu v. State Street Corp.*,
　686 F. Supp. 2d 369 (S.D.N.Y. 2010)............................................................. passim

## STATUTES

15 U.S.C. § 77k(a) .........................................................................................................10

15 U.S.C. § 77k(e) .........................................................................................................22

15 U.S.C. § 80a-2(a)(41) ...............................................................................................24

15 U.S.C. §§ 80a-33(b) ..................................................................................................29

15 U.S.C. § 80a-35(b) ....................................................................................................29

## OTHER AUTHORITIES

17 C.F.R. §§ 270.2a-4, 270.22c-1 (2009) ......................................................................24

17 C.F.R. § 270.22c-1(b) ...............................................................................................30

70 Fed. Reg. 1508 (Jan. 7, 2005) .....................................................................................6

Christopher Condon & Jody Shenn, *Evergreen Liquidating Ultra-Short Fund After 18%
　Drop* ...........................................................................................................................8

David M. Geffen, *A Shaky Future for Securities Act Claims Against Mutual Funds* ...................25

Fed. R. Civ. Proc. 12(b)(6) ..............................................................................................9

H.R. Rep. No. 73-85 (1933).............................................................................................29

Tom Petruno, *Market Beat: Wall Street Can't Cage Its Mortgage Monster* ...................................8

## PRELIMINARY STATEMENT

This putative class action alleges that the Registration Statement for the SSgA Yield Plus Fund ("YPF" or the "Fund") was false and materially misleading in violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, as amended (the "Securities Act").  The Court previously dismissed Plaintiff's Amended Complaint for failure to plead a material misrepresentation in the Fund's offering documents.  *See Yu v. State Street Corp.*, 686 F. Supp. 2d 369 (S.D.N.Y. 2010).  The Court did not reach any of State Street's other arguments, including the Plaintiff's failure to plead loss causation.  It granted the Plaintiff leave to amend in the Court's July 14, 2010 Opinion and Order (the "July Op."), vacating the judgment of dismissal, and invited State Street to file a new motion to dismiss.  July Op. at 8.

Like its predecessor, the Second Amended Complaint ("SAC") continues to allege material misrepresentations in the "description" of the Fund's investment "objective" and the "extent" of the Fund's holdings in securities collateralized by residential mortgages.  With respect to YPF's investment objective, the SAC isolates two adjectives – "liquid[ ]" and "diversified" – and asserts that they were materially misleading because the Fund invested in mortgage-related securities that had a "great risk of becoming illiquid," and because the Fund was not "diversified" due to its heavy weighting to mortgage-related securities.  SAC ¶¶ 119-33.  The Court previously rejected Plaintiff's claim that the phrase "high quality" in the description of the Fund's investment objective could mislead investors other than in hindsight.  *See Yu*, 686 F. Supp. 2d at 377.  Its reasoning there applies fully to the Plaintiff's liquidity argument here.  The Plaintiff's allegations reduce to the charge that the Fund's holdings *must* have been of *low* quality and were *il*liquid because of the losses they suffered in the bond market collapse that began in mid-2007.  But that is "pleading by hindsight" again.  "A backward-looking assessment

of the infirmities of mortgage-related securities" is not actionable.  *Id.*  And the Plaintiff's allegation that the Fund's use of the term "diversified" was misleading ignores the definition of the term in the Registration Statement and the Investment Company Act, and the "total mix" of information that State Street provided about the Fund.

With respect to the "extent" of the Fund's "exposure" to mortgage-related investments, SAC ¶ 76, the SAC sets forth some more detail about the magnitude of the purported understatement of the Fund's exposure to mortgage-related securities.  But the thrust of the claim is unchanged – that the categorization of the Fund's holdings under the labels "Mortgage-Backed Securities," "Asset-Backed Securities," and "International Debt" left a misleading impression that the Fund's mortgage-related holdings were less significant than they actually were, and therefore understated risk.  *See* SAC ¶¶ 81-118.

But although the SAC's new allegations add details of ostensibly "false" statements – in the form of mislabeled holdings – the amended pleading does not connect the dots between the alleged mislabeling and any inaccurately portrayed risk.  The new allegations advance three related contentions about the grouping of securities in the Fund's periodic reports, including:  (1) "sectoring" certain mortgage-related securities within the Asset-Backed Securities category, SAC ¶¶ 81-98; (2) categorizing some mortgage-related securities within the International Debt category, SAC ¶¶ 99-109; and (3) failing to "correctly" categorize some investments secured by first lien mortgages within the Mortgage-Backed Securities category.  SAC ¶¶ 110-118.  But the SAC alleges nothing to show that the purported misclassification served to understate the risk posed by the Fund's holdings or that the alleged underreporting of mortgage-related securities misled investors into overestimating the Fund's safety from loss.  The Plaintiff contends that mislabeling made it appear that the Fund held more bonds backed by consumer debt like student

and auto loans and credit card debt, and fewer mortgage-related bonds.  But there is no allegation that those instruments were less risky than mortgage-related bonds; and not a hint that YPF would have performed better with a mix tilted more towards bonds backed by other consumer debt.  The Plaintiff's materiality contention again hinges only on the dramatic decline in the value of mortgage-related securities in 2007.  Hindsight alone, again, supports the Plaintiff's claim.[1]

Plaintiff's Section 11 and 12(a)(2) claims also fail for an independent reason not addressed previously by the Court:  the decline in the Fund's NAV was not the result of any purported misstatement or omission.  Loss causation is absent.  Sections 11 and 12 of the Securities Act preclude recovery if the decline in the value of securities "result[ed] from" something *other* than the alleged misstatements or omissions in a fund's prospectus.  None of the misstatements or omissions alleged by Plaintiff caused the Fund's NAV to be inflated, only to decline when the "truth" became known.  To the contrary, the Plaintiff would have suffered precisely the same loss whether the "extent" of the Fund's "exposure" to mortgage-related instruments was "accurately" disclosed or not.  As a matter of law, the disconnect between the ostensibly defective disclosure and the Plaintiff's loss as a consequence of cataclysmic market conditions is dispositive.

---

[1] Plaintiff repeats his conclusory allegation that the Registration Statement misrepresented the Fund's net asset value ("NAV") by reporting inflated values for the Fund's mortgage-related securities.  SAC ¶¶ 142-45.  The Court rejected this claim in the February Opinion because the Amended Complaint "[did] not aver a single concrete fact to suggest that defendants deviated from the prescribed valuation methods."  *Yu*, 686 F. Supp. 2d at 380.  The Court held in the July Opinion that Plaintiff's [Proposed] SAC failed to "address the shortcomings identified," and accordingly, held that it did not state plausible misvaluation claims.  July Op. at 8 n.4.  Dismissal of Plaintiff's claim on this aspect of the SAC remains appropriate.

**BACKGROUND**

Plaintiff invested in YPF, a series of SSgA Funds.  Lead Plaintiff, Anatoly Alexander, claims to have acquired shares of YPF "pursuant and/or traceable" to several amendments to the Fund's Registration Statement filed with the Securities and Exchange Commission ("SEC"). Plaintiff seeks to represent a class of persons and entities who purchased shares of the Fund between July 1, 2005 and June 30, 2008.  SAC ¶¶ 1, 5.  As detailed in State Street's previous Motion to Dismiss, the Registration Statement (herein referring to the Fund's Prospectuses, Statements of Additional Information ("SAI") and periodic reports during the putative class period)[2] provided comprehensive disclosures relating to YPF's investments in mortgage-related securities.

A.    **The Registration Statement Contained Detailed Descriptions of YPF's Strategies, Risks, and Holdings Specifically Related to the Fund's Investments in Mortgage-Related Securities**

The Registration Statement's opening statement describing YPF alerted investors to the fact that the Fund's strategy involved material exposure to securities collateralized by mortgages, and informed purchasers that investments in "mortgage related securities" were "principal" to the achievement of the Fund's investment objective.  The Registration Statement went on to warn of multiple risks associated with investing in mortgage-related securities, including "sector risk,"

---

[2] Each year, SSgA Funds files with the SEC an amendment to the SSgA Funds' Registration Statement, containing the combined Prospectuses and SAIs for all the mutual funds offered by SSgA Funds.  The amendment is often supplemented or reissued between the yearly filings. Each year, SSgA Funds also publishes Annual Reports, dated as of August 31.  The Prospectuses, SAIs, and Annual Reports are all incorporated by reference and deemed to be part of the Fund's Registration Statement (herein collectively, "the Registration Statement"), the contents of which are governed by the Securities Act, the Investment Company Act and other statutes and rules.  Unless otherwise noted, language quoted from the Registration Statement appeared in the Fund's December 2006 filings.  *See* Declaration of Robert A. Skinner ("Skinner Declaration"), dated August 27, 2010, Ex. A (2006 Prospectus) and Ex. B (2006 SAI).  The language concerning the relevant disclosures is virtually identical in each of the filings throughout the putative class period.

which arises from concentrating significant portions of the Fund's assets in a specific type of security.  *See* Prospectus at 4.[3]

The Registration Statement's opening statement also referred investors to later sections, which provided additional detail about the Fund's principal investment strategies and risks. These later sections, in the Prospectus and SAI, supplied both general investment risk disclosures, as well as detailed descriptions and comprehensive definitions that cautioned purchasers about the risks associated with the Fund's exposure to mortgage-related securities. For example:

- The definition of "sector risk" alerted investors that the Fund was "subject to greater risk of loss as a result of adverse economic, business or other developments than if [its] investments were diversified across different industry sectors.  Securities of issuers held by [the Fund] may lack sufficient market liquidity to enable [the Fund] to sell the securities at an advantageous time or without a substantial drop in price."  Prospectus at 19. [4]

- The SAI warned investors that the "value of asset-backed securities is affected by

---

[3] The defined term "Asset-Backed Securities" refers to an open-ended category of obligations "whose principal and interest payments are collateralized by pools of assets."  Prospectus at 43. The defined term "Mortgage-Backed Securities" refers, in contrast, to a more specifically-defined category of instruments, including those backed by "first deeds of trust or other similar security instruments" of certain defined types of properties.  *Id.* at 48.  Herein, State Street uses the term "mortgage-related securities" to refer generally to any securities collateralized by mortgage loans, and "Mortgage-Backed Securities" to refer to the more specifically-defined category of instruments backed by "first deeds of trust or other similar security instruments" of certain defined types of properties.  *Id.*  This is consistent with both the Registration Statement's generic use of the term "mortgage-related securities," *see, e.g.*, Prospectus at 4, and with the Court's use of the terms in the February and July Opinions.  *See Yu*, 686 F. Supp. 2d at 372 n.2; July Op. at 3 n.2.

[4] The type of market illiquidity addressed by sector risk should not be confused with the limited class of securities defined as illiquid by nature.  *See., e.g.*, SAI at 5; Skinner Declaration, Ex. C (2006 Annual Report, dated Aug. 31, 2006) (the "2006 Annual Report") at 68.

- 5 -

changes in the market's perception of the asset backing the security" and "the market-value of mortgage-related securities depends on, among other things . . . the payment history of the underlying borrowers."  SAI at 3-4.

- The Registration Statement's definition of Asset-Backed Securities both defined what that term meant ("securities whose principal and interest payments are collateralized by pools of assets"),[5] and warned of specific risks affiliated with Asset-Backed Securities, including: "if any required payments of principal and interest are not made with respect to the underlying loans, the Fund may experience loss or delay in receiving payment and a decrease in the value of the security."  Prospectus at 43.

- The description of "Mortgage-Backed Securities Risk" cautioned that "[t]he investment characteristics of mortgages differ from those of traditional fixed-income securities.  These differences can result in significantly greater price and yield volatility than is the case with traditional fixed-income securities."  *Id.* at 18.

- Further, the description of "Asset-Backed Securities Risk" explicitly stated that "[d]efaults on the underlying assets may impair the value of an asset-backed security."  *Id.* at 15.

---

[5] The asset pools referred to in the Registration Statement's Asset-Backed Securities definition include residential mortgages, as well as student loans, credit cards, commercial mortgages and auto loans.  *See, e.g.*, Prospectus at 43; 2006 Annual Report at 8-12, 35-44.  The Registration Statement's definition comports fully with the SEC's Final Rules issued in January 2005 concerning Asset-Backed Securities, in which the SEC noted: "The four primary asset classes [of Asset-Backed Securities] currently securitized are residential mortgages, automobile receivables, credit card receivables and student loans, which represented approximately 52%, 19%, 16% and 9% of 2003 new issuance, respectively."  *See* 70 Fed. Reg. 1508 (Jan. 7, 2005), Ex. 1 to Memorandum in Support.

### B.      YPF's Periodic Reports Contained Detailed Schedules Of Investments That Itemized The Fund's Holdings In Mortgage-Related Securities

YPF's periodic reports included schedules of investments that listed every security held by the Fund on the dates of the reports.  These schedules broke the Fund's holdings into several categories – including "Asset-Backed Securities," "International Debt," and "Mortgage-Backed Securities" – with the name of each security provided underneath the category headings.  It was evident from these schedules that the Fund was significantly invested in mortgage-related securities, and that all three categories included securities collateralized by mortgage-related assets.  For example, the 2006 Annual Report noted that 68.3% of the Fund was invested in Asset-Backed Securities and 11.3% in Mortgage-Backed Securities.  2006 Annual Report at 12. The fact that mortgage-related assets comprised a material portion of the Fund's "Asset-Backed Securities" category was apparent from the names of the listed securities, which included "New Century Home Equity Loan Trust," "Novastar Home Equity Loan," "Ameriquest Mortgage Securities, Inc.," "JP Mortgage Acquisition Corp.," and "Ownit Mortgage Loan Asset Backed Certificates."[6]  *Id.* at 9-10.

YPF's periodic reports also categorized some mortgage-related securities in the "International Debt" category.  Many of the securities listed under the International Debt category were linked to foreign mortgage investments (*e.g.*, those issued by "Granite Mortgages PLC").  *Id.* at 10.  As with the Asset-Backed and Mortgage-Backed Securities categories, the name of each individual holding was provided.  No shareholder actually reading the schedules

---

[6] Others included "Amortizing Residential Collateral Trust," "Asset Backed Securities Corporate Home Equity," "Centex Home Equity," "Chase Funding Mortgage Loan," "IXIS Real Estate Capital Trust," Long Beach Mortgage Loan Trust," "Morgan Stanley Home Equity Loans," and "SG Mortgages Securities Trust."  2006 Annual Report at 9-10.

could fail to conclude that all three categories included mortgage-related instruments, and that the Fund's overall exposure to mortgage-related securities was significant.

### C.      YPF's Investment Losses Were Directly Linked To Fully Disclosed Risks

There is a direct causal link between the risks disclosed in the Registration Statement and YPF's NAV declines in 2007-08.  The Fund was affected by the very market forces that the Registration Statement warned could provoke losses.   The suddenly illiquid market for mortgage-related securities and the market's perception of the assets backing these securities were both significant factors in the Fund's NAV declines.   As disclosed in the Registration Statement, if an entire market sector suffers a downturn, the Fund may be forced to sell assets at a loss due to the absence of market liquidity.[7]  Prospectus at 19.  The values of the Fund's mortgage-related securities also declined due to pressure caused by the failure of underlying loan holders to make principal and interest payments and outright defaults on the underlying assets – risks that the Registration Statement fully disclosed with respect to Asset-Backed and Mortgage-Backed Securities.[8]  *Id.* at 43.

---

[7] As reported in the Fund's 2007 Annual Report: "As a result of negative reports regarding the residential mortgage backed securities market, market participants, looking to reduce their exposure to this sector, sold higher quality securities where valuations were most favorable.  The combination of these events resulted in severe illiquidity in this sector. . . ." Skinner Declaration, Ex. D (2007 Annual Report, dated August 31, 2007) (the "2007 Annual Report") at 6, 30; *see also* Christopher Condon & Jody Shenn, *Evergreen Liquidating Ultra-Short Fund After 18% Drop*, Bloomberg.com, June 19, 2008, Ex. 2 to Memorandum in Support (noting that the Wachovia Fund's decline "points to the difficulty asset managers have in pricing illiquid securities").

[8] As reported in the Fund's 2007 Annual Report: "The Fund experienced underperformance due to its holdings in primarily high credit quality instruments related to mortgage and home-equity payments . . . .  In July and August of 2007, the AAA and AA rated sectors of this market experienced significant price depreciation," 2007 Annual Report at 6; s*ee also* Tom Petruno, *Market Beat: Wall Street Can't Cage Its Mortgage Monster*, L.A. Times, July 22, 2007, at C-1, *available at* 2007 WLNR 13980731 (noting that securities backed by mortgage-related assets were devalued due to loan delinquencies on the underlying assets).

- 8 -

**ARGUMENT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must grant a motion to dismiss where the allegations of the complaint fail to provide "'plausible grounds' for the allegations with 'enough fact to raise a reasonable expectation that discovery will reveal evidence' to support them." *Coronel v. Quanta Capital Holdings, Ltd.*, No. 7 Civ. 1405 (RPP), 2009 WL 174656, at *10 (S.D.N.Y. Jan. 26, 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." (internal citation and quotation marks omitted)). "*Twombly* and *Iqbal* require a heightened pleading standard in those contexts where factual amplification is needed to render a claim plausible." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (internal quotation marks and citation omitted). While the court must take all well-pleaded facts as true in deciding a motion to dismiss under Rule 12(b)(6), "[a]llegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99; *see also De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." (internal citation and quotation marks omitted)); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996) ("While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice.").[9]

---

[9] Plaintiff's SAC repeats without alteration many of the same allegations asserted in the Amended Complaint. Accordingly, State Street refers the Court to the following arguments contained in its previous Motion to Dismiss: (1) the certifications signed by defendants Ross and Swanson and attached to YPF's periodic reports did not contain any untrue statements of material fact; (2) Plaintiff's Section 12(a)(2) claims must be dismissed against State Street Corporation, SSgA, and individual defendants Leahy, Ross and Swanson because these parties are not "sellers" of the Fund; and (3) the "control person" claims under Section 15 must be

- 9 -

## I.    THE SAC FAILS TO ALLEGE ACTIONABLE MATERIAL MISREPRESENTATIONS OR OMISSIONS

To state a claim under Sections 11 and 12(a)(2) of the Securities Act, a plaintiff must allege that an offering document contained a false statement of material fact or omitted a material fact "necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 433-34 (S.D.N.Y. 2009); *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 466 (S.D.N.Y. 2009).  A false or misleading statement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act."  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal citations and quotation marks omitted).  An actionable misrepresentation claim arises only if the relevant disclosure documents *read as a whole* could have misled a reasonable investor about the securities offered.  *See Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 418-19 (S.D.N.Y. 2008).  "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."  *Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002).

Moreover, a securities plaintiff cannot make out actionable misrepresentations in hindsight.  "[T]he truth of a statement made in the registration statement is judged by the facts as they existed when the registration statement became effective."  *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 205 (S.D.N.Y. 2004) (dismissing Section 11 claims regarding

---

dismissed because Plaintiff alleges no viable causes of action under Section 11 or 12(a)(2) in the first instance.  *See* Defs.' Mem. in Support of Mot. to Dismiss dated Mar. 11, 2009, at Sections I.D, III, and IV (Doc. No. 37 in No. 08 Civ. 8235).

alleged misstatements and omissions in a registration statement that were true when made); *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 525-26 (S.D.N.Y. 2009) (same); *Lin*, 574 F. Supp. 2d at 421 ("To be actionable under Section 11, the registration statement must contain an untruth or material omission 'when such part became effective' . . . plaintiffs [must] at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were [ ] knowable, at the time of the offering.") (*quoting* 15 U.S.C. § 77(k)(a)); *Coronel*, 2009 WL 174656, at *13.

Courts in this District have consistently rejected claims based on hindsight following the sudden and cataclysmic debt market crisis that began in 2007. *See N.J. Carpenters Vacation Fund v. Royal Bank of Scotland*, No. 08 CV 5093, 2010 WL 1172694, at *14 (S.D.N.Y. March 26, 2010) (dismissing as "hindsight allegations" plaintiff's claim that certain risk disclosures in a mortgage-backed security offering were insufficient); *Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 539-40 (S.D.N.Y. 2009) (stating that "[t]he veracity of a registration statement is determined by assessing the facts as they existed when the statement became effective" in dismissing claims based on a real estate investment IPO prospectus and registration statement). As this Court held in the February Opinion, "[a] backward-looking assessment of the infirmities of mortgage-related securities . . . cannot help plaintiffs' case." *Yu*, 686 F. Supp. 2d at 377. Here, Plaintiff has failed to plead any actionable material misrepresentations regarding YPF's investment objective or the extent of the Fund's mortgage-related holdings.

### A.     YPF's Investment Objective Was Not False and Materially Misleading

Plaintiff contends that the Registration Statement's "description" of YPF's investment objective – to seek "high current income and liquidity by investing primarily in a diversified portfolio of high-quality debt securities" – was misleading because the Fund was "heavily-weighted" with investments in "risky" mortgage-related and/or Mortgage-Backed Securities,

- 11 -

including sub-prime mortgages.  SAC ¶¶ 63, 120.  Specifically, Plaintiff isolates three phrases from the Fund's investment objective – "high quality," "liquidity" and "diversified portfolio" – and claims that these three phases were materially misleading because of the volume of the Fund's mortgage-related securities, including a significant percentage of investments in sub-prime mortgages that were "risky," "unsecure," and had a "great risk of becoming illiquid." SAC ¶¶ 120, 123, 127, 132, 135, 139.  But these claims that the "investment objective" was misportrayed rely exclusively on hindsight and ignore the "total mix" of information that State Street provided about the Fund.  The Registration Statement's description of the Fund's "investment objective" was a general statement of aspirational goals, which must be considered in the context of the entire Registration Statement's content, including specific representations. *See In re TCW/DW North Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 338 (S.D.N.Y. 1996) (rejecting claim that a statement by a mutual fund holding mortgage-backed securities that its "investment objective is to earn a high level of current income while maintaining relatively low volatility of principal" was misleading).[10]  It was not a warranty that every instrument held by the Fund would live up to that goal.

### 1.    The Phrase "High Quality" in the Fund's Investment Objective Was Not False or Materially Misleading

The SAC repeats the Plaintiff's old allegation that the Registration Statement's representation that the YPF would invest primarily in "high quality debt securities" was false and materially misleading because the Fund held mortgage-related and/or Mortgage-Backed

---

[10] *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998) is both analogous and instructive.  There, the plaintiffs complained that a fund's name and description of its investment objective was misleading because the defendants did not alert investors to the risk of significant exposure to Mexican and other Latin American securities, as well as to "risky mortgage-backed derivatives."  *Id.* at 727.  The Second Circuit affirmed in relevant part, holding that the fund's name and investment objective could not mislead investors into thinking that the fund would *not* invest in Mexican instruments and other Latin American instruments.  *Id.*

Securities, including investments in subprime mortgages, which were "widely recognized as risky and unsecure." SAC ¶¶ 134-40. But rote repetition does not revive the charge. The Court previously considered and rejected this claim, holding: (1) the "high quality" phrase "surely cannot be understood as a guarantee that investors would not suffer losses" or as an "implicit representation that the Fund posed little or no risk"; (2) the Registration Statement "employed the term 'high quality' to describe the relative credit grade of the Fund's holdings, which the [Registration Statement] language made clear would include mortgage-related securities"; and (3) the Registration Statement "defined 'investment grade securities' as securities 'rated in one of the four highest categories' by a national ratings agency," which the Fund's periodic reports confirmed that it held (*e.g.*, "80% of the Fund's holdings were rated 'AAA' or 'AA'" and "every security in the portfolio received at least an 'A' rating"). *Yu*, 686 F. Supp. 2d at 375-76. As State Street previously argued and as the Court ruled, the full text of the Registration Statement left no investor guessing about the meaning of "high quality debt securities." *Id.*

The SAC offers nothing new to alter the Court's previous analysis. Plaintiff advances a conclusory allegation to suggest that "during the Class Period" mortgage-related securities were a "risky investment." SAC ¶ 136. But Plaintiff offers no factual allegations in support of this assertion, and tenders nothing to contradict the Court's earlier observation that the Registration Statement married the "quality" description to "investment grade" ratings. *See Yu*, 686 F. Supp. 2d at 376. The SAC's tacit suggestion that mortgage-related securities must have been "low quality" because their prices later fell is *only* tacit. But implied claims do not adequately charge "falsity," especially where the Registration Statement made clear – as the Court previously noted – that "high quality" meant "investment grade debt instruments, such as mortgage related

securities, corporate notes, variable and floating rate notes and asset backed securities," as well as various "derivative securities."  Prospectus at 4;  *Yu*, 686 F. Supp. 2d at 376.

The SAC also alleges that, by the summer of 2007, ratings associated with mortgage-related securities were "not indicative of their quality" and these instruments were "deteriorating, unstable, and generally risky."  SAC ¶¶ 137-138.  This again is pure hindsight.  State Street cannot be held accountable for the supposed failure of the rating agencies to keep abreast of the burgeoning debt market crisis in 2007.  A prospectus is simply not a vehicle for current market commentary, nor for predictions about market conditions and their potential price impact on portfolio securities.  *See Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 320-21 (S.D.N.Y. 1996).

Accordingly, the Court should affirm its previous rejection of Plaintiff's claim relating to the "high quality" phrase appearing in YPF's investment objective.

### 2.    YPF's Stated Investment Objective of Seeking "Liquidity" Was Not False or Materially Misleading

Plaintiff also fails to allege an actionable misstatement regarding the statement in the YPF's investment objective that the Fund seeks "high current income and liquidity." This allegation suffers from the same infirmity that infects all of Plaintiff's misrepresentation claims – it stems from hindsight following the global market crisis, dubbed "The Great Recession." Beyond conclusory assertions, Plaintiff's factual allegations amount only to an assertion that the Fund's investments *became illiquid* during an unprecedented market liquidity crisis.  *See* SAC ¶¶ 128-29.  This cannot support a claim that the Fund's investment objective of "liquidity" was materially misleading when made.  *See N.J. Carpenters Vacation Fund*, 2010 WL 1172694, at *14.

- 14 -

Indeed, Plaintiff flatly misconstrues the obvious meaning of the term "liquidity" in the description of the Fund's investment objective. *See* SAC ¶ 133 ("the Yield Plus Fund's stated objective of maintaining liquidity, *or investing in liquid securities*, concealed the true risk of the Fund") (emphasis added). Plaintiff's allegation centers on supposedly illiquid mortgage-related securities held by YPF. SAC ¶ 127 (asserting that the Fund "became increasingly invested in mortgage-related and/or mortgage-backed securities . . . which encompass a great risk of becoming illiquid . . . ."). But the Fund's investment objective referred to providing *investors* with "income and liquidity," *i.e.*, the ability to transact in and out of the fund without creating substantial price variations. Prospectus at 4. The relative liquidity of the Fund's underlying instruments presents a different question – and one not addressed in the Fund's investment objective. Plaintiff has not alleged that the Fund failed to pursue (or achieve) its liquidity objective by, for example, not providing Plaintiff with the ability to transact redemptions of his shares without impinging on their value, nor could he. Plaintiff simply cannot concoct a material misrepresentation from a misreading of the phrase he isolates.

Even if Plaintiff's reading of the word "liquidity" was not faulty, he plucks the term "liquidity" out of the context of the rest of the Registration Statement, and fails to consider the term within the total mix of information disclosed about the Fund. *See Halperin*, 295 F.3d at 357 (requiring materiality to be evaluated in the context of the total mix of information presented). The relative liquidity of YPF's securities can be meaningfully assessed only against the type of instruments in which the Fund was permitted to invest. As the investment objective explained, YPF was neither an equity fund, nor exclusively a government bond fund. Accordingly, the Fund could not invest material amounts in the most liquid assets, such as large-cap equities or sovereign debt. Prospectus at 4. Plaintiff alleges only generally that the Fund's holdings

"encompass[ed] a great risk of becoming illiquid," SAC ¶ 127, and nowhere specifies whether mortgage-related securities became more or less liquid as market events unfolded compared to when the Registration Statement was issued, or even whether mortgage-related securities were more or less liquid than other securities in which the Fund could invest, including securities backed by credit card debt, or auto and student loans.   The absence of context fails the "plausibility" test of pleading.  *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009)) ("[M]ere conclusory statements, do not suffice" and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task.").

Finally, Plaintiff ignores the Registration Statement's risk disclosures accompanying the Fund's investment objective, which specifically warned of the very liquidity risk that materialized in the third quarter of 2007.  The definition of "sector risk" alerted investors that "Securities of issuers held by [the Fund] may lack sufficient market liquidity to enable [the Fund] to sell the securities at an advantageous time or without a substantial drop in price." Prospectus at 19.  The Fund was affected by the very market forces that the Registration Statement warned about.

Accordingly, Plaintiff has failed to state a claim that YPF's stated investment objective of "seeking liquidity" was false or materially misleading.

### 3.    The Phrase "Diversified Portfolio" in YPF's Investment Objective Was Not False or Materially Misleading

The SAC alleges that the Fund's statement that it would seek to invest in a "diversified portfolio" was false and materially misleading because the Fund "did not have a diversified portfolio" due to its "heavy weight[ing]" in mortgage-related and/or Mortgage-Backed Securities. SAC ¶¶ 119-20.  However, when the term "diversified portfolio" is considered in the

- 16 -

context of the entire Registration Statement and the "total mix" of information that State Street provided about the Fund, Plaintiff's contention is clearly without merit.

As an initial matter, Plaintiff assumes that the word "diversified" has only one meaning, namely, whether the Fund's assets were invested across different industry sectors or in bonds backed by different types of collateral.  *See, e.g.*, SAC ¶ 125.  That ignores the definition of "diversification" in the Registration Statement itself and that found in the Investment Company Act.  The SAI sets forth the criteria for a "diversified" fund: "at least 75% of the value of . . . total assets is represented by cash and cash items (including receivables), Government securities, securities of other investment companies, and other securities of any single issuer limited to 5% or less of each of the Fund's total assets, and to not more than 10% of the outstanding voting securities of such issuer."   SAI at 3 (citing Investment Company Act, 15 U.S.C. § 80a-5(b)(1) (2007)).  Thus, according to the SAI and the Investment Company Act, the term "diversified" means a distribution of assets across different *issuers* of securities.  Plaintiff does not allege, nor could he, that the Fund was not "diversified" under this standard.  Therefore, upon a complete reading of the Registration Statement and considering the "total mix" of information provided to investors about the Fund, Plaintiff has failed to make a facial claim that the term "diversified portfolio" constituted a false or misleading description of the Fund.  *See Twombly*, 550 U.S. at 569-70; *Rubin*, 634 F. Supp. 2d at 470.

Plaintiff attempts, with the benefit of hindsight, to narrow the definition of "diversified" to refer only to securities backed by different types of collateral.  *See* SAC ¶ 125.  But YPF's stated investment objective made no representation that the Fund would be "diversified" in this manner.  Rather, the investment objective stated only that the Fund *may* invest in a number of different categories of debt instruments, including mortgage-related securities and Asset-Backed

- 17 -

Securities.  Prospectus at 4.  Moreover, the Fund's Annual Reports, Semi-Annual Reports, and Form N-Qs (Quarterly Reports) all disclosed the Fund's overweight to Asset-Backed Securities. *See, e.g.*, Skinner Declaration, Ex. H (Form N-Q dated July 28, 2006) and Ex. I (Form N-Q dated July 30, 2007) (providing that YPF was composed of 69.4% and 60.4% Asset-Backed Securities, respectively).  As part of these periodic reports, investors were also provided with the Fund's full lists of holdings.  *See, e.g.*, 2006 Annual Report at 9-12.  Plaintiff does not allege, nor could he, that State Street included, or failed to include, any securities other than those actually held by the Fund.  Moreover, the Registration Statement warned that the Fund was "subject to greater risk of loss as a result of adverse economic, business or other developments *than if [it was] diversified across different industry sectors*."  Prospectus at 19 (emphasis added).  Read in the context of these specific disclosures, the phrase "diversified portfolio" could not have misled investors about market "sector" risk;  to the contrary it specifically warned investors about the jeopardy the absence of sector diversification could pose.

As with "high quality" and "liquidity," Plaintiff has failed to state an actionable claim that the "diversified portfolio" phrase within YPF's stated investment objective was false or materially misleading.

**B.  YPF Did Not Omit Or Materially Misrepresent Its "Exposure" To Mortgage-Related Securities**[11]

Plaintiff asserts that State Street underreported YPF's exposure to mortgage-related securities by miscategorizing such bonds as Asset-Backed Securities and International Debt, by failing to list as Mortgage-Backed Securities assets that fell within that category's definition,

---

[11] In its ruling of July 14, 2010, the Court directed the parties not to re-brief issues that the Court therein decided.  July Op. at 8.  To the extent that the Court decided the issues of materiality regarding State Street's categorization of securities into sectors or the disclosure of sector weights, State Street respectfully moves the Court to reconsider its July Opinion.

and/or by reporting aggregate mortgage exposure that differed from internal State Street metrics. But even accepting Plaintiff's allegations as true, the SAC is devoid of any allegations about the risk characteristics of the Fund's mortgage-related holdings in comparison to non-mortgage-related securities such as unsecured credit card debt or student loans "properly" classified as Asset-Backed Securities and/or International Debt – either prior to, during, or after the 2007 market collapse.   The Court in the February Opinion remarked that "the Court cannot discern whether the table had the effect of cloaking particularly risky mortgage securities within a category of safer bets, or whether the asset-backed securities – which included instruments backed by credit card and other personal debt – were on the whole riskier than the mortgage-related subcategory in their midst."[12] *Yu*, 686 F. Supp. 2d at 378.   This remains true.   The SAC continues to suffer from this same fatal infirmity, and alleges nothing demonstrating that the purported misclassification of mortgage-related securities as Asset-Backed Securities or International Debt served to understate YPF's risk, or misled investors at the time into believing that the Fund was a safer investment than it was.   The SAC's failure even to allege (much less advance concrete facts) that securities backed by auto and student loans or credit card debt would have been perceived by investors as safer than bonds collateralized by subprime mortgages – or in fact proved safer in the Great Recession – is fatal to this complaint.   Plaintiff's only basis for alleging the materiality of the supposed underreporting of the Fund's mortgage-related securities is that mortgage-related assets declined in value in 2007.   But materiality cannot be pled by hindsight and *ipse dixit*.   *See Spielman v. Gen. Host Corp.*, 402 F. Supp. 190, 194 (S.D.N.Y. 1975), *aff'd per curiam*, 538 F.2d 39 (2d Cir. 1976) ("The determination of materiality is to be

---

[12] While this Court in the July Opinion indicated that this issue might be better left for summary judgment, July Op. at 6, State Street respectfully submits that the SAC plainly fails to meet the *Iqbal* standard in this regard, and should be dismissed at this stage.

made upon all the facts as of the time of the transaction and not upon a 20-20 hindsight view long after the event.").

As the Court stated in dismissing Plaintiff's Amended Complaint, there is no dispute that the Fund disclosed the fact that it made investments in securities collateralized by residential mortgages. *Yu*, 686 F. Supp. 2d at 377; *accord* July Op. at 4. The Fund's itemized holdings in its periodic reports showed substantial exposure to mortgage-related securities, and investors were informed in the Registration Statement's opening description not only that the Fund intended to meet its investment objective by investing in "mortgage-related securities" and Asset-Backed Securities, but also that Asset-Backed securities and Mortgage-Backed Securities were principal to achieving the Fund's investment objective. Prospectus at 4-5.

Instead, Plaintiff's apparent qualm is that the Fund purportedly underrepresented the *quantum* of its mortgage-related securities by including certain securities in the Asset-Backed Securities and International Debt categories that allegedly should have been classified as Mortgage-Backed Securities. SAC ¶¶ 35, 40. But Plaintiff utterly fails to explain why these purported misclassifications were material during the relevant time period. The SAC alleges no facts to make out a plausible case that the categorization of these securities, read as part of the total mix of information and without the benefit of hindsight, would have affected the actions of a reasonable shareholder. Plaintiff's theory relies on the implicit assumption that securities collateralized by subprime mortgages would have been perceived by a reasonable investor as riskier than non-mortgage related Asset-Backed Securities or International Debt securities – prior to the market collapse of 2007. But there is no factual support for this proposition in the SAC's allegations, *i.e.*, that a reasonable investor at that time would have viewed securities avowedly

- 20 -

backed by non-mortgage receivables such as student loans, credit card debt, and auto loans, SAC ¶ 66, as any more conservative than mortgage-related assets.

In fact, the Registration Statement says precisely the opposite.  On its face, it warns that securities backed by *non-mortgage* assets are generally perceived as *riskier* than those collateralized by mortgages:

> Asset-backed securities present certain additional risks that are not presented by mortgage-backed securities because asset-backed securities generally do not have the benefit of a security interest in collateral that is comparable to mortgage assets.[13]  Credit card receivables are generally unsecured and the debtors on such receivables are entitled to the protection of a number of state and federal consumer credit laws, many of which give such debtors the right to set-off certain amounts owed on the credit cards, thereby reducing the balance due. Automobile receivables generally are secured, but by automobiles rather than residential real property . . . Therefore, there is the possibility that, in some cases, recoveries on repossessed collateral may not be available to support payments on these securities.

Prospectus at 43-44.  Thus, the allegation that the Fund misleadingly appeared to own more bonds backed by credit cards and personal debt than by mortgages could only have served to *increase* the reasonable investor's perception of risk in the Fund, not downplay the risk.

Plaintiff points to a scattershot of news and analyst reports describing the developing turmoil in the housing and mortgage markets from the early 2000s through 2007 in order to suggest that mortgage-related securities were perceived as particularly "risky" during this time period.  SAC ¶¶ 38, 43-59.   Despite the SAC's failure to cite to any reports describing bonds backed by student loans or credit cards as safer or more conservative, Plaintiff's implicit thesis is that such news reports so sensitized investors to the perils of mortgage-related securities that the relative weighting of mortgage-related securities versus other types of Asset-Backed Securities

---

[13] Plaintiff claims that this sentence suggests that the Asset-Backed Securities category did not contain mortgage-related assets.  SAC ¶¶ 66, 85.  But the Court has already determined that the Fund disclosed the presence of mortgage-related assets within the Asset-Backed Securities category.  *Yu*, 686 F. Supp. 2d at 378-79; *accord* July Op. at 4-5

would have been a material factor in a reasonable investor's investment decisions.  But this logical leap is grounded entirely on hindsight.  Neither State Street nor the broader investment industry foresaw the sudden seismic illiquidity in the mortgage-related securities market in 2007, or the broader credit crisis that followed – and Plaintiff's cherry picked media and analyst reports do not plausibly establish that they should have.  As the Court previously ruled, Plaintiff cannot rely on such hindsight to support a claim of materiality.  *See Yu*, 686 F. Supp. 2d at 377; s*ee also In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d at 205 ("[T]he truth of a statement made in the registration statement is judged by the facts as they existed when the registration statement became effective."); *Landmen Partners Inc.*, 659 F. Supp. 2d at 539-40 (same).

## II.     PLAINTIFF'S SECTION 11 AND 12(A)(2) CLAIMS ALSO FAIL BECAUSE THE ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED TO THE ALLEGED MISSTATEMENTS OR OMISSIONS

### A.     None of Plaintiff's Alleged Registration Statement Misrepresentations Could Have Caused the Decline of the Fund's NAV

Plaintiff's Section 11 and 12(a)(2) claims also fail for the independently sufficient reason that any losses allegedly suffered were not the result of the purported misstatements and omissions.  Loss causation is absent.  Sections 11(e) and 12(b) of the Securities Act provide that a plaintiff is not entitled to damages if the decline in the value of the securities "result[ed] from" something other than the alleged misstatements or omissions in the Fund's Registration Statement:

> [I]f the defendant proves that any portion or all of such damages represents *other than* the depreciation in value of such security *resulting from* such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e) (emphases added); *accord id.* § 77*l*(b).  This language prohibits recovery of damages related to any purportedly false or misleading statement that does not "result[] in" a

- 22 -

depreciation in the share value of the security.  Courts have held that the loss causation standard under Sections 11 and 12(a)(2) is the same as for fraud actions under Rule 10b-5, "except that the defendants bear the burden of negating causation."[14]  *In re Vivendi Universal, S.A. Securities Litigation,* 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009) (Holwell, J.).   However, where it is apparent on the face of the complaint that the alleged loss is not causally connected to the alleged misstatements or omissions, the complaint may be dismissed.  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003) (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998)).

In the leading Second Circuit case of *Lentell v. Merrill Lynch & Co.*, 396 F. 3d 161 (2d Cir. 2005), the court held that "[t]o establish loss causation, a plaintiff must allege that . . . the misstatement or omission concealed something from the market that, *when disclosed*, negatively affected the value of the security." *Id.* at 173 (emphasis added).  As this Court explained in *Vivendi*, "[t]he Court of Appeals called the event or events that released the previously concealed information the 'materialization of the risk.'"  *In re Vivendi*, 634 F. Supp. 2d at 363 (quoting *Lentell*, 396 F.3d at 173).  Crucially, "[o]nce an event qualifies as a materialization of the risk, plaintiffs must still prove that their *losses were caused by that event*." *Id.* at 364.   As summarized by this Court:

> [P]laintiffs seeking to prove loss causation must establish two causal connections: a connection between the alleged false or misleading statements and one or more events disclosing the truth concealed by that fraud, and a connection between these events and actual share price declines. *Lentell*, 396 F.3d at 173. To demonstrate the connection between the statements and the events – termed "materializations of the concealed risk" – plaintiffs must show: (1) that these events were foreseeable consequences of the alleged fraud, *id.;* and (2) that these

---

[14] *But cf. Akerman v. Oryx Commc'ns, Inc.*, 609 F. Supp. 363, 369-70 (S.D.N.Y. 1984), *aff'd*, 810 F.2d 336 (2d Cir. 1987) (stating that courts have interpreted causation under the Exchange Act as less strict than under the Securities Act); *Castillo v. Dean Witter Discover & Co.*, No. 97-1272, 1998 WL 342050, at *6 (S.D.N.Y. June 25, 1998) (same).

> events revealed new information previously concealed by defendants' alleged fraud, *id.; see also Dura* [*Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)]. <u>To demonstrate the connection between the events and the share price declines, plaintiffs must: (1) show a correlation between news of the event and the declines; and (2) disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events.</u> *Dura,* 544 U.S. at 342-43; *Lattanzio* [*v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007)].

*In re Vivendi*, 634 F. Supp. 2d at 365 (emphasis added).  It is clear from the face of the SAC that Plaintiff cannot allege the required causal connection between the alleged misrepresentations in the Fund's Registration Statement and the decline in the value of YPF's shares.  This is because Plaintiff cannot plausibly allege that disclosure of some previously concealed or misrepresented "truth" is what caused the NAV of the Fund's shares to decline.  From all that the SAC alleges about the cataclysmic events of 2007, Fund investors would have sustained the same losses whether or not the Fund's investment objective was different and whether or not the quantum of exposure to mortgage-related securities was accurately portrayed.[15]

The price of shares in an open-ended mutual fund is, of course, not determined by open-market securities trading, where misstatements or omissions might distort the market's perception of the value of a security.  Rather, mutual fund share prices are a function of a fund's NAV, which is calculated daily based on a formula prescribed by the Investment Company Act that takes into account the fund's total assets (*i.e.*, the securities and cash owned by the fund) and its liabilities.  *See* 15 U.S.C. § 80a-2(a)(41); 17 C.F.R. §§ 270.2a-4, 270.22c-1 (2009); SAC ¶ 141; *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 590 (S.D.N.Y. 2006) (noting that a mutual fund's share price is a function of NAV, "minus liabilities such as

---

[15] Plaintiff alleges that he would not have purchased shares of the Fund had such disclosures been made.  *See, e.g.*, SAC ¶ 102 ("Investors were precluded from adequately or accurately assessing the risk associated with investing in the Yield Plus Fund as they could not reasonably decipher or infer that many securities listed in the International Debt sector of the Yield Plus Fund . . . .").  But these allegations assert only *transaction* causation, not loss causation, *see In re Vivendi*, 634 F. Supp. 2d at 360, and cannot salvage Plaintiff's claims.

- 24 -

fees") (quoting *In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208, 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006)).  It is axiomatic that, because the NAV is determined by the price of the underlying securities, alleged misrepresentations regarding a fund's investment objective and holdings – rather than the inputs into the NAV calculation – can have no effect on a fund's share price.[16]  *See Clark v. Nevis Capital Mgmt., LLC*, No. 04 Civ. 2702, 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005) (noting that the price of "shares in a mutual fund . . . [is] unaffected by alleged misrepresentations and omissions concerning the fund itself") (citing *Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998) ("[T]he share price of a mutual fund is not affected by alleged misrepresentations or omissions.  The share price of a mutual fund is determined by the value of all the underlying securities it holds at a given time, and the fund price fluctuates with the price of those underlying securities.")); *see also In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1188  (N.D. Cal. 2004) (noting that "the share price of a mutual fund is not affected by alleged misrepresentations or omissions; the share price of a mutual fund is determined by the value of all underlying securities it holds at a given time").

Here, none of the misstatements or omissions alleged by Plaintiff caused the Fund's NAV to be inflated, only to decline later as a result of the "truth" becoming known through a corrective disclosure or other "materialization of the risk."  The alleged misstatements relate to the description of the Fund's investment objective, and to the categorization and quantity of mortgage-related securities within the Fund.  But the NAV declines that caused Plaintiff's losses inarguably were due to the decline in the value of the Fund's underlying investments, irrespective of what was disclosed about the nature, inherent risk, or amount of those securities.

---

[16] *See* David M. Geffen, *A Shaky Future for Securities Act Claims Against Mutual Funds*, 37 Sec. Reg. L.J. 20, 23-27 (2009).

No matter how the Fund's holdings were categorized, how the Fund's mortgage-related exposure was quantified, or how the Registration Statement described the Fund's investment objective, the plain fact is that the bonds held in the Fund's portfolio would have experienced the same market value losses, causing the same depreciation in the Fund's NAV.

Plaintiff cannot plug the causation gap by simply arguing that the decline in the Fund's NAV was caused by its investments in mortgage-related securities, which were not adequately disclosed – and thus that the losses "result[ed]" from the "materialization of a concealed risk."[17] SAC ¶ 70. That does not establish causation. As the Court explained in *Vivendi*: "To demonstrate the connection between the [materialization] events and the share price declines, plaintiffs must: (1) show a correlation between news of the event and the declines; and (2) disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events." *In re Vivendi*, 634 F. Supp. 2d at 365; *see also Lentell*, 396 F. 3d at 173 (misrepresentation must "conceal[] something from the market that, when disclosed, negatively affected the value of the security"). Given the undeniable fact that the decline in the

---

[17] Such faulty reasoning regarding "materialization of the concealed risk" was recently applied by the Northern District of California in *In re Charles Schwab Corp. Sec. Litig.*, No. 08 Civ. 01510, 2010 WL 1463490, at *6 (N.D. Cal. Apr. 8, 2010), where the court concluded that loss causation might be found in the mutual fund context based on the plaintiffs' allegations of misrepresentations about a mutual fund's investments in mortgage-related securities. The *Schwab* court pointed to no evidence that the fund's alleged misstatements artificially inflated the NAV of the fund, or that the revelation of those misstatements caused it to decline. The *Schwab* court's causation standard cannot be squared with the law of this Circuit. (*Schwab*'s discussion of the "materialization of a concealed risk" was recently borrowed as an illustration in the recent Southern District of New York case *King County, Wash. v. IKB Deutsche Industriebank AG*, Nos. 09 Civ. 8387, 09 Civ. 8822, 2010 WL 1702196, at *5 (S.D.N.Y. Apr. 26, 2010), but the use of this language was not an endorsement of the mutual fund loss causation point; rather, it was used merely to explain that a plaintiff's Exchange Act claim was not defeated on loss causation grounds merely "because the credit crisis occurred contemporaneously with Rhinebridge's collapse." *Id.*). Similarly, the District of Massachusetts court in *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, No. 08-11064, 2010 WL 1253114, at *7 (D. Mass. Mar. 31, 2010), also failed to apply an actual causation standard to the unique pricing issues of a mutual fund, as required by Second Circuit precedent.

Fund's NAV would have been precisely the same even if the Fund's disclosures had been made just as Plaintiff claims they should have been made, there can be no (1) "correlation" between "news" of the Fund's "true" characteristics and the NAV declines, or (2) a "disaggregation" from the "losses resulting from other, non-fraud-related events" (*i.e.,* market declines in the value of the types of bonds held in the portfolio).

Thus, because the "depreciation in the value of the security" cannot possibly have "result[ed] from" the alleged misrepresentations in the Registration Statement, loss causation cannot be established, and Plaintiff's Section 11 and 12(a)(2) claims should be dismissed.

**B.      Mutual Fund Liability Exists for Misrepresentations in Registration Statements, But Not in the Circumstances Presented Here**

Neither can Plaintiff successfully argue that the application of the causation requirements of *Lentell* and similar cases to an open-end mutual fund means that causation can *never* be established against mutual funds in securities cases.   Courts in this Circuit have rightfully permitted mutual fund shareholders' claims under the Securities Act or Exchange Act where a fund's purported misrepresentations concealed a defect in the NAV itself.   For example, in *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, the plaintiff brought a claim under Section 10(b) of the Exchange Act alleging that an adviser had failed to disclose that it was "grossly overcharg[ing]" for management services, such that the reported NAV was unduly diminished.   595 F.3d 86, 93 (2d Cir. 2010).   Specifically, the defendant had negotiated a reduced fee with the funds' transfer agent, but did not disclose the reduction and secretly withheld the commensurate savings from the funds.   *Id.*   The Second Circuit reversed the lower court's dismissal of plaintiffs' claim, holding that the plaintiff had adequately pled loss causation by alleging that "the deductions [from the funds' assets in calculating the NAV] used to fund the transfer agent 'fees' diminished for [plaintiff] money under management and, as a result,

- 27 -

negatively and predictably impacted returns."[18]  *See id.* at 96.  Because the disputed fees – the

subject of the alleged misrepresentations in that case – were deducted from the funds' assets in

calculating its NAV, they diminished the value of investors' shares.  *See Lentell*, 396 F.3d at 173

("[A] plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the

cause of the actual loss suffered.") (internal citation and quotation marks omitted).  Thus, the

misrepresentations "caused" losses under the standard described in *Lentell* and *Vivendi* in the

same manner that misrepresentations about an operating company's risk profile cause investor

losses by distorting the price of the company's shares.[19]

Additionally, the SEC may successfully bring actions against mutual fund defendants in

many contexts that private investors may not.[20]  For example, in enforcement actions under

Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, the SEC need not

allege or prove loss causation, investor reliance, or damages.  *SEC v. Lee*, No. 08-CV-9961, 2010

---

[18] Similarly, in *In re AIG Advisor Group*, the Eastern District of New York held that mutual fund investors pled loss causation, using reasoning similar to the Second Circuit in *Operating Local*, by alleging that they were misled into paying fees that funded an adviser's shelf-registration business instead of management services, thereby improperly diminishing performance.  No. 06 CV 1625, 2007 WL 1213395, at *11 (E.D.N.Y. April 25, 2007) (dismissing claim on other grounds, but holding that mutual fund investors pleaded loss causation as to portion of claim).

[19]  Although Plaintiff has attempted to plead a causation case by conclusorily alleging misrepresentations regarding portfolio asset valuations that directly affected the calculation of the NAV, *see, e.g.*, SAC ¶¶ 141-45, these allegations have already been rejected by the Court in both the February and July Opinions as failing to state a claim for an actionable misrepresentation.  *See Yu*, 686 F. Supp. 2d at 380 ("Plaintiffs' over-valuation claims fail because the Complaint does not aver a single concrete fact to suggest that defendants deviated from the prescribed valuation methods.  Most of the relevant allegations are conclusory."); July Op. at 8 n.4 ("With regard to the misvaluation claims, the PSAC does not contain amendments that address the shortcomings identified in the [February] Opinion.").

[20]  It is beyond cavil that Congress may choose to create liability for certain acts that are enforceable by federal regulators, but not by private parties, and that this "enforcement power is not toothless."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 166-67 (2008).  *See also id.* at 165 ("The determination of who can seek a remedy has significant consequences for the reach of federal power." (citing *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 509 n.9 (1990))).

- 28 -

WL 2594280, at *7 (S.D.N.Y. June 18, 2010) (citing *SEC v. Simpson Capital Mgmt.*, 586 F.

Supp. 2d 196, 201 (S.D.N.Y. 2008)).  Congress also created extensive liability for advisers under

provisions of the Investment Company Act and the Investment Advisers Act that are enforceable

by the SEC.  *See, e.g.*, 15 U.S.C. §§ 80a-33(b) (prohibiting materially misleading statements or

omissions in documents filed with the SEC), 80a-35(a) (breach of fiduciary duty involving

personal misconduct with respect to a fund), 80b-6 (prohibiting fraudulent transactions), 80b-7

(prohibiting untrue statements of material fact in registration applications or reports filed with

the SEC).[21]

　　　However, the legislative history of the Securities Act unambiguously indicates that

Congress was not concerned with providing a private remedy for claims such as Plaintiff's here;

rather, it confirms that, in passing the Securities Act, Congress was concerned with statements

that *in and of themselves* had the potential to affect the value of a security:

> Liability is imposed upon [defendants under § 11 and § 12] as a condition of the
> acquisition of the privilege to do business through the channels of interstate or
> foreign commerce.  *The statements for which they are responsible*, although they
> may never actually have been seen by the prospective purchaser, because of their
> wide dissemination, *determine the market price of the security, which in the last
> analysis reflects those manifold causes that are the impelling motive of the
> particular purchase*.

H.R. Rep. No. 73-85, at 10 (1933) (emphasis added); *id.* at 22 ("Inasmuch as the value of the

security may be affected by the information given in the registration statement . . . . the civil

remedies accorded by this subsection . . . are given to all purchasers.").  *Cf. Clark*, 2005 WL

488641, at *18 (quoting *Young*, 183 F.R.D. at 510) ("[F]raud-on-the-market does not apply here

---

[21] Congress also explicitly created a private right of action against advisers under the Investment
Company Act.  *See* 15 U.S.C. § 80a-35(b) (breach of fiduciary duty involving adviser's receipt
of compensation for services).  Moreover, in addition to actions under the securities laws, other
state and common law remedies may be available to mutual fund plaintiffs arising from
mismanagement of a mutual fund, either directly by the fund or derivatively.  *See, e.g.*, *In re Am.
Mut. Funds Fee Litig.*, No. 04-5593, 2005 WL 3989803, at *4 (C.D. Cal. Dec. 16, 2005).

because the share price of a mutual fund is not affected by alleged misrepresentations or omissions.").  To protect against such market distortion of prices, Congress dispensed with the elements of scienter and reliance and created near-strict liability for misrepresentations in registration statements.

To be sure, where a prospectus misrepresentation artificially inflates the price of a security, there may be sound policy reasons for providing a claim to investors who did not actually rely upon those misrepresentations in making their decisions to purchase the security. But absent any effect on the purchase price, the basis for providing such a recovery ceases to exist.  Mutual fund investors are already protected from artificially inflated pricing by the statutory requirement that mutual funds mark their securities to market value on a daily basis. 17 C.F.R. § 270.22c-1(b).  As a result, many of Congress's concerns in passing Sections 11 and 12 simply do not apply to mutual funds, and an expansive interpretation of loss causation would be trying to fit a square peg into a round hole.  Indeed, it is difficult to understand how an investor's damages could "result[] from" alleged misrepresentations that an investor has never seen, let alone relied upon, and which, by definition and by requirement of federal law, had no impact on the price they paid for their shares.  This Court is not compelled to provide a private remedy where one was not intended.  *See Aaron v. SEC*, 446 U.S. 680, 695-96 (1980) (noting that "general references to the 'remedial purposes'" of the securities laws "will not justify reading a provision 'more broadly than its language and the statutory scheme reasonably permit'") (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)).

## CONCLUSION

For the reasons provided above, the Second Amended Complaint should be dismissed with prejudice.

Dated:  August 27, 2010                     Respectfully submitted,

                                            ROPES & GRAY LLP


                                            /s/ John D. Donovan, Jr.
                                    By      John D. Donovan, Jr.
                                            Harvey J. Wolkoff
                                            Robert A. Skinner
                                            One International Place
                                            Boston, Massachusetts 02110
                                            (617) 951-7000
                                            john.donovan@ropesgray.com
                                            harvey.wolkoff@ropesgray.com
                                            robert.skinner@ropesgray.com


                                            *Attorneys for Defendants*
                                            *State Street Corporation, State Street Global*
                                            *Advisors, SSgA Funds, Peter G. Leahy,*
                                            *James Ross and Mark E. Swanson*

- 31 -

25207593_11

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2010, I caused a true and correct copy of the foregoing document to be served upon all counsel of record via the ECF system.

/s/ Allison M. Boscarine
Allison M. Boscarine

Edwin G. Schallert
Jeremy Klatell
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022

John R. Nelson
LOCKE LORD BISSELL & LIDDELL LLP
100 Congress, Suite 300
Austin, TX 78701

Caren S. Sweetland
Tracy D. Larson
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002

Robert Burford
BURFORD & MANEY PC
700 Louisiana, Suite 4600
Houston, TX 77002

John J. Butts, Esq.
Steven Cherry
Felicia Ellsworth
Kevin Prussia
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, MA 02109

Thomas J. Dougherty
Peter Simshauser
Michael S. Hines
SKADDEN ARPS SLATE MEAGHER &
FLOM LLP
One Beacon Street
Boston, Massachusetts  02108

Lewis R. Clayton
Jonathan Hurwitz
Aliza Balog
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON
1285 Avenue of the Americas
New York, NY  10019-6064

Steven L. Severson
Justin Krypel
Debbie Ellingboe
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

David E. Lurie
Thomas Lent
LURIE & KRUPP, LLP
One McKinley Square
Boston, MA 02109

Samuel H. Rudman
David A. Rosenfeld
Evan J. Kaufman
Carolina Torres
Mark Reich
COUGHLIN, STOIA, GELLER, RUDMAN &
ROBBINS, LLP
58 S. Service Road, Ste. 200
Melville, NY 11747

- 32 -

Douglas K. Spaulding
REED SMITH LLP
1301 K Street NW
Suite 1100 - East Tower
Washington, DC 20005

Richard B. Walsh, Jr.
LEWIS, RICE, FINGERSH LC
500 N. Broadway, Suite 2000
St. Louis, MO 63102

25207593_11