UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MEMORIAL HERMANN HEALTHCARE SYSTEM and THE HEALTH PROFESSIONALS INSURANCE COMPANY, LTD. | § § § § § | |
| Plaintiffs, | § § | 1:08-md-1945 |
| v. | § § | 1:08-cv-05440-RJH |
| STATE STREET BANK AND TRUST COMPANY; | § § | |
| Defendants. | § § § | |

## PLAINTIFFS' FOURTH AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Plaintiffs MEMORIAL HERMANN HEALTHCARE SYSTEM and THE HEALTH PROFESSIONALS INSURANCE COMPANY, LTD. file this Fourth Amended Complaint against DEFENDANT STATE STREET BANK AND TRUST COMPANY and would respectfully show the Court the following:

## PARTIES

1.      Plaintiff MEMORIAL HERMANN HEALTHCARE SYSTEM ("Memorial Hermann") is a not-for-profit, community-owned healthcare system with its principal place of business in Houston, Harris County, Texas.

2.      Plaintiff THE HEALTH PROFESSIONALS INSURANCE COMPANY, LTD. ("HePIC") is a Cayman Islands corporation.  Memorial Hermann and HePIC are collectively referred to as "Plaintiffs."

1

3.      Defendant STATE STREET BANK AND TRUST COMPANY ("State Street") is a wholly owned subsidiary of State Street Corporation, a publicly registered financial holding company.  State Street is organized under the laws of the Commonwealth of Massachusetts, with its principal place of business in Boston, Massachusetts.   State Street provides investment servicing and investment management services and products.  As of June 30, 2007, it had $1.9 trillion of assets under management.  State Street has already filed an answer in this case, and further service is not necessary.

## JURISDICTION AND VENUE

4.      This is a civil action arising under state law.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

5.      Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1441, and this case will be remanded to that District for trial.

## FACTUAL BACKGROUND

6.      Memorial Hermann is the largest not-for-profit health care provider in Texas.  It serves the greater Houston and southeast Texas communities through 11 hospitals and many specialty programs and services, including three premiere Heart & Vascular Institutes, TIRR Memorial Hermann and Children's Memorial Hermann Hospital, the Memorial Hermann Sports Medicine Institute, the Mischer Neuroscience Institute, seven comprehensive Cancer Centers, 25 sports medicine and rehabilitation centers, 19 diagnostic laboratories, a substance abuse treatment center, 25 outpatient imaging centers, and dozens of other specialty and outpatient centers.  In order to continue to grow and provide medical services for those in need, Memorial Hermann often invests money above operating capital until a worthy project is identified and developed.  Because of the nature of its operations and the speed at which needs arise, Memorial

Hermann requires investments that have predictable returns, preserve capital, and are relatively liquid.

7.     In the Spring of 2004, Ernest Liebre of Cambridge Financial Services ("Cambridge"), who served as Memorial Hermann's investment consultant, discussed a laddered investment approach that had the objective of enhancing yield without increasing volatility with Carrol Aulbaugh, Memorial Hermann's Chief Financial Officer, as well as Memorial Hermann's Investment Subcommittee. Liquidity and preservation of capital were key to the objective of this approach so that Memorial Hermann would have funds available for construction projects, repairs, and purchases of equipment. During a meeting of Memorial Hermann's Investment Subcommittee in June 2004, the Subcommittee approved the laddered investment approach and commissioned Cambridge with initiating Requests for Proposals for asset managers.

8.     In July 2004, Liebre issued Request for Proposals on behalf of Memorial Hermann to various asset managers, including State Street, seeking investment opportunities that met Memorial Hermann's investment criteria. Liebre sent the Request for Proposal to Edward Armstrong, a client services representative with State Street, who in turn forwarded the Request to State Street's Brad Allinson. Allinson forwarded the Request to Jim Hopkins, a product engineer for State Street's Limited Duration Bond Fund ("LDBF" or the "Fund"), and State Street's "RFP" group. The Request for Proposal sent to State Street made clear that Memorial Hermann was seeking the services of an asset manager for one of three layers of its current cash segments, with absolute return goals, preservation of capital requirements, and liquidity requirements. The Request for Proposal described the three layers as follows:

> The first layer of $50.0 million is open for fixed income bids that provide liquidity with preservation of capital at a return greater than money markets.

3

The second layer of $100.0 million is open for fixed income bids that provide less liquidity than an enhanced money market with preservation of capital.

The third layer of $100.0 million is open for fixed income bids that provide less liquidity than the second layer with preservation of capital.

The Request for Proposal specified that no proposals would be accepted by oral communication, telephone, electronic mail, telegraphic transmission, or telefacsimile transmission.

9.      State Street promptly assessed Memorial Hermann's Request for Proposal, and Hopkins recommended the LDBF in response to Memorial Hermann's criteria.

10.     On July 22, 2004, State Street's Brad Allinson submitted a written response to Liebre and Memorial Hermann's Lynn DeBlance. Allinson warranted that as an officer of State Street, he was authorized to bind State Street to the proposal submitted in the response. State Street's written response represented that the LDBF had daily liquidity. Further, the response included a draft "Agreement of Trust" representing that State Street would employ an investment objective to "match or exceed the return of the J.P. Morgan three month U.S. Dollar LIBOR Index." But for this response, Memorial Hermann would not have continued its consideration of State Street to serve as an asset manager for Memorial Hermann's laddered investment approach with preservation of capital and liquidity objectives.

11.     On August 12, 2004, Hopkins made a presentation to Liebre and Memorial Hermann in Texas pitching both State Street's Prime Money Market Fund and the LDBF in response to Memorial Hermann's Request for Proposal. Memorial Hermann, however, already had satisfactory money market funds. Concerning LDBF, Hopkins represented that State Street had a deep history and experience in structured product markets, was one of the largest investors in structured products in the world, and had dedicated and experienced portfolio management and credit research teams, with five portfolio managers and two credit analysts dedicated to

4

Mortgage Backed Securities ("MBS"), Asset Backed Securities ("ABS"), and Commercial Mortgage Backed Securities ("CMBS").  Hopkins represented that State Street's investment philosophy focused on adding value through high credit quality structured products and maintenance of portfolio liquidity.  Hopkins further represented that State Street had broad expertise in cash, enhanced cash products, and other short duration alternatives.  Hopkins, on behalf of State Street, presented LDBF as an "enhanced cash" fund.

12.     In the August 2004 presentation, Hopkins represented that as of June 30, 2004, the LDBF was comprised of 51.4% ABS, 22.3% CMBS, 8.1% Cash, 11.1% MBS, and 7.1% Agency.  The presentation did not include any definition, breakdown, or description of any of the categories, particularly ABS, which typically includes an array of subsectors.  The presentation did not reveal that even though the sector breakdowns delineated CMBS and MBS separately from ABS, there were also mortgage backed securities contained within the percentage of the Fund described as merely ABS.  And to make matters worse, in the presentation, Hopkins made no mention of the presence of subprime mortgage securities in the Fund.  Instead, Hopkins touted LBDF as a "low volatility means of generating 50-75 bps alpha over an equity index" that "avoids undue credit exposure and interest rate risk."  Further, Hopkins represented that the underlying portfolio in the Fund was "comprised of high quality, liquid securities" with the return driven by State Street's "unique investment expertise and product mix."

13.     Neither Hopkins nor his presentation revealed the existence or use of leverage in the Fund.  In presenting a sector allocation that totaled 100 percent, Hopkins, on behalf of State Street, instead represented that the Fund did not use leverage, and that representation was consistent with Hopkins' representations to Memorial Hermann of the Fund's capabilities to meet Memorial Hermann's preservation of capital and liquidity requirements.

5

14.     Memorial Hermann was unaware at this time that Hopkins' presentation of State Street's LDBF was highly misleading and omitted key facts about the actual composition of the Fund, such as that there was a greater allocation to ABS than represented, that the ABS allocation consisted of almost entirely subprime mortgages, and that, as the Fund's portfolio manager, Robert Pickett, has confirmed, the Fund did, in fact, utilize leverage "by design." Moreover, neither Hopkins nor anyone else at State Street told Memorial Hermann that (and that Memorial Hermann was unaware that) *since its inception*, the Fund had been *heavily concentrated in bonds backed by first lien mortgages to subprime borrowers*, a fact that Michael O'Hara, State Street's head of Active U.S. Fixed Income, made clear in the summer of 2007 in his document entitled "The U.S. Subprime Market and Limited Duration Bond in 2007."

15.     In the August 2004 presentation, Hopkins assured Memorial Hermann that LDBF was "safe" because of State Street's "commitment to technology" and the sophisticated credit analysis performed by State Street's credit and research groups.  Hopkins claimed that State Street's "rigorous" investment process played an essential role in its risk-controlled investment strategy and accounted for its "superior risk management."  Both of those representations were inaccurate, as internal State Street documents reveal that State Street was struggling with technology issues and routinely disregarded risk management protocols and advice.  State Street wanted Memorial Hermann to invest in LDBF due to its goal of tripling fixed income assets under management.   State Street and its employees were motivated to make those misrepresentations by their own financial interests.

16.     On August 19, 2004, Hopkins sent Memorial Hermann, by way of an email to Liebre, a purported listing of LDBF's portfolio holdings as of June 30, 2004.  The listing claimed that the Fund had a mixture of various types of asset backed securities, including "Auto,"

6

"Card," "Equip," "HEL," "HELIO," and "SL," as well as various MBS holdings. The list of holdings, however, did not include the dollar amount of each holding, and thus it concealed the holding percentages of those sectors. Discovery in this case has revealed that the list actually said the Fund held securities that it did not own as of June 30, 2004, and it failed to disclose other securities that the Fund did own as of that date. Due to those discrepancies, Hopkins, on behalf of State Street, misrepresented 50% of the Fund's actual holdings.

17.    On November 15, 2004, Hopkins, along with Joseph Cadigan of State Street, made another pitch to Memorial Hermann in Texas concerning the Fund. Hopkins again stressed State Street's deep history and experience in structured product markets, dedicated and experienced portfolio management and credit research teams, and broad expertise in cash, enhanced cash products, and other short duration alternatives. Additionally, Hopkins again represented that State Street's investment philosophy focused on adding value through high credit quality structured products and maintenance of portfolio liquidity.

18.    Concerning the sector allocations, Hopkins, on behalf of State Street, represented that as of September 30, 2004, the LDBF was comprised of 56.7% ABS, 16.9% CMBS, 11.2% Cash, 12.6% MBS, and 2.6% Agency. Again, because the percentage breakdown listed CMBS and MBS in separately delineated categories from ABS, State Street concealed from Memorial Hermann that the ABS category included mortgage backed securities. Moreover, as with the August 2004 presentation, Hopkins' November 2004 presentation concealed both the subsector composition of the ABS sector and the predominance of subprime mortgage securities in the Fund. Hopkins again touted LBDF as a "low volatility means of generating 50-75 bps alpha over an equity index" that "avoids undue credit exposure and interest rate risk" and has a portfolio "comprised of high quality, liquid securities" with the return driven by State Street's

"unique investment expertise and product mix." Hopkins again failed to mention the existence or use of leverage in this presentation, and again, the sector allocations totaled 100 percent, indicating that there was no leverage involved in the Fund.

19.    Further, in promoting LDBF to Memorial Hermann, State Street provided a Fact Sheet, authored by Jim Hopkins, representing LDBF's conservative "Investment Objective" as seeking to "maximize income while preserving capital by investing in a diversified portfolio of highly rated fixed income securities" and also seeking to "match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index over trailing one-year periods." State Street assured Memorial Hermann that the Fund utilized "an expanded universe of securities that goes beyond typical money markets including: Treasuries, agencies, collateralized mortgage obligations, adjustable rate mortgages, fixed rate mortgages, corporate bonds, asset backed securities, futures, options, and swaps." That was untrue. The Fund was, in fact, heavily concentrated in bonds backed by subprime residential mortgages. The Fact Sheet also touted "Key Features" of the Fund, such as "[e]nhanced performance over traditional money market returns," "[h]igh credit quality," and "[s]ophisticated credit analysis." Those claims were also untrue. Further, the Fact Sheet falsely represented that the Fund had "better sector diversification, higher average credit quality, and higher expected returns" compared to the "typical 2 A-7 regulated money market portfolio."

20.    The Fact Sheet listed the sector allocations as of September 30, 2004 as 53.7% ABS, 21.5% CMBS, 16.3% MBS, 2.60% Agencies, and 5.90% Cash. Like Hopkins' Texas presentations to Memorial Hermann earlier that summer, the Fact Sheet's delineation of CMBS and MBS, separate and apart from ABS, gave the misimpression that there were no mortgage backed securities included within the ABS category. And, as with the August and November

8

2004 presentations, the Fact Sheet did not define ABS to disclose the components contained within that category, or in any way reveal that a substantial percentage of the Fund was invested in subprime residential mortgage backed securities.  Also, State Street failed to mention the existence or use of leverage in the Fact Sheet.  On the contrary, by presenting a sector allocation that totaled 100 percent, State Street implied that the Fund did not use leverage.

21.     Based on State Street's presentations and Fact Sheets, Memorial Hermann moved forward with reviewing State Street's "Agreement of Trust" and "Fund Declaration" relating to Memorial Hermann's contemplated investment in LDBF.  State Street's Beth Anne Flynn presented these documents to Lynn DeBlance of Memorial Hermann in late December 2004. The "Agreement of Trust" said that State Street would employ a conservative investment objective to "match or exceed the return of the J.P. Morgan one month U.S. Dollar LIBOR Index."  Even though the "Agreement of Trust" said that State Street could amend the Fund's objective, provided that State Street signed an instrument and Memorial Hermann acknowledged the signed instrument amending the Fund objective at least 30 days prior to the effective date of the amendment, State Street never even attempted to amend or clarify the Fund's stated Investment Objective to confirm that the fund was actually being managed to return 50 – 75 basis points over LIBOR.

22.     Likewise, the "Fund Declaration" represented that the Fund's investment objective was to "match or exceed the return of the J.P. Morgan one month U.S. Dollar LIBOR Index," and further represented that the Fund would achieve this objective by investing in a diversified mix of several types of fixed income securities, including U.S. Treasury securities, debt of agencies of the United States Government, corporate debt, asset-backed securities, commercial mortgage backed securities, and derivative securities.  The Fund Declaration was

9

executed by Timothy Connolly, a State Street Senior Principal.  At that time, Memorial Hermann was completely uninformed regarding the fact that State Street had heavily concentrated the Fund in subprime residential mortgage backed securities since its inception.  Further, State Street never told Memorial Hermann (and Memorial Hermann was unaware) that despite the representations of the Fund's investment objective in the "Agreement of Trust" and "Fund Declaration,"  LDBF's portfolio manager Robert Pickett ran the Fund with an objective of "earn[ing] alpha over LIBOR."

23.     In short, when State Street responded to Memorial Hermann's request for a fund with liquidity and preservation of capital for its laddered investment approach, State Street said all the right things.  State Street claimed that the LDBF met Memorial Hermann's stated investment criteria.  State Street claimed the Fund operated as an "enhanced cash" vehicle that preserved capital and maintained liquidity through, among other things, broad diversification in highly rated fixed income securities.  Moreover, State Street's oral comments, Fact Sheet, written presentations, "Agreement of Trust," and "Fund Declaration" told Memorial Hermann that the LDBF's investment objective was to maximize income while preserving capital by matching or exceeding the return of the J.P. Morgan one month U.S. Dollar LIBOR Index through investments in a diversified portfolio of highly rated fixed income securities.  What Memorial Hermann did not know, however, was that the LDBF's portfolio was not diversified, most of its investments were in bonds backed by subprime residential mortgages, and the Fund's real objective was to "earn alpha over LIBOR."  State Street hid those facts from Memorial Hermann.  Further, Memorial Hermann did not know that the Fund had historically used leverage "by design," and that State Street had concealed that fact by manipulating the reported

HOU:0017275/00023:1484949v1

sector holdings allocations so they did not alert Memorial Hermann to State Street's use of leverage.

24.    Based on State Street's misleading pre-investment representations, Memorial Hermann entered into the "Agreement of Trust" with State Street in January of 2005, and HePIC entered into the "Agreement of Trust" with State Street in September of 2005.   In January 2005, Memorial Hermann invested $70,460,000 in the Fund, and in September 2005, HePIC invested $14,240,000 in the Fund, for a combined initial investment of $84,700,000.   In 2006 and 2007, based on those representations, Memorial Hermann and HePIC invested a combined $6,241,000 of additional capital in the Fund, with Memorial Hermann investing an additional $4,300,000 in May 2006, and HePIC investing an additional net amount of $1,941,000 from March 2006 through August 2007.  Ultimately, under the Agreements of Trust, State Street served as Trustee of $90,941,000 of Memorial Hermann's and HePIC's assets.

25.    Although the LDBF was already heavily concentrated in subprime residential mortgages in 2004, the Fund's concentration in subprime continued to grow in 2005 and 2006, and increased substantially in 2007.  At no time did State Street reveal this fact to Plaintiffs. Instead, State Street continued to make similar misleading representations regarding the Fund's sector allocations and characteristics and present Fact Sheets to Plaintiffs with the same misleading representations that the Fund:

> Had an investment objective to "maximize income while preserving capital by investing in a diversified portfolio of highly rated fixed income securities" and "match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index over trailing one-year periods;"
>
> Utilized "an expanded universe of securities that goes beyond typical money markets including: Treasuries, agencies, collateralized mortgage obligations, adjustable rate mortgages, fixed rate mortgages, corporate bonds, asset backed securities, futures, options, and swaps;"

Offered "[e]nhanced performance over traditional money market returns," "[h]igh credit quality," and "[s]ophisticated credit analysis;" and

Had "better sector diversification, higher average credit quality, and higher expected returns" compared to the "typical 2 A-7 regulated money market portfolio."

26.     Throughout 2005 and 2006, Beth Anne Flynn and others at State Street continued to tout State Street's portfolio management and credit research capabilities to Plaintiffs, as well as the enhanced cash nature of LDBF with its "low volatility means of generating 50-75 bps alpha over an equity index," "high quality, liquid securities," and lack of "undue credit exposure and interest rate risk." State Street continued to conceal LDBF's use of leverage, even when specifically asked whether the Fund used leverage. When asked about the use of leverage, State Street's Jane Flaherty flatly responded, "[w]e do not maintain a leveraged exposure."

27.     State Street did not reveal the actual subsector composition of the ABS investments in the Fund or the continually growing allocation of subprime mortgage securities in the Fund. For example, LDBF's Fact Sheet dated September 30, 2006 showed the Fund's sector weights as 68.5% ABS, 21.9% Cash, and 9.6% MBS, with no indication that the expanding ABS allocation was actually comprised mainly of subprime mortgage backed securities.

28.     By the Spring of 2007, the Fund was comprised of 100% ABS, 95% of which was subprime mortgage backed securities. State Street concealed that fact from Plaintiffs. In May 2007, Kimberly Jones of State Street informed Plaintiffs of an underperformance in the Fund, representing that the underperformance was caused by "modest exposure" to the triple B ABS market. State Street assured Plaintiffs that it remained "confident in the underlying fundamentals" and was "uniquely qualified to understand and evaluate" the securities in the Fund. Further, State Street told Plaintiffs that "holding existing positions" was the "prudent decision." State Street also reassured Plaintiffs that it had adhered to its "soft-stop" and "hard-

12

stop" risk management rules, which Plaintiffs have since learned was yet another misrepresentation.

29.    During the summer of 2007, as the LDBF's value plummeted, State Street sold off or redeemed Fund shares that it held in its other internal funds, all the while keeping Plaintiffs uninformed or misinformed regarding those actions.   What's more, State Street encouraged Plaintiffs to leave their investments in LDBF while it redeemed its own co-mingled internal funds' investments out of LDBF and advised several of its preferred clients to do the same.  And when Plaintiffs explicitly asked State Street whether State Street was redeeming its own internal funds' investments out of LDBF, State Street refused to answer the question.

30.    In early August 2007, while State Street was planning to get its other funds out of LDBF, and after advising its preferred clients to redeem, State Street's Beth Anne Flynn, Nick Mavro, and Robert Pickett continued to tell Plaintiffs that State Street believed in the long term fundamentals of the Fund and that State Street was taking steps to reduce risk in the Fund. Further concealing what State Street was actually doing in connection with the Fund, in mid-August 2007, State Street's Chief Investment Officer, Sean Flannery, misled Plaintiffs by saying State Street believed that "judicious investors will hold the positions in anticipation of greater liquidity in the months to come."

31.    During the first three weeks of August 2007, the Fund lost about 37 percent of its value, and by August 21, 2007, the Fund had fallen 42 percent for the year.

32.    It was not until mid-September 2007 that Plaintiffs realized the extent of the Fund's exposure to subprime mortgage backed securities.   By this time, LDBF's losses had already mounted, a trend that continued for the remainder of 2007 and into 2008.  Ultimately, State Street liquidated the Fund, sending a series of liquidation payments to Plaintiffs between

HOU:0017275/00023:1484949v1

December 2007 and March 2008.   Those payments totaled $47,857,707.98, with Plaintiffs receiving a total of $39,524,532.71 and HePIC receiving a total of $8,333,175.27.

33.     In the final analysis, State Street caused Plaintiffs to lose $43,083,292.02 of capital that State Street said it would preserve.

34.     Through fact discovery in this case, Plaintiffs have learned that State Street's efforts to persuade them to invest in, reinvest in, and remain invested in the Fund were littered with misrepresentations and omissions.  Since its inception, State Street heavily concentrated the Fund in subprime residential mortgages.  Robert Pickett, LDBF's portfolio manager, confirmed that he actually managed the Fund with an objective of "earn[ing] alpha over LIBOR" and that the Fund "used leverage by design."   State Street failed to inform Plaintiffs of the high concentration of LDBF in subprime mortgage backed securities.  State Street failed to inform Plaintiffs that the Fund used leverage by design and that the purpose of the Fund was not to serve as an "enhanced cash" fund that preserves capital as State Street represented, but rather to aggressively generate excess alpha.  In fact, State Street never told Plaintiffs that it pitched the Fund to Plaintiffs in conjunction with an internal mandate of tripling the amount of fixed income assets under management by 2008.

35.     State Street misled Plaintiffs regarding the actual securities that were in the Fund. State Street sent Plaintiffs misleading information about the relative investment allocations among asset backed securities, commercial mortgage backed securities, and residential mortgage backed securities.

36.     State Street failed to tell Plaintiffs that its own Credit Research group did not vet the Fund's holdings and rarely, if ever, participated in the decisions regarding the Fund's investments and management.  State Street gave Plaintiffs misleading information about its

14

internal risk management, use of technology, and supposedly sophisticated credit analysis. And State Street failed to inform Plaintiffs that the Fund, which State Street characterized as satisfying Memorial Hermann's absolute return goals, preservation of capital requirements, and liquidity requirements, was being marketed simultaneously to and used by other investors who had aggressive risk tolerances and who sought higher returns than Plaintiffs.

37.     The Fund's precipitous losses were caused by, among other things, a portfolio composition that was inconsistent with State Street's representations and promises, not to mention the Fund's stated investment objectives.   Moreover, the Fund was unjustifiably and recklessly comprised mainly of complex and illiquid instruments backed by subprime and non-conforming residential mortgages of dubious credit quality.   As a result, the Fund's portfolio constituted a one-sided and reckless bet on subprime and other non-conforming mortgage credit, as well as the CDO (Collateralized Debt Obligations) and non-Agency CMO (Collateralized Mortgage Obligations) market.   State Street's actions were contrary to its promises and the Fund's stated "Investment Objectives" requiring preservation of "capital by investing in a diversified portfolio of highly rated fixed income securities."   LDBF's investments in high-risk, long-term mortgage instruments were made by State Street's fund managers even though the Fund's stated objective was for short-term, fixed-income investments to be measured by "the returns of the J.P. Morgan one month U.S. Dollar LIBOR Index."

38.     During the summer of 2007, State Street advised its internal clients and many of its other preferred clients to liquidate their investments in the Fund.   Leaving Memorial Hermann misinformed or uninformed, State Street acted in its own best interests, knowingly and recklessly causing the value of Memorial Hermann's investment to decline by millions of dollars.

Moreover, State Street knowingly and recklessly mismanaged the liquidation of the securities held within the Fund, causing huge additional losses to the value of Plaintiffs' investment.

## FIRST CAUSE OF ACTION:

## FRAUDULENT INDUCEMENT

39.     Plaintiffs incorporate paragraphs 1-38 of this Complaint as if fully set forth herein.

40.     To induce Plaintiffs to enter the Trust Agreements, to invest in the LDBF, and to maintain those investments, State Street made material misrepresentations about LDBF and failed to disclose material facts to induce Plaintiffs to invest in LDBF.  Without limitation, State Street made the following material representations to Plaintiffs:

LDBF met Memorial Hermann's preservation of capital and liquidity requirements in the Request for Proposal Memorial Hermann sent to State Street;

LDBF's investment objective was to "maximize income while preserving capital" and "match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index over trailing one-year periods;"

LDBF invested "in a diversified portfolio of highly rated fixed income securities" (State Street represented LDBF's sector allocation without any definition, breakdown, or description of any of the categories and without including any mention of the presence of subprime mortgage securities in the Fund);

LDBF utilized "an expanded universe of securities that goes beyond typical money markets including: Treasuries, agencies, collateralized mortgage obligations, adjustable rate mortgages, fixed rate mortgages, corporate bonds, asset backed securities, futures, options, and swaps;"

LDBF offered "[e]nhanced performance over traditional money market returns;"

LDBF offered "[h]igh credit quality;"

LDBF offered "[s]ophisticated credit analysis;"

LDBF had "better sector diversification, higher average credit quality, and higher expected returns" compared to the "typical 2 A-7 regulated money market portfolio;"

16

LBDF was a "low volatility means of generating 50-75 bps alpha over an equity index;"

LDBF avoided "undue credit exposure and interest rate risk;"

LDBF's underlying portfolio was comprised of high quality, liquid securities;

LDBF was as an "enhanced cash" fund;

LDBF had daily liquidity;

LDBF held securities it did not actually hold;

LDBF's sector allocations totaled 100 percent;

Leverage was not used in the Fund;

State Street had a deep history and experience in structured product markets, was one of the largest investors in structured products in the world, and had dedicated and experienced portfolio management and credit research teams, with five portfolio managers and two credit analysts dedicated to MBS/ABS/CMBS;

State Street had broad expertise in cash, enhanced cash products, and other short duration alternatives;

State Street employed a risk-controlled investment strategy; and

State Street's investment philosophy focused on adding value through high credit quality structured products and maintenance of portfolio liquidity.

41.     State Street made these material misrepresentations to Plaintiffs with the intent to induce them to enter the respective Trust Agreements, invest substantial sums of money in LDBF, and maintain that money in LDBF.

42.     State Street made those material misrepresentations with knowledge of their falsity or recklessly without any knowledge of the truth and as a positive assertion.

43.     But for those misrepresentations, Plaintiffs would not have entered the Trust Agreements with State Street, invested in LDBF, or maintained their investment in LDBF.

44.     Plaintiffs justifiably relied on State Street's false representations.

17

45.    As a direct and proximate result of the misrepresentations, Plaintiffs have suffered damages, both general and specific.

46.    In addition, because the harm to Plaintiffs resulted from malice, fraud, or gross negligence, Plaintiffs are entitled to exemplary damages.

## SECOND CAUSE OF ACTION:

## NEGLIGENT MISREPRESENTATION

47.    Plaintiffs incorporate paragraphs 1-46 of this Complaint as if fully set forth herein.

48.    In the course of its business dealings with Plaintiffs, State Street made many misrepresentations about the Fund.  For example, State Street claimed the Fund was invested in a diversified portfolio, and it was not.  State Street claimed the Fund was only slightly more risky than a typical money market fund, and it was much more risky.  Moreover, without limitation, State Street made the following additional material misrepresentations to Plaintiffs:

LDBF met Memorial Hermann's preservation of capital and liquidity requirements in the Request for Proposal Memorial Hermann sent to State Street;

LDBF's investment objective was to "maximize income while preserving capital" and "match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index over trailing one-year periods;"

LDBF invested "in a diversified portfolio of highly rated fixed income securities" (State Street represented LDBF's sector allocation without any definition, breakdown, or description of any of the categories and without including any mention of the presence of subprime mortgage securities in the Fund);

LDBF utilized "an expanded universe of securities that goes beyond typical money markets including: Treasuries, agencies, collateralized mortgage obligations, adjustable rate mortgages, fixed rate mortgages, corporate bonds, asset backed securities, futures, options, and swaps;"

LDBF offered "[e]nhanced performance over traditional money market returns;"

LDBF offered "[h]igh credit quality;"

18

LDBF offered "[s]ophisticated credit analysis;"

LDBF had "better sector diversification, higher average credit quality, and higher expected returns" compared to the "typical 2 A-7 regulated money market portfolio;"

LBDF was a "low volatility means of generating 50-75 bps alpha over an equity index;"

LDBF avoided "undue credit exposure and interest rate risk;"

LDBF's underlying portfolio was comprised of high quality, liquid securities;

LDBF was as an "enhanced cash" fund;

LDBF had daily liquidity;

LDBF held securities it did not actually hold;

LDBF's sector allocations totaled 100 percent;

Leverage was not used in the Fund;

State Street had a deep history and experience in structured product markets, was one of the largest investors in structured products in the world, and had dedicated and experienced portfolio management and credit research teams, with five portfolio managers and two credit analysts dedicated to MBS/ABS/CMBS;

State Street had broad expertise in cash, enhanced cash products, and other short duration alternatives;

State Street employed a risk-controlled investment strategy; and

State Street's investment philosophy focused on adding value through high credit quality structured products and maintenance of portfolio liquidity.

49.     State Street's representations supplied Plaintiffs with that false information and other false information about the Fund in an effort to guide Plaintiffs in making their investment decisions.

50.     State Street made the representations without exercising reasonable care or competence in obtaining, verifying, or communicating the information.

HOU:0017275/00023:1484949v1

51.     Plaintiffs justifiably relied on State Street's false representations by entering the Trust Agreements and investing in the Fund.

52.     As a direct and proximate result of the misrepresentations, Plaintiffs have suffered damages, both general and specific.

53.     In addition, because the harm to Plaintiffs resulted from State Street's malice, fraud, or gross negligence, Plaintiffs are entitled to exemplary damages.

**THIRD CAUSE OF ACTION:**

**VIOLATION OF THE TEXAS SECURITIES ACT**

54.     Plaintiffs incorporate paragraphs 1-53 of this Complaint as if fully set forth herein.

55.     Plaintiffs purchased interests LDBF.  Those interests were "securities" under the Texas Securities Act.

56.     State Street offered and sold the securities by means of untrue statements of material fact and by omitting material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Without limitation, State Street made the following untrue statements of material fact and failed to state material facts necessary in order to make the statements made not misleading:

> LDBF met Memorial Hermann's preservation of capital and liquidity requirements in the Request for Proposal Memorial Hermann sent to State Street;
>
> LDBF's investment objective was to "maximize income while preserving capital" and "match or exceed the returns of the JP Morgan one-month US Dollar LIBOR Index over trailing one-year periods;"
>
> LDBF invested "in a diversified portfolio of highly rated fixed income securities" (State Street represented LDBF's sector allocation without any definition, breakdown, or description of any of the categories and without including any mention of the presence of subprime residential mortgage-backed securities in the Fund);

20

LDBF utilized "an expanded universe of securities that goes beyond typical money markets including: Treasuries, agencies, collateralized mortgage obligations, adjustable rate mortgages, fixed rate mortgages, corporate bonds, asset backed securities, futures, options, and swaps;"

LDBF offered "[e]nhanced performance over traditional money market returns;"

LDBF offered "[h]igh credit quality;"

LDBF offered "[s]ophisticated credit analysis;"

LDBF had "better sector diversification, higher average credit quality, and higher expected returns" compared to the "typical 2 A-7 regulated money market portfolio;"

LBDF was a "low volatility means of generating 50-75 bps alpha over an equity index;"

LDBF avoided "undue credit exposure and interest rate risk;"

LDBF's underlying portfolio was comprised of high quality, liquid securities;

LDBF was as an "enhanced cash" fund;

LDBF had daily liquidity;

LDBF held securities it did not actually hold;

LDBF's sector allocations totaled 100 percent;

LDBF did not utilize leverage;

State Street had a deep history and experience in structured product markets, was one of the largest investors in structured products in the world, and had dedicated and experienced portfolio management and credit research teams, with five portfolio managers and two credit analysts dedicated to MBS/ABS/CMBS;

State Street had broad expertise in cash, enhanced cash products, and other short duration alternatives;

State Street employed a risk-controlled investment strategy; and

State Street's investment philosophy focused on adding value through high credit quality structured products and maintenance of portfolio liquidity.

57.     State Street was a seller of securities in that it directly sold securities to Plaintiffs or was a link in the chain of the selling process.    Additionally, State Street was a "control

person" in that it possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of the sellers and issuer of the securities and did in fact exercise control over the operations of the issuer in general.

58.     Plaintiffs tendered their interests in the securities and now seek to recover the consideration paid for the securities, together with interest, costs, and attorneys' fees.  In the alternative, Memorial Hermann and HePIC seek damages, interest, costs, and attorneys' fees.

59.     In addition to the above, Plaintiffs seek an Order requiring State Street to disgorge all compensation it received pursuant to its relationship with Plaintiffs.

## FOURTH CAUSE OF ACTION:

## BREACH OF FIDUCIARY DUTY

60.     Plaintiffs incorporate paragraphs 1-59 of this Complaint as if fully set forth herein.

61.     Pursuant to the Agreements of Trust with Plaintiffs, State Street had a fiduciary relationship with Plaintiffs.  *See, e.g.,* First Amended and Restated State Street Bank and Trust Company Global Managed Common Trust Funds Declaration of Trust, II, § 7 at 4 ("The term 'trustee' shall mean [State Street], acting as a fiduciary with respect to a trust for [Plaintiffs]. . . .) & Art. VI, § 2 Ownership of Assets at p. 13 ("Title to all the assets of the Fund shall at all times be considered vested in [State Street] in a fiduciary capacity.").

62.     As a result of this fiduciary relationship, State Street owed Plaintiffs a fiduciary duty to invest and manage the trust property in good faith, as a reasonably prudent investor, in accordance with the terms of the Trust Agreements, the Investment Objectives set forth in the Trusts Agreements, and other representations made by State Street concerning the investment of property held in trust.  State Street also owed Plaintiffs the fiduciary duties of loyalty and

22

impartiality, which required State Street to act with undivided loyalty and in Plaintiffs' sole interests in all matters involving the administration of the trust and its property. The fiduciary duty of loyalty required State Street to deal fairly with Plaintiffs and to communicate to them all material facts State Street knew or should have known in connection with its administration of the trust property. The duty of loyalty also prohibited State Street from engaging in transactions that involved self-dealing or created conflicts of interests.

63. By failing to invest and manage Plaintiffs' trust property in accordance with the terms of the Trust Agreements, the Investment Objectives set forth in the Trust Agreements, and representations made by State Street in Fact Sheets and other presentations concerning the investment of property held in trust, State Street breached the fiduciary duties it owed to Plaintiffs, including but not limited to the duty of loyalty, the duty of impartiality, and the duty to act as a prudent investor. Additionally, by advising its own commingled funds that had invested in LDBF and its preferred clients to liquidate or redeem their investments out of LDBF (without making the same recommendation at the same time to Plaintiffs), State Street breached its duties of loyalty and impartiality. Those breaches of fiduciary duty were not mere errors of judgment but were acts of willful default, gross negligence, or reckless disregard.

64. As a direct and proximate result of State Street's breaches of its fiduciary duty, Plaintiffs have suffered damages, both general and specific.

65. In breaching its fiduciary duties to Plaintiffs, State Street not only harmed Plaintiffs but also realized revenues and profits as a result of its actions. Accordingly, Plaintiffs ask the Court to award equitable relief including, but not limited to, requiring State Street to disgorge all compensation it received pursuant to its fiduciary relationship with them.

66.     Under the Massachusetts law applicable to Plaintiffs' breach of fiduciary duty claims, Plaintiffs specifically seek the maximum allowable prejudgment interest.

## DEMAND FOR JURY

67.     Plaintiffs have demanded a jury trial and have tendered the appropriate fee.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs MEMORIAL HERMANN HEALTHCARE SYSTEM and THE HEALTH PROFESSIONALS INSURANCE COMPANY, LTD. pray for the following relief:

1.     All actual damages awarded by the trier of fact;

2.     Exemplary damages;

3.     Statutory damages under Section 33(D) of the Texas Securities Act;

4.     Disgorgement of all compensation received by State Street pursuant to their relationship with Plaintiffs;

5.     Pre-judgment interest at the maximum rate allowable by law, including without limitation the maximum rate allowed by Massachusetts law associated with Plaintiffs' breach of fiduciary duty claim;

6.     Post-judgment interest at the maximum rate allowable by law;

7.     Such other costs, as well as reasonable and necessary attorneys' fees, as are equitable and just;

8.     All costs of court; and

9.     All other and further relief to which Plaintiffs may be entitled, in law or in equity.

HOU:0017275/00023:1484949v1

Respectfully submitted,

By: _Charles R. Parker / by Jerke_
      _w/ permission_

Charles R. Parker
cparker@lockelord.com
Southern District of Texas No. 2314
State Bar No. 15479500
LOCKE LORD BISSELL & LIDDELL LLP
600 Travis, Suite 3400
Houston, Texas  77002-3095
Telephone:  (713) 226-1469
Facsimile:  (713) 229-2632

*Admitted Pro Hac Vice*

**ATTORNEY-IN-CHARGE FOR
PLAINTIFFS**

OF COUNSEL:

LOCKE LORD BISSELL & LIDDELL LLP
 Jay G. Safer (JS-4609)
 jsafer@lockelord.com
3 World Financial Center, 20th Floor
New York, New York 10281-2101
Telephone: (212) 812-8305
Facsimile: (212) 812-8365

LOCKE LORD BISSELL & LIDDELL LLP
 John R. Nelson
 jnelson@lockelord.com
 Southern District of Texas No. 32683
 State Bar No. 00797144
100 Congress, Suite 300
Austin, Texas 78701-4042
Telephone: (512) 305-4868
Facsimile: (512) 305-4800
*Admitted Pro Hac Vice*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was electronically filed on the 1st day of October, 2010.  All attorneys of record are being served by e-service.


John R. Nelson

HOU:0017275/00023:1484949v1