UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————

IN RE STATE STREET BANK AND
TRUST CO. FIXED INCOME FUNDS          MDL No. 1945
INVESTMENT LITIGATION

—————————————————————

PRUDENTIAL RETIREMENT INSURANCE
AND ANNUITY COMPANY,

      Plaintiff,

v.                                        No. 07 Civ. 8488 (RJH)

STATE STREET BANK & TRUST
COMPANY

      Defendant.

—————————————————————

**STATE STREET'S PRE-TRIAL MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................1

ISSUES FOR TRIAL............................................................................................8

I.  STATE STREET MANAGED THE BOND FUNDS PRUDENTLY, AND THE
    FUNDS' LOSSES WERE CAUSED BY AN UNPRECEDENTED AND
    UNFORESEEABLE MARKET CRISIS ...................................................8

    A.  Under Established ERISA Authority, Prudence Is a Process-Based Analysis,
        Evaluated in the Context of Stated Investment Objectives .........................8

    B.  Prudential Will Not Meet Its Burden of Establishing that State Street
        Employed Imprudent Investment Practices or Caused Losses Beyond What
        the Plans Have Already Recovered ...........................................................14

II. PRUDENTIAL CONTRIBUTED TO THE PLANS' LOSSES BY FAILING TO
    PROVIDE THE PLANS WITH CRITICAL INFORMATION DURING THE
    SUBPRIME CRISIS ...............................................................................26

    A.  Legal Standard.....................................................................................28

    B.  The Evidence Will Show that Prudential Is Liable to the Plans for a Breach of
        Fiduciary Duty.....................................................................................29

    C.  The Evidence Will Show that Prudential's Breach Contributed Substantially
        to the Losses Suffered by the Plans .........................................................37

III. PRUDENTIAL'S FALSE AND DEFAMATORY STATEMENTS, ISSUED
    AFTER IT REDEEMED ITS INVESTORS FROM THE BOND FUNDS,
    DAMAGED STATE STREET'S BUSINESS REPUTATION.........................38

    A.  Prudential Published the False Statements at Issue to Plan Sponsors and Third
        Party Investment Consultants .................................................................39

    B.  Prudential's Statements Were False .........................................................39

    C.  Prudential's Employees Made The False Statements with Actual Malice.............41

    D.  Because Prudential's False Statements Harmed State Street's Reputation in
        the Community of Investment Professionals, State Street May Recover Non-
        Economic Damages .............................................................................45

IV. STATE STREET IS ENTITLED TO A CREDIT OF $48,590,223 AGAINST ANY
    DAMAGES OWED TO PRUDENTIAL....................................................46

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000)................................................................29

*Andreucci v. Foresteire*,
No. 957183, 1998 WL 1184151 (Mass. Super. Ct. Jan. 6, 1998)...........................46

*Bose Corp. v. Consumers Union of U.S., Inc.*,
692 F.2d 189 (1st Cir. 1982)..........................................................43, 44

*Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*,
259 F.3d 1036 (9th Cir. 2001) ....................................................... passim

*Catalfo v. Jensen*,
628 F.Supp. 1452 (D.N.H. 1986)........................................................43

*Celle v. Filipino Reporter Enters., Inc.*,
209 F.3d 163 (2d Cir. 2000)........................................................43, 44, 45

*Chandok v. Klessig*,
632 F.3d 803 (2d Cir. 2011)............................................................42

*Chao v. Merino*,
452 F.3d 174 (2d Cir. 2006)........................................................10, 24, 26

*Chemung Canal Trust Co. v. Sovran Bank/Maryland*,
939 F.2d 12 (2d Cir. 1991)..........................................................12, 28

*Dardaganis v. Grace Capital, Inc.*,
889 F.2d 1237 (2d Cir. 1989)............................................................14

*De Costa v. Rodrigues*,
334 Fed. App'x 807 (9th Cir. 2009) ......................................................13

*DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*,
920 F.2d 457 (7th Cir. 1990) ........................................................10, 21

*Donovan v. Bierwirth*,
754 F.2d 1049 (2d Cir. 1985)........................................................12, 14, 37

*Edgar v. Avaya, Inc.*,
503 F.3d 340 (3d Cir. 2007)........................................................28, 29, 32, 33

27238601_13

*Free v. Briody*,
  732 F.2d 1331 (7th Cir. 1984) ................................................................37

*Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  504 F.3d 189 (1st Cir. 2007) ................................................................42

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ...................................................................45, 46

*GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*,
  895 F.2d 729 (11th Cir. 1990) ................................................................13

*Goldwater v. Ginzburg*,
  414 F.2d 324 (2d Cir. 1969) ................................................................44

*Harris Trust & Savs. Bank v. John Hancock Mut. Life Ins. Co.*,
  302 F.3d 18 (2d Cir. 2002) ...........................................................29, 30

*Harte-Hanks Cmmcn's v. Connaughton*,
  491 U.S. 657 (1989) ................................................................44

*Henry v. Champlain Enters.*,
  445 F.3d 610 (2d Cir. 2006) ................................................................10

*In re Citigroup ERISA Litig.*,
  No. 07 Civ. 9790, 2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009) ...................29, 30

*In re Morgan Stanley ERISA Litig.*,
  696 F. Supp. 2d 345 (S.D.N.Y. 2009) .................................................29, 36

*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litig.*,
  772 F. Supp. 2d 519 (S.D.N.Y. 2011) ............................................ passim

*In re Toel's Estate*,
  180 Misc. 447 (N.Y. Sur. Ct. 1943) ................................................................13

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir.1996) ................................................................29

*In re Unisys Sav. Plan Litig.*,
  173 F.3d 145 (3d Cir. 1999) ................................................................12

*In re Unisys Sav. Plan Litig.*,
  No. 91-3067, 1997 WL 732473 (E.D. Pa. Nov. 24, 1997) ...........................14

*In re WorldCom, Inc. ERISA Litig.*,
  263 F. Supp. 2d 745 (S.D.N.Y. 2003) ...........................................29, 33

*Israel Travel Advisory Serv. v. Israel Identity Tours*,
    61 F.3d 1250 (7th Cir. 1995) ................................................................46

*Jones v. O'Higgins*,
    No. 87-CV-1002, 1989 WL 103035 (N.D.N.Y. Sept. 5, 1989).................22

*Katsaros v. Cody*,
    744 F.2d 270 (2d Cir. 1984).................................................................10

*Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*,
    173 F.3d 313 (5th Cir. 1999) ..........................................................15, 16

*Miller v. Butler*,
    60 Mass. 71 (1850) ..............................................................................43

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)........................................................................41, 43

*Poland v. Post Pub. Co.*,
    116 N.E.2d 860 (Mass. 1953) ..............................................................45

*Ravnikar v. Bogojavlensky*,
    782 N.E.2d 508 (Mass. 2003) ...................................................38, 45, 46

*Ruder & Finn Inc. v. Seaboard Surety Co.*,
    422 N.E.2d 518 (N.Y. 1981)................................................................45

*Scalp & Blade, Inc. v. Advest, Inc.*,
    300 A.D.2d 1068 (N.Y. App. Div. 2002) ............................................37

*Sharratt v. Housing Innovations, Inc.*,
    10 N.E.2d 343, 348 (Mass. 1973) ........................................................46

*Silverman v. Mut. Benefit Life Ins. Co.*,
    138 F.3d 98 (2d Cir. 1998)...............................................................9, 13

*South Middlesex Opportunity Council, Inc. v. Town of Framingham*,
    752 F. Supp. 2d 85 (D. Mass. 2010) ....................................................39

*St. Vincent Catholic Med. Ctrs. Centers v. Morgan Stanley Inv. Mgmt., Inc.*,
    No. 09 Civ. 9730 (PKC), 2010 WL 4007224 (S.D.N.Y. Oct. 4, 2010)......................10, 11, 25

*Stone v. Essex County Newspapers, Inc.*,
    330 N.E.2d 161 (Mass. 1975) ..............................................................43

*Ulico Cas. Co. v. Clover Capital Mgmt., Inc.*,
    146 F. Supp. 2d 163 (N.D.N.Y. 2001) .................................................28

iv

*Ulico Cas. Co. v. Clover Capital Mgmt., Inc.*,
    335 F. Supp. 2d 335 (N.D.N.Y. 2004) ...................................................................16

*White v. Blue Cross & Blue Shield of Mass., Inc.*,
    809 N.E.2d 1034 (Mass. 2004) .............................................................................39

*Yu v. State Street*,
    686 F. Supp. 2d 369, 377, (S.D.N.Y 2010)...........................................................25

## STATUTES

29 U.S.C. § 1104(a)(1)(B) .................................................................................10, 11

## OTHER AUTHORITIES

44 Fed. Reg. 37221, 37224 (June 26, 1979) ...............................................................11

Restatement (Second) of Trusts § 205 (1959) ...............................................12, 1428

Restatement (Second) of Trusts § 228 cmt. H (1959) ...............................................14

Restatement (Second) of Trusts § 258 (1959) ...........................................................29

Pursuant to the Court's Order of April 14, 2011 and the Pretrial Procedures set forth in the Court's Individual Practices, defendant State Street Bank and Trust Company ("State Street") respectfully submits this Pretrial Memorandum.

## PRELIMINARY STATEMENT

In the summer of 2007, the market for asset-backed bonds collateralized by subprime mortgages suffered a massive and unprecedented collapse, with extreme illiquidity leading to dramatic price declines and widespread losses.  Plaintiff Prudential Retirement Insurance and Annuity Company ("Prudential") has brought this action under the Employee Retirement Income Security Act ("ERISA") to recover non-recourse "loans" that it made to approximately 200 retirement plan clients (the "Plans").  The Plans sustained losses during the 2007 market crisis in two collective investment trust funds managed by State Street:  the Intermediate Bond SL Series Fund ("IBF") and the Government Credit Bond Fund ("GCBF") (collectively, the "Bond Funds" or the "Funds").

The Bond Funds suffered substantial losses under State Street's management, due to their exposure to mostly AA- and AAA-rated asset backed securities ("ABS") collateralized by subprime mortgages.  But the Plans themselves have now been made whole through the non-recourse "loans," making the issue in this case how to allocate fault between two major financial institutions.  Because Prudential has already received over 68% of the principal that it "lent" to the Plans – already more than any of the non-Prudential Plans received in a class settlement previously approved by this Court as a "favorable recovery" – the issue can be further refined:  whether Prudential bears no responsibility and should be made whole despite failure to provide key information to its clients during a financial crisis.

State Street believes that it was doing its best to manage the Funds – and acting prudently – during what turned out to be an economic tsunami, and that a good deal of hindsight has been applied to its efforts.  Indeed, the evidence will show that State Street's portfolio managers selected the securities in which the Funds invested based on detailed credit analyses of the bonds, cutting-edge risk metrics, and a robust review of macro-economic factors.  The decision to concentrate the Bond Funds in ABS, nearly all of which was rated AAA and AA with an average AA plus rating, reflected a careful, team-oriented process.  Indeed, State Street will adduce compelling evidence that its actions were at all times prudent.

Nevertheless, State Street has paid considerable amounts to the other ERISA plans in a class action settlement, while Prudential has received a Fair Fund Payment of $52.5 million – which it has retained as 68.4% of its "loans."  Prudential is not satisfied with the 68.4%, however; it wants 100%, including interest and substantial attorneys' fees.  It seeks that full recovery even though the opinion and testimony by its chief expert actually supports the idea that at least some subprime was appropriate.  That expert presents no conclusions as to how much subprime was too much, or which specific trades were inappropriate, or which allegedly inappropriate trades caused losses.

Further, by insisting on a full award, Prudential is asking the Court to ignore the effects of a market crisis and refrain from holding Prudential accountable for its own failings.  The evidence will show that Prudential had a fiduciary duty to provide timely and accurate information to its Plan clients so they could evaluate the Funds in light of their own individual investment goals and objectives.  Indeed, Prudential's role in this regard – as set up by Prudential – was both key and exclusive:  Prudential would not even disclose to State Street who the Plans were.  The evidence will show that Prudential utterly failed at fulfilling these fiduciary duties.

During the ordinary course, Prudential told its clients that the IBF was a "passive index fund" even as State Street informed Prudential that the Fund was actively managed, with an aggressive objective to achieve returns above the benchmark, and was concentrated in ABS. Prudential passed none of this information along to its clients.  Then, as the beginnings of the financial crisis began to emerge, and admittedly spurred on by Prudential's largest client, Cigna, State Street fully informed Prudential by no later than July 18, 2007 about the substantial concentration in ABS backed by subprime mortgages, the total return swaps and other derivatives being used to attempt to reach the aggressive investment goal, the leverage being employed for that purpose as well, and the effect of that strategy on performance.  State Street also confirmed that Prudential had been erroneously referring to the Fund as a passive index fund when it clearly was not.  Even though monitoring, analysis and disclosure were its exclusive duties, for which it extracted handsome fees from the Plans, Prudential passed none of that information along.

Indeed, when Cigna itself informed Prudential that it wished to redeem, Prudential's reaction was to withhold from Cigna (and all its other Plan clients) a key letter sent by State Street to Prudential on August 2nd that surely would have sent Cigna scurrying to consummate its withdrawal – indicating in an internal email that it would provide the letter to Cigna only if Cigna somehow were sufficiently clairvoyant to ask for it.  (When, on August 15th, Cigna finally did receive the information in the August 2nd letter, it withdrew the next day.)  Prudential did not even reach out to the Plans to let them know that the IBF's name was so misleadingly wrong – instead, they waited several weeks and then posted a cryptic note on their website that did nothing to bring itself to anyone's attention.  And then, as the economic crisis strengthened and losses (as well as client complaints) mounted, Prudential had the temerity to publish claims that

State Street's failings extended well beyond its management of the Funds, but included concealing the very information that State Street had in fact provided and which Prudential itself had failed to convey.  Prudential then quelled the clamor of its clients by paying them off with non-recourse loans, and then sued State Street for everything, as if its own breaches of duty amounted to nothing.

Trial in this case will be focused on three primary issues:

(i)   <u>Prudence Issue</u>:  Whether State Street imprudently managed the Bond Funds, in violation of its ERISA fiduciary duties to the Plans, by investing the Funds in subprime-related ABS prior to the subprime crisis at a level in excess of a prudent level, and whether any such imprudence caused losses in excess of the amounts Prudential has already recovered in the Fair Fund payment.

(ii)   <u>Contribution Issue</u>:  Whether Prudential contributed to the Plans' losses, in violation of its own fiduciary duties to the Plans, by failing to provide material information about the Funds' subprime exposure and mounting losses prior to and during the subprime crisis.

(iii)   <u>Defamation Issue</u>:  Whether Prudential, with actual malice, published statements to third parties about State Street that damaged State Street's reputation.

The Prudence and Contribution Issues are to be tried to the Court, while the Defamation Issue is to be tried to a jury.

**Prudence Issue:**  The evidence does not support Prudential's allegations that the Bond Funds were imprudently managed, and that this imprudence entitles Prudential to 100% recovery of the Plans' subprime-related losses.  Under the law of ERISA, imprudent management cannot be established by hindsight, which is precisely what Prudential seeks to do.  Prudential does not claim that State Street invested the Funds in securities that were unauthorized under the Funds'

4

governing documents – nor could it, as the Fund Declarations expressly allowed investments in ABS and derivative instruments commonly used to achieve leverage. Nor does Prudential assert that any level of subprime holdings would have been *per se* imprudent. To the contrary, its own expert concedes that a certain level of subprime-backed ABS would have been appropriate for the Funds. Accordingly, Prudential's argument that it is entitled to 100% recovery has no foundational basis. Prudential's argument appears to be that the Bond Funds' holdings diverged too greatly from the holdings of their respective underlying benchmarks, and that investment funds referred to as "enhanced index" funds in marketing materials should track their indices more closely than these Funds ultimately did. According to Prudential and its expert, the Funds' investment objective of attempting to beat their benchmarks is irrelevant; all that matters in determining prudence is the degree of similarity between the Funds' portfolio and the benchmark holdings, measured in terms of "expected tracking error."

Prudential's narrow approach to prudence is inconsistent with the law of ERISA, which measures prudent management relative to a fund's stated investment objectives and guidelines, and focuses heavily on the quality of the manager's investment *processes*. Here, the Bond Funds' governing declarations and investment management agreements provided that the Funds sought to match or exceed their benchmark returns, utilizing instruments that included ABS and derivatives. The evidence will show that State Street utilized a sound investment process to pursue these investment goals and objectives, including industry-standard risk modeling tools, analyses of the credit quality of the mortgage pools underlying the ABS instruments, and research of macroeconomic and market factors. The evidence will further show that State Street's decision to overweight the Bond Funds in subprime-related ABS was consistent with market norms – indeed, as explained herein, Prudential itself had substantial subprime holdings

throughout 2007 – and was prudently based upon the data available at that time. State Street took considered and appropriate risks to meet the Funds' excess return goals.  Prior to the mid-2007 crisis, subprime-backed ABS had provided historically steady returns above other instruments, and macroeconomic indicators supported State Street's reasoned belief that AA- and AAA-rated ABS would continue to perform in this fashion.  Indeed, nearly all of the Funds' ABS holdings were rated AA and AAA, reflecting care and attention to avoid payment interruptions, absent extreme mortgage default and recovery rates.  In sum, the evidence will show that the Bond Funds' underperformance in 2007 was not due to a flawed process, an unsound investment thesis, or incommensurate risk.  State Street cannot be held responsible for being one of many who failed to foresee the market crash in the summer of 2007.

With its chief expert having failed to identify any specific imprudent trade, while simultaneously indicating that some level of subprime would have been prudent, Prudential's only recourse is to argue that there was simply too much subprime in the funds.  Even if that were true, however, Prudential is entitled under ERISA only to the amount of damages reflecting the degree of overconcentration.  Prudential has no evidentiary foundation to establish the level of overconcentration at which State Street's management became imprudent.  As a consequence, Prudential has no evidentiary foundation to establish that losses due to the degree of overconcentration in subprime-related ABS exceed the amounts Prudential has already been paid.  Prudential thus has no valid claim to further compensation.

**Contribution Issue:**  Prudential's own fiduciary breaches contributed materially to the Plans' investment losses, further limiting any recovery.  Prudential concedes, as it must, that it had its own fiduciary duties, including monitoring and analyzing the Funds' performance and characteristics, and serving as the intermediary between the Plans and State Street as the Plans'

6

sole source of information about their investments.  Indeed, Prudential would not even disclose to State Street who the Plans were.  Prudential undertook to analyze and report to the Plans on the Bond Funds and the other investment options sold through its Manager of Managers (or "MOM") Program, and to deselect the Funds under "extenuating circumstances."  For these services, Prudential collected a fee of 0.35% of the Plan assets under management – more than twice what State Street received to manage the Funds.

The evidence will show that Prudential breached its fiduciary duties to the Plans by failing to provide the Plans with material information on a timely basis regarding the Bond Funds' subprime exposure and mounting losses.  Prior to the crisis and then as it continued to unfold, State Street provided Prudential with detailed information about the Bond Funds, including the level of subprime and other holdings, strategy, the use of derivatives and leverage, the role of risk metrics and the very negative impact of market events on the Bond Funds' performance.  Despite these and other storm warnings of the potentially grave threats to the Plans' assets, Prudential continued with "business as usual" – failing to provide any information to the Plans until well after they had suffered substantial losses.

Exacerbating its breach is the fact that Prudential was aware that the Intermediate Bond Fund had been misnamed as a passive index fund (*i.e.*, a fund designed to track its benchmark index exactly).

In light of Prudential's clear contribution to the Plans' losses, Prudential can have no further recovery on top of the Fair Fund payment.

**Defamation Issue:**  As the evidence will plainly show, Prudential orchestrated a scheme to deflect client criticism by shifting all the blame fully on State Street's shoulders, publishing false statements to financial advisors and their clients that State Street, in sum and substance, had

7

hidden and in many cases misrepresented its investment activities.  Prudential's actions show that it understood that it had breached its duties, that the information it withheld from the Plans was material, and that its delay had caused major client losses.  Thus, when Prudential finally provided the Plans with the information it had held since mid-July – information that had already caused many other State Street clients to exit the Funds – it falsely told the Plans and other clients that State Street had withheld this information until late August.  The documents and testimony of Prudential's own employees will demonstrate the falsity of these statements and the fact that Prudential acted with malice in spreading them.  State Street, whose reputation as an investment manager and fiduciary obviously depends heavily on its reputation for candor and trustworthiness, has been tangibly harmed by these defamatory statements.  State Street is entitled to damages for the harm to its reputation, in an amount to be determined by the jury.

## ISSUES FOR TRIAL

I.   **STATE STREET MANAGED THE BOND FUNDS PRUDENTLY, AND THE FUNDS' LOSSES WERE CAUSED BY AN UNPRECEDENTED AND UNFORESEEABLE MARKET CRISIS**

   A.   **Under Established ERISA Authority, Prudence Is a Process-Based Analysis, Evaluated in the Context of Stated Investment Objectives**

Many of the most critical elements regarding State Street's investment prudence are not subject to dispute.  Prudential was aware that at all material times the Bond Funds' investment goal was to attain excess returns above their respective benchmarks.  In addition, State Street informed Prudential each month about the Funds' increasing off-index concentration in ABS, a strategy employed in order to achieve excess returns.  Also, at all relevant times State Street maintained a host of specialized systems and personnel designed to manage the Bond Funds in a prudent manner in light of the Funds' return objectives.

At trial, Prudential will have the burden of proving (i) that State Street managed the Bond

Funds imprudently in violation of ERISA, and (ii) that State Street's alleged imprudence caused the losses in the Bond Funds. *Prudential Retirement Ins. & Annuity Co. v. State Street Bank & Trust Co. (In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.)* ("*In re State Street Bank & Trust Co. I*"), 772 F. Supp. 2d 519, 542 (S.D.N.Y. 2011) (noting that the Second Circuit has observed that Congress "'plac[ed] the burden of proving causation on the plaintiff'" (quoting *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98 (2d Cir. 1998))).  Nonetheless, Prudential and its experts do not assert that State Street violated the Funds' stated investment restrictions or failed to maintain appropriate credit analysis or risk management processes.  Rather, Prudential argues a matter of degree, *i.e.*, that State Street invested *too much* in off-index securities and that its processes and analyses were *not rigorous enough*.  At trial, Prudential will be unable to meet its burden on three critical points that preclude Prudential from establishing its imprudent-management claim:  (i) in light of the Bond Funds' stated investment objectives, the historical performance of subprime-related ABS, and the market circumstances in 2007, the Bond Funds' exposure to subprime-related ABS was not imprudent; (ii) State Street in fact maintained and utilized sound investment processes and analyses that were fully consistent with industry standards; and (iii) because Prudential can only recover the portion of the Bond Funds' losses arising from those investments deemed to be in excess of prudent levels of subprime, Prudential has no basis to recover more than it has already received from the Fair Fund.[1]

---

[1] Through the Fair Fund, Prudential received $52,552,696.77.  If Prudential is awarded damages for prevailing under its ERISA claim, State Street is entitled to a credit for a portion of the Fair Fund payment Prudential received.  *See infra* Section V.  The penalty paid by State Street into the Fair Fund constitutes 7.54% of the $663,191,540 in total compensation the SEC considered to be paid to investors.  Thus, of the $52,552,696.77 payment made to Prudential, $48,590,223 (or 92.46%) is not attributable to the civil penalty portion of the total compensation paid to investors, and State Street is entitled to a credit in that amount.

### 1.      Prudence Requires Sound Investment Processes, Not Prescience

Prudential has the burden to show that State Street's investment process was imprudent. A fiduciary under ERISA must discharge its duty "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (citing 29 U.S.C. § 1104(a)(1)(B)).  Courts in the Second Circuit have construed this as an objective standard that centers on whether a fiduciary – at the time it engaged in the challenged transactions – "'employed the appropriate methods to investigate the merits of the investment and to structure the investment.'"  *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 618 (2d Cir. 2006) (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)); *see also St. Vincent Catholic Med. Ctrs. v. Morgan Stanley Inv. Mgmt., Inc.*, No. 09 Civ. 9730 (PKC), 2010 WL 4007224 (S.D.N.Y. Oct. 4, 2010) ("The fiduciary's investigative process, therefore, is critical to determining whether the duty of prudence is satisfied.").

"Because the fiduciary's obligation is to exercise care prudently and with diligence under the circumstances then prevailing, his actions are not to be judged from the vantage point of hindsight." *Chao*, 452 F.3d at 182 (internal citations and quotation marks omitted).  For this reason, "the ultimate outcome of an investment is not proof of imprudence . . . [, and thus ERISA] "'requires prudence, not prescience.'"  *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (dismissing prudence-based claims because plaintiffs failed to show evidence that defendant should have foreseen high risk and volatility at the time of the alleged losses).  A contrary rule would "convert the [ERISA fund] into an account with a guaranteed return and would immunize plaintiffs from assuming any of the risk of loss associated with their investment." *Id.*

10

## 2.   Prudent Management Must be Evaluated In the Context of the Funds' Policies and Objectives

Prudent investment management under ERISA, including the requirement of diversification, cannot be analyzed in a vacuum.  Instead, prudence depends upon the "character" and "aim" of the particular investment strategy at issue and the "circumstances prevailing" at the time a particular course of action is undertaken.  29 U.S.C. § 1104(a)(1)(B).  In the context of unregistered pooled investment vehicles such as the Bond Funds, guidance from the U.S. Department of Labor ("DOL") provides that the "character" and "aim" of the investment necessarily refers to the fund's published objectives and policies.  *See* Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets Under the "Prudence" Rule, 44 Fed. Reg. 37221, 37224 (June 26, 1979) (focusing prudence analysis for a pooled fund primarily on whether its manager "invest[s] in accordance with its published investment objectives and policies").[2]  Accordingly, a fund's objective with respect to its benchmark index – whether it seeks to exceed a benchmark as opposed to passively mirror the benchmark – strongly influences ERISA prudence analysis.  So, for example, in *St. Vincent Catholic Medical Centers*, Judge Castel held that where a fund seeks to "track and modestly exceed" a performance benchmark rather than "replicate the investments of the Index," allegations that the fund sustained greater losses than the index or invested outside the index fail to state a claim, absent further allegations of improper diligence in investigating the investment.  2010 WL 4007224, at *4.

Courts also have made clear that a fund's objectives guide evaluation of both general prudence under ERISA § 404(a)(1)(B) and diversification under § 404(a)(1)(C).  *See, e.g.*, *In re*

---

[2] Related DOL guidance makes clear that "in dealing with pooled funds . . . the manager of that pooled fund should comply with the fund's investment guidelines."  ERISA Advisory Council on Employee Welfare & Pension Benefit Plans, Report Of The Working Group On Prudent Inv. Process, Nov. 2006, http://www.dol.gov/ebsa/publications/ac_1106a_report.html (testimony of Lou Campagna, Chief of the Division of Fiduciary Interpretation & Regulations, Dep't of Labor).

*Unisys Sav. Plan Litig.*, 173 F.3d 145 (3d Cir. 1999) (holding that investing 20% of a fund into a Guaranteed Investment Contract ("GIC") from a single issuer may not be imprudent where the fund holds only GICs). The specific duty to diversify must be evaluated against the fund's objectives, the nature of the investment at issue and the various types of investments permitted. *Id*. at 158.

### 3.    Damages are Limited to Only the Portion of an Investment Deemed to be Imprudent

Under established ERISA principles, where only a portion of an investment is deemed imprudent, recoverable damages are limited to those resulting from the improper *portion* of the investment. "It would be both illogical and unjust to require a fiduciary to pay damages resulting from the entire amount of an investment when only a portion of the investment was imprudent." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047 (9th Cir. 2001); *see also* Restatement (Second) of Trusts, § 205 (1959) ("If a breach of trust consists only in investing too large an amount in a single security or type of security, the trustee is liable only for such loss as results from the investment of the excess beyond the amount which it would have been proper so to invest.").[3] As noted, it is the plaintiff's burden to prove the losses that the improper portion of the investment caused. *In re State Street Bank and Trust Co. I*, 772 F. Supp. 2d at 542 (Congress "'plac[ed] the burden of proving causation on the plaintiff'" (quoting *Silverman*, 138 F.3d at 105)). Indeed, allowing Prudential to recover *all* of its investment losses

---

[3] As Prudential has itself argued, in the Second Circuit, fiduciary liability under ERISA should be interpreted with reference to principles of trust law. Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. Dismissing All Countercls. at 29. So for example, in *Chemung Canal Trust Company v. Sovran Bank/Maryland*, the Second Circuit held that "federal courts have been authorized to develop a federal common law under ERISA, and in doing so, are to be guided by the principles of traditional trust law." 939 F.2d 12, 16 (2d Cir.), *cert. denied*, 505 U.S. 1212 (1991). *See also Donovan v. Bierwirth*, 754 F.2d 1049, 1055 (2d Cir. 1985) ("We thus look to principles developed under the common law of trusts, which in large measure remain applicable under ERISA.").

where a certain level of subprime would not be imprudent would amount to a windfall.

In ERISA cases, courts have applied this principle and limited damages accordingly.  In *California Ironworkers*, for example, the court held that an investment in inverse floaters was not in itself imprudent; the investment manager had breached its fiduciary duties by investing an excessive proportion of an employee benefit trust's assets in such securities.  The court held the manager liable only to the extent the investment was deemed excessive, and not for what the court called the "permissible percentage standard."  259 F.3d at 1046-47.  Similarly, in *GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc*., 895 F.2d 729 (11th Cir. 1990), an investment in long-term treasuries, although over-concentrated, was not imprudent *per se*.  Therefore, the court measured the investor's damages by calculating the difference in yields between the actual portfolio and a hypothetical portfolio containing a permissible percentage of long-term treasuries.  Similarly, in *De Costa v. Rodrigues*, 334 Fed. App'x 807, 810 (9th Cir. 2009), the "permissible percentage standard" was recognized as the correct standard for calculating damages where the breach of fiduciary duty arose from the degree rather than the mere fact of the investment.[4]

This fundamental principle stems ultimately from ERISA § 409(a), which limits a breaching fiduciary's liability to "losses to the plan *resulting from* each such breach" and is consistent with the Second Circuit's holding in *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985).  *See id.* at 1052.  In *Bierwirth*, the Second Circuit interpreted the "resulting from" language of ERISA § 409(a) by looking to the language of the Restatement of Trusts § 205 – the

---

[4] Courts have also relied on this limiting liability principle of trust law to determine the proper scope of damages even outside the ERISA context.  *See, e.g.*, *In re Toel's Estate*, 180 Misc. 447, 450-51 (N.Y. Sur. Ct. 1943) ("The trustee is entitled to exoneration for any liability in making the investment up to the maximum limit" and responsible only for "the excess above the permissible limit.").

provision on which courts have consistently relied to limit recovery to only those losses resulting from the excess portion of an investment. *See, e.g.*, *Cal. Ironworkers*, 259 F.3d at 1047 (citing Restatement (Second) of Trusts, § 205 cmt. f); *In re Unisys Sav. Plan Litig.*, No. 91-3067, 1997 WL 732473, at *29 (E.D. Pa. Nov. 24, 1997) (quoting Restatement (Second) of Trusts, § 228 cmt. h for the same principle that an ERISA trustee's liability is limited to only losses that flow from the "excess" portions of an investment).

Although *Bierwirth* itself did not involve the question of "excess" portions of a plan investment, the Second Circuit has applied this principle since *Bierwirth*, in *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237 (2d Cir. 1989). *Dardanganis* involved an investment manager who invested approximately 80% of a plan's assets in equities despite plan guidelines capping equity exposure at 50%. The Court in *Dardanganis* applied *Bierwirth* to hold that the proper measure of damages was limited to the difference between the losses the fund experienced versus those it would have experienced had it been invested 50% in equity securities. *Id.* at 1244.

### B. Prudential Will Not Meet Its Burden of Establishing that State Street Employed Imprudent Investment Practices or Caused Losses Beyond What The Plans Have Already Recovered

#### 1. State Street's Investment Process Met or Exceeded Industry Standards

The evidence will show that State Street employed state-of-the-art methodologies and highly trained and experienced personnel to perform sophisticated credit analysis, risk management, and portfolio management functions with respect to the Bond Funds. Collectively, these groups worked together to promote State Street's management of the Bond Funds in a manner consistent with their investment objectives and policies.

> ### a. The Evidence Will Show that State Street's Credit Analysis Group Conducted Appropriate Analyses of the Creditworthiness of the ABS Bonds Held in the Bond Funds

The evidence will show that State Street's Credit Analysis group conducted appropriate analyses of the creditworthiness of the ABS bonds held in the Bond Funds, both before and after the bonds were purchased.  For those ABS offerings collateralized by mortgages, State Street analysts reviewed the quality of the underlying loan pools at both the issuer level and the individual bond level, and conducted extensive stress testing and modeling of the bonds.

In order to perform this modeling, State Street's systems included access to real-time industry standard third-party data feeds from Bloomberg and Intex.  These data allowed credit analysts to select and monitor fixed income assets using the up-to-date information regarding the bonds' underlying collateral performance characteristics.  It is expected that State Street's witnesses will testify that these systems allowed them to examine not only the rating agencies' views of the assets in question, but also the key data points regarding the characteristics of the securities and the underlying collateral pools, including geographic distribution, borrower FICO data, loss coverage ratio, expected loss, loan-to-value characteristics, conditional prepayment rate, and cumulative default rate.  By analyzing these performance characteristics with modeling software that projected a range of future market conditions, State Street analysts were able to fulfill their procedural duties by performing stress tests on the fundamental value of the securities both before and after purchasing them.  *See Cal. Ironworkers*, 259 F.3d at 1044 (affirming district court's finding that fiduciary acted prudently and conducted an adequate investigation in using the Bloomberg financial analysis system – a tool commonly used in the industry – to assess potential investments in inverse floaters); *Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.*, 173 F.3d 313, 322 (5th Cir. 1999) (finding that investment manager/fiduciary acted prudently by considering characteristics of mortgage backed securities and utilizing stress

simulation models to project their performance under various market conditions); *Ulico Cas. Co. v. Clover Capital Mgmt., Inc.*, 335 F. Supp. 2d 335, 341 (N.D.N.Y. 2004) (finding that investment management/fiduciary acted prudently in investigating the merits of a purchase and sale of collateralized mortgage obligation bonds where, among other things, it tracked the securities in its internal software systems and considered statistical data from Bloomberg). Indeed, State Street's Credit Analysis group rejected many bonds in accordance with its analysis protocol. The evidence will show that State Street's practices were even more well-informed and meticulous than many other industry participants.

The evidence will show that Prudential is wrong to suggest that State Street relied blindly on credit ratings, or failed to distinguish among highly-rated bond offerings – indeed, State Street employed several skilled analysts to make precisely those distinctions. State Street's investigation, analysis and continual monitoring of the bonds in the Funds places State Street's process squarely in the realm of those approved by courts as sound and prudent under the circumstances. *See, e.g.*, *Cal. Ironworkers*, 259 F.3d at 1044; *Laborers Nat'l Pension Fund*, 173 F.3d at 322; *Ulico Cas. Co.*, 335 F. Supp. 2d at 341.

### b. State Street's Risk Management Tools Met Or Exceeded Industry Standards And Were Not Imprudently Designed Or Implemented

The evidence will show that State Street's Risk Management Team employed appropriate tools to measure volatility, value at risk and expected shortfall, that met or exceeded industry standards, in order to monitor and manage the risk of the Funds' active portfolios. For example, the evidence at trial will show that State Street utilized industry standard VaR ("Value at Risk") and CVaR ("Conditional Value at Risk") modeling to analyze the Funds' exposure to extreme price fluctuations. These tools utilize advanced statistical techniques and extensive historical performance data to model the likelihood and magnitude of extreme price fluctuations based on

historical price movements.  Among other indications that these metrics were at the leading edge of industry practices, the so-called "Basel Committee" of central bankers and regulatory authorities from the major industrialized nations expressly encouraged the use of VaR as a risk management technique.[5]  Prudential simply cannot prove that this international industry-standard methodology was imprudent.

At trial, State Street expects to show that State Street aggregated the estimated price fluctuation risks for all the instruments held in the Funds into what was called a "risk budget," to provide the Portfolio Managers a quantitative snapshot of the overall estimated severity of extreme price fluctuation at a given point in time.  The Portfolio Managers utilized the risk budget tool – along with other tools, including monthly risk reviews, ongoing analyses of the underlying asset pool, and attention to market conditions and macroeconomic variables – in making their investment decisions.

State Street's evidence will also show that it utilized "hard stop" and "soft stop" tools to monitor and manage risk.  Based upon VaR and CVaR estimates for a given security, when a "soft stop" price level was reached, the investment team discussed as a group whether continued investment in the security was warranted.  If the price fell further so that a "hard stop" price level was reached, a discussion about the continued investment in the security was convened among senior investment and risk management personnel.  Accordingly, as reflected in State Street's procedures manual – and consistent with industry practice – the hard stop and soft stop tools were not designed or utilized as the equivalent of a "stop-loss limit," or a price at which the

---

[5]  Basel II, the second of the Basel Accords, is an effort by the Basel Committee on Banking Supervision "to improve the consistency of capital regulations internationally, make regulatory capital more risk sensitive, and promote enhanced risk-management practices among large, internationally active banking organizations."  Basel II Capital Accord, Basel I Initiatives, and Other Basel-Related Matters, *available at* http://www.federalreserve.gov/generalinfo/basel2.

security was required to be sold.

State Street thus will show at trial that it maintained sound risk management procedures and adhered to them in all material respects.  Importantly, the evidence will also show that no risk management tool could adequately predict the severe market volatility of the summer of 2007 or reasonably be expected to prevent the resulting investment losses.

      **c.**      *State Street's Portfolio Managers Utilized Advanced Tools to Guide Their Decision Making, Including the Inputs from Risk Management, Credit Analysis, and Macroeconomic Research*

The Funds' Portfolio Managers used a variety of sophisticated portfolio construction and tracking tools, including proprietary tools known as "Absolute Return Analytics" and "Port Weights," to monitor the Funds' exposures and investment strategies in relation to current market conditions.  For example, the evidence will show that the Intermediate Bond Fund's Portfolio Manager tracked risk budget consumption, market exposures, daily performance, and other industry-standard metrics for managing a fixed income portfolio with diverse exposures, seeking to outperform the Funds benchmark.  In addition, it is anticipated that the evidence will show that the Portfolio Managers – who worked together in the same room – regularly communicated with one another and with the risk management specialists and credit analysts about the Funds' investment strategy and how to respond to current and anticipated market conditions.

Evidence will further establish that State Street managed both GCBF and IBF in a related manner using a "fund of funds" approach that is common within the investment industry.  In particular, managers for both Funds used similar sector substitution strategies to one another and attained exposure to their respective benchmarks by investing in other State Street vehicles.  Both also sought to achieve excess returns in part by investing in State Street's Limited Duration Bond Fund ("LDBF").  The Funds' related strategies were described in a similar fashion in their

18

respective Fund Declarations, and in State Street marketing materials provided to Prudential. Furthermore, for years, State Street described the two Funds' related approaches to Prudential in quarterly commentaries that addressed both Funds together and detailed their shared strategies.

> **d.      Prudential's Experts' Analyses Are Flawed and Will Fail to Demonstrate Any Material Deficiencies in State Street's Investment Processes**

Despite the claims by Prudential's experts, Drs. Blume and Culp, of purported deficiencies in State Street's investment and risk management processes, their analyses ignore many critical facts and fail to explain how any of the purported deficiencies or violations led to the Funds' losses.  While Dr. Blume asserts that State Street consistently exceeded its risk budget for the Funds, he ignores the key evidence that will show that a less than 2% position in a BBB rated ABS instrument called "ABX" accounted for almost 80% of the Funds' risk budget during the period in question – an anomaly due to rapid price fluctuations in that specific holding. Significantly, Dr. Blume fails to account for the fact that State Street adjusted the Funds' holdings of ABX in response to this early price movement by selling most of the position. Moreover, Dr. Blume fails to account for the evidence that, while taking up a disproportionate piece of the risk budget, the ABX position nevertheless contributed just 12.5% of the Funds' losses.  Instead, the Funds' losses were primarily caused by highly-rated, historically sound AA- and AAA-rated instruments that contributed little to the risk budget figures.

Similarly, Dr. Culp's opinion relies heavily on the view that State Street failed to adhere to its "hard stop" and "soft stop" policies.  The only example he cites, however, again relates to the BBB ABX investment, and he acknowledges that his basis for alleging a violation is that one member of the senior management team who was supposed to attend a meeting regarding the trade did not attend.  Dr. Culp concedes that senior management otherwise discussed the trade as prescribed in the procedures, and does not opine that State Street would have done anything

differently with the investment had the additional manager attended.

Dr. Culp also claims that State Street did not adhere to its "active trade template" policy, which he describes as requiring State Street portfolio managers to circulate to the entire State Street investment team (including international) a written summary template of new investments made in fund portfolios.  *See* Culp Report at ¶¶ 48-52 (Prudential Proposed Trial Ex. 16).  As the heads of risk management and fixed income investing consistently have testified at their depositions, however, that was simply not a requirement, especially for subprime investments that were not part of the international investment managers' portfolio.  And, in any event, this supposed violation relates again only to the BBB ABX investment.  Additionally, Dr. Culp has no opinion as to whether compliance with the policy (*i.e.*, circulation of the written summary about the trade) would have caused the trade to turn out differently.  It is anticipated that Prudential will not have any evidence to meet its burden of proving that any of these supposed process failings actually impaired the risk management function, affected the Funds' holdings, or caused the losses at issue.

In sum, Prudential's experts do not question the fundamental structure or soundness of State Street's investment process – *i.e.*, the use of the VaR and CVaR methodologies for risk modeling, the creditworthiness analyses, the macroeconomic research, or the portfolio managers' utilization of these inputs in making investment decisions.  Instead, Prudential's experts seek to create the impression of a breakdown in the operation of these processes by pointing to a few instances of arguable violations by State Street of written policies.  Such evidence will be flatly contradicted by State Street's witnesses, and will be inadequate to meet Prudential's burden of establishing a lack of prudent investment processes at State Street.  Tellingly, Prudential's experts were unable to opine that the portfolios would have been invested differently or that the

Bond Funds' 2007 losses would have been less severe had State Street taken the few specific steps that Prudential now argues were missed.

> e.     **Prudential's Reliance on Internal Finger-pointing Is Misplaced**

Prudential attempts to buttress its claim of imprudent management by offering selected emails, telephone calls, and notes, created during the subprime crisis of 2007, in which certain State Street employees made negative statements about the Funds' investments and/or other employees.  These documents show no more than the interpersonal tensions and frustrations that can arise during any crisis, and are of little or no probative value.  The subprime crisis was an unprecedented "100-year storm," a market upheaval that led to large investment losses; many clients redeemed their investments, many of the funds were closed, and many State Street jobs were lost.  But these very human reactions are ultimately nothing but expressions of dismay over the large losses and the consequences of those losses; they do not stand as proof of faulty processes or an imprudent investment thesis when viewed from an *ex ante* perspective, as ERISA requires.  *See DeBruyne*, 920 F.2d at 465.

> 2.     **State Street's Decision to Invest the Bond Funds Significantly in Subprime Mortgage-Related ABS Was Prudent Under the Circumstances, Given the Character and Aims of the Bond Funds**

> > a.     **State Street's Use of Sector Substitution to Attain Excess Returns Was Prudent and Did Not Violate State Street's Duty to Diversify**

Evidence will establish that it is standard industry practice to attempt to beat an index using a "sector substitution" strategy of overweighting exposure to a particular sector of the index.  For a number of years before the 2007 crisis, ABS collateralized by subprime mortgages provided steady returns above the benchmark.  State Street monitored not only the individual bonds it held, but also macroeconomic trends, based on which State Street reasonably believed that the highly-rated tranches of ABS like AAA and AA were safe, given historical default and

recovery models.

Moreover, the Bond Funds were appropriately diversified.  *See Jones v. O'Higgins*, No. 87-CV-1002, 1989 WL 103035, at *5 (N.D.N.Y. Sept. 5, 1989) (listing seven factors to be considered in evaluating prudent investment diversification, including "the type of investment, whether mortgages, bonds or shares of stock or otherwise, . . . distribution as to geographical location . . . the dates of maturity," and "financial and industrial conditions").  State Street's decision to overweight the Funds to up to 55% in ABS was not imprudent, and provided appropriate diversification within the Funds.  The Bond Funds held ABS subprime positions, but also were a majority invested in government, corporate, and other fixed income bonds.  Moreover, even within the Bond Funds' ABS positions, these bonds were diversified by issuer, by geography, by borrower, and by credit quality.  Prior to the mid-2007 crisis, bonds that had these varying factors were uncorrelated, meaning their prices did not move in tandem in response to a given market condition (*e.g.*, regional housing market decline, interest rate movement).  Such a lack of correlation is in fact the guiding principle behind diversification.

Critically, nearly all the Funds' ABS subprime exposure was highly rated, meaning these bonds benefited from structured protection against payment defaults in the underlying mortgage pools absent very extreme default and recovery rates.  Even to this day, few, if any, of these securities have suffered defaults from non-payment of the underlying loan pools, further bearing out State Street's view that the losses were attributable largely to a market liquidity crisis.  In the spring of 2002, the Funds employed leverage to gain additional exposure to highly-rated but lower-yielding AA and AAA subprime ABS, replacing riskier BBB-rated exposure, as defined by the CVaR metric described above; because the higher-rated bonds offered less yield than the BBB bonds, the portfolio managers used leverage to increase the quantity of notional exposure in

order to continue to meet the Funds' objectives of outperforming the benchmark index.

Prudential's expert, Dr. Blume, asserts in his expert report that State Street managed the Bond Funds imprudently by investing too heavily in "off-index" securities, *i.e.*, instruments that are not included in the underlying benchmark index. In Dr. Blume's opinion, State Street's allegedly imprudent management can be demonstrated with a single measurement, "expected standard deviation of tracking error." Blume Report at 4 (Prudential Proposed Trial Ex. 18). Of course, any investment outside of the benchmark creates greater potential for tracking error than mirroring the benchmark – but that is the definition of active rather than passive management, as Dr. Blume concedes. Indeed, the evidence will show that prior to the market crisis in the summer of 2007, no data suggested that off-benchmark investments in highly-rated ABS would have led to any greater departure from the index than off-benchmark investments in agency mortgage-backed securities ("MBS") or commercial mortgage-backed securities ("CMBS") – sectors in which the Baird and Accessor funds pointed to by Prudential as prudently invested chose to overweight.

Dr. Blume's narrow and exclusive focus on tracking error to establish State Street's purported imprudence is also unsupported by law. As ERISA case law provides, evaluation of investment prudence requires examining not just one specific metric, but all aspects of an investment decision at the time it was made, including the soundness of the underlying investment processes. *See supra* Section I.A.1.

        **b.**    **State Street's Focus on Subprime in 2007 was Prudent because the Subprime Market Crisis was Unforeseen**

Prudential argues that State Street should have foreseen the 100-year storm in the financial market and invested the Funds so as to better protect them from the resulting illiquidity and price declines. This hindsight-driven argument inverts the proper analysis under ERISA. As

27238601_13

a fiduciary, State Street is charged with prudence, not prescience.  State Street's actions must rather be judged "under the circumstances then prevailing" and not "from the vantage point of hindsight."  *Chao*, 452 F.3d at 182 (internal citations and quotation marks omitted).

The subprime crisis in the summer of 2007 was driven by illiquidity, and not by actual defaults or downgrades of ABS.  The evidence will show that beginning in late July 2007, fixed income investors fled several sectors of the bond market.  Highly rated corporate bond yields, for example, spiked to unprecedented levels.  Yield spreads – effectively, market returns reflecting the perceived default risk of a bond – for AA and AAA home equity ABS remained largely stable prior and up through June, 2007; on June 28, 2007 the spreads for AA and AAA home equity floating-rate ABS sat at 29 and 18 basis points, respectively.  But by August 2, 2007, spreads had risen to 508 and 80, respectively – unfathomably high and previously unheard of levels.

These dramatic and ever-widening spreads beginning in July 2007 led to the collapse of liquidity in the ABS market.  As hedge funds and investment banks received margin calls on their ABS holdings, and as downgrades triggered credit quality restrictions, the pressure to sell grew more intense.  Carron Report ¶¶ 116-17 (State Street Proposed Trial Ex. 351).  Sellers flooded the market, and buyers were nowhere to be found.

Notably, the evidence will show that the collapse in the market for investment grade ABS was not caused by interruptions to the payment streams servicing those securities.  The structuring and credit enhancements applied to the securities held by State Street did their job, and mortgage default rates never reached the extreme levels necessary to affect the payment flows collateralizing AA and AAA bonds.  Indeed, only about 3% of the cash bonds held by State Street's Limited Duration Bond Fund experienced principal losses even as late as the end

of 2009.

Much of Prudential's case focuses on State Street's reactions to early price volatility in the BBB ABX investment.  However, the BBB ABX investment accounted for only 12.5% of the Plans' investment losses.  In contrast, approximately 40% of the Bond Funds' losses are attributable to declines in the AA and AAA bonds, instruments which did not experience meaningful price volatility prior to the summer of 2007, did not hit any "hard stop" or "soft stop" price levels, and did not cause any increase in risk budget figures.  Only with impermissible hindsight can it "be alleged that investments that were viewed by defendants – and the marketplace – to be 'high-quality . . . investment grade instruments' in fact stood on shaky foundations."  *Yu v. State Street*, 686 F. Supp. 2d 369, 377, (S.D.N.Y 2010), *vacated on other grounds*, 2010 WL 2816259 (S.D.N.Y. Jul. 14, 2010).

> **3.    Prudential Will Not Show that State Street's Alleged Imprudence Accounted for Losses Greater than the Amounts Prudential Has Already Recovered**

Neither Prudential nor its experts assert that it was imprudent for State Street to have invested *any* of the Bond Funds' assets in subprime-related ABS.  Indeed, such a claim would be untenable in light of the Bond Funds' objective of outperforming their respective benchmarks.  *See St. Vincent Catholic Med. Ctrs.*, 2010 WL 4007224 (dismissing a complaint alleging that a fund seeking to outperform its fixed income benchmark imprudently over-concentrated by investing 12% in mortgage-related securities).  Prudential's expert, Dr. Blume, opines that the Bond Funds, relative to the index, were obligated by virtue of an "understanding" not to exceed a maximum standard deviation of tracking error of 75 basis points.  By definition, then, off-index investments – such as ABS collateralized by subprime – that did not exceed the 75 basis point maximum were not imprudent.  Dr. Blume has done no calculation on the losses to show what portion of the Bond Funds' subprime exposure created more than a 75 basis point prospective

tracking error.  Indeed, Dr. Blume repeatedly indicates that some subprime was appropriate,[6] and

he has failed to identify which securities were imprudent, or what losses such securities caused.[7]

Accordingly, because Prudential has no evidentiary basis to allocate the Funds' losses between

prudent holdings and allegedly imprudent holdings, it also has no basis to prove that the losses

due to allegedly imprudent investments exceed the $52.5 million Fair Fund payment it has

already received.  *See Cal. Ironworkers*, 259 F.3d at 1047.

## II.   PRUDENTIAL CONTRIBUTED TO THE PLANS' LOSSES BY FAILING TO PROVIDE THE PLANS WITH CRITICAL INFORMATION DURING THE SUBPRIME CRISIS

Even if Prudential were somehow to meet its burden of proving that State Street

imprudently managed the Bond Funds, Prudential nonetheless is entitled to no further recovery

because its own fiduciary breaches contributed significantly to the Plans' investment losses.  At

trial, State Street will present evidence that, in exchange for a sizeable fee, Prudential pledged to

its clients that it would:  (i) "monitor the performance, risk, and style of [the Bond Funds]"; (ii)

"provide comprehensive quarterly due diligence reports to assist plan sponsors in making

informed decisions regarding these funds with their plans"; (iii) provide "interim reports on

important developments"; and (iv) even "deselect an Alliance Fund" under "extenuating

circumstances."  Investment Policy Statement ("IPS") at 25 (State Street Proposed Trial Ex.

327).

---

[6] As but one example, when asked, "Did you conclude that there were any securities in the State Street Funds that were inappropriate at any level," he responds, "I did not conclude that."  Blume Dep. 194:22-25.

[7] *See, e.g.*, Blume Dep. 214:16-215:5 ("Q: Did you calculate which portions of investment losses in the funds were caused by the different types of subprime mortgage-backed securities in the portfolio?  A: I did do a rough calculation of the losses from the different types of subprime investments.  Q: Are you  presenting in your report an allocation of the funds' losses across the different types of subprime securities?  A: No, I did not present that.  Q: Do you intend to present that at trial?  A: No, I do not.").

State Street provided Prudential with monthly reports, quarterly commentary, quarterly investment characteristics, daily website access, and other *ad hoc* reporting that showed that the Bond Funds were actively managed, sought substantial returns above those of their benchmarks, and were increasingly concentrated in asset-backed securities.  When the liquidity crisis in the summer of 2007 caused a sharp drop in ABS prices, State Street provided *more* critical information about, *inter alia*, the material underperformance arising from the ABS backed by subprime mortgages in which the Bond Funds concentrated, the ensuing illiquidity in the bonds, and the leverage being used.  State Street also told Prudential as early as June 2007 that Prudential was and had been for several years miscommunicating to its clients that the IBF was a "passive" and "index" fund when in fact it was actively managed.

The evidence will also show that Prudential breached its fiduciary duties to the Plans by withholding the critical information that State Street provided until it was too late.  Even with regard to information provided in the ordinary course, Prudential filtered out key information – such as State Street's description of its investment styles and comparisons of the Funds' overweighted concentrations in ABS to the indices, while at the same time referring to the IBF as a "passive" fund, thus obscuring the Funds' active management strategies.  Furthermore, Prudential withheld from the Plans the highly material information that State Street provided when the liquidity crisis hit in the summer of 2007.  State Street made one of its portfolio managers available for a conference call on July 18, 2007, during which State Street discussed that the Bond Funds were suffering steep losses as a result of a liquidity issue affecting ABS prices; the leverage being used; the impact of market events on quantitative risk metrics; and that Prudential's reporting had incorrectly referred to the IBF as a "passive" and "index" Fund.  But Prudential did not reach out to the Plans, other than its largest client CIGNA, with this critical

information for over a month.  Nor did Prudential redeem the Plans' investments in the Funds –
which it reserved the right to do in "extenuating circumstances" – until late August.

Accordingly, unlike other bond investors who received information directly from State
Street, the Plans were not in a position to make informed decisions to redeem their investments.
Prudential thus breached its fiduciary duties to the Plans and caused them substantial additional
losses.  Consequently, should State Street be found liable, State Street is entitled to contribution
from Prudential for "increasing the amount of harm" to the Plans.  *Ulico Cas. Co. v. Clover
Capital Mgmt., Inc.*, 146 F. Supp. 2d 163, 168 (N.D.N.Y. 2001).

### A.    Legal Standard

Contribution is "a procedural device for equitably distributing responsibility for
plaintiff's losses proportionally among those responsible for the losses, and without regard to
which particular persons plaintiff chose to sue in the first instance."  *Chemung*, 939 F.2d at 15-16.
The Second Circuit held in *Chemung* that courts "are to be guided by the principles of traditional
trust law" in developing the common law of ERISA, including the law of contribution.  The
Restatement provides that contribution is appropriate "where two trustees are liable to the
beneficiary for a breach of trust."  Restatement (Second) of Trusts § 258 (1959).  In such cases,
courts in this Circuit have elaborated that each trustee is "entitled to contribution from . . . [the
other] for that portion of the harm attributable to its actions."  *Ulico Cas. Co.*, 146 F. Supp. 2d at
168.  Thus, to obtain contribution from Prudential, State Street must prove by a preponderance of
the evidence that (i) Prudential is liable to the Plans for its breach of fiduciary duty or trust, in
violation of ERISA, and (ii) Prudential's breach contributed to the losses suffered by the Plans.

27238601_13

**B.**     **The Evidence Will Show that Prudential is Liable to the Plans for a Breach of Fiduciary Duty**

Prudential had a duty to timely disclose to the Plans – both on a regular and *ad hoc* basis – material, accurate information sufficient to permit the Plans to make "their own informed investment choice[s]" about the Bond Funds. *Edgar v. Avaya, Inc.*, 503 F.3d 340, 350 (3d Cir. 2007). Furthermore, it is "clear that *if* an ERISA fiduciary communicates information to plan participants, the fiduciary must be truthful." *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790, 2009 WL 2762708, at *20 (S.D.N.Y. Aug. 31, 2009). But this duty is "'not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'" *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 445 (3d Cir. 1996) (citation omitted); *see also In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 765 (S.D.N.Y. 2003) (holding that 401(k) plan investors in a company stock fund stated ERISA claim against company officer for failing to disclose deteriorating financial condition of company); *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345 (S.D.N.Y. 2009) (acknowledging that ERISA fiduciaries have "'an affirmative duty to inform when the [fiduciary] knows that silence might be harmful'" (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 492 (3d Cir. 2000))). As the Court further observed, this affirmative duty to disclose stems from an ERISA fiduciary's duties of loyalty and prudence. *In re State Street Bank and Trust Co. I*, 772 F. Supp. 2d at 542; *see also Edgar*, 503 F.3d at 350 ("Indeed, the 'duty to inform is a constant thread in the relationship between beneficiary and trustee.'" (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d at 441)). Importantly, the scope of a fiduciary's duty to disclose may also stem from its duty to comply with representations made to beneficiaries about services that it will provide. *See Harris Trust & Savs. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 29 (2d Cir. 2002) (construing the

scope of an insurer's ERISA fiduciary obligations in light of the insurer's contractual agreement).

Thus, both well-established ERISA fiduciary standards and Prudential's own fundamental documents dictate that Prudential owed duties to the Plans to actively analyze the Bond Funds and timely disclose material information.  Prudential breached these duties to disclose by (i) obscuring the Funds' active risk profiles from 2005 until 2007 by, *inter alia*, sending the Plans quarterly reports that referred to the IBF as "passive" and omitting vital information provided by State Street, such as comparisons of Funds' current holdings to those of their benchmarks and detailed commentary calling the Bond Funds "active," and (ii) failing to timely provide the Plans with the important additional information that State Street provided during the liquidity crisis of 2007 about the mounting losses as a result of declines in the subprime-related ABS in which the Funds concentrated – information made even more important by Prudential's failure to adequately communicate to the Plans the Bond Funds' risk profiles before the crisis in 2007.

### 1.    Prudential's Quarterly Reporting Obscured the Active Management Strategies Utilized by the Bond Funds' Managers

The evidence will show that, as part of Prudential's so-called MOM Program, Prudential provided its clients with quarterly reports, called DDA Reports, as well as Fact Sheets that contained information about the Bond Funds.  Pursuant to its MOM Program descriptions, Prudential undertook a duty to "provide comprehensive quarterly due diligence reports to assist plan sponsors in making informed decisions regarding these funds with their plans."  State Street Proposed Ex. 327; *see also Harris Trust*, 302 F.3d at 29.  Having undertaken to provide the Plans with robust analysis and reporting, Prudential had a fiduciary duty under ERISA to describe the Bond Funds accurately.  *In re Citigroup ERISA Litig.*, 2009 WL 2762708 at *20.  But instead,

Prudential's disclosures gave the Plans the false impression that the Bond Funds were passively managed Funds designed to closely track their benchmark indices, despite the fact that State Street's reporting clearly revealed otherwise.

Critically, beginning in 2005, Prudential began referring in both DDA reports and fund fact sheets to the IBF as a "passive" and "index" fund, despite the fact that – as State Street will show – key Prudential personnel *knew* that the IBF was not a passive or index fund all along.  As State Street's expert will testify, this naming error gave the impression that the IBF was a passively managed fund with a composition similar to that of its benchmark, and thus with low tracking error.  Meanwhile, State Street was sending Prudential monthly reports that indicated just the opposite:  that the IBF and the GCBF were concentrated in the ABS sector, while their benchmark indices were not.  Furthermore, State Street routinely produced commentary about IBF and GCBF to Prudential indicating that the Funds' managers utilized active management strategies.  But Prudential omitted key portions.  So, for example, in the case of the third quarter 2006 DDA Report for the IBF, the summary stated that the fund was "designed to operate much like a benchmark."  But State Street's commentary covering the same time period made no mention of operating like a benchmark, and instead stated that State Street planned "to hold overweight exposures to the securitized debt markets."  As noted earlier, State Street's first quarter 2007 commentary referred to the IBF as an "Active" fund, but the corresponding DDA Report continued to refer to the IBF as "Passive."

Unlike State Street's more frequent monthly reports, the quarterly DDA Reports contained no direct comparison of the Bond Funds' current compositions to those of their benchmarks.  Instead, the DDA reports provided a comparison of the Fund's "average asset weightings" to those of the benchmark over a three year period.  State Street's expert will testify

that this analysis was misleading because it masked recent changes and trends in the Bond

Funds' holdings as compared to those of their benchmarks, by over-emphasizing older data.

Prudential's DDA reports at times also contained incomplete information, and, in some cases,

contained material that was simply untrue.[8]

The net result, as shown in testimony from State Street's expert and the complaints

Prudential received from clients who were misled,[9] was that Prudential's quarterly reporting to

the Plans gave a false impression: that the Bond Funds were designed to closely track their

benchmark indices with low tracking error and were in fact passively managed.  Prudential's

failure to provide the Plans with accurate information sufficient to make informed choices about

their investments was a violation of its duties under ERISA.  *See Edgar*, 503 F.3d at 350.

### 2.   Prudential Withheld from the Plans Urgent Additional Information that State Street Provided in the Summer of 2007

The evidence will show that Prudential further breached its duty to disclose by failing to

provide the Plans with the additional information that State Street provided once the liquidity

problems in the subprime mortgage market began to materialize in the spring of 2007.  In the

---

[8] For example, the DDA report for the second quarter of 2006 offered a pie chart describing the sector allocation of IBF and GCBF, but the sector weights for both funds in the corresponding State Street monthly report were materially different.  Similarly, a comparison of the DDA Report from the second quarter of 2006 to the State Street performance report for the month ending December 2006 showed discrepancies in both Funds' sector weightings.

[9] Internal Prudential memos state that Prudential received numerous complaints from its clients. Throughout discovery, Prudential worked to prevent State Street from obtaining those complaints.  During discovery, Prudential initially produced documents from only six of 250 client facing employees.  When State Street sought to compel a broader production, Prudential succeeded in opposing State Street's request before Magistrate Judge Eaton.  *In re State Street Bank & Trust Co. II)*, Nos. 08 MD1945 (RJH), 07 Civ. 8488 (RJH), 2009 WL 1033359 (Apr. 13, 2009).  Later when State Street sought to subpoena complaints directly from Prudential's clients, Prudential again succeeded in blocking State Street from receiving this information.  Mem. & Order, Apr. 13, 2009, Dkt. No. 89 (holding that any Prudential client "shall not be obligated to comply with such subpoena").  Nevertheless, the available evidence shows that Prudential received numerous client complaints, and acted to stave off litigation by derogating State Street.

midst of a crisis and with the information State Street provided, Prudential cannot credibly contend that it did not know that its silence "might" increase harm to the Plans. *In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp 2d at 765. Such circumstances clearly triggered Prudential's duty to issue "interim reports on important developments." IPS at 25. Also, as the Court observed in its summary judgment opinion, Prudential's duty to provide information was especially critical in this instance because of the need to correct the Plans' misunderstanding of the Bond Funds' risk profiles that resulted from Prudential's failure to adequately describe them before 2007. *In re State Street Bank and Trust Co. I*, 772 F. Supp. 2d at 542 (observing that Prudential's affirmative duty to disclose stemmed in part from the need to "correct the misleading disclosures already in existence, and is consistent with the duties of loyalty and prudence for ERISA fiduciaries" (citing *Edgar*, 503 F.3d at 350)).

The evidence will show that Prudential failed to transmit to the Plans material information that State Street provided, broadly falling into three categories. First, as the market for the ABS in which the Funds concentrated began to seize up, State Street provided Prudential with detail about the Bond Funds' subprime-driven underperformance. State Street sent Prudential commentary on April 11, 2007 and July 6, 2007 attributing the material underperformance of the Bond Funds in the first part of 2007 to ABS subprime mortgage exposure, describing both Bond Funds as "active," and stating that State Street nonetheless intended to continue to maintain its ABS subprime exposure – indeed, to increase its holdings in AA and AAA subprime bonds. State Street also provided holdings and ABS portfolio characteristics for the IBF on July 12, 2007, which Prudential provided only to its largest client, CIGNA. On August 2, 2007, State Street provided Prudential with a status report discussing "downward pressure on valuations in the subprime mortgage market" and stating that, as a result,

the IBF had underperformed by 550 basis points year-to-date (or 5.50%) – dramatic

underperformance for a bond fund.  Moreover, as set forth in Part I.B.1.c above, State Street had

described the intertwined strategies of IBF and GCBF to Prudential jointly for years in its

quarterly commentaries, so any claim by Prudential that it viewed issues in one Fund as isolated

or unrelated to the other is simply spurious.  State Street's August 2, 2007 letter painted a stark

picture and stated that State Street had been required to sell a significant number of AAA bonds

just to maintain liquidity in its fixed income strategies.  Yet almost a week after receiving the

update, Prudential was still withholding the information, indicating internally that, even as to

CIGNA, it would provide the information only "in case [they] inquir[ed] about it."  State Street

Proposed Trial Ex. 142.

     <u>Second</u>, State Street will also present evidence at trial that Prudential failed to pass on to

the Plans additional material information that State Street provided regarding the Bond Funds'

use of leverage.  The list of holdings provided by State Street to Prudential on July 12, 2007 –

which State Street shared only with CIGNA – prompted CIGNA to request a conference call

directly with State Street on July 18, 2007 among CIGNA, State Street and Prudential to discuss

leverage.  The evidence will show that on the call, State Street discussed in detail IBF's

concentration in ABS backed by subprime mortgages, the use of 4 to 1 leverage and home-equity

related derivatives, and the resulting underperformance.  In fact, State Street will present

evidence to show that Prudential was aware of the importance of this information, because

CIGNA decided no later than July 30, 2007 to redeem its investment from IBF.  Furthermore,

Prudential's subsequent false claim that State Street told Prudential "for the first time [on August

22] that the State Street Fund was leveraged and had broad exposures to sectors outside of its

stated benchmark strategy" underscores Prudential's recognition of the materiality of the
information Prudential failed to share with other Plans.   State Street Proposed Trial Ex. 258.

      Third, State Street will also present evidence that it informed Prudential that it was using
the incorrect and misleading "passive" name to describe the IBF by an email dated late June
2007, but that Prudential delayed reaching out to its clients until late August.   On July 12, 2007,
State Street again informed Prudential that the use of "passive" and "index" in the name of IBF
in communications to Prudential's clients was incorrect – a fact that key Prudential personnel
actually knew all along.   On the July 18 conference call, State Street reiterated this correction.
But Prudential waited until August 2 before correcting the fund name at all, and even then only
did so on its client-facing website.   Prudential took no action to affirmatively notify the Plans of
the error, or to correct their false impressions about the investment style of IBF, until late August
2007.   Yet, Prudential told its clients that the information it received from State Street was
"passed along to clients in its entirety" and the Prudential was "providing to clients the
information [it] received from SSgA in as close to 'real time' as possible."   State Street Proposed
Trial Ex. 129.   As CIGNA, the first Plan to learn of the correct name, told Prudential, "On the
most basic level, the use of the terms "passive" and "index" in the Fund's name misled
investors . . . into believing that the Fund's approach would be to generally mirror the practices
of its benchmark bond index fund."   State Street Proposed Trial Ex. 117.

      Only by fully reimbursing its clients' losses through nonrepayable "loans" in exchange
for the authority to bring this suit against State Street did Prudential silence its clients, who
complained loudly when Prudential finally provided to them the information State Street had
sent over the preceding three months.   Instead of acting quickly to prevent its clients' losses,
Prudential took time to set up its defense:  that State Street failed to timely respond to additional

questions that Prudential posed following the July 18 call.  But the evidence will show that Prudential's questions were mere pretext; Prudential was already in possession of the material information that was needed to make informed choices.  Prudential's questions consisted of nothing more than dozens of irrelevant requests for detailed data going back several years. Meanwhile, Prudential was fully aware that State Street was in the midst of a crisis, inundated with other client requests, and potentially unable to respond to such detailed questions on short notice.  To support its defense, Prudential points out that State Street's relationship manager in August 2007, Mark Flinn, conceded in emails to Prudential that he regretted his inability to respond to Prudential's requests more quickly.  But as the evidence will show, by apologizing, Mr. Flinn was simply doing what client service managers do:  attempting to maintain a client relationship on good terms.

The evidence will show that Prudential delayed and withheld information at the expense of its clients.  Thus, Prudential breached its duty under ERISA to provide timely, accurate information sufficient to permit the Plans to make their own informed investment choices about the Bond Funds, which included an obligation to "inform when the [fiduciary] knows that silence might be harmful."  *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d at 360 (internal quotation marks omitted).  That duty is grounded in the ERISA duties of loyalty and prudence and was particularly salient here, where disclosure was needed "to correct the misleading disclosures already in existence" that led the Plans to believe they were in two passive funds.  *In re State Street Bank and Trust Co. I,* 772 F. Supp. 2d at 542.  When Prudential finally moved to redeem the Plans from the Bond Funds on August 29, 2007, it was too late; the Plans had suffered the bulk of their losses, and State Street was already closing the Funds.

**C.     The Evidence Will Show that Prudential's Breach Contributed Substantially to the Losses Suffered by the Plans**

At trial, State Street will present evidence that Prudential's breaches of its fiduciary duties contributed substantially to the Plans' losses.  Because Prudential is the third party defendant to State Street's contribution claim, any uncertainties in measuring the amount of damages attributable to Prudential's breach will be resolved against Prudential.  *Bierwirth*, 754 F.2d at 1056 ("[O]nce a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer.").  Nevertheless, State Street's evidence is more than sufficient to show that the Plans' losses would have been significantly less but for Prudential's breach of its fiduciary duties, based on the testimony and evidence presented by State Street's expert Dr. Carron, and on the actions of other clients, who received disclosures similar to those State Street provided to Prudential – and in many cases *less* detailed – and then redeemed.

Prudential argues that the contribution claim is barred because State Street is "substantially more at fault" than Prudential.  But the cases relied upon by Prudential concern actions for contribution against plan trustees or committees who merely failed to "catch" co-fiduciaries in the act of breaching.  *See Free v. Briody*, 732 F.2d 1331 (7th Cir. 1984) (trustee could not be liable for his co-trustee's breach, because his simple failure to exercise control over his co-trustee did not contribute substantially to the retirement plan losses at issue); *Scalp & Blade, Inc. v. Advest, Inc.*, 300 A.D.2d 1068, 1069 (N.Y. App. Div. 2002) (holding that a trustee's failure to monitor its co-fiduciary's actions did not contribute substantially to the trust's losses).  Those cases do not deal with a situation similar to the one here, where an investment professional like Prudential failed to carry out specific duties that it – and it alone – undertook to perform, and then failed to do so in the midst of a fast-moving crisis.

State Street will present compelling evidence of the materiality of the information that Prudential failed to pass along, and the damage caused by its failure to do so.  Prudential will be shown to be not entitled to further recovery on top of its $52.5 million Fair Fund payment; even if Prudential could establish that State Street invested some portion of the Bond Funds imprudently, the evidence will show that Prudential's own contribution to the Plans' losses more than exceed the remaining unreimbursed investment losses.

III.    **PRUDENTIAL'S FALSE AND DEFAMATORY STATEMENTS, ISSUED AFTER IT REDEEMED ITS INVESTORS FROM THE BOND FUNDS, DAMAGED STATE STREET'S BUSINESS REPUTATION**

After redeeming the Plans' investments in the Bond Funds on August 29, 2007, Prudential issued a series of defamatory statements to investment consultants and plans, accusing State Street of dishonestly concealing material facts from Prudential.  These false statements, knowingly made by Prudential's employees responsible for overseeing the Bond Funds, damaged State Street's reputation within the community of investment professionals.  State Street will ask the jury to compensate it for that harm.

To prove a claim for defamation under the law of the Commonwealth of Massachusetts,[10] State Street must show that (i) Prudential made a statement about State Street to a third party[11]; (ii) the statement could damage State Street's reputation; (iii) Prudential was at fault in making the statement; and (iv) the statement either caused State Street economic loss or is actionable without proof of economic loss.  *In re State Street Bank and Trust Co. I*, 772 F. Supp. 2d at 559

---

[10] This Court has previously held that Massachusetts law should govern State Street's defamation claim because Prudential's false and defamatory statements "concern a Massachusetts entity's Massachusetts-based actions."  *In re State Street Bank and Trust Co. I*, 772 F. Supp. 2d at 559.

[11] "The statement may be published in writing or some other equivalent medium (in which case it is designated as libel), or , . . .orally (in which case it is designated as slander)."  *Ravnikar v. Bogojavlensky*, 782 N.E.2d 508, 510 (Mass. 2003).

("[S]tatements that may prejudice the plaintiff's profession or business" are among those actionable without a showing of economic loss." (citing *Ravnikar*, 782 N.E.2d at 510-11)).

### A.   Prudential Published the False Statements at Issue to Plan Sponsors and Third Party Investment Consultants

The evidence will show that on five occasions between August 29, 2007 and February 1, 2008, Prudential circulated client communications, consisting of Q&As and talking points, to its client-facing employees for use with Prudential's clients.  Prudential admittedly caused these documents to be widely published to various investment consultants and investment plans.  The evidence will show that many of the most important pension consulting firms, such as Aon, New England Pension Consultants, Hunter Advisors, Mercer, and DiMeo Schneider, received these communications.  State Street's interaction and cultivation of relationships with these firms forms a critical part of its business.

### B.   Prudential's Statements Were False

Prudential's statements, designed to distract the plan sponsors from Prudential's own lapses, mistakes, and breaches of fiduciary duty, were false.[12]  This contention is not reasonably in dispute.  Within each of its false and libelous statements, Prudential accused State Street of

---

[12]  Prudential will likely argue that it only needs to show that the "gist" of the defamatory statements were substantively true.  However, in Massachusetts, the standard is not so lenient, and in fact Massachusetts permits a plaintiff to recover for even a truthful defamatory statement when the defendant acts with malice.  G.L. c. 231, § 92; *S. Middlesex Opportunity Council, Inc. v. Town of Framingham*, 752 F. Supp. 2d 85, 114-115 (D. Mass. 2010) (holding that under Massachusetts law, "[a]s a defense to a defamation claim, a defendant may establish the truth of the statement in question . . . [but] if the plaintiff proves that the defendant acted with 'actual malice' in making the statement, then the defamation action may proceed whether or not the statement was false.  The meaning of 'actual malice' in this particular context is 'ill will,' which is not the same as the meaning developed by the Supreme Court of the United States under federal constructional law in the context of public figures" (internal citations omitted)); *see also White v. Blue Cross & Blue Shield of Mass., Inc.*, 809 N.E.2d 1034, 1036 (Mass. 2004).  Nevertheless, the evidence will show that the statements at issue here were simply untrue.

misrepresenting the investments held by the Bond Funds, and concealing their concentration in

subprime-backed ABS.  Prudential claimed:

- [W]e did not learn about the fund's extensive leverage and broad exposure to sectors outside its stated benchmark until a call with the head of SSgA's North American Fixed Income division, on August 22 . . . . SSgA's reporting on this fund did not clearly indicate a widespread concentration of assets outside the sectors identified as part of the fund's investment benchmark nor the use of leverage, let alone the extent to which leverage was being used. (Sept. 4, 2007)[13]

- Despite a continuing information vacuum from SSgA, we  . . .[provided] to clients the information we received from SSgA in as close to "real time" as possible. (Sept. 4, 2007)[14]

- As part of our ongoing monitoring procedures, periodically we ask the asset managers of the underlying investment funds in our Alliance Funds program to update the Fund Fact Sheets we provide quarterly to plan sponsors and participants.  On August 1, SSgA reviewed and approved the Fund Fact Sheet. (Sept. 5, 2007)[15]

- On August 22, during a call we made to SSgA as part of a series of inquiries about the State Street Fund's index-lagging performance, the head of SSgA's North American Fixed Income division stated for the first time that the State Street Fund was leveraged and had broad exposure to sectors outside its stated benchmark strategy. (Sept. 5, 2007)[16]

- SSgA did not explain the fund's extensive leveraged sector concentration until a call with the head of SSgA's North American Fixed Income division, in mid-August, well after we had begun questioning SSgA about their index-lagging performance. . . . In short, what they told us after the fact about SSgA's actual investment strategy and holdings did not at all comport with what we had previously been led to believe.  (Oct. 1, 2007 & Feb. 1, 2008)[17]

An investment professional reading Prudential's misstatements would believe that State

Street hid the Bond Funds' leverage and concentration in subprime-backed ABS until Prudential

uncovered this information on an August 22, 2007 conference call.  This investment professional

---

[13] State Street Proposed Trial Ex. 481 (Summ. J. Opp. App. A, Statement #15).

[14] *Id.*

[15] State Street Proposed Trial Ex. 258 (Summ. J. Opp. App. A, Statement #16)

[16] *Id.*

[17] State Street Proposed Trial Ex. 270 (Summ. J. Opp. App. A, Statement #17); State Street Proposed Trial Ex. 269 (Summ. J. Opp. App. A, Statement #23).

would not learn of State Street's timely provision of material information about the Bond Funds to Prudential in July and August of 2007.  No mention is made of State Street's monthly reports to Prudential that indicated that the Bond Funds were heavily invested in sectors, such as ABS, that were not contained in the Bond Funds' benchmarks.  Prudential is silent on the commentary provided to it by State Street that described the Bond Funds' predominant strategy of overweighting the home equity market.  Similarly ignored is State Street's provision of a complete holdings report for the IBF on July 12, 2011 which indicated that the Fund was leveraged, and Prudential's conference call with State Street on July 18 in which Prudential learned that the IBF employed a 4 to 1 leverage ratio.  This evidence will plainly demonstrate the falsity of Prudential's statements.

### C.    Prudential's Employees Made The False Statements with Actual Malice

In its summary judgment ruling, this Court held that a conditional privilege protects Prudential's publication of the statements at issue because Prudential and the Plans shared a common business interest.  *See In re State Street Bank and Trust Co. I*, 772 F. Supp. 2d at 561. The Court further held that the conditional privilege immunized Prudential from liability unless its employees acted with actual malice.  *See id.*  A statement is made with actual malice if it is made with knowledge that it was false or with reckless disregard of whether it was false or not. *Id.* at 560 (*citing N.Y. Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

The evidence will also show that Prudential made these demonstrably false statements with actual malice.  The burden of proof for "actual malice" varies with the circumstances in which it arises.  When actual malice is required under *constitutional* principles – *e.g.*, when the plaintiff is a public figure – it must be proven by clear and convincing evidence.  By contrast, where actual malice is required under *common law* principles to defeat a conditional privilege, actual malice may be established by a preponderance of the evidence.  *Chandok v. Klessig*, 632

F.3d 803, 816 (2d Cir. 2011) (New York law); *accord Galarneau v. Merrill Lynch, Pierce,*

*Fenner & Smith Inc.*, 504 F.3d 189, 200 (1st Cir. 2007) (holding that the plaintiff does not need

to show the "clear and convincing proof" of actual malice required by the Constitution to

overcome the conditional privilege under Maine common law).  State Street is not a public

figure, and thus the constitutional requirement of actual malice is not at issue here; accordingly,

State Street is required to establish this element merely by a preponderance of the evidence.

Prudential claims that George Palms, Prudential's Senior Vice President for Investment

Products and Advisory Services during the relevant period, was the only person responsible for

publishing the defamatory statements.  Prudential will further contend that Mr. Palms did not

know that the defamatory statements were false.  Neither contention is accurate.  First, other

Prudential employees were responsible for publishing the false statements, including Mr. Palms'

subordinate and Investment Product Manager Robert Frascona, and Mr. Frascona's subordinate

Matthew Dingee, who was the Prudential Investment Analyst responsible for monitoring the

Bond Funds.  The evidence will show that both Mr. Frascona and Mr. Dingee were aware that

the statements were false when they were made.  Second, the evidence will also show that Mr.

Palms himself knew the statements were false, or at the very least, acted with reckless disregard

of their truth by failing before publishing the statements to consult with his subordinates who

were in contact with State Street.  Accordingly Prudential, through its employees, acted with

actual malice in issuing the defamatory statements at issue.

### 1.   George Palms was not the Sole Prudential Employee Responsible for the False Statements

Prudential argues that George Palms was solely responsible for the statements at-issue.

Mr. Palms, however, has testified that he worked with a committee of Prudential employees to

create the five documents containing the defamatory statements.  These employees, each of

whom can be said to bear "responsibility for the publication" of the defamatory statements, acted with actual malice. *See N.Y. Times Co.*, 376 U.S. at 287 ("[S]tate of mind required for actual malice would have to be brought home to the persons . . . having responsibility for . . . publication"); *Miller v. Butler*, 60 Mass. 71 (1850) (holding that collaboration of two authors in creation of a libelous letter was sufficient evidence to prove publication by both); *Catalfo v. Jensen*, 628 F. Supp. 1453, 1455 (D.N.H. 1986) (noting that "[E]very person who directly or indirectly publishes or assists in the publication of an actionable defamatory statement" may be found liable). Robert Frascona and other Prudential employees worked closely with George Palms in drafting each of the five defamatory statements. Mr. Palms' role was largely limited to that of an editor. For instance, in describing the creation of the September 5 CFT Flash, Mr. Palms testified that "there was a fairly large group of people . . . involved" and "I was probably performing more of a review function than a drafting function." Palms Dep. at 61:15 – 62:2.

### 2.     George Palms, Robert Frascona and Matthew Dingee Acted with Actual Malice

State Street will ask the jury to examine the totality of the facts surrounding its disclosures to Prudential, and the behavior of Prudential's employees when in receipt of those disclosures. Because a defendant will rarely admit he entertained doubts as to the truth of a statement, actual malice is typically proven through inference. *Bose Corp. v. Consumers Union of U.S., Inc.*, 692 F.2d 189, 196 (*quoting Stone v. Essex Cty. Newspapers, Inc.*, 330 N.E.2d 161, 173 (Mass. 1975)). These inferences are drawn from a range of permitted sources and objective facts. *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 180 (2d Cir. 2000) (citing *Bose Corp.*, 692 F.2d at 196); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (holding that a defamation plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence). For instance, a fact-finder may infer actual malice from

evidence of negligence, motive, and intent. *Goldwater v. Ginzburg*, 414 F.2d 324, 335 (2d Cir. 1969); *Celle*, 209 F.3d at 180; *Bose Corp.*, 692 F.2d at 196. Evidence of ill will can be combined with other evidence to support such an actual malice inference. *Celle*, 209 F.3d at 180. Similarly, while a "failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." *Connaughton*, 491 U.S at 692 (internal citation omitted).

Here, there is ample evidence to infer that both George Palms and Robert Frascona lied about their knowledge of the management of the Bond Funds, specifically what they learned about the July 18, 2007 conference call between State Street, CIGNA and Prudential. Dean Molinaro, for instance, will testify that he kept George Palms apprised of what he was learning about the IBF in July and August. Mr. Molinaro knew that IBF used leverage as of the July 18, 2007 conference call, and he briefed Mr. Palms regarding this call. Similarly, Mr. Molinaro informed Robert Frascona of CIGNA's concerns about the leverage in the IBF. Because of those same concerns, Mr. Frascona himself arranged the July 18, 2007 call, and instructed his subordinate Matthew Dingee to attend as his representative. While Mr. Dingee claims that he could not hear what was discussed on this conference call, he never raised that issue during the call, and he does recall that Mr. Molinaro and Mr. Frascona discussed the call subsequently.

Additionally, the ill will Prudential felt towards State Street in August and September of 2007 further evidences that its employees acted with actual malice. Beginning in early August, Prudential's clients demanded to have their entire investment losses repaid by Prudential. Several of these clients threatened to sue, including the two largest Plans in the IBF. Other clients expressed their belief that Prudential should have more closely monitored the Bond Funds, and should have released information in a more timely fashion. The investment

consultant for IMS Health, the largest Plan invested in the GCBF, complained that Prudential

had not even mentioned the presence of non-benchmark subprime ABS during a July 31, 2007

investment in person review.  Prudential's gambit – accusing State Street of hiding the ball and

masking its own decision to sit on material information – served as a strong motive to

misrepresent what it actually knew about the Bond Funds in July in these client communications.

> **D.** **Because Prudential's False Statements Harmed State Street's Reputation in the Community of Investment Professionals, State Street May Recover Non-Economic Damages**

Prudential's statements impugning State Street's integrity and accusing it of concealing

the investment style of the Bond Funds are of the sort that are capable of damaging State Street's

reputation in the community of investment professionals.  *See Ravnikar*, 782 N.E.2d at 510-11;

*Poland v. Post Pub. Co.*, 116 N.E.2d 860, 861 (Mass. 1953) (holding that words are defamatory

if they impair the plaintiff's standing in a community); *see also Celle,* 209 F.3d at 180 ("[W]here

a statement impugn[ed] the basic integrity or creditworthiness of a business, an action for

defamation lies and injury in conclusively presumed." (quoting *Ruder & Finn Inc. v. Seaboard

Sur. Co.* 422 N.E.2d 518, 522 (N.Y. 1981))).  State Street's reputation for truthfulness is a

critical component of its business.

"Under the traditional rules pertaining to actions for libel, the existence of injury is

presumed from the fact of publication."  *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 349 (1974)

(holding that "plaintiffs who do not prove knowledge of falsity or reckless disregard for the

truth" may only recover for "actual injury," which includes harm to reputation that is "supported

by competent evidence concerning the injury, although there need be no evidence which assigns

an actual dollar value to the injury").  Because State Street will show that Prudential acted with

actual malice, the jury may award general damages as compensation for the injury it feels that

Prudential visited on State Street's reputation.  *See id.*; *Ravnikar*, 782 N.E.2d at 511; *Sharratt v.

*Hous. Innovations, Inc.,* 310 N.E.2d 343, 348 (Mass. 1973) ("These elements of recovery are based on the harm which the law assumes is done by the defamatory words."). The jury is entitled to use its experience and judgment to weigh the damage to State Street's reputation, and to quantify this harm. *See Israel Travel Advisory Serv., Inc. v. Israel Identity Tours*, 61 F.3d 1250, 1255-56 (7th. Cir. 1995) ("ITAS was able to prove that lies had been told, but the extent of their effect was bound to be problematic. That's why general damages are available in the law of defamation."); *Andreucci v. Foresteire,* No. 957183, 1998 WL 1184151, at *3 (Mass. Super. Ct. Jan. 6, 1998) ("[I]f a statement is defamatory, then it has harmed a person's reputation. In a defamation action, the natural consequences of the false statement are assumed, including damage to reputation. . . ."). State Street will prove this damage by presenting evidence of its reputation, and the harm Prudential caused to that reputation.

## IV.   STATE STREET IS ENTITLED TO A CREDIT OF $48,590,223 AGAINST ANY DAMAGES OWED TO PRUDENTIAL

In February 2010, State Street entered into a settlement agreement with the SEC and state regulators pursuant to which a Fair Fund was established and distributed to affected investors in these strategies. *In re State Street Bank and Trust Co. I*, 772 F. Supp. 2d at 537. Pursuant to this agreement, State Street agreed to:

> [E]stablish a fund (the Fair Fund) that combines the 50,000,000 penalty with $830,181 in disgorgement and prejudgment interest, and a payment of $255,240,472 to compensate investors . . . for their losses. Taking into account a credit for payments Defendant has already made or otherwise committed to pay to these investors State Street [paid] total compensation . . . of $663,191,540.

Prudential Proposed Trial Ex. 810 ¶ 2. Through the Fair Fund, Prudential received $52,552,696.77. If Prudential is awarded damages for prevailing under its ERISA claim, State Street is entitled to a portion of the Fair Fund payment Prudential received as a credit against those damages. *In re State Street Bank and Trust Co. I*, 772 F. Supp. 2d at 537. State Street

does not seek an offset for the civil penalty portion of the total compensation it paid to investors in the affected funds.  The penalty paid by State Street constitutes 7.54% of the $663,191,540 in total compensation paid to investors.  Thus, of the $52,552,696.77 payment made to Prudential, $48,590,223 (or 92.46%) is not attributable to the civil penalty portion of the total compensation paid to investors.


Dated:  August 12, 2011                    ROPES & GRAY LLP



                                           /s/ Harvey J. Wolkoff
                                           Harvey J. Wolkoff
                                           Robert A. Skinner
                                           Daniel J. Maher
                                           Prudential Tower
                                           800 Boylston Street
                                           Boston, MA  02199-3600
                                           Tel: (617) 951-7000
                                           Fax: (617) 951-7050
                                           harvey.wolkoff@ropesgray.com
                                           robert.skinner@ropesgray.com
                                           daniel.maher@ropesgray.com

                                           *Attorneys for Defendant State Street Bank and Trust Company*

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that on August 12, 2011, I caused a true and correct copy of the foregoing document to be served upon all counsel of record by ECF.

<u>/s/ Allison M. Boscarine</u>
Allison M. Boscarine

27238601_13