UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE STATE STREET BANK AND TRUST CO. FIXED INCOME FUNDS INVESTMENT LITIGATION | MDL No. 1945 |
| PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>STATE STREET BANK & TRUST COMPANY,<br><br>    Defendant. | No. 07 Civ. 8488 (RJH) |

**STATE STREET'S [UPDATED] MEMORANDUM OF LAW IN SUPPORT OF MOTION UNDER RULE 52(c) FOR JUDGMENT ON PARTIAL FINDINGS**

Defendant State Street Bank and Trust Company ("State Street") respectfully submits this updated[1] memorandum of law in support of its motion for a judgment on partial findings pursuant to Fed. R. Civ. P. 52(c).

## PRELIMINARY STATEMENT

Plaintiff Prudential Retirement Insurance and Annuity Company ("Prudential") bears the burden of proving causation in this case – that is, what losses "result[ed] from" State Street's alleged breaches of fiduciary duty.  *See* ERISA § 409(a); *In re State Street Bank & Trust Co. Fixed Income Funds Investment Litig.*, 772 F. Supp. 2d 519, 542 (S.D.N.Y. 2011).  State Street respectfully submits that, at the close of Prudential's case in chief, Prudential has failed to make out a prima facie case on causation.  In cases such as this, involving alleged over-concentration of investments in a single type of security, an ERISA plaintiff can recover only those portions of their investment losses that "result[] from" the allegedly excessive, *i.e.*, imprudent, portion of the investment.  Prudential has failed to introduce any evidence on the issue of the losses caused by the "too much subprime" they allege.  Accordingly, State Street is entitled to judgment on partial findings under Rule 52(c).

Prudential's case is premised on the alleged over-concentration of the Bond Funds in a single type of security, subprime-backed ABS.  Its experts on liability, Marshall Blume and Christopher Culp, have opined (respectively) that the extent of the Bond Funds' exposure to subprime was inconsistent with the characteristics of an "enhanced index fund" and that failures in State Street's risk management processes made a large loss to the Bond Funds more likely.  But neither expert, nor anyone else from Prudential, has presented evidence as to what portion of the Plans' losses resulted from the allegedly excessive portion of the subprime exposure – or, for

---

[1] This memorandum updates the memorandum filed on October 13, 2011 to incorporate trial testimony that took place on that day.

1

that matter, even quantifies what portion of the exposure should be deemed excessive. Dr. Blume simply opines generically that State Street's investment policies "contributed to" the Plans' losses, while Dr. Culp expressly disavows any opinion regarding the relationship between State Street's risk management failures and the Plans' losses. This complete absence of causation evidence is a fatal hole in Prudential's case, leaving it without evidence to sustain its burden of proving which losses "result[ed] from" State Street's alleged fiduciary breaches.

As the Court is aware, Prudential has already recovered approximately two-thirds of its losses via the SEC Fair Fund, entitling State Street to a credit of more than $48 million against any liability in this case. Even if Prudential could prove that the Bond Funds were imprudently over-concentrated in subprime-backed ABS, it has not proven that the alleged over-concentration caused specific losses in any amount, and certainly not in excess of the Fair Fund recovery.

## I.    LEGAL STANDARDS

### A.    Rule 52(c) Motion for Judgment on Partial Findings

Fed R. Civ. P. 52(c) provides as follows:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

A Rule 52(c) motion by a defendant may be granted "where the plaintiff has failed to make out a prima facie case or where the plaintiff has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim." *Stokes v. Perry*, No. 94 Civ. 0573, 1997 WL 782131, at *9 (S.D.N.Y. Dec. 19, 1997). "Unlike under Rule 50 which governs judgment as a matter of law in jury trials, under Rule 52(c), the court does not consider the evidence in the light most favorable to the non-moving party. Rather, 'the court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance

lies.'" *Wechsler v. Hunt Health System, Ltd.*, 330, 433 F. Supp. 2d 383 (S.D.N.Y. 2004) (citations omitted).

### B.    Causation in ERISA Fiduciary Duty Claims

Prudential's recovery on behalf of the Plans for alleged breaches of fiduciary duty under ERISA § 409(a) is limited by statute to "losses to the plan[s] *resulting from* each such breach" ERISA § 409(a) (emphasis added).  As the Court properly held earlier in this case, the burden of proof on causation under ERISA rests with the plaintiff.  *See In re State Street Bank & Trust Co. Fixed Income Funds Investment Litig.*, 772 F. Supp. 2d 519, 542 (S.D.N.Y. 2011) (noting that Congress "'plac[ed] the burden of proving causation on the plaintiff'" (quoting *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 105 (2d Cir. 1998)).

In *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985), the Second Circuit explained that courts should interpret the "resulting from" causation requirement of § 409(a) by "look[ing] to principles developed under the common law of trusts, which in large measure remain applicable under ERISA."  *Id.* at 1055.  In particular, the *Bierwirth* court pointed to § 205 of the Restatement of Trusts (2d), which sets forth the recoverable remedies for a breach of trust.  The commentary on § 205, which addresses various particular circumstances, contains the following standard applicable to Prudential's allegations here:

> If a breach of trust consists only in investing too large an amount in a single security or type of security, the trustee is liable only for such loss as results from the investment of the excess beyond the amount which it would have been proper so to invest.

Rstmt. (2d) of Trusts § 205, comment f.[2]  Courts have applied this principle in ERISA cases alleging that plan assets have been invested in an overly concentrated or otherwise partially

---

[2] This standard is also embodied verbatim in the comments to § 228 of the Restatement Second, which addresses diversification of investments.  *See* Rstmt. (2d) Trusts § 228, comment h.

imprudent way.

In *California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, (9th Cir. 2001), the Ninth Circuit held that an investment in securities denominated as "inverse floaters" was not in itself imprudent; the investment manager had breached its fiduciary duties by investing an excessive portion of a plan's assets in such securities. The court held the manager liable only to the extent the investment was deemed excessive, reasoning that "[i]t would be both illogical and unjust to require a fiduciary to pay damages resulting from the entire amount of an investment when only a portion of the investment was imprudent." *Id.* at 1047.

Similarly, in *Dardanganis v. Grace Capital, Inc.*, 889 F.2d 1237 (2d Cir. 1989), the Second Circuit limited the breaching fiduciary's liability to losses resulting from the improper portion of the investment. *Dardanganis* involved an investment manager that invested approximately 80% of a plan's assets in equities despite plan guidelines capping equity exposure at 50%. The court in *Dardanganis* applied *Bierwirth* to hold that recovery was limited to the difference between the losses the fund experienced and those it would have experienced had it been invested 50% in equity securities. *Id.* at 1244.

Other courts have followed the principle articulated in the Restatement Second in resolving the causation issue in ERISA cases. So, for example, in *GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*, 895 F.2d 729 (11th Cir. 1990), the Eleventh Circuit affirmed the district court's holding that an investment in long-term treasuries, although over-concentrated, was not imprudent *per se.* Therefore, the court determined the recoverable losses by calculating the difference in yields between the actual portfolio and a hypothetical portfolio containing a permissible percentage of long-term treasuries. *Id.* at 733-34. In *De Costa v. Rodrigues*, 334 Fed. App'x 807, 810 (9th Cir. 2009), the court applied what it called the

"permissible percentage standard" for calculating damages where the breach of fiduciary duty arose from the degree rather than the mere fact of the investment. The court held that the fiduciary breach arose from five of six loans that the fiduciary had made from the assets of an ERISA plan. Because the fiduciary was found not to have breached his fiduciary duty with respect to the first loan, the fiduciary was held responsible only for the five remaining loans, and not for any and all transactions under his mandate. *See also In re Unisys Sav. Plan Litig.*, No. 91-3067, 1997 WL 732473, at *29 (E.D. Pa. Nov. 24, 1997) ("[A] fiduciary can be held liable for failing to diversify only to the extent that such actions can be said to have caused some unique loss flowing specifically from the alleged failure to diversify.").[3]

## II. PRUDENTIAL'S TRIAL EVIDENCE FAILS TO PROVE CAUSATION

Prudential has presented the opinions of two expert witnesses on liability, Marshall Blume and Christopher Culp, and their trial testimony will be addressed in turn below. Neither witness established or even attempted to establish any portion of the Bond Funds' subprime holdings that should be considered imprudent, or the portion of the Plans' losses that purportedly resulted from the allegedly imprudent holdings. Prudential's third expert, Daniel Fischel, was a damages expert who was told to assume that Prudential would establish liability in the case and simply calculated the Plans' aggregate losses – with no discussion of ABS bonds or subprime holdings at all. Thus, neither Prudential's expert testimony nor anything else in the voluminous trial record establishes a prima facie case on the losses "resulting from" State Street's alleged

---

[3] This principle of trust law has been followed in other analogous settings. *See, e.g.*, *In re Toel's Estate*, 180 Misc. 447, 449 (N.Y. Sur. Ct. 1943) and authority cited therein. In *Toel's*, a will authorized the trustee to place $10,000 in any one investment. The trustee lent $50,000 from the assets of the trust on a mortgage, which was at the time of accounting was paid down to $18,000. The trustee was surcharged $8,000 and not $18,000, with the New York court holding: "The trustee is entitled to exoneration for any liability in making the investment up to the maximum limit" and was therefore responsible only for "the excess above the permissible limit."

5

breaches.

    A.    **Marshall Blume**

Dr. Marshall Blume, Prudential's expert on prudence, opines that, in the aggregate, State Street's off-index investment in ABS backed by subprime caused the Bond Funds to exceed their allegedly agreed maximum tracking errors. He also concedes that *some* amount of subprime exposure in the Bond Funds would have been appropriate. Trial Tr. at 148:23 – 149:3. However, Dr. Blume presents no evidence on the amount of ABS backed by subprime that was allegedly imprudent. In other words, he never identifies how much was too much. Lacking any such conclusion, Dr. Blume's testimony fails to identify what amount of subprime caused the Bond Funds to exceed the prudence threshold, much less whether that undefined amount caused losses in excess of $48 million.

In his trial testimony, Dr. Blume describes the issues on which Prudential asked him to opine, neither of which directly addresses the element of causation. Dr. Blume was asked to "assess the appropriateness of the investment policies followed by State Street for an enhanced index fund with a standard deviation tracking error between 40 and 75 basis points" and "was asked to form an opinion as to whether the investment strategy contributed to the losses experienced in the damage period." Trial Tr. at 56:14 – 22. Regarding these two issues, Dr. Blume concluded that "the investment strategies were inappropriate" and that "were it not for these substantial investments in these off-index assets, the fund would not have experienced the losses that it did." Trial Tr. at 58:15-17; 59:13-17. In essence, Dr. Blume concluded that the funds had too much ABS backed by subprime, without quantifying what portion of the subprime holdings was excessive.

While Dr. Blume asserted his belief that the Bond Funds undertook certain

"inappropriate" investment strategies such as "off-index," "levered" exposure "concentrated in securities of subprime mortgages," (Trial Tr. at 58:20 – 59:12), Dr. Blume in fact confirmed that *some* amount of subprime exposure in the Bond Funds would have been prudent, and that he did essentially no analysis regarding the element of causation:

> Q. You are not saying that the ABS bonds backed by subprime were improper to be held in any amount by these two funds, are you, sir?
>
> A. No. I would have to look at the entire portfolio, but **certainly some off-index investments would be appropriate for an enhanced index fund.**
>
> Q. Did you determine how much that some, s-o-m-e, is?
>
> A. No, I did not determine the exact amount because I would have to know the exact changes in the rest of the portfolio to accommodate.
>
> . . .
>
> Q. You never calculated any losses caused by or resulting from any excess above tracking error or risk budget utilized, did you, sir?
>
> A. I did not except for that one report in, I think it was February where I attributed it to the ABX. I generally did not do any substantial analysis on returns by sector.
>
> Q. There is nothing in your report on that, is there, sir?
>
> A. No.

Trial Tr. at 148:23 – 149:22 (emphasis added).  By opining that some amount of subprime exposure would have been appropriate for the Bond Funds, but at the same time conceding that he did not determine any threshold for imprudent over-concentration – or what amount of the investment losses (if any) were caused by such excess – Dr. Blume offers no opinions relevant to the issue of causation.

The only opinion Dr. Blume offers in his report or testimony at all regarding the source of the Bond Funds' losses consists of his determination that "had [the Bond Funds] not been in

7

the home equity market in the scale that they were they would not have realized the losses that they realized." Trial Tr. at 102:5 – 12.  Of course, there is no dispute over the obvious fact that the home equity portion of the Bond Funds' portfolios lost value in the summer of 2007.  Dr. Blume's testimony, however, does not in any way support a prima facie showing regarding the extent of State Street's alleged imprudence, much less what losses that undefined imprudence caused.

### B. Christopher Culp

Prudential called Dr. Christopher Culp as an expert on the subject of State Street's alleged risk management policy violations.  He was not asked to offer an opinion as to whether these alleged violations contributed to the Funds' losses.  Instead, Dr. Culp was asked to offer opinions at trial on three subjects: (i) the investment risk management process at State Street as it pertained to the Bond Funds; (ii) the risk management information that was available to State Street's portfolio managers; and (iii) whether any failures occurred in that process.  Day 2 Tr. 159: 10 – 16.  At trial, Dr. Culp offered the opinion that State Street committed violations of three of its internal risk management policies or procedures relating to the Bond Funds – its (i) "hard stop" policy; (ii) risk budgeting process; and (iii) "active trade template" policy.  Trial Tr. at 377: 9 – 15. But Dr. Culp expressly disavowed *any* opinion that the alleged risk management failures contributed to the Plans' losses or any knowledge regarding the asset-backed securities in the Bond Funds.  Like Dr. Blume, then, Dr. Culp also contributes no probative evidence on Prudential's burden of proving which losses "result[ed] from" State Street's alleged risk management failures.

First, Dr. Culp opined that State Street violated its risk management policy requiring that senior management convene if the price of a security in the Bond Funds declined to the point that

8

a pre-determined "hard stop" price level was reached. Dr. Culp testified that his opinion was limited to purported violations that occurred when the Bond Funds' positions in a BBB ABX position hit "hard stop" price levels on three occasions – first in February 2007, and later in June and July 2007. Dr. Culp agreed that his opinion was based only on his conclusion that Matthew Steinaway, one of five members of State Street's senior management team, failed to participate in the senior management team discussions that took place surrounding the Funds' BBB ABX positions. Trial Tr. at 419:23 – 421:3. Setting aside the threshold question of whether Mr. Steinway's purported absence violated the State Street "hard stop" policy at all, Dr. Culp expressly disclaimed that he was offering any opinion as to whether Mr. Steinaway's absence contributed to losses:

> Q. Now, with regard to Mr. Steinaway's purported absence, you are not opining that that's what caused losses in the funds, his absence from meetings, are you, sir?
>
> A. No, sir, I'm commenting on process. **I haven't formulated any opinions about losses**.

Trial Tr. at 436: 1 – 5 (emphasis added).[4]

Second, Dr. Culp testified at trial that State Street did not adhere to its "active trade template" policy, which he described as requiring State Street portfolio managers to circulate to the entire State Street investment team (including non-U.S. trading desks) a written summary template of new investments made in fund portfolios. As with the "hard stop" policy, Dr. Culp

---

[4] Dr. Culp confirmed more than once that he had performed no analysis of any impact State Street's supposed "hard stop" violations may have had on the Funds' losses:

> Q. And you are not opining that any of these purported hard stop violations caused any of Prudential's losses in this case, are you sir?
>
> A. Not one way or the other, sir, I'm not making any commentary to the losses.

Trial Tr. at 436:6 – 10.

9

identified only one specific occasion on which State Street allegedly violated its active trade template policy, with respect to the purchase of ABX positions in June 2007.[5] Trial Tr. at 487: 17 – 488:6. Here again, Dr. Culp offered no opinion or analysis of any losses that resulted from State Street's purported violation of its active trade template policy. Nor did Dr. Culp opine that compliance with the active trade template policy (*i.e.*, circulation of the written summary about the trade) would have caused any trades to have turned out differently:

> Q. You don't opine in your report anywhere, sir, that any failure to use the active trade template caused any losses, is that correct?
>
> A. Yes, sir, that's correct.

Trial Tr. at 503: 5 – 8. In short, Dr. Culp's testimony on the active trade template was not probative on the issue of causation.

Third, Dr. Culp opined at trial that State Street disregarded its risk management processes by consistently exceeding its risk budgets for the Bond Funds, and thus increased its exposure to "downside or catastrophic risk" to a greater extent than it said it was prepared to tolerate. Trial Tr. at 397: 19 – 25. However, Dr. Culp offered no opinion at trial as to which of State Street's investments caused or substantially contributed to the excess consumption of the Bond Funds' risk budgets, or anything connecting any of that excess to the Bond Funds' losses. Instead, Dr. Culp again confirmed that he had performed no analysis on the issue of causation:

---

[5] While Dr. Culp also pointed to a State Street email asserting that the active trade template had not been used on "most global trades," he was unable to identify whether those trades even involved bonds backed by subprime, or were the cause of any losses.

10

> Q.  You didn't determine, Dr. Culp, how much of the Prudential's losses, if any, were caused by either the Intermediate Bond Fund or Government Credit Bond Fund portfolios being above their risk budget, did you, sir?
>
> A.  No, sir. I didn't do any analytical work on loss determination or amounts, sir.

Trial Tr. at 520: 4 – 9. In fact, Dr. Culp expressly disavowed having performed *any* analysis relating to the funds' losses resulting from *any* of the risk management violations alleged:

> Q.  Nor did you express any opinions on the amount of losses you believed were caused by any of the risk management issues that you've testified to in this court, is that correct?
>
> A.  You're right again.
>
> Q.  In fact, sir, you have given us no opinion on what the losses would have been if so-called appropriate risk management policies had been followed, correct, sir?
>
> A.  Correct.

Trial Tr. at 520: 10 – 19(objections omitted). Thus, even if Prudential *could* prove that State Street imprudently violated its risk management policies, it has offered no evidence that the alleged violations or over-concentration caused any losses, let alone losses in excess of the recovery Prudential has already obtained.

### C. Daniel Fischel

Prudential called Daniel Fischel to testify on the issue of damages. Trial Tr. at 445: 5 – 10. Mr. Fischel was instructed by Plaintiff's counsel to assume liability for the purposes of his analysis, and performed no analysis of his own on the issue of liability. Trial Tr. at 445: 11 – 23. By comparing the performance of the two State Street funds over the period beginning June 1, 2007 until the Funds' closure to that for the same period of two purportedly "comparable" funds selected by Mr. Fischel, Mr. Fischel determined that the Plan's aggregate losses in this case are

11

equal to $76.7 million. However, like Prudential's other experts, Mr. Fischel expressed no opinion at trial about what portion of those losses resulted from the Bond Funds' alleged overexposure to inappropriate subprime mortgage-related investments or other risks:

> Q. Your report does not include any opinion on whether it was all or just a portion of the 76.7 million that resulted from the alleged overexposure of the funds to risk, is that right?
>
> A. That's correct.
>
> Q. You haven't set forth in your report any opinion about what portion of the purported 76.7 million in aggregate losses is the result of the alleged overexposure of the funds to risk, is that right?
>
> A. Correct, for the reasons that I just said.

Trial Tr. at 483: 11 – 19. Thus, by Mr. Fischel's own admission, nothing in his testimony supports Prudential's allegation that the Funds' losses "resulted from" State Street's supposed imprudence under ERISA Section 409.

### D. <u>Fair Fund Credit</u>

In February 2010, State Street entered into a settlement agreement with the SEC and state regulators to resolve their investigations into subprime-related losses incurred by certain of State Street's active fixed-income strategies, including the Bond Funds. A Fair Fund was established and distributed to affected investors in these strategies, from which Prudential received a payment of $52,552,696.77. The parties are in agreement that State Street is entitled to a credit against any recoverable damages in this case, in an amount equal to the portion of Prudential's Fair Fund payment *not* attributable to the civil penalty portion of State Street's regulatory settlement payment. The parties disagree over how to calculate the amount of the credit. *See* PRIAC Prop. Findings & Conclusions ¶ 201; State Street Prop. Findings & Conclusions ¶¶ 162-163.

State Street paid a civil penalty of $50,000,000. In announcing the settlement, the SEC stated that the total amount paid to investors by State Street to resolve the regulatory claims was $663,191,540 – over $340 million of which was paid directly to investors prior to the regulatory settlement, an amount for which State Street was credited in the regulatory settlement. *See* SEC Litigation Release No. 20148 (Feb. 4, 2010). The $50 million civil penalty constitutes 7.54% of the total compensation paid to investors. Under State Street's calculation of the credit, **$48,590,223** (or 92.46%) of the $52.5 million payment to Prudential is not attributable to the civil penalty portion of the total compensation paid to investors.

Prudential's alternative calculation ignores the $340 million paid by State Street prior to the regulatory settlement, despite the fact that the SEC expressly credited State Street for this amount. According to Prudential, the total compensation paid to investors by State Street is only $313.59 million, the amount paid by State Street at the time of the settlement. The $50 million civil penalty constitutes 15.94% of $313.59 million. Prudential's calculation of the credit to which State Street is entitled in this case is **$44.174 million**, or 84.06% of the $52.5 million payment to Prudential. *See* PRIAC Prop. Findings & Conclusions ¶ 201.

This disagreement is of no significance to the present motion, however. Whether the credit to which State Street is entitled is $48.59 million or $44.17 million, the result here is the same – Prudential has failed to carry its burden that the Plans had losses resulting from the allegedly imprudent portion of the subprime holdings in an amount greater than *either* of these figures.

### E.  Prudential's Position on Causation

In a pretrial submission, Prudential argues that the "permissible percentage" standard embodied in the Restatement and the foregoing cases is inapplicable. Prudential asserts instead

13

that it is *State Street's* obligation to come forward with evidence regarding which losses "result[ed] from" the alleged breaches: "State Street provides no guidance as to how the Court would determine the portion of the Bond Funds' subprime holdings that was prudent or how it should measure damages as to the imprudent portion." PRIAC's Mem. in Resp. to State Street's Pre-Trial Mem. at 6. But this argument turns the burden of proof upside down, because this is precisely the causation evidence that *Prudential* must produce, as the authority above makes clear, and as this Court has previously held in its opinion on summary judgment.

Prudential insists that it need not present evidence of which portions of the losses result from the allegedly imprudent portion of the Bond Funds' investments, because State Street's "overall investment strategy and approach were imprudent." *Id.* at 10. Thus, according to Prudential, because it alleges that the over-exposure to subprime arose out of *other* alleged breaches (*e.g.,* self-interested business motive, risk management policy violations), this case is distinguishable from those cited above. But this argument is unavailing, because it is beyond cavil that Prudential's case is based fundamentally on the theory that the Bond Funds held too much subprime – and Prudential's inclusion of a series of "lesser included offense" allegations does nothing to change that fact. Prudential's own Proposed Conclusions of Law confirms that their argument boils down to the assertion that "by the spring of 2007, State Street was excessively investing in risky subprime securities in the face of obvious market turbulence so as to breach its fiduciary duties of prudence, loyalty, and diversification." PRIAC Proposed Conclusions of Law at ¶ 62.

All of the supposedly distinct fiduciary breaches asserted by Prudential, even if proven, manifest themselves in just one way: too much subprime. Prudential must establish by a preponderance of the evidence how much was too much, and what losses resulted from the

14

imprudent portion. If Prudential could evade its causation burden simply by surrounding its core allegation with related subsidiary allegations, then any ERISA plaintiff could do the same when alleging a claim of over-concentration. Such an outcome would run afoul of the Ninth Circuit's reasoning that "[i]t would be both illogical and unjust to require a fiduciary to pay damages resulting from the entire amount of an investment when only a portion of the investment was imprudent." *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047 (9th Cir. 2001).

Finally, Prudential pleads impossibility: that "the Court would have no way to determine which portions of the massive subprime holdings State Street would have held if it had acted prudently." PRIAC Mem. at 8. But this assertion is demonstrably incorrect. State Street has produced vast quantities of information regarding every aspect of the Bond Funds' holdings and performance. Prudential has had full access to data establishing every holding in each of the Funds and how each of those holdings performed during every day of the relevant period. Attribution of losses resulting from particular holdings is quite feasible, and State Street has done so – for example, with respect to the losses resulting from the ABX-BBB trade. There is no basis for Prudential to assert that it was impossible to determine what losses resulted from those portions of the subprime holdings it claims to be imprudent – Prudential just did not have its experts do the work. State Street's expert, Dr. Carron, has determined from the very same holdings and performance data that only $6.7 million of the Plans' losses resulted from the ABX-BBB trade that is the focus of much of Prudential's affirmative case. Prudential's experts plainly could have done similar calculations, including the amount of losses resulting from the purported excess over their assumed tracking error and risk budgets.

15

## **CONCLUSION**

State Street respectfully requests that the Court enter judgment in State Street's favor under Rule 52(c), based upon partial findings that Prudential has failed to meet its burden of proving which losses "result[ed] from" State Street's alleged breaches of fiduciary duty.


Dated: October 16, 2011                            Respectfully submitted,

                                                            ROPES & GRAY LLP

                                                            By: /s/ Harvey J. Wokoff
                                                            Harvey J. Wolkoff
                                                            Robert A. Skinner
                                                            Prudential Tower
                                                            800 Boylston Street
                                                            Boston, MA  02199-3600
                                                            Tel: (617) 951-7000
                                                            Fax: (617) 951-7050
                                                            harvey.wolkoff@ropesgray.com
                                                            robert.skinner@ropesgray.com
                                                            *Attorneys for Defendant State Street Bank and Trust Company*

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 16, 2011, I caused a true and correct copy of the foregoing document to be served upon all counsel of record by ECF.

                                                  /s/ Geoffrey M. Atkins
                                                  Geoffrey M. Atkins